# 23 CV 06414

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

BANCO SAN JUAN INTERNACIONAL, INC.,

*Plaintiff,*

v.

THE FEDERAL RESERVE BANK OF NEW YORK
AND THE BOARD OF GOVERNORS OF THE
FEDERAL RESERVE SYSTEM,

*Defendants.*

Case No.

## COMPLAINT

Plaintiff Banco San Juan Internacional, Inc. ("BSJI" or the "Bank"), in support of its Complaint against Defendants the Federal Reserve Bank of New York (the "FRBNY") and the Board of Governors of the Federal Reserve System (the "Board"), alleges and states as follows:

### NATURE OF THIS ACTION

1.      BSJI, a Puerto Rico international banking entity ("IBE") and "master account" holder with the FRBNY since 2012, brings this action for declaratory judgment, injunctive relief, and issuance of a writ of mandamus to prevent the FRBNY from arbitrarily and unlawfully closing BSJI's "master account" and terminating its access to FRBNY services, in violation of BSJI's statutory, Constitutional, and contractual rights.  The FRBNY's decision, if carried out, will likely sound the death knell for BSJI as a depository institution, despite its relatively small retail footprint, high capital position, and excellent system of controls and governance.

2.      As one Circuit Court explained, a Federal Reserve "master account" is a "bank account for banks" that gives depository institutions access to the Federal Reserve System's core

1

banking services, including its electronic payment systems. "Without such access, a depository institution is nothing more than a vault." A master account also enables a holder, such as BSJI, to access various services promised by 12 U.S.C. § 248a including, among other things, wire transfer services, automated clearinghouse services, and settlement services. As the Board itself acknowledges, these "key financial services [] undergird the nation's payment system" – which necessarily includes Puerto Rico – and financial institutions often refuse to transact with institutions without access to such services.

3.      BSJI previously worked in tireless lockstep with the FRBNY to develop industry-leading, exemplary internal controls and compliance systems. Consistent with BSJI's corporate ethos, BSJI has dedicated substantial resources – including by hiring additional compliance personnel – and time to these efforts, with an eye towards meeting the FRBNY's every request and ensuring BSJI's continued use of its master account for the benefit of its customers and Puerto Rico generally. BSJI's efforts culminated in the development of what one former FRBNY official described as a "front of the line" compliance system, many components of which were mirrored in guidelines the FRBNY has since issued.

4.      As part of its continued efforts to develop and maintain its exemplary compliance program, BSJI has retained the services of several well-regarded external review firms and consultants, including K2 Integrity ("K2"), to evaluate and enhance its Bank Secrecy Act/anti-money laundering ("BSA/AML") and sanctions compliance program.

5.      Notwithstanding BSJI's substantial expenditure of resources and sustained and consistent reliance on outside consultants and former regulators to enhance its BSA/AML and sanctions compliance program, the FRBNY notified BSJI on April 24, 2023, and reaffirmed on June 30, 2023, that it would terminate BSJI's master account in a matter of weeks due to purported

"concerns" with its BSA/AML and sanctions compliance program.  The FRBNY also went so far as to baselessly claim that BSJI somehow posed an "undue risk to the overall economy."

6.      The FRBNY's decree marks the culmination of what has become a protracted and crippling game of whack-a-mole for BSJI, as its existence hangs in the balance.  Indeed, to take this past year as just one example, the FRBNY has offered wavering and varying "justifications" for the purported need to shutter BSJI's master account.  Without fail, as soon as BSJI conclusively rebuts a "reason" proffered by the FRBNY – as it has done each and every time – the FRBNY conjures yet another "rationale" that BSJI must rush to address.  Throughout this process the FRBNY and the Board have been steadfast in both their refusal to substantively engage with BSJI and their dogged determination, despite all logic and proper basis, to ensure that BSJI is stripped of vital access to the basic banking services that the United States Congress created the Federal Reserve System to provide.

7.      Taken in isolation, the FRBNY's and the Board's actions towards BSJI are beyond the pale.  But they are even more galling when viewed within the context of the FRBNY's statutory ambit, which plainly precludes the Board and Federal Reserve banks from denying master account access on a discretionary basis.  Indeed, the FRBNY's actions towards BSJI underscore the wholly unsupported position the Board and the FRBNY now take more broadly: that a Federal Reserve bank (here, the FRBNY) is the sole and unchecked arbiter of master account access, unrestrained by any statutory, regulatory, contractual, or Constitutional requirements.  The FRBNY has wholly embraced this unmoored notion of its unchecked "authority," as it has gone so far as to assert that it does "not have to rely on any particular basis" to terminate BSJI's – or any bank's – master account.  It alone decides which bank shall live, and which shall die.

8.      Per the FRBNY, not only must a depository institution be statutorily eligible for master account access but, separate and apart, that bank must also obtain and retain the blessing of the Federal Reserve Bank in its respective jurisdiction, and that access can be threatened, granted, or stripped at that Federal Reserve Bank's whim, on a moment's notice, and without basis or proper explanation.

9.      The Board is also a proponent of this improper interpretation of the scope of the FRBNY's authority, having published guidelines that purport to identify factors the FRBNY, and other Federal Reserve Banks, should consider in assessing master account access.

10.      This reimagination of the scope of the FRBNY's authority is a recent development and a dramatic departure from the historical position of the Board and the Federal Reserve Banks. For decades, the right of legally eligible entities (those like BSJI that satisfy the statutory requirements for accessing the Federal Reserve System) to a master account was a matter of fact, explicitly recognized by the Board, the Federal Reserve Banks, and market participants more generally.  And with good reason, as the Federal Reserve Banks are mandated by statute to provide Federal Reserve services to such entities.

11.      The myriad issues with the Board's and the Federal Reserve Banks' efforts to improperly create a "new regime" (*Biden v. Nebraska*, 143 S. Ct. 2355, 2369 (2023)) by expanding the scope of the Federal Reserve Banks' delegated authority have come to a head of late.  Recently, Congressional investigations have focused on the Federal Reserve Banks' standardless, inconsistent, and unchecked decision-making when granting or terminating master account access. Indeed, this widespread concern regarding Federal Reserve Banks' behavior – exacerbated by their refusal to cooperate with the corresponding Congressional inquiry – led to recent legislation requiring heightened transparency into the Board's and the Federal Reserve Banks' activities.

12.     Despite both this and the fact that the only federal circuit court judge to examine the right of a legally eligible institution to a master account conclusively rejected the Federal Reserve Banks' new position, the FRBNY continues to act as if it has unfettered discretion with respect to master accounts.

13.     To be sure, BSJI does not contest the mandate of the Board and Federal Reserve Banks to protect the Federal Reserve System.  But they cannot accomplish these aims in violation of the law.  As the FRBNY's and the Board's approach to BSJI illustrates, such unfettered discretion both threatens disastrous results for BSJI and creates dangerous precedent that could be applied to any financial institution, irrespective of its *bona fides*.  Indeed, even assuming that the FRBNY holds some level of discretion over master account access, its decision here was plainly arbitrary and improper.

14.     The most recent iteration of BSJI's battle with the FRBNY began with a letter in July 2022, when the FRBNY initially announced that it would permanently close BSJI's master account.  The basis then for that decision, the FRBNY claimed, was that BSJI had purportedly failed to meet an arbitrary June 2022 reporting "deadline" – *a deadline that is not contained in any FRBNY guideline, letter, contract, or rule*.  Making the FRBNY's action even more confounding, BSJI had previously requested in writing that the FRBNY clarify the precise due date for that filing on two separate occasions, in light of what BSJI pointed out was the existence of conflicting guidance.  The FRBNY ignored both of BSJI's requests for clarification, preferring instead to lie in wait and use that "phantom deadline" as a pretext for terminating BSJI's master account.  The FRBNY's actions were all the more unreasonable considering that BSJI shortly thereafter submitted the filing that the FRBNY had asserted was tardy, a filing that was itself dependent on a well-credentialed third party (previously approved by the FRBNY) concluding its independent

review of BSJI's system of controls.  That filing demonstrated that the Bank is, as it always has been, a safe, well-regulated, and appropriately-controlled institution.

15.     After receiving the FRBNY's July 2022 surprise termination decision based on its "phantom deadline" rationale, BSJI time and again sought dialogue with the FRBNY, sending a litany of emails and letters in an attempt to engage the FRBNY and provide it with any information, assurances, or submissions it needed or wanted so that BSJI could remain in business and continue to serve its customers.  The FRBNY ignored or rebuffed all such efforts, both denying the Bank's request for an in-person meeting and repeatedly insisting that its decision was grounded in "clear" deadlines that BSJI purportedly missed.  The FRBNY also relied on the "phantom deadline" to claim that BSJI somehow posed "undue risk" to the FRBNY.  It was only after BSJI notified the FRBNY in September 2022 that it would immediately seek judicial recourse that the FRBNY relented and agreed to "consider" whether BSJI's "late" filing impacted its decision to terminate BSJI's master account.

16.     In search of new grounds to justify its pre-ordained decision, in September 2022, the FRBNY advised BSJI that it would issue Requests for Information regarding an array of transactions, which it distributed to BSJI shortly thereafter. BSJI timely provided comprehensive responses to the FRBNY, but BSJI's communication went unanswered for months.

17.     In the face of the FRBNY's silence, BSJI again sought a dialogue with the FRBNY, this time by letter dated January 25, 2023.  In that letter, BSJI identified all the steps it had taken since 2019 to enhance its compliance program, its pending plans to do still more, and even noted its willingness to do whatever the FRBNY might ask of it going forward:  "BSJI is prepared to take additional action in collaboration with the FRBNY, including, for example, by establishing a cap on master account activity, limiting the functionality of BSJI-provided accounts, or adopting

capital requirements, all to address any perceived risk to the Reserve Bank associated with use of the master account."  Again, the FRBNY chose not to respond and continued to refuse BSJI's efforts to engage.

18.     Instead, and consistent with its prior practice, rather than open a dialogue with BSJI about any purported concerns it might have had, the FRBNY opted instead to notify the Bank, through a letter on April 24, 2023, that BSJI would lose its master account in a matter of weeks. The April 24 letter focused on 13 purported "deficiencies" in BSJI's compliance system that the FRBNY claimed supported its decision to close BSJI's master account.  Principally relying on these 13 purported "deficiencies," the FRBNY alleged that BSJI – a small bank operating from a single office in Puerto Rico that has 12 employees serving a small number of customers – somehow posed an "undue risk" of illicit activity to the "overall economy."  This outlandish assertion, of course, bore no relation to the FRBNY's original justification for terminating access (the "phantom deadline").  Moreover, the FRBNY's letter was based on outdated information which, had the FRBNY engaged in the dialogue BSJI repeatedly sought, it would have known.  As the FRBNY itself stated in its letter of April 24, 2023, "the New York Fed must assess BSJI based on the circumstances that exist now," and yet the FRBNY chose to knowingly rely on stale and inaccurate information.

19.     Further, what the FRBNY termed "deficiencies" in BSJI's compliance program were in fact best practice recommendations made by industry-leader K2 to supplement BSJI's extant compliance program *on a forward-looking basis in the event BSJI eventually expanded its size and services*. K2 itself made that clear in making the recommendations.  As such, the recommended enhancements were not required by applicable law, regulation, or regulatory

standard, nor were they "deficiencies" as claimed by the FRBNY.  Yet, the FRBNY interpreted these recommendations as purportedly precluding BSJI from master account access.

20.     BSJI swiftly responded to the FRBNY's newly minted "forward-looking enhancements are deficiencies" rationale with several letters and submissions, all of which provided a comprehensive response to the FRBNY's April 24 letter.  Included among BSJI's submissions was a 15-page analysis of the merit (or lack thereof) of each of the topics identified by the FRBNY, the steps already taken to address each topic, and additional improvements that BSJI was employing or would employ to alleviate any further concern.  BSJI also provided the FRBNY with sworn declarations from (i) K2's Senior Managing Director explaining K2 findings, (ii) the Chief Executive Officer of BSJI identifying the multiple enhancements to BSJI's compliance program and its retention of multiple experts and former regulators to ensure best practices; (iii) a former compliance and ethics executive and former employee of the Federal Reserve Bank regarding his consulting work for BSJI and his varied conversations and meetings with the FRBNY; and (iv) a former Federal Reserve officer and examiner explaining that the FRBNY had failed to engage in the necessary dialogue required under the circumstances and the standards by which BSJI must be measured.  But yet again, BSJI's efforts were to no avail.

21.     Following the FRBNY's receipt of a sworn declaration saying that regulatory guidance required a dialogue, the FRBNY – which offered no dialogue *before* deciding to terminate BSJI's master account – relented and agreed to a telephone call, which occurred on June 20, 2023.  In that call, BSJI again made clear that nearly all of the concerns expressed by the FRBNY in its April 24 letter were moot.  BSJI further underscored, as it had in its submissions, that its modest retail size could not plausibly pose the risk to the Federal Reserve System that the FRBNY claimed.  Once again, the FRBNY changed tack.  Having been made aware through

BSJI's submissions that BSJI had, over the last year, adopted measures with respect to each of the thirteen recommendations made by K2, the FRBNY did not invoke these "deficiencies" on the call.

22.     Rather, the FRBNY's decree was based on, according to the FRBNY, the "collective set of circumstances." The FRBNY thereafter focused not on their "forward-looking enhancements are deficiencies" rationale, but instead expressed concern about a high volume of what the FRBNY characterized as "party-related" "shell company" transactions. In response, BSJI laid out in detail, in its June 27, 2023 letter to the FRBNY, that none of BSJI's accounts actually involves "shell companies." Not surprisingly, the FRBNY failed to identify *any* specific transaction involving any "shell company," much less one that is indicative of money laundering.

23.     This discussion was soon followed by another letter from the FRBNY, on June 30, announcing that it would move forward with terminating BSJI's account anyway. BSJI again offered further dialogue in an effort to reach an amicable resolution but the FRBNY, in consistent fashion, refused to engage.

24.     Viewed alone, the FRBNY's treatment of BSJI over the past year has been wildly improper. But unfortunately, this recent year-long saga does not reflect the first time the FRBNY has targeted BSJI without merit or reason.

25.     In February 2019, without notice, the FRBNY suspended BSJI's master account in light of media reports about a federal investigation then being conducted regarding two loan facilities granted by BSJI. The investigating authorities ultimately concluded that the transactions were perfectly lawful, and BSJI regained access to its master account in December 2020. But by that point, without access to its master account for 22 months, BSJI was a mere shell of its former self, and its customer relationships were decimated. Had the FRBNY engaged in an appropriate

review of any concerns, and not blindly invoked its "media reports" rationale, it could have avoided the unnecessary and crippling harm that befell BSJI.

26.     The FRBNY's lack of consistency has created an inherently unstable business environment for BSJI, repeatedly causing it to divert substantial resources to continuously fight for its business life rather than devoting all of its energies to implementing its business plans.

27.     The FRBNY's course of conduct, coupled with BSJI's modest risk profile and ceaseless devotion to a top-of-the-line compliance program blessed by reputable independent consultants, makes clear that the FRBNY's decision to close BSJI's master account is rooted not in any reasoned decision making. Instead, on information and belief, as evidenced by an April 27, 2019 FRBNY letter, the FRBNY is determined to deny master access to Puerto Rican IBEs.[1] According to media reports, this decision is rooted in the "expansion of U.S. economic sanctions relating to Venezuela."  Improper targeting of BSJI because it was founded by a Venezuelan national more than 12 years ago – never mind that he was educated in the United States and in Europe and has lived in in the United States and Europe for nearly 22 of the last 25 years – and is regulated by a Puerto Rican government agency rather than a federal agency is, of course, patently unreasonable (and unlawful).

28.     Closing BSJI's master account based on arbitrary and pretextual grounds, particularly where BSJI (i) has been a master account holder for more than 10 years and (ii) has devoted tremendous resources and time working closely with the FRBNY and well-regarded advisors to develop the first-in-class controls and procedures which the FRBNY now criticizes, is a

---

[1] Reuters, *Exclusive: New York Fed Cracks Down on Puerto Rico Bank Following Venezuela Sanctions* (April 18, 2019),  *available at*  https://www.reuters.com/article/us-venezuela-politics-puertorico-exclusi/exclusive-new-york-fed-cracks-down-on-puerto-rico-banks-following-venezuela-sanctions-idUSKCN1RU2EI.

gross abuse of administrative power.  It also violates BSJI's statutory, due process, and contractual rights.

## THE PARTIES

29.     Plaintiff BSJI operates under the supervision of the Office of the Commissioner of Financial Institutions of Puerto Rico ("OCIF").  BSJI was founded in 2011 by Marcelino Bellosta Varady, a national of Venezuela (as well as of Hungary and Spain).  BSJI's principal place of business is Galería San Patricio, B5, Calle Tabonuco, Suite # 207, Guaynabo, Puerto Rico 00968. BSJI offers business banking, including corporate accounts, premier corporate accounts, and financing; and personal banking, including personal accounts, premier personal accounts, and fixed-term deposits.

30.     Defendant FRBNY is one of the 12 Federal Reserve Banks of the United States, with its principal place of business at 33 Liberty Street, New York, New York 10045.  The FRBNY is responsible for the Second District in the Federal Reserve System, which is comprised of the State of New York, the 12 northern counties of New Jersey, Fairfield County in Connecticut, Puerto Rico, and the U.S. Virgin Islands.  In this capacity, it supervises and regulates Federal Reserve member banks and bank holding companies within the Second District.  It is a federal agency of the United States, created by Congress, with its own board of directors.  The FRBNY is incorporated as a non-profit governmental corporation, with the capacity to sue and be sued in its own name.

31.     Defendant Board is the governing body of the Federal Reserve System, with its principal place of business at Constitution Ave N.W. & 20th St. N.W., Washington, DC 20551. The Board is responsible for overseeing the 12 regional Federal Reserve Banks.  It is an agency of the United States, and is comprised of seven members – also known as "governors" – who are nominated by the President and confirmed by the Senate.

## JURISDICTION AND VENUE

32.     This Court has subject matter jurisdiction under 12 U.S.C. § 632, which provides that "all suits of a civil nature at common law or in equity to which any Federal Reserve bank shall be a party shall be deemed to arise under the laws of the United States, and the district courts of the United States shall have original jurisdiction of all such suits."  Additionally, this Court has jurisdiction under 28 U.S.C. § 1331, as this is a civil action "arising under the Constitution, laws or treaties of the United States."

33.     Venue in this District is proper as to the FRBNY under 28 U.S.C. § 1391(b)(1) and (2) because (i) the FRBNY has its principal place of business in this district and (ii) a substantial part of the events giving rise to the claims at issue occurred here.  The Federal Reserve Banks Operating Circular No. 1, Account Relationships ("Operating Circular No. 1") also states that "[a]ny action against a Reserve Bank for any act or omission relating to an account relationship or transaction must be brought . . . in the United States District Court and Division where the Administrative Reserve Bank is located."  Operating Circular No. 1 ¶ 7.4.  The FRBNY is, as mentioned above, located in lower Manhattan.  Venue in this District is also proper as to the Board under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims at issue occurred here.

34.     The FRBNY and the Board are subject to this Court's personal jurisdiction because they have purposefully availed themselves of the privileges of conducting business in this District, and a substantial part of the events giving rise to the claims at issue occurred in this District.

## FACTUAL BACKGROUND

## I.  BSJI

35.     IBEs like BSJI serve as a bridge between U.S. companies and foreign investors. Under Puerto Rican law, the principal goal of IBEs is to attract United States and foreign investors to Puerto Rico.  To that end, BSJI offers corporate banking services, including both corporate accounts and financing as well as personal banking, including personal checking accounts and time deposits.

36.     BSJI operates under the supervision of the Office of the Commissioner of Financial Institutions of Puerto Rico ("OCIF") with whom BSJI regularly consults and engages.  ████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████  Indeed, in recognition of these controls and procedures, in 2014, OCIF expanded the scope of BSJI's powers to authorize BSJI to engage in fiduciary activities, which permits the Bank to offer paying agent and custodial services to bond issuers.

37.     BSJI's capital is well over any regulatory benchmark established by any federal regulator for a well-capitalized depository institution.  As of July 13, 2023, the total stockholder's equity of BSJI represented more than 60% of its total assets.  By stark contrast, a typical U.S. depository institution's total shareholders' equity is usually somewhere between 8% and 12% of its total assets.  Further, more than 76% of BSJI's total assets is cash and due from banks.  In short, BSJI's current financial condition is exceedingly sound.

38.     As of July 13, 2023, BSJI's total account balances of customers' demand deposit accounts were less than $13 million held in 14 demand deposit retail accounts. On average, considering wires and all other transactions, BSJI undertook fewer than two transactions per day, totaling less than $90,000 per day for the entire institution.

39.     More than 11 years ago, on April 5, 2012, pursuant to a Foreign Banking Institution Account Agreement between BSJI and the FRBNY (the "Account Agreement"), BSJI opened its master account with the FRBNY.  The Account Agreement is governed by New York law and incorporates "all the provisions" of Operating Circular No. 1, which, in turn, sets forth the terms under which a Financial Institution opens, maintains, and terminates a Master Account with a Federal Reserve Bank.  Operating Circular No. 1 ¶ 1.0.[2]  Operating Circular No. 1 is also governed by New York law, and expressly incorporates a duty of care applicable to both the FRBNY and the contracting bank.  *Id.* ¶¶ 7.1; 7.4.

## II.    THE IMPORTANCE OF THE FRBNY MASTER ACCOUNTS

40.     Without a master account, BSJI cannot effectively function as a depository institution for at least four reasons.  First, the Bank will be unable to connect to the Federal Reserve Bank payment services.  Second, it is both practically impossible and cost-prohibitive for BSJI to utilize a correspondent bank to access Federal Reserve System services.  Financial institutions generally will not accept deposits that have been rejected by a Federal Reserve Bank.  Indeed, all of BSJI's efforts to find a correspondent bank in the wake of the FRBNY's 2019 suspension of a master account and the FRBNY's more recent announcement regarding BSJI's master account have been rebuffed.  What is more, even if BSJI could find an institution that would be willing to act as a correspondent bank, given the modest size of BSJI and the significant expenditures recently made in relation to the FRBNY's termination decision, the additional cost of retaining an intermediary correspondent bank would be ruinous.  Third, the closure of BSJI's master account will seriously impede BSJI's attempts to apply for FDIC deposit insurance of its deposit accounts because the FDIC would not grant insurance to an applicant that the FRBNY determined poses an

---

[2] https://frbservices.org/assets/resources/rules-regulations/020113-operating-circular-1.pdf

"undue risk," even if there is no legitimate basis for such determination.  Fourth, certain long-term projects that BSJI has worked on are themselves dependent on BSJI having a master account.  For example, BSJI has been working with a well-recognized credit card company for the issuance of BSJI credit cards, which would in turn yield an important revenue stream as part of BSJI's business plan.  The credit card company, however, conditions its continued commitment on BSJI having a master account at a Federal Reserve Bank.  Absent court involvement now, this relationship – literally years in the making – will crater.

III.    **BSJI'S HISTORY WITH THE FRBNY**

     A.    **The FRBNY's prior temporary suspension of BSJI's master account**

     41.    BSJI and the FRBNY worked collaboratively together for many years without incident.

     42.    In February 2019, however, the FRBNY temporarily suspended BSJI's master account in light of media reports of an investigation then being conducted in Puerto Rico regarding two loan facilities granted by BSJI, one of which primarily benefitted U.S.-based Caterpillar Inc., in its business dealings with Petroleos de Venezuela S.A. ("PDVSA"), the Venezuelan state-owned oil and natural gas company.  BSJI did not rely only on in-house expertise to consummate the transactions.  Instead, experienced U.S. and international legal counsel were involved, including Hogan & Lovells representing PDVSA; Reed Smith and Baker McKenzie representing the contractors in 2016 and 2017, respectively; and Shutts & Bowen, Allen & Overy (English counsel), Mendoza Palacios (Venezuelan counsel), and DLA Piper (Puerto Rican counsel) representing BSJI.

43.    The loan agreements were complex and sophisticated, and, as the investigating authorities ultimately concluded, entirely lawful.[3]

**B.    BSJI's development of state-of-the-art compliance and controls**

44.    In response to the FRBNY's suspension and the "media reports" rationale upon which it was predicated, BSJI representatives promptly began communicating and meeting with FRBNY officials.  From BSJI's perspective, it wanted to give the FRBNY whatever comfort it needed to avoid termination of BSJI's Federal Reserve services.

45.    As an initial step, in April 2019, BSJI retained a highly credentialed team at FTI Consultants, one of the leading management consultant firms in the world, to assess and improve BSJI's BSA/AML compliance program.  This team was led by the former Chairman of the FDIC, William M. Isaac, and former compliance and ethics executive Richard J. Wolf.

46.    Mr. Isaac was appointed by President Carter and confirmed by the United States Senate in early 1978 to serve on the board of directors of the FDIC.  President Reagan appointed him as Chairman of the FDIC where he served for five years, steering the industry out of a financial crisis that saw scores of bank failures.  He also served as chairman of the Federal Financial Institutions Examination Council (1983–1985), as a member of the Depository Institutions Deregulation Committee (1981–1985), and as a member of the Vice President's Task Group on Regulation of Financial Services (1984).  He had also served as Vice President, General Counsel & Corporate Secretary of the largest banking company in Kentucky for four years.

47.    Mr. Wolf was at the time a senior advisor with FTI Consulting.  Before that, he served in a variety of legal and compliance roles, including periods of service as Senior Advisor

---

[3] U.S. Dep't of Justice, *Bank Of San Juan Internacional, Inc. And The U.S. Attorney's Office For The District Of Puerto Rico Resolve Pending Litigation And Related Matters* (Feb. 11, 2020) https://www.justice.gov/usao-pr/pr/bank-san-juan-internacional-inc-and-us-attorney-s-office-district-puerto-rico-resolve.

for the Federal Reserve Bank of New York, Chief Ethics Officer for HSBC North America, and

global head of compliance and ethics for Cendant Corporation.

48. The FTI assessment was undertaken despite the fact that  But in keeping

with its business philosophy – and to provide the FRBNY with the assurances it demanded – BSJI

and FTI proceeded with what turned out to be a multi-million-dollar, multi-year assessment of

BSJI's compliance program that ultimately cost over $7 million.

49. The assessment began with FTI dispatching a team of BSA/AML experts, under

Mr. Isaac's direction, to the only office of BSJI (in Guaynabo, Puerto Rico), where they were

tasked with identifying any gaps in BSJI's BSA/AML program, formulating a comprehensive plan

to address any potential shortcomings, and implementing any such plan to ensure its long-lasting

effect.

50. As Mr. Isaac described, his team focused:

> on establishing a comprehensive customer identification/customer due
> diligence program; evaluating and strengthening the bank's other pillars
> associated with policies, procedures, and related controls; assisting the bank
> with recruiting a permanent and well-qualified BSA/AML compliance
> officer; implementing a thorough and ongoing compliance training
> program; and providing for periodic, risk-based, and independent testing of
> the compliance program. . . .  Among other things, we conducted a detailed
> BSA/AML "lookback" review of customer transactions, from January 1,
> 2018, to March 30, 2019, using a risk-based approach.  We also conducted
> a know-your-customer due diligence review of all BSJI customers to ensure
> that no prohibited parties may have had access to the U.S. financial system
> through their accounts at BSJI. At all times, my team and I committed
> ourselves to being fully transparent with the Federal Reserve Bank of New
> York ("FRBNY") with our findings and regularly provided the FRBNY
> with updates—frequently in person at the FRBNY's headquarters offices in
> New York City.

51.     This fully voluntary "lookback" was an immense undertaking, lasting about a year, requiring more than 5,500 hours of personnel time, precipitating more than 200 requests for information, and costing BSJI more than $4 million.  At the review's conclusion, FTI certified to the FRBNY that it discovered no evidence of any illicit activity at BSJI.  In other words, the FRBNY suspended BSJI's master account not because of any wrongdoing – there was none – but merely because of a media report and pendency of an investigation: BSJI was deemed guilty until proven innocent.  We are not aware of any instance where the FRBNY, or any other Reserve Bank, suspended the master account of a large U.S. bank for those reasons.  To the contrary, there are a number of examples of large U.S. banks being fined, charged, and/or convicted of crimes yet they did not lose their master account.

52.     In July 2019, the FRBNY informed BSJI that it would consider allowing BSJI access to limited service if and when the FRBNY was convinced that no sanctioned or otherwise illicit transactions were, or would be, processed through BSJI's accounts at the FRBNY.  Mr. Isaac and FTI continued to build and enhance BSJI's compliance program, devoting thousands of hours of employee and third-party personnel time to create top-tier internal controls and compliance systems.  At every step of this process, BSJI worked collaboratively and transparently with the FRBNY to satisfy its every request and address any concerns it had.

53.     On December 6, 2019, BSJI and FTI presented updated findings to the FRBNY, confirmed the lack of evidence of illicit activity in BSJI's transaction history, identified the additional improvements made by BSJI over the preceding eight months, and discussed the next steps that BSJI intended to take in improving its compliance system.  During the December 2019 meeting, BSJI also informed the FRBNY that BSJI would be engaging an independent private examiner to review its BSA/AML/OFAC program and other key internal controls on a biannual

basis, beginning in Q1 2020, to ensure the Bank was performing with optimal risk mitigation practices.  In so doing, BSJI would be expending its own resources to have an independent third party, acceptable to the FRBNY, act as its private examiner.  BSJI also told the FRBNY that it was prepared to have that independent private examiner report its findings directly to the FRBNY.

54.    The FRBNY and, in particular, its general counsel, Michael Held, who had been intimately involved in the BSJI review, expressed appreciation for the efforts BSJI had undertaken and was willing to take in the future.

55.    Notably, as BSJI's discussions with the FRBNY matured, the FRBNY indicated fewer misgivings about BSJI in particular, but rather conveyed its discomfort with IBEs more generally, because they are neither federally regulated nor federally examined; they are instead regulated and examined by their local regulator.  This, of course, was in line with the April 2019 news reports of the FRBNY's decision to curtail master accounts for IBEs. *See supra at* p. 10 n. 1.

56.    During a second meeting, on February 13, 2020, among Mr. Isaac, Mr. Wolf, and BSJI's management on the one hand, and the FRBNY on the other, BSJI and the FTI team apprised the FRBNY of BSJI's progress over the preceding months and reiterated the additional steps BSJI intended to take in the immediate future.  During the meeting, Mr. Held informed BSJI and its consultants that the FRBNY intended to impose new master-account-related obligations on all IBEs, and observed that BSJI would be "at the front of the line" in terms of meeting the new requirements because many of the steps BSJI had taken proactively, including the use of independent examiners to conduct testing of controls, were among the new obligations the FRBNY intended to impose.  In other words, BSJI had already taken many of the actions that the FRBNY would later impose on all IBEs.

57. On April 22, 2020 – over a year after the FRBNY suspended BSJI's account – the FRBNY informed BSJI that access to its master account would be restored in a phased approach. Specifically, the FRBNY advised that after:

> consideration of the information provided on the call and the documents provided to FRBNY, FRBNY lays out below a phased path for BSJI to: (1) reestablish limited access to its FRBNY accounts and certain Federal Reserve financial services; and (2) demonstrate full compliance with the requirements of the FRBNY Account and Financial Services Handbook (the "Handbook"). FRBNY will consider providing BSJI with broader access to Federal Reserve financial services if FRBNY is satisfied that BSJI is in full compliance with the requirements of the Handbook.

58. BSJI immediately began to take the steps requested by the FRBNY, and hired two more premiere independent consultant firms, K2 and Chain Bridge Partners LLC ("Chain Bridge"), to assist with these efforts. K2, a preeminent risk, compliance, investigations, and monitoring firm, was tasked with validating BSJI's transaction monitoring and sanctions screening systems, while Chain Bridge, an independent advisory firm led by Jeremiah Norton, a former director of the FDIC, was responsible for testing and satisfying the operational risk management, resiliency, and continuity requirements of the Handbook.

59. BSJI submitted the first tranche of documents called for under the Handbook and Phase 1A of the restoration plan mandated by the FRBNY on May 8, 2020. This process continued over the next seven months, during which BSJI and its consultants regularly met with FRBNY representatives and apprised them of BSJI's progress, while contemporaneously developing and submitting additional information for the FRBNY's consideration. These documents included a revised business plan and updated policies and procedures for transaction monitoring based on recommendations from K2. During this period BSJI also engaged a fourth leading independent consultancy firm, AML RightSource (AMLRS), to perform an independent audit review of BSJI's

BSA/AML and OFAC Compliance Programs for the upcoming period of October 1, 2020 to September 30, 2021.

60.     Finally, on December 3, 2020, BSJI was notified that the FRBNY "ha[d] completed its review of both the initial and additional documentation in accordance with the Phase 1B of the plan and [was] satisfied that BSJI ha[d] met the requirements of Phase 1B." Accordingly, BSJI had its master account and "unrestricted access to the Fedwire Securities Service restored via the Federal Reserve Banks' standard offline process," effective December 14, 2020.

61.     During the 22-month period when BSJI's master account access was suspended, BSJI built on its system of controls and governance and transformed it into a top-tier system beyond that of its immediate peer group, and which proved acceptable to the FRBNY.  Indeed, some of BSJI's ideas, such as the use of credentialed third parties acceptable to the FRBNY to act as independent examiners, were adopted by the FRBNY in guidance recently promulgated by the Board to all IBEs and other financial institutions.[4]  These third-party independent examiners were intended to serve as the eyes and ears of the FRBNY since the FRBNY did not have a direct regulatory or supervisory role over IBEs.

62.     BSJI's Chief Executive Officer, Héctor J. Vázquez, summarizes the extensive measures that BSJI undertook during this 22-month period:

> Also in 2019, BSJI inventoried all bank policies and procedures and completed a compliance program gaps analysis. With the assistance of FTI and with the new BSA Officer's involvement, and added backup staff and resources to assist him, BSJI enhanced its overall system of compliance controls, including revised policies and procedures, and, critically, completed the implementation of the fully automated transaction-monitoring system. The process also yielded revised Bank Secrecy Act ("BSA")/anti-money laundering ("AML") policies and procedures assembled in a new AML/CFT Manual, which includes specific instructions and clear policy on the filing of Suspicious Activity Reports and a process

---

[4] See Board of Governors of the Federal Reserve System, *Guidelines for Evaluating Account and Services Requests*, Final Guidance, 87 Fed. Reg. 51,099-51,110 (Aug. 19, 2022).

for escalating questions regarding whether and when to file such a report. BSJI also updated the Know Your Customer program to risk-rate and evaluate BSJI's unique customer base specifically designed for heightened concerns regarding the region and market in which the Bank operates, including a customized risk-rating form to evaluate all customers during the initial due diligence and the enhanced due diligence processes.

In 2020, BSJI adopted new codes of business conduct and ethics for employees, officers, and directors. BSJI trains and tests all employees on BSJI policies regarding AML, sanctions, ethics, and AML. Importantly, BSJI has not only updated its policies and procedures, and automated its transaction monitoring system, but it actively strives to ensure that a culture of compliance permeates its every day decision-making process.

### C. BSJI suffers immense reputational and economic harm during the temporary suspension of its master account

63.     While BSJI's FRBNY master account access was temporarily suspended, BSJI's inability to access Federal Reserve services caused it enormous reputational and financial harm. Specifically, BSJI was forced to shrink to a mere fraction of what it once was, and today retains less than 2 percent of the retail depositors it had prior to the suspension.

64.     As a result, the total number of deposit accounts was reduced by over 90% from January 1, 2019, to July 31, 2022, while the corresponding dollar amount of total deposits dropped by over 66% during the same period.  Moreover, the FRBY's suspension of BSJI's master account, and the corresponding exodus of retail clients, effectively ended BSJI's retail banking services business: BSJI now primarily engages in corporate and investment banking activities.

65.     BSJI's valuable customer relationships were catastrophically frayed as well, and BSJI continues to work, to this day, to try to rebuild itself after the disaster caused by the FRBNY master account temporary suspension.

## IV.   K2'S 2021 AND 2022 REPORTS

66.     In 2021, in light of the COVID pandemic, K2, BSJI, and the FRBNY reached a variety of accommodations on the respective due dates of various compliance reports.

Accordingly, K2 produced (i) the OFAC screening technical validation on June 14, 2021, (ii) the BSA/AML and OFAC compliance program assessment on June 16, 2021, and (iii) the BSA/AML transaction monitoring technical validation on June 29, 2021.  While the reports were all submitted in June 2021, the end of the review period for the various subject matters ranged from April 30 through June 2021, although the information provided for June 2021 was very limited given the timing of the submissions.

67.     Because the FRBNY requires "annual" submissions, BSJI and K2 discussed the appropriate review period and anticipated submission dates for 2022.  Though the precise submission date of these "annual" reports is not identified in the Handbook, the FRBNY stated that the review period "must cover a full 12-month period.  Generally, FRBNY requires the date of the report of Independent Consultant or Auditor be no more than three months from the end of the 12-month period reviewed by the Independent Consultant or Auditor."

68.     In light of the inconsistent review periods for BSJI's preceding submissions, the FRBNY's requirement that the consultant/auditor reports cover a full 12-month period, and due to the varying due dates the FRBNY had previously announced as a result of the COVID-19 pandemic, K2 and BSJI concluded that it would be most appropriate to align the review periods going forward.  The 2022 review period was consequently set to be through and including June 30, 2022, one year from the review period covered by BSJI's final 2021 compliance report submission.  Given that the last of K2's review periods concluded on June 30, 2022, the K2 reports (per the FRBNY's guidance) would need to be concluded and dated "no more than three months" thereafter, that is, by September 30, 2022.

69.     However, BSJI recognized that the Handbook's guidance was internally contradictory: the Handbook required "annual" submissions, but such a submission would

necessarily violate in this instance the Handbook's requirement that the reports cover a 12-month period, given that it would be impossible to submit a comprehensive report of data from the very same day as the report deadline.  Moreover, the Handbook stated that reports were "generally" required to be submitted "no more than three months from the end of the 12-month" review period but did not provide a concrete deadline, further confusing the matter.  This lack of consistent guidance, coupled with the reporting delays caused by the COVID-19 pandemic, rendered BSJI's reporting deadlines less than clear.

70.     BSJI believed that the obvious and appropriate approach was to seek guidance from the FRBNY itself, as it had done on a regular basis while working with the FRBNY to develop its industry-leading compliance system.  As such, and consistent with the Handbook's guidance that banks should contact the FRBNY in the event of any questions, BSJI contacted the FRBNY on April 7, 2022.

71.     Specifically, on April 7, 2022, BSJI emailed Claudette Bridgewater of the FRBNY, stating:

> BSJI is developing a work plan to ensure that all documentation required by the FRB-NY Handbook for the year ending December 31, 2022, is completed and submitted in a timely fashion.  As part of the planning process, we would like to confirm our understanding of the steps to be followed and arrange a bilateral call with your group, at your earliest convenience, to ensure that we fulfill FRB-NY requirements.  To facilitate such discussion, below please find a summary of our understanding of this year's process as follows: . . . BSJI is hiring K2 Integrity to provide a model validation and compliance program assessment, the Factor 2 Attestation for 2022.  Their review period will cover [the period] from May 2021 to June 30, 2022.  (BSJI expects that field work and Attestation report be completed by the latter part of the third quarter of 2022).

72.     Notwithstanding the close contact and rapport that BSJI and the FRBNY had over the preceding years, BSJI's request went unanswered.  With the conclusion of the review period

approaching, BSJI diligently again reached out to Ms. Bridgewater on June 3, 2022 – less than 60

days from its first written request to the FRBNY for guidance.  BSJI again told the FRBNY that:

> BSJI has engaged K2 Integrity, operating through K2 Intelligence, LLC, as
> an Independent Consultant to perform the BSA/AML and OFAC Program
> Assessment, Technical Validation, meeting the requirements of factor 2 of
> the FRB-NY Handbook.  The scope of the review period will cover from
> May 1, 2021 to June 30, 2022.  The inclusion of June 2022 in the review
> period is to align the review periods of both the Program Assessment and
> the Technical Validation and to ensure complete coverage of relevant
> internal controls for the current review.

73.     BSJI's second request for FRBNY guidance fared no better.  Once again, the

FRBNY did not respond.  Under the circumstances, and in light of the FRBNY's non-objection to

BSJI's twice-announced plans, BSJI reasonably proceeded with its process as required by the

Handbook, and as communicated to the FRBNY: to submit its reports within three months of the

review period's conclusion on June 30, 2022.

## V.   THE FRBNY ARBITRARILY AND INAPPROPRIATELY DECIDES TO TERMINATE BSJI'S MASTER ACCOUNT, THEN PAUSES TERMINATION

74.     Through the conclusion of the review period, the FRBNY did not respond to BSJI's

outreach.  Suddenly, on July 18, 2022 – fewer than three weeks after the review period's

conclusion, several months after the Bank's first outreach on the issue, and well within the three

*months* the Handbook affords for the submission of a report – the FRBNY sent a letter to BSJI

stating that the Bank's "non-compliance" with an alleged June 2022 filing date, "among other

things," presented "undue risk" to the FRBNY – a baseless refrain that, as BSJI would soon learn,

the FRBNY would repeatedly, baselessly invoke.  Accordingly, the FRBNY informed BSJI that

the FRBNY would terminate BSJI's master account on September 15, 2022 (a date later briefly

extended to September 29, 2022).  Despite the vague reference to "other things," the letter

specifically identified only BSJI's alleged tardy filing as a basis for the termination of the master

account.

25

75.     The letter came as a complete shock to BSJI.  Just a year and a half before, the FRBNY had blessed BSJI's systems and controls, as well as its extensive efforts to become a model IBE, by granting BSJI unrestricted access to a master account and FRBNY offline services. Moreover, and importantly, *the Bank had continually improved its systems and controls since that time*.  Further, the FRBNY's own published advice did not support the FRBNY's actions, and BSJI was denied an opportunity to remedy any purported submission deficiencies.  And, of course, the FRBNY could have avoided any misunderstanding, if in fact there actually was a misunderstanding, had it merely responded to either of BSJI's communications.

76.     BSJI promptly responded on July 19, 2022, emphasizing that BSJI had repeatedly contacted the FRBNY seeking guidance on the very deadline on which the FRBNY was now predicating its account termination.  BSJI likewise clarified that the reports at issue were currently being prepared, which was consistent with the three-month submission process articulated in the FRBNY Handbook.

77.     Thereafter, on August 11, 2022, BSJI was able to finally have a call with the FRBNY.  During that call, the FRBNY refused to consider BSJI's position, would not explain why it had not responded to BSJI's requests for guidance, claimed that the deadlines for report submission were "clear," and stated that it would not change its decision to terminate BSJI's account.  The FRBNY had decided to terminate BSJI's master account based on the "phantom deadline," and it made clear that its decision was not going to change.

78.     BSJI nonetheless continued to reach out to the FRBNY, re-explaining the conflicting guidance regarding the supposed deadline, informing it of K2's extensive work to date, pleading with the FRBNY to afford K2 the time necessary to complete preparation of its reports,

especially since they were nearing completion, and, more generally, asking that the FRBNY enter into a constructive dialogue with BSJI, all to no avail.

79.     Facing the imminent termination of its master account and with hope of convincing the FRBNY to change tact diminishing by the day, BSJI was left with limited options.  It consequently informed the FRBNY, on September 15, 2022, that the FRBNY's actions were arbitrary and unsupported, leaving BSJI with no other option than to challenge the decision in court.

80.     In response, on September 19, 2022, the FRBNY wrote to BSJI and stated that it would not proceed with the master account closing on September 29, but would rather "consider whether [K2's then just-filed and soon-to-be-filed] submission[s] impacts the Federal Reserve Bank of New York's . . . decision to close BSJI's master account."  The FRBNY simultaneously advised that it would transmit to BSJI Requests for Information ("RFI") and would consider those responses of BSJI in determining how to proceed.

81.     On information and belief, within the past five years the FRBNY began implementing an internal policy to substantially downside the number of IBEs who have access to the Federal Reserve System, including and especially those owned by individuals who were born outside the United States.  Likewise on information and belief, the FRBNY is pursuing this policy – which paints all institutions with a broad brush – because it considers IBEs inherently high risk since they are not federally regulated, giving short shrift to the fact that BSJI is regulated by a supervisory authority in Puerto Rico, a U.S. territory, and notwithstanding the FRBNY's official's prior statement that BSJI was "front of the line."

82.     The implementation of this policy has, as discussed earlier, been affirmed by public reporting, including the disclosure of an April 27, 2019 letter wherein the FRBNY stated that it

would refuse to grant master account access to Puerto Rican IBEs for the indefinite future. According to this report, the FRBNY's decision was driven by the "expansion of U.S. economic sanctions relating to Venezuela." The FRBNY, in essence, has adopted a policy of "guilty until proven innocent" to an entire sector of the banking community, based simply on the actions of a handful of bad actors. This decision is unsupportable and unlawful.

83.     On information and belief, the FRBNY's July 18, 2022 decision to terminate BSJI's master account on the purported basis of a phantom deadline was designed to eliminate one such IBE in furtherance of this policy. Upon learning that BSJI would seek judicial review of its groundless decision to terminate BSJI's master account on the basis of a "phantom deadline," caused by the FRBNY's own failure to respond to multiple inquiries, the FRBNY elected to stand down for the time being to afford it an opportunity to do what it had done before – look for and generate different, additional bases to justify its pre-ordained decision.

84.     Over the next several months, BSJI submitted an additional filing the FRBNY had requested, and responded to RFIs concerning BSJI's compliance programs, systems, controls, and client basis. Additionally, to ensure the FRBNY's comfort with BSJI maintaining master account access, it volunteered to be supervised by the FRBNY. By January 2023, BSJI's requested submissions were complete. Nothing more was heard from the FRBNY.

85.     BSJI sought to be proactive and therefore again reached out to the FRBNY. As noted above, by letter dated January 25, 2023, BSJI sent two letters to the FRBNY, again seeking a dialogue. BSJI described therein many of the steps it had taken since 2019, many of which were at the direction of or in concert with the FRBNY, to enhance its compliance program, including its retention of many of the best and most respected consultants – many former regulators – in the country, at an extraordinary cost to BSJI. BSJI offered to do still more, if only the FRBNY would

share with BSJI what the FRBNY wanted it to do.  In this regard, BSJI advised the FRBNY that it "is prepared to take additional action in collaboration with the FRBNY, including, for example, by establishing a cap on master account activity, limiting the functionality of BSJI-provided accounts, or adopting capital requirements, all to address any perceived risk to the Reserve Bank associated with use of the master account."  In other words, BSJI was prepared to take any reasonable measure to give the FRBNY its needed comfort.  The FRBNY's response was silence.

## VI.    THE FRBNY AGAIN ACTS TO CLOSE BSJI'S MASTER ACCOUNT

86.    On April 24, 2023, again without warning or dialogue, BSJI received yet another termination letter from the FRBNY.  The FRBNY's original basis for account closure – the "phantom deadline" – went entirely unmentioned.  Rather, the FRBNY concocted a new list of purported "deficiencies" in BSJI's compliance program and vaguely cited the volume of transactions from unidentified "high-risk jurisdictions" as now justifying its truly remarkable conclusion: that BSJI, a bank with fewer than 20 retail clients and a modest transaction volume, comprising a mere fraction of its former self, poses an "undue risk to the overall economy" and consequently violated Principle 5 of the Board's Guidelines.  The FRBNY further concluded that the information provided by BSJI concerning its compliance program and willingness to be directly supervised by the FRBNY did nothing to "alter its determination to close BSJI's account."

87.    This latest effort to deprive BSJI of its master account – its "forward-looking enhancements are deficiencies" rationale, and the FRBNY's third unsupported bite at the apple – lacks any substantive basis.  Among other things, even though K2 (which had been pre-approved by the FRBNY in response to their request that BSJI appoint an independent BSA/AML and OFAC auditor) conducted an exhaustive, on-the-ground audit of BSJI's BSA/AML and OFAC compliance program, the FRBNY – in a move that can fairly be described as Kafkaesque – chose to discard K2's months of analysis and conclusions that BSJI's BSA/AML and OFAC compliance

program met regulatory standards and was otherwise satisfactory.  Given K2's reputation as the "gold standard" in the industry and its history of careful, in-depth, and professional work, BSJI does not believe the FRBNY has ever previously discarded K2's conclusions as it related to any non-IBE/IFE financial institution, much less in circumstances where the FRBNY has not itself actually conducted an on-site examination.

88.    In addition to K2, BSJI's BSA/AML and OFAC compliance program, largely prepared by top consultants and former regulators, have been reviewed and blessed by its regulator (OCIF) and by AMLRS, which, like K2, is a nationally-recognized, well-credentialed, independent BSA/AML and OFAC auditor. Further still, on September 21, 2022, another governmental entity, the highly-respected Financial Industry Regulatory Authority ("FINRA"), which is the self-regulatory organization that regulates and supervises the hundreds of securities broker dealers and more than 600,000 securities brokers in the United States, approved BSJI's transaction in which it indirectly acquired a 40 percent interest in a securities broker dealer in Illinois.  FINRA, of course, conducts rigorous reviews as a condition of such a sizable acquisition of any securities broker dealer that is a member of FINRA.

89.    Lastly, a major credit card company independently audited BSJI's BSA/AML and OFAC compliance program by hiring its own BSA/AML and OFAC auditor.  That major credit card company's auditor concluded in 2022 that ███████████████████████ ████████████████.  Consequently, the major credit card company approved BSJI's request to employ such credit cards, that is, so long as BSJI maintains a master account at the FRBNY.

90.    Moreover, while the FRBNY contended that BSJI imposes a risk of facilitating "economic or trade sanctions violations," in 2020, the U.S. Department of the Treasury's Office of Foreign Assets Control conducted a civil investigation and audit of BSJI's OFAC compliance

plan.  OFAC closed that investigation without a single finding and BSJI's OFAC compliance plan has only been enhanced since then, belying the FRBNY's claims.

91.     The FRBNY and the Board are the only outliers, as only they purport to lack comfort with BSJI's compliance program, having purportedly concluded that BSJI poses an "undue risk to the overall economy."  As mentioned above, several different independent organizations have reviewed and blessed BSJI's compliance program, leaving the FRBNY and the Board, as it were, on an island, a fact all the more striking given that neither the FRBNY nor the Board audited BSJI or visited BSJI to assess its compliance systems in-person during this process.  Indeed, the FRBNY has not conducted an in-person visit – a crucial component of any compliance system assessment – since before it first suspended BSJI's account in 2019.

92.     As it does in every bank assessment, K2 identifies any regulatory deficiencies it finds.  K2 separately provides banks with (nonbinding) enhancement recommendations to further bolster their respective compliance programs.  The FRBNY, in order to manufacture a basis to support its decision to close BSJI's master account, shockingly chose to discard K2's finding that no regulatory deficiencies existed, and instead chose to recharacterize certain of K2's recommended, future-looking enhancements as regulatory deficiencies.

93.     K2, per industry standards, considered BSJI's entire risk profile in reaching its conclusions.  For example, BSJI was forced to reduce or "de-risk" its retained account base by 97% from December 31, 2018, to March 31, 2023.  With so few accounts, and with so few incoming transactions over the course of a year – fewer than one or two a day – BSJI represents a far smaller risk profile than almost all financial institutions across the country.  Whereas the typical financial institution must rely on computer analytics to discover anomalies among its customers, BSJI's compliance team knows its customers, understands the businesses they are in, and can and

does evaluate *in real time* the transactions when made.  Simply put, the compliance program for a bank with tens of thousands of customers and potentially hundreds of thousands of transactions annually should be and is very different than a bank with a small number of customers and fewer than 300 wire transfers each year.

94.     In this respect, the FRBNY found the fact that BSJI had not filed any Suspicious Activity Reports ("SAR") in the last two years is an indication of "weakness in BSJI's compliance program."  The FRBNY, however, did not point to a single transaction for which a SAR should have been filed.  The Financial Crimes Enforcement Network ("FinCEN") surely has not warned (much less fined) BSJI for failing to flag a transaction for which a SAR should have been filed. That is not surprising given the exceedingly low number of transactions that pass through BSJI and the fact that each transaction, unlike at the majority of financial institutions, is capable of being reviewed – and is reviewed – in real time.

95.     As it turns out, BSJI's compliance committee, in the ordinary course, had been working on implementing many of K2's recommendations when the FRBNY sent its April 24, 2023 letter advising BSJI of the FRBNY's intent to close the master account.  Of the FRBNY's 16-bullet points in the April 24, 2023 letter, 13 of them relate directly to K2's recommended enhancements (re-labeled by the FRBNY as either "deficiencies", "concerns" or "programmatic weaknesses").  The BSJI compliance committee has taken steps to remedy each and every one of the 13 as of this date, and K2 is currently engaged to validate that each has in fact been remedied to K2's high standards.  As of this date, K2 has already validated 10 of the 13, and K2 will continue to work with BSJI in the next several weeks to complete its validation process.  These measures will further bolster an already strong compliance program in anticipation of BSJI's eventual, deliberate growth pursuant to its business plan over the next several years.  Additionally, K2 is

just now devoting resources to conduct its annual audit of BSJI's BSA/AML and OFAC functions, with a review date ending on June 30, 2023.

96.    With its April 24, 2023 letter referencing the "totality of [the FRBNY's] concerns" consisting of 16 bullet points, the FRBNY's calculus should have materially changed when advised that BSJI has been in the process of addressing K2's recommended enhancements and that K2 is in the process of validating those measures.  Put another way, more than 80 percent of the FRBNY's concerns should have been put to rest because those purported concerns were outdated. Instead, in an ensuing June 20, 2023 phone call with BSJI, the grounds upon which the FRBNY's decision rested shifted yet again, with the FRBNY not relying at all on the K2 so-called deficiencies, but now and instead on alleged transactions of "shell companies" in "high-risk" jurisdictions.  Not surprisingly, the FRBNY did not identify any particular customer or any particular set of transactions as indicative of supposed illicit activity.  But as BSJI laid out in detail in its June 27, 2023 letter responding to the FRBNY's "unspecified shell company" rationale, none of BSJI's accounts involves "shell companies," and BSJI knows and understands the business of each of its customers as part of its enhanced due diligence.

97.    In its submissions to the FRBNY, BSJI has provided an exhaustive response to the April 24, 2023 letter, painstakingly detailing BSJI's recent compliance efforts, the FRBNY's failure to account for BSJI's exceedingly modest risk profile, small retail customer base, and limited transaction volume, and the faulty assumptions upon which the FRBNY's contentions – particularly, that BSJI posed an undue risk to the overall economy – rested.  These submissions, by any measure, should have put any legitimate concerns the FRBNY might have had to rest or, at a minimum, encouraged the FRBNY to engage BSJI in dialogue.

98.     The FRBNY, however, did not act in good faith.  Instead, three days after BSJI provided information about each of its customers (since the FRBNY failed to identify which particular customer(s) the FRBNY had concerns about), on June 30, 2023, the FRBNY sent a third termination letter, in which the FRBNY both mandated that BSJI's account would be closed on July 31, 2023 and lobbed new allegations concerning unspecified "high-risk transaction typologies" it claimed were "suggestive" of illicit activity.  BSJI nevertheless continued to seek a constructive dialogue with the FRBNY.  In a response dated July 7, BSJI noted that the vague nature of the FRBNY's latest round of allegations prevented BSJI from offering a substantive response, and that BSJI was more than willing to address any of the FRBNY's concrete concerns. As before, these efforts were rebuffed.  After a year-long saga marked by consistently unreasonable and bad-faith action on the part of the FRBNY, and with the bank's master account and lifeline at stake, it has now been forced to bring suit.

99.     The wholly arbitrary nature of the FRBNY's decision is all the more apparent when contrasted with its actions towards other financial institutions.  Indeed, just days ago, the FRBNY simply imposed a consent decree and financial penalty against Deutsche Bank for its lack of "adequate BSA/AML internal controls" and its "insufficient progress" in reducing compliance risk with respect to money laundering and sanctions violations – strikingly similar conclusions to the allegations it has lodged against BSJI.[5]  But there are in fact two differences.  First, there have been actual findings against Deutsche Bank for violations of law, including for sanctions violations.  Second, there is no hint that Deutsche Bank has been accused of posing an undue risk to the overall economy or that its master account is being terminated.  Simply, the FRBNY has

---

[5] Board of Governors of the Federal Reserve System, *Federal Reserve Board announces two enforcement actions against Deutsche Bank AG, its New York branch, and other U.S. affiliates* (July 19, 2023) *available at* https://www.federalreserve.gov/newsevents/pressreleases/enforcement20230719a.htm.

taken drastically different approaches as to a small IBE in Puerto Rico compared to a large financial institution, taking no action against Deutsche Bank's master account, despite it being a far larger bank (that actually might affect the overall economy) with a less stringent compliance system.

100.    It cannot be overstated that BSJI's actions in (i) implementing a rigorous (and expensive) compliance program, (ii) engaging multiple outside advisors to examine and improve its operations, (iii) providing a seemingly endless stream of submissions to the FRBNY, and (iv) offering to accommodate every FRBNY request at every turn, are hardly the actions one would expect of a bank engaged in illicit, "high-risk transactions."  And with good reason: BSJI is the exact opposite of such a bank.

## VII.   THE BOARD'S INVOLVEMENT IN THE FRBNY'S UNLAWFUL DECISION TO TERMINATE BSJI'S MASTER ACCOUNT

101.    The decision to terminate BSJI's master account was not made by the FRBNY alone.  The Board, which has expressly endorsed the FRBNY's claim to discretion over BSJI's master account and issued "Guidelines" purporting to provide transparency as to how that discretion is applied, is also driving the decision.

102.    Historically, the Board has been silent as to the topic of master account eligibility given that, as detailed above (*supra at* ¶ 9), the right of a statutorily-eligible institution[6] to a master

---

[6]  BSJI is a "nonmember depository institution" within the meaning of 12 U.S.C. § 248a(c)(2) and is thus a statutorily-eligible institution.  The term "depository institution" means "any insured bank as defined in Section 3 of the Federal Deposit Insurance Act of 1933, as amended [12 U.S.C. § 1813] (the "FDI Act") or any bank which is eligible to make application to become an insured bank under Section 5 of such the FDI Act [12 U.S.C. § 1815]."  12 U.S.C. § 461(b)(1)(A)(i).  The term "bank," in turn, means "any insured or noninsured bank, as defined in Section 3 of the Federal Deposit Insurance FDI Act [12 U.S.C. § 1813]."  Id. § 461(b)(1)(B).  Section 3 of the Federal Deposit Insurance Act FDI Act defines "noninsured bank" as "any bank the deposits of which are not . . . insured," 12 U.S.C. § 1813(h), where "bank" means, as relevant here, "any bank, banking association, trust company, savings bank, industrial bank . . . , or other banking institution which—(A) is engaged in the business of receiving deposits, other than trust funds . . .; and (B) is incorporated under the laws of any State [or Puerto Rico] . . . ."  12 U.S.C. § 1813(a)(1)–(3).  BSJI is a banking institution engaged in the business of receiving deposits and is incorporated under the laws of Puerto Rico.  HJV Decl. ¶ ___.  As such, it is eligible to become an insured bank under 12 U.S.C. § 1815

account had been a matter of accepted fact.  However, and in concert with the FRBNY's (as well as other Federal Reserve Banks') reimagination of the scope of their authority, the Board developed and issued Guidelines that purport to clarify the factors Federal Reserve Banks consider in determining whether an entity should be allowed master account access.  The Board issued final guidelines on August 15, 2022 (the "Guidelines"), after the FRBNY had determined it would terminate BSJI's master account access on the basis of an allegedly missed deadline.  *See* Bd. of Govs. Of Fed. Rsrv. Sys., *Guidelines for Evaluating Account and Service Requests*, 87 Fed. Reg. 51,0999 (August 15, 2022).

103.    The Guidelines state that the Federal Reserve Banks, including the FRBNY, have ultimate decision-making discretion on master account access, though the Board made clear that it retains full responsibility for "interpreting the provisions of the [Federal Reserve] Act concerning legal eligibility."  *Id.* at 51,103 n. 11.  Given that the FRBNY operates under the "general supervision authority" of the Board (*id.* at 51,106) and can exercise only that authority which has been delegated to it by the Board (setting aside express congressional delegations to the Federal Reserve Bank), the Board's interpretation of the scope of the FRBNY's authority both enabled and empowered the FRBNY in its decision to terminate BSJI's master account.  Moreover, it is hard to envision how a decision to close BSJI's master account is not a decision concerning "legal eligibility," which puts this decision squarely in the Board's bailiwick.

104.    The Guidelines articulate six "Principles" that Federal Reserve Banks should consider in assessing whether an institution merits access to a Federal Reserve Account. Of particular significance here, Principle 5 of the Guidelines directs Federal Reserve Banks to consider whether "[provision of an account and services to an institution should not create undue

---

and is therefore a "depository institution" within the meaning of 12 U.S.C. § 248a(c)(2). http://www.federalreserve.gov/paymentsystems/pfs_standards htm

risk to the overall economy by facilitating activities such as money laundering, terrorism, financing, fraud, cybercrimes, economic and trade sanctions violates, or other illicit activity." *Id.* at 51,109. The FRBNY predicated its decision to terminate BSJI's master account expressly upon Principal 5.

105. The Board has likewise acted to improperly validate the breadth of the FRBNY's claimed authority specifically with respect to BSJI. Following the FRBNY's July 2022 termination decision, Mr. Isaac, on behalf of BSJI, contacted the Board in August 2022 concerning the impropriety of the FRBNY's decision. Mr. Issac further requested that the Board intervene both to prevent the FRBNY's unlawful conduct and to resolve the dispute amicably. The Board demurred, making clear that pursuant to their supervision and direction, the FRBNY holds ultimate "discretion over BSJI's master account and access to Federal Reserve services."

## VIII. BSJI'S CONSISTENT DISPLAYS OF GOOD FAITH

106. As is plain from above, BSJI boasts experienced management and extraordinary consultants on whom BSJI has relied for years and who have validated the strength of BSJI's compliance program. Among all those familiar with BSJI, the FRBNY is an outlier, not only as to its conclusions, but its total failure to even engage in a dialogue with BSJI.

107. One such BSJI consultant is Chris Laursen, former Manager of Risk Policy and Guidance for the Federal Reserve Board, as Head of Trading and Capital Markets Risk within the Market and Liquidity Section of the Board of Governors. Mr. Laursen has affirmed that "BSJI's BSA/AML and OFAC Program is better developed than the programs of larger banks with a substantially greater number of customers, assets, accounts, transactions, and activity types."

108. The former Chairman of the FDIC, William Isaac, similarly affirms that he "find[s] the FRBNY's mistreatment of BSJI to be among the worst that I have seen in the industry, in light of BSJI's inordinate expenditure of resources and absolute commitment to satisfy the FRBNY's

every concern. There is no reason why the FRBNY could not have identified any alleged new concerns and afforded BSJI a reasonable opportunity to remedy any purported shortcomings – which is what the guidelines published in August 2022 by the Board of Governors of the Federal Reserve System provide for before a Reserve Bank such as the FRBNY opts for account closure."

109.    Independent third parties have likewise affirmed the merit of BSJI's compliance systems.  In 2023, BSJI acquired (the "2023 Broker Dealer Investment") a 40% equity interest in Intelligenics Inc., which is the sole stockholder of Insight Securities Inc., Highland Park, Illinois ("Insight Securities").  Insight Securities is registered with the U.S. Securities and Exchange Commission as a securities broker dealer, and Insight is a FINRA member firm.  Intelligenics Inc. has over $1,500 million in assets under providing securities brokerage and financial services to customers across the United States and Latin America.  Under FINRA rules, the 2023 Broker Dealer Investment by BSJI required the prior approval of FINRA.  FINRA conducted a rigorous review – which lasted approximately six months – of BSJI and its sole stockholder, Mr. Marcelino Bellosta.  FINRA was satisfied with BSJI and Mr. Bellosta and approved the Investment.

110.    Likewise, credit card network VISA, as a condition to providing credit card services for BSJI, engaged Kaufman Rossin & Co. P.A. ("Kaufman Rossin") to review the BSJI BSA/AML compliance program.  Kaufman Rossin issued a BSA/AML and OFAC compliance program report in 2022 that concluded



VISA

it consequently entered into a credit card program services agreement with BSJI earlier this year.

## COUNT I

**VIOLATION OF THE APA, 5 U.S.C. § 706**

**(AGAINST DEFENDANTS FRBNY AND THE BOARD)**

111.    All prior paragraphs are incorporated as if fully set forth here

112.    Under Section 706 of the APA, "[t]o the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall . . . hold unlawful and set aside agency action findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706.

113.    The FRBNY and the Board are federal agencies for purposes of the APA.

114.    The FRBNY and the Board are mandated by 12 U.S.C. § 248 to provide Federal Reserve bank services, including access to a master account, to all eligible "depository institutions" on a non-discretionary basis.  BSJI satisfies the statutory requirements for eligibility.  Their failure to fulfill this statutory mandate amounts to arbitrary and capricious action in violation of the APA.

115.    Yet even assuming that the FRBNY and the Board possess some level of discretion concerning master account access, their actions here are patently improper. As detailed in the Complaint, the decision to terminate BSJI's account is arbitrary, capricious, an abuse of discretion, and/or otherwise not in accordance with law.  The decision was made without fair notice nor any real opportunity for hearing. Moreover, the decision (like the two that preceded it) is based on an incomplete and inaccurate assessment of BSJI, lacks any reasonable basis, and is disproportionate to the claimed compliance-related issues the FRBNY has cited, particularly in light of the fact that those purported issues have been remediated.

116.    In particular, the finding that BSJI poses an undue risk to the overall economy is arbitrary and capricious, and contrary to law, in light of, among other things, (i) BSJI's small footprint and ███████████████████████████████████████████████

████████████ and by several different BSA/AML/Sanctions audit firms who conducted on-the-ground analysis.

117. Accordingly, the FRBNY and the Board's decision to terminate BSJI's master account and, more generally, Federal Reserve services, is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, in violation of 5 U.S.C. § 706(2)(A).

## COUNT II

**Relief Under the Mandamus Act, 28 U.S.C. § 1361**
**(AGAINST DEFENDANTS FRBNY AND THE BOARD)**

118. All prior paragraphs are incorporated as if fully set forth here.

119. Under 28 U.S.C. § 1361, "[t]he district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." Here, BSJI requests that this Court issue a writ of mandamus to the FRBNY and the Board to fulfill their nondiscretionary duty to provide BSJI with master account access and Federal Reserve services.

120. This Court has jurisdiction over BSJI's claim under the Mandamus Act.

121. The FRBNY and the Board are federal agencies for purposes of a claim under 28 U.S.C. § 1361, and are subject to the mandamus power of this Court.

122. Mandamus is here appropriate given that BSJI is entitled by law to a master account. Pursuant to 12 U.S.C. § 248, Federal Reserve services "shall be available" to all eligible depository institutions on a non-discretionary basis. BSJI satisfies the statutory criteria for eligible depository institutions, and Federal Reserve services are only available through a master account. The FRBNY and/or the Board consequently have a clear nondiscretionary duty to provide BSJI with continuing access to its master account and the associated Federal Reserve services.

123.     Mandamus is necessary in this case because BSJI has exhausted its administrative remedies.  BSJI has constantly attempted to engage the FRBNY in discussions concerning its master account, in an effort to reach an amicable resolution.  Yet the FRBNY has unequivocally stated that BSJI's master account will be terminated on July 31, 2023.  The Board has refused to intervene to FRBNY's unlawful conduct and to resolve the dispute amicably, instead taking the position that the FRBNY holds ultimate "discretion over BSJI's master account and access to Federal Reserve services."

124.     Without a master account, BSJI will suffer substantial injury.  BSJI will no longer be able to effectively function as a depository institution (*see supra* at ¶ 40), and is all but certain to experience a terminal loss of business and clients.

## COUNT III

**DECLARATORY JUDGMENT OF BSJI'S RIGHT TO A MASTER ACCOUNT UNDER 12 U.S.C. § 248A(C)(2) (AGAINST DEFENDANTS FRBNY AND THE BOARD)**

125.     All prior paragraphs are incorporated as if fully set forth here.

126.     An actual controversy exists within this Court's jurisdiction concerning the interpretation and application of 12 U.S.C. § 248 and related statutes, regulations, and policy pronouncements, such that the Court should declare the rights of BSJI.

127.     BSJI asserts this claim under 28 U.S.C. § 2201(a), which provides that "[i]n the case of an actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration."

128.     An actual controversy exists in the present case.  The FRBNY and the Board are mandated by 12 U.S.C. § 248 to provide Federal Reserve bank services, including access to a

master account, to all eligible "depository institutions" on a non-discretionary basis.  The FRBNY and the Board act jointly to satisfy this statutory obligation: the FRBNY engages directly with applicant entities, and the Board is obligated to exercise its supervisory authority concerning such applications.

129.    BSJI satisfies the statutory requirements for eligibility, and as the Supreme Court's recent opinion in *Biden v. Nebraska* demonstrates, the Board and the FRBNY lack the power to unilaterally expand the scope of authority delegated to it by Congress.  Yet the FRBNY has, in violation of its statutory obligations, arbitrarily decided to terminate BSJI's master account, effective July 31, 2023, foreclosing BSJI's much-needed access to FRBNY services.

130.    This controversy arises in the Court's jurisdiction. The FRBNY resides in New York and many of the events giving rise to this claim have occurred in New York, including the FRBNY's decision to terminate BSJI's master account.

131.    Through this Complaint, BSJI has filed an appropriate pleading to have its rights declared. The Court can resolve this controversy by declaring that the effectuation of the FRBNY's and the Board's decision to terminate BSJI's master account would violate BSJI's statutory right to a master account and corresponding FRBNY services.

132.    Accordingly, BSJI seeks a declaration from this Court that BSJI has a right to its master account and that the termination of BSJI's master account under the present circumstances and on this record would be contrary to the statutory obligations of the FRBNY and the Board.

## COUNT IV

**DECLARATORY JUDGMENT THAT THE FRBNY'S MASTER ACCOUNT TERMINATION WOULD VIOLATE THE FIFTH AMENDMENT'S DUE PROCESS CLAUSE (AGAINST DEFENDANTS FRBNY AND BOARD)**

133.    All prior paragraphs are incorporated as if fully set forth here.

134.    BSJI has a property interest in the master account and the continued operation of the Bank.  The Due Process clause of the Fifth Amendment to the United States Constitution protects that property interest against irrational, arbitrary, or capricious deprivations by federal instrumentalities.

135.    The Due Process clause also requires that the FRBNY and the Board afford BSJI adequate procedures, including but not limited to, a meaningful opportunity to be heard, before terminating the master account.  BSJI has been afforded no such procedures. Instead, BSJI not only had no opportunity to be heard, but no notice at all prior to being advised that its master account would be closed and its access to other Federal Reserve System services would be terminated.  On information and belief, the FRBNY's refusal to afford BSJI adequate procedures is also based, in part, on a targeted effort by the FRBNY to prevent all IBEs from maintaining, or being granted access to, master accounts.

136.    Accordingly, BSJI seeks a declaration from this Court that the FRBNY's and the Board's termination of BSJI's master account and, more generally, of BSJI's access to Federal Reserve services, if effectuated, under the present circumstances and on this record would violate the Due Process clause of the Fifth Amendment to the United States Constitution.

<u>**COUNT V**</u>

**DECLARATORY JUDGMENT THAT THE FRBNY'S MASTER ACCOUNT TERMINATION WOULD BREACH ITS CONTRACTUAL DUTY OF GOOD CARE (AGAINST DEFENDANT FRBNY)**

137.    All prior paragraphs are incorporated as if fully set forth here.

138.    BSJI's master account opened on April 5, 2012, pursuant to a Foreign Banking Institution Account Agreement between BSJI and the FRBNY.  The Account Agreement is governed by New York law and incorporates "all the provisions" of Operating Circular No. 1.

Operating Circular No. 1, in turn, sets "forth the terms under which a Financial Institution may open, maintain, and terminate a Master Account with" a Federal Reserve Bank.

139.    Operating Circular No. 1 imposes upon the FRBNY a "duty of care," under which it is responsible for "actual damages incurred by the Account Holder and proximately caused by the Reserve Bank's lack of good faith and failure to exercise ordinary care."

140.    The FRBNY's arbitrary decision to close BSJI's account, first based on its "media reports" rationale, next on its "phantom deadline" claim, then on a "forward-looking enhancements are deficiencies" basis, and finally on an "unspecified shell company" theory, breaches the contractual duty of care it owes to BSJI.

141.    Accordingly, BSJI seeks a declaration from this Court that the FRBNY's termination of BSJI's master account, if effectuated, under the present circumstances and on this record would breach the FRBNY's contractual duty of care to BSJI.

## COUNT VI

### DECLARATORY JUDGMENT THAT THE FRBNY'S MASTER ACCOUNT TERMINATION WOULD BREACH THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING (AGAINST DEFENDANT FRBNY)

142.    All prior paragraphs are incorporated as if fully set forth here.

143.    BSJI's master account opened on April 5, 2012, pursuant to a Foreign Banking Institution Account Agreement between BSJI and the FRBNY.  The Account Agreement is governed by New York law and incorporates "all the provisions" of Operating Circular No. 1. Operating Circular No. 1, in turn, sets "forth the terms under which a Financial Institution may open, maintain, and terminate a Master Account with" a Federal Reserve Bank.  It is also governed by New York law.

144.    BSJI and the FRBNY's agreements incorporate the covenant of good faith and fair dealing implied in every contract governed by New York law.  This requirement includes an obligation that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.  The FRBNY's arbitrary decision to close BSJI's master account – an account to which it is legally entitled – first based on its "media reports" rationale, next on its "phantom deadline" claim, then on a "forward-looking enhancements are deficiencies" basis, and finally on an "unspecified shell company" theory, breaches the contractual duty of care it owes to BSJI and clearly frustrates BSJI's ability to enjoy the fruits of the Account Agreement.

145.    Accordingly, BSJI seeks a declaration from this Court that the FRBNY's termination of BSJI's master account, if effectuated, under the present circumstances and on this record would violate the covenant of good faith and fair dealing.

### REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

A. Enter a  declaratory judgment, pursuant to 28 U.S.C. § 2201, that Defendants' decision to terminate BSJI's master account, if effectuated, would (i) violate FRBNY and the Board's statutory obligations; (ii) constitute arbitrary and capricious action, be an abuse of discretion, and/or otherwise not in accordance with law under the APA; (iii) violate BSJI's right to Due Process; (iv) breach the FRBNY's contractual duty of care; and (v) constitute a breach of the implied covenant of good faith and fair dealing implied in BSJI's contract with the FRBNY;

B.      Issue a writ of mandamus ordering the FRBNY and the Board to continue to provide access to its master account and to Federal Reservice services;

C.      Preliminarily and permanently enjoin the FRBNY and the Board from terminating

BSJI's master account and BSJI's access to Federal Reserve services on the basis of the issues

raised by the FRBNY in its letters to BSJI to date;

D.      Award Plaintiff reasonable costs, attorneys' fees, and expenses under the Equal

Access to Justice Act, 28 U.S.C. § 2412; and

E.      Award such further relief as this Court deems appropriate.


Dated: July 24, 2023                                    Respectfully submitted,

                                                        Abbe David Lowell
                                                        Kelly A. Librera
                                                        ADLowell@winston.com
                                                        KLibrera@winston.com
                                                        WINSTON & STRAWN LLP
                                                        200 Park Avenue
                                                        New York, NY 10166
                                                        T: 1-212 294-6700
                                                        F: 1-212-294-4700

                                                        *Counsel for Banco San Juan Internacional,
                                                        Inc.*