**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

BANCO SAN JUAN INTERNACIONAL, INC.,

*Plaintiff*,

v.                                                          Case No. 1:23-cv-06414-JGK

THE FEDERAL RESERVE BANK OF NEW YORK
AND THE BOARD OF GOVERNORS OF THE
FEDERAL RESERVE SYSTEM

*Defendants*.

## MEMORANDUM OF LAW IN SUPPORT OF BSJI'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ............................................................................................. 1

STATEMENT OF FACTS ................................................................................................... 5

I.      BSJI ............................................................................................................................ 5

II.     BSJI'S DEPENDENCE ON ITS MASTER ACCOUNT AND THE
        SUBSTANTIAL SYSTEMS AND CONTROLS IT HAS IMPLEMENTED TO
        PROTECT IT ............................................................................................................. 6

        A.      The FRBNY's temporary suspension of BSJI's account in 2019 ...................... 6

        B.      BSJI's extensive efforts to enhance its internal controls and protect its
                master account ................................................................................................. 7

        C.      The FRBNY, in recognition of BSJI's extensive efforts, reinstates BSJI's
                master account ................................................................................................. 8

III.    BSJI'S 2021 REPORTS FOR THE FRBNY AND ITS PREPARATION FOR THE
        2022 SUBMISSIONS ................................................................................................ 9

IV.     THE FRBNY'S PRETEXTUAL BASIS FOR CLOSURE OF THE MASTER
        ACCOUNT AND ENSUING PAUSE OF THAT DECISION .................................... 10

V.      THE BOARD'S VALIDATION OF THE FRBNY'S UNFETTERED CLAIMS TO
        DISCRETION .......................................................................................................... 12

VI.     THE FRBNY CONCOCTS ADDITIONAL PRETEXTUAL GROUNDS FOR
        CLOSING BSJI'S MASTER ACCOUNT .................................................................. 12

ARGUMENT .................................................................................................................... 14

I.      BSJI WILL SUFFER IRREPARABLE HARM ........................................................... 15

II.     BSJI IS LIKELY TO SUCCEED ON THE MERITS OR, AT A MINIMUM,
        RAISES SERIOUS QUESTIONS THAT ARE FAIR GROUND FOR
        LITIGATION ............................................................................................................ 17

        A.      Likelihood of Success on the Merits ................................................................ 18

                1.      BSJI Has a Nondiscretionary Statutory Right to a Master Account ......... 18

                2.      The FRBNY and the Board Cannot Terminate Master Accounts on
                        Arbitrary Grounds ................................................................................... 22

                3.      Terminating the Master Account Would Violate BSJI's Right to Due
                        Process .................................................................................................... 26

                4.      Terminating the Master Account Would Breach FRBNY's
                        Contractual Duty of Care and the Duty of Good Faith and Fair
                        Dealing .................................................................................................... 27

        B.      Serious Questions Present Fair Ground for Litigation ...................................... 28

III.    THE PUBLIC INTEREST FAVORS GRANTING AN INJUNCTION ........................ 29

CONCLUSION ................................................................................................................. 31

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*511 W. 232nd Owners Corp. v. Jennifer Realty Co.*,
   98 N.Y.2d 144 (2002) ..................................................................................... 6

*A.T. by & through Tillman v. Harder*,
   298 F. Supp. 3d 391 (N.D.N.Y. 2018).......................................................... 29

*Abdul Wali v. Coughlin*, 754 F.2d 1015 (2d Cir. 1985), *overruled on other grounds*,
   *United States v. Thorn*, 317 F.3d 107 (2d Cir. 2003).......................................... 14

*AIM Int'l Trading LLC v. Valcucine SpA.*,
   188 F. Supp. 2d 384 (S.D.N.Y. 2002).......................................................... 29

*Airbnb, Inc. v. City of New York*,
   373 F. Supp. 3d 467 (S.D.N.Y. 2019)........................................................... 17

*Allentown Mack Sales & Serv., Inc. v. N.L.R.B.*,
   522 U.S. 359 (1998) ...................................................................................... 23

*Barrows v. Burwell*,
   777 F.3d 106 (2d Cir. 2015) .......................................................................... 26

*Beckles v. United States*,
   580 U.S. 256 (2017)....................................................................................... 26

*Bell & Howard: Co. v. Masel Supply Co. Corp.*,
   719 F.2d 42 (2d Cir. 1983) ............................................................................ 15

*Biden v. Nebraska*,
   143 S. Ct. 2355 (2023).............................................................................4, 22

*Bhd. of Locomotive Eng'rs v. Missouri-Kansas-Texas R.R. Co.*,
   363 U.S. 528 (1960)........................................................................................ 31

*Brenntag Int'l Chem., Inc. v. Bank of India*,
   175 F.3d 245 (2d Cir. 1999) .......................................................................... 15

*Broker Genius, Inc. v. Volpone*,
   313 F. Supp. 3d 484 (S.D.N.Y. 2018) ......................................................17, 29

*Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*,
   598 F.3d 30 (2d Cir. 2010) ....................................................................17, 18, 28

*City of Brookings Mun. Tel. Co. v. FCC*,
  822 F.2d 1153 (D.C. Cir. 1987) ........................................................................ 26

*Custodia Bank, Inc. v. Fed. Rsrv. Bd. of Governors*,
  No. 22-CV-00125 (D. Wyo. June 8, 2023) .................................................. 4, 19

*Dong v. Smithsonian Inst.*,
  125 F.3d 877 (D.C. Cir. 1997) ........................................................................ 23

*Eng v. Smith*,
  849 F.2d 80 (2d Cir. 1988) .............................................................................. 17

*F. & M. Schaefer Corp. v. C. Schmidt & Sons, Inc.*,
  597 F.2d 814 (2d Cir. 1979) ............................................................................ 28

*Flight Int'l Group, Inc. v. Fed. Rsrv. Bank of Chic.*,
  583 F. Supp. 674 (N.D. Ga. 1984), *vacated on other grounds*, 597 F. Supp. 462
  (N.D. Ga. 1984) ................................................................................................ 23

*Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kansas City*,
  861 F.3d 1052 (10th Cir. 2017) ................................................................. *passim*

*Frank Brunckhorst Co. v. G. Neileman Brewing Co., Inc.*,
  875 F. Supp. 966 (E.D.N.Y. 1994) .................................................................. 15

*Greater Buffalo Press, Inc. v. Fed. Reserve Bank of N.Y.*,
  866 F.2d 38 (2d Cir. 1989) .............................................................................. 21

*John B. Hull, Inc. v. Waterbury Petroleum Prods., Inc.*,
  588 F.2d 24 (2d Cir. 1978) .............................................................................. 16

*Judulang v. Holder*,
  565 U.S. 42 (2011) ........................................................................................... 24

*Kapps v. Wing*,
  404 F.3d 105 (2d Cir. 2005) ............................................................................ 26

*Ky. Dep't of Corr. v. Thompson*,
  490 U.S. 454 (1989) ......................................................................................... 26

*L.V.M. v. Lloyd*,
  318 F. Supp. 3d 601 (S.D.N.Y. 2018) ............................................................. 18

*League of Women Voters of U.S. v. Newby*,
  838 F.3d 1 (D.C. Cir. 2016) ............................................................................ 31

*Lee Const. Co., Inc. v. Fed. Rsrv. Bank of Richmond*,
  558 F. Supp. 165 (D. Md. 1982) ...................................................................... 23

*Lopez v. Davis*,
   531 U.S. 230 (2001)...................................................................................20

*M/A–COM Sec. Corp. v. Galesi*,
   904 F.2d 134 (2d Cir. 1990)....................................................................27

*Mfrs. Ry. Co. v. Surface Transp. Bd.*,
   676 F.3d 1094 (D.C. Cir. 2012)..............................................................24

*Michigan v. EPA*,
   576 U.S. 743, 758 (2015).........................................................................24

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983)............................................................................23, 25

*Otero Sav. & Loan Ass'n v. Bd. of Governors of Fed. Rsrv. Sys.*,
   497 F. Supp. 370 (D. Colo 1980)............................................................15

*Red Earth LLC v. United States*,
   657 F.3d 138, 143 (2d Cir. 2011)............................................................15

*Register.com, Inc. v. Verio, Inc.*,
   356 F.3d 393 (2d Cir. 2004)....................................................................16

*Reuters Ltd. v. United Press Int'l*,
   903 F.2d 904 (2d Cir. 1990)....................................................................16

*Rex Med. L.P. v. Angiotech Pharm. (US), Inc.*,
   754 F. Supp. 2d 616 (S.D.N.Y. 2010) ...............................................16, 17

*Roso-Lino Beverage Distributors, Inc. v. Coca-Cola Bottling Co. of NY*,
   749 F.2d 124 (2d Cir. 1984)....................................................................29

*RxUSA Wholesale, Inc. v. Dep't of Health & Hum. Servs.*,
   467 F. Supp. 2d 285 (E.D.N.Y. 2006) ...............................................15, 16

*New York ex rel. Schneiderman v. Actavis PLC*,
   787 F.3d 638 (2d Cir. 2015)....................................................................29

*Somoza v. NYC Dep't of Educ.*,
   No. 06 CIV. 5025 (VM), 2006 WL 1981758 (S.D.N.Y. July 10, 2006) ..............................15

*Thyroff v. Nationwide Mut. Ins. Co.*,
   460 F.3d 400 (2d Cir. 2006)....................................................................27

*TVT Recs. v. Island Def Jam Music Grp.*,
   244 F. Supp. 2d 263, 278 (S.D.N.Y. 2003)............................................28

*United Techs. Corp. v. U.S. Dep't of Def.*
  601 F.3d 557, 562 (D.C. Cir. 2010) ................................................................ 26

*Westchester Legal Servs., Inc. v. Westchester Cnty.*,
  607 F. Supp. 1379 (S.D.N.Y. 1985) ............................................................... 18

*Wisdom Imp. Sales Co. v. Labatt Brewing Co.*,
  339 F.3d 101, 113 (2d Cir. 2003) ................................................................... 15

*Bank of Am., N.A. v. Won Sam Yi*,
  294 F. Supp. 3d 62 (W.D.N.Y. 2018) ............................................................ 31

**Statutes**

5 U.S.C. § 551(1) ................................................................................................... 23

5 U.S.C. § 706(2)(A) .............................................................................................. 23

12 U.S.C. § 248a ............................................................................................. *passim*

12 U.S.C. § 461(b)(1) ............................................................................................ 20

12 U.S.C. § 1813 .................................................................................................... 20

12 U.S.C. § 1815 .................................................................................................... 20

**Other Authorities**

126 Cong. Rec. 6250 (1980) .................................................................................. 21

A. Kuprianov, *The Monetary Control Act and the Role of the Federal Reserve in
  the Interbank Clearing Market*, Econ. Rev. (July/Aug. 1985) ........................... 19

Fed. R. Civ. P. 65 ..................................................................................................... 1

Fed. Reserve Sys., *Policies: Standards Related to Priced-Service Activities of the
  Federal Reserve Banks* (1984) ....................................................................... 20

FRBNY, Annual Report: 1980 at 35 (1981) .......................................................... 21

Fred H. Miller, Robert G. Ballen, & Hal S. Scott, *Commercial Paper, Bank
  Deposits and Collections, and Commercial Electronic Fund Transfers*,
  39 Bus. Law 1333 (1984) ............................................................................... 21

H.R. Rep. No. 95-1590 (1978) ............................................................................... 21

http://www.federalreserve.gov/paymentsystems/pfs_frpaysys.htm .......................... 21

http://www.federalreserve.gov/paymentsystems/pfs_standards.htm ......................... 21

Puerto Rico, *Bank Of San Juan Internacional, Inc. and The U.S. Attorney's Office
    For The District Of Puerto Rico Resolve Pending Litigation And Related
    Matters* (Feb. 11, 2020)..................................................................................................6

Reuters, *Exclusive: New York Fed Cracks Down on Puerto Rico Bank Following
    Venezuela Sanctions* (April 18, 2019)..............................................................................7

Thomas C. Baxter, Jr. & James H. Freis, Jr., *Fostering Competition in Financial
    Services: From Domestic Supervision to Global Standards*,
    34 New Eng. L. Rev. 57 (1999)......................................................................................21

Timothy K. Armstrong, *Chevron Deference and Agency Self-Interest*,
    13 Cornell J.L. & Pub. Pol'y 203 (2004)........................................................................21

Banco San Juan Internacional, Inc., a Puerto Rico international banking entity ("BSJI" or the "Bank"), respectfully submits this Memorandum of Law in Support of its Motion for Temporary Restraining Order and Preliminary Injunction (the "Motion"), pursuant to Federal Rule of Civil Procedure 65(a) and (b), to preserve the status quo and prevent the Federal Reserve Bank of New York ("FRBNY") and the Board of Governors of the Federal Reserve System (the "Board") from implementing a number of actions that would cause BSJI irreparable harm, including closing BSJI's master account and terminating BSJI's access to Federal Reserve System services. Absent grant of injunctive relief, the FRBNY and the Board will make it impossible for the Bank to function as a depository institution, which is all but certain to result in the Bank's demise.

## PRELIMINARY STATEMENT

BSJI, a master account holder with the FRBNY since 2012, brings this Motion to enjoin the FRBNY and the Board from arbitrarily and unlawfully closing BSJI's master account and terminating its access to essential FRBNY services on July 31, 2023. The decision to close BSJI's master account contravenes the FRBNY's and the Board's statutory duty to provide access to master accounts, ignores Supreme Court precedent restricting executive branch agencies from unilaterally expanding their regulatory ambit, and violates their obligation to engage in reasoned decision-making. Indeed, the Board's and the Federal Reserve Banks' recent attempts to make themselves the sole, unchecked arbiters of master account access despite their statutory mandate to provide such services have attracted both Congressional and judiciary scrutiny. Yet, as the FRBNY's and the Board's actions here show, they remain undeterred, and BSJI's existence now hangs in the balance.

For the past four years, BSJI has worked in lockstep with the FRBNY to develop comprehensive internal controls and compliance systems, devoting both an immense amount of time and vast financial resources to complying with the FRBNY's every request and recommendation. BSJI's efforts culminated in the development of what one former FRBNY official described as a "front of the line" compliance system, many components of which were

1

mirrored in guidance the Board has since issued to other banks. Despite these Herculean efforts, after it changed its reason for doing so several times, the FRBNY informed BSJI on April 24 and June 30, 2023 (the "2023 Closure Letters") that the FRBNY would soon shutter BSJI's master account, allegedly due to "concerns" with this same compliance program.

The 2023 Closure Letters are the culmination of the FRBNY's dedicated campaign to close BSJI's master account. One year ago, in July of 2022, the FRBNY announced that it would permanently shutter BSJI's master account based on a purported failure to meet an alleged June 2022 filing deadline that, remarkably, *is not contained in any FRBNY guideline, letter, contract, or rule*. What's more, before that announcement, BSJI had twice requested in writing that the FRBNY clarify, in light of conflicting guidance, the due date for the filing. The FRBNY never responded, preferring instead to lie in wait only to announce, just weeks after its "phantom deadline" had purportedly passed, that BSJI's alleged failure to meet that date was grounds for termination of its master account. The Board – which is statutorily required to exercise supervisory authority over the FRBNY – blessed this decision and rebuffed BSJI's request that it intervene to prevent the FRBNY's unlawful action. In fact, the Board went so far as to state that the FRBNY has total "discretion" over BSJI's master account.

It was only after BSJI advised that it would bring the issue to court that the FRBNY backed down last year, informing BSJI that it would take additional time to "consider" whether it would reverse its termination decision. Unfortunately, the reprieve was only temporary. The FRBNY's April 24 and June 30, 2023 termination letters, grounded in stale data and baseless assertions, make clear that the FRBNY will not stop coming up with new reasons until BSJI is stripped of its master account.

The FRBNY's and the Board's actions underscore their belief that the FRBNY has the unfettered discretion to terminate, at its whim, a legally eligible institution's access to its master account and the corresponding Federal Reserve System services. This extraordinary interpretation of the power of a federal agency – or indeed, any federal instrumentality – finds no support in the Constitution, in federal statute or regulation, or in contract. On the contrary, each either entirely

negates or substantially limits the breadth of the FRBNY's discretion; at a minimum, they mandate that the FRBNY engage in reasoned, good faith, and non-arbitrary decision-making when exercising its authority.

The common-sense nature of this proposition is validated by the history of the Board, the Federal Reserve Banks, and governing law. Until recently, the fact that a legally eligible institution (like BSJI) had a right to a master account was both entirely uncontroversial and explicitly recognized by the Board and the Federal Reserve Banks. Only within recent years, seemingly in conjunction with the growing number of institutions, *unlike BSJI*, that service non-traditional industries (e.g., fintech firms or cryptocurrency firms) have these federal entities taken the position that they possess unchecked authority to grant or deny master accounts to legally eligible institutions.

In light of the FRBNY's refusal to change course, BSJI seeks judicial intervention to validate its right to a master account. Under the present unique circumstances, injunctive relief is wholly warranted. That BSJI will suffer irreparable harm from the closing of its master account is beyond serious debate. A master account is the gateway to crucial Federal Reserve Bank payment services, which are the backbone of the U.S. national banking system and dollar-denominated payments (all of BSJI's accounts are dollar-denominated). Without access to one, a depository institution is a mere vault, meaning BSJI will almost certainly be unable to meet its obligations to its depositors. BSJI is also particularly vulnerable, having been through this debilitating exercise before. The cumulative loss of customer goodwill and patronage will be inescapable and devastating and is well-settled to constitute irreparable harm.

More fundamentally, BSJI is likely to succeed on the merits or, at a minimum, show "serious questions" going to the merits of its claims. These conclusions follow *a fortiori* from the fact that the only federal circuit court judge to have addressed the issue conclusively determined that the Federal Reserve Banks cannot preclude legally eligible institutions, like BJSI, from accessing a master account. And, just last month, a sister district court relied on that case and found a triable question as to whether the Board and Federal Reserve Banks have any discretion

concerning master account access, a determination "based mostly" on the soundness of the federal circuit court's analysis. *Custodia Bank, Inc. v. Fed. Rsrv. Bd. of Governors*, No. 22-CV-00125 (D. Wyo. June 8, 2023), Dkt. 164 at 12. These decisions are in line with recent United States Supreme Court precedent condemning agency efforts to create "new [statutory] regime[s]" through overly broad interpretations of delegated statutory authority. *See Biden v. Nebraska*, 143 S. Ct. 2355, 2369 (2023).

But even if the FRBNY and the Board possess some level of discretion in master account-related decision making, their actions here can hardly be described as meeting their statutory obligations. Simply put, the FRBNY continues to conjure either unsupported or pretextual reasons to act against BSJI. And the FRBNY's shifting "rationales" for closing BSJI's master account – including a "phantom deadline" that the FRBNY could not be bothered to share with BJSI, a "forward-looking enhancements are deficiencies" rationale that fundamentally mischaracterized BSJI's compliance system, and an "unspecified shell company" theory devoid of any basis – speak volumes. The FRBNY's decision is, accordingly, patently unreasonable, *even if* it is permitted to exercise discretion concerning master account access; so too is the Board's failure to exercise its supervisory authority over the FRBNY, particularly where, as here, it is well aware of the FRBNY's dispute with BSJI and the plainly improper grounds on which it rests.

BSJI has repeatedly offered to engage constructively both with the FRBNY and the Board and accept, as it has always done, still additional limitations to address any reasonable concerns they might have, so long as BSJI can continue to serve its customers. Though the FRBNY and the Board lack the discretionary power they so vehemently claim, it was never the intent of BSJI to litigate the ambit of their statutory authority, and it remains readily willing to accommodate the FRBNY and the Board with the imposition of reasonable conditions on usage of the master account. They have declined all such efforts to reach an amicable resolution. The Bank is also amenable to any reasonable conditions this Court deems necessary to protect any legitimate interest the FRBNY and the Board might reasonably assert during the pendency of a temporary or preliminary injunction.

## STATEMENT OF FACTS[1]

I.     **BSJI**

BSJI, incorporated in 2011, is an international banking entity ("IBE") operating from one office in Guaynabo, Puerto Rico.  Under Puerto Rican law, the principal goal of IBEs is to attract United States and foreign investors to Puerto Rico.  Although that public policy purpose existed long before Hurricane Maria, the storm's extensive damage intensified the territory's pressing need for economic development.  BSJI primarily offers commercial and investment banking services.

BSJI operates under the regulation, supervision and examination of the Office of the Commissioner of Financial Institutions of Puerto Rico ("OCIF") with whom BSJI regularly consults and engages.  Declaration of Francisco Aponte ("FA Decl.") ¶ 2.  The Bank is not the subject of any litigation of any kind (regulatory or otherwise), or any actual or threatened U.S. federal or Commonwealth government enforcement actions or remedial decrees.  *Id.*  On the contrary, ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████.  BSJI's capital is well over any regulatory benchmark established by any U.S. federal regulator for a "well-capitalized" depository institution.  Declaration of Hector J. Vazquez ("HJV Decl.") ¶ 19.  As of July 13, 2023, the total stockholder's equity of BSJI represented more than 60% of the total assets of BSJI, and more than 76% of the total assets of BSJI is in cash and due from banks.  In short, BSJI is a financially strong depository institution.

More than 10 years ago, on April 5, 2012, pursuant to a Foreign Banking Institution Account Agreement between BSJI and the FRBNY, BSJI opened its master account with the FRBNY.  Declaration of Abbe D. Lowell ("ADL Decl.") Ex. 1.  The Account Agreement is governed by New York law and incorporates "all the provisions" of Operating Circular No. 1, Account Relationships.  *Id.* at 1 ("Operating Circular No. 1").  Operating Circular No. 1, in turn, sets forth the terms under which a Financial Institution may open, maintain, and terminate a Master

---

[1] BSJI incorporates by reference the Complaint in this action.

Account with a Federal Reserve Bank.  ADL Decl. Ex. 2.  Operating Circular No. 1 is also governed by New York law and incorporates a duty of care applicable to both the FRBNY and the contracting bank.  *Id.* § 7.4.  And because the Account Agreement is governed by New York law, the Account Agreement, like all other agreements governed by New York law, "impl[ies] a covenant of good faith and fair dealing in the course of its performance." *511 W. 232nd Owners Corp. v. Jennifer Realty Co.*, 98 N.Y.2d 144, 153 (2002).  This implied duty includes "a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract."  *Id.*

## II.    BSJI'S DEPENDENCE ON ITS MASTER ACCOUNT AND THE SUBSTANTIAL SYSTEMS AND CONTROLS IT HAS IMPLEMENTED TO PROTECT IT

### A.    The FRBNY's temporary suspension of BSJI's account in 2019

BSJI and the FRBNY worked collaboratively together for many years without incident.  In February 2019, however, the FRBNY suspended BSJI's master account, reacting to media reports regarding a federal investigation then being conducted regarding two loan facilities granted by BSJI, the first of which primarily benefitted New York Stock Exchange-listed Caterpillar Inc., in its business dealings with Petroleos de Venezuela S.A. ("PDVSA"), the Venezuelan state-owned oil and natural gas company.  These agreements were, as the investigating authorities ultimately concluded, "sophisticated" and perfectly lawful.[2]

The FRBNY's suspension decision, and the paper-thin "media reports" rationale that catalyzed it, were seemingly driven by a broader policy aimed at restricting master account access to Puerto Rican IBEs more broadly.  Public reporting following BSJI's suspension identified a February 27, 2019 letter from the FRBNY where it acknowledged its own policy of denying Puerto Rico IBEs master account access, purportedly "in light of recent events, including the expansion

---

[2] United States Attorney's Office, District of Puerto Rico, *Bank Of San Juan Internacional, Inc. and The U.S. Attorney's Office For The District Of Puerto Rico Resolve Pending Litigation And Related Matters* (Feb. 11, 2020), *available at* https://www.justice.gov/usao-pr/pr/bank-san-juan-internacional-inc-and-us-attorney-s-office-district-puerto-rico-resolve.

of U.S. economic sanctions relating to Venezuela."[3]  BSJI, it was apparent, was (and still is) "guilty until proven innocent" in the FRBNY's eyes.

Following the FRBNY's abrupt suspension of BSJI's services, the FRBNY and BSJI held an in-person meeting on February 11, 2019 to discuss BSJI's accounts and Federal Reserve Bank services.  At this meeting, the FRBNY informed BSJI that it would consider resuming limited services if BSJI could provide adequate assurances that no illicit activity would be processed through BSJI's accounts at the FRBNY.  BSJI then began a multi-year process pursuant to which BSJI devoted substantial time, expended extraordinary resources, and worked closely both with the FRBNY and well-credentialed consultants to build a top-of-the-line system of Bank Secrecy Act and anti-money laundering ("BSA/AML") and sanctions controls and governance.

**B.     BSJI's extensive efforts to enhance its internal controls and protect its master account**

In April 2019, BSJI retained the former Chairman of the FDIC, William M. Isaac, and former compliance and ethics executive Richard J. Wolf, both of whom were then associated with the global consulting firm FTI Consulting.[4] HJV Decl. ¶ 7.  Mr. Isaac was appointed by President Carter and confirmed by the United States Senate in early 1978 to serve on the board of directors of the Federal Deposit Insurance Corporation.  President Reagan appointed him as Chairman of the FDIC, where he served for five years, steering the industry out of a financial crisis that saw scores of bank failures.  Declaration of William M. Isaac ("WMI Decl.") ¶ 1.  Mr. Wolf was at the time a senior advisor with FTI Consulting, and he had previously served in a variety of legal and compliance roles, including a period of service as Senior Advisor for the Federal Reserve Bank of New York.  Declaration of Richard J. Wolf ("RJW Decl.") ¶ 2.

BSJI retained Mr. Isaac and his highly credentialed team at FTI as independent consultants to assess and remediate, as appropriate, BSJI's BSA/AML compliance program.  Critically, in its

---

[3] Reuters, *Exclusive: New York Fed Cracks Down on Puerto Rico Bank Following Venezuela Sanctions* (April 18, 2019), *available at* https://www.reuters.com/article/us-venezuela-politics-puertorico-exclusi/exclusive-new-york-fed-cracks-down-on-puerto-rico-banks-following-venezuela-sanctions-idUSKCN1RU2EI.

[4] Messrs. Isaac and Wolf left FTI in 2020 and joined a newly created firm called Isaac-Milstein Group LLC, which is predecessor in interest to Secura-Isaac Group LLC, where Mr. Isaac is chairman and Mr. Wolf is managing director.

most recent examination prior to FTI's retention, OCIF ██████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████ But to satisfy the FRBNY, and in keeping with BSJI's own business philosophy, BSJI was determined to enhance further its system of controls and governance. At Mr. Isaac's direction and under his leadership, FTI dispatched a team of BSA/AML experts to the headquarters of BSJI in Guaynabo, Puerto Rico, to assess BSJI's BSA/AML compliance program and identify any gaps in the program, formulate a comprehensive plan to address any shortcomings, and remediate any deficiencies in a sustainable and lasting manner. WMI Decl. ¶ 3.

Mr. Isaac's team also conducted a detailed 15-month BSA/AML "lookback" review of customer transactions executed from the period January 1, 2018 to March 30, 2019. WMI Decl. ¶ 5. The "lookback" was an extraordinary exercise, lasting about a year, requiring more than 5,500 hours, precipitating more than 200 requests for information, and costing BSJI over $4 million. FTI certified the results to the FRBNY, concluding that it discovered no illicit activity at BSJI. HJV Decl. ¶ 12.

While the FRBNY conveyed to BSJI its discomfort with IBEs generally, purportedly because they are only locally regulated and not federally examined (RJW Decl. ¶ 8), the FRBNY indicated greater comfort with and fewer concerns about BSJI as discussions matured. FRBNY's general counsel noted that BSJI's work put it at the "front of the line" with regard to their assessment of the quality of IBE compliance programs. RJW Decl. ¶ 19.

### C.   The FRBNY, in recognition of BSJI's extensive efforts, reinstates BSJI's master account

Finally, on December 3, 2020, 22 months after the FRBNY suspended BSJI's master account, the FRBNY notified BSJI that the Reserve Bank "has completed its review [] and is satisfied that BSJI has met the requirements of Phase 1B." RJW Decl. ¶ 27. Accordingly, effective December 14, 2020, BSJI had its services and "unrestricted access to the Fedwire Securities

Service restored." *Id*. The 22-month period during which BSJI lacked access to Federal Reserve master account services was marked by two indisputable facts.

First, BSJI built a system of BSA/AML compliance controls and governance acceptable to its own regulator and transformed it into a top-tier system beyond that of its immediate peer group, and which proved acceptable to the FRBNY. Indeed, some of BSJI's ideas, such as the use of credentialed third parties acceptable to the FRBNY to act as independent examiners, were adopted by the FRBNY in recently promulgated guidance to IBEs and other financial institutions. BSJI has relied on, and continues to rely on, a battery of trusted, independent BSA/AML audit firms. They have each concluded that BSJI's BSA/AML and OFAC Compliance Program is satisfactory, comprehensive, and effective in implementing the current BSA/AML and OFAC regulatory requirements and guidance. Declaration of Samson Leung ("SL Decl.") at ¶ 28, Ex. A; HJV Decl. ¶ 73.

Second, BSJI's 22-month inability to access Federal Reserve services caused it enormous reputational and financial harm. Among other things, BSJI was forced to substantially shrink, and it today retains only about two percent of the depositors it had prior to the suspension of its access to these services, while the corresponding dollar amount of total deposits dropped by over 66% during the same period. HJV Decl. ¶¶ 64-65.

## III.   BSJI'S 2021 REPORTS FOR THE FRBNY AND ITS PREPARATION FOR THE 2022 SUBMISSIONS

In 2021, in light of the COVID-19 pandemic, K2 Integrity ("K2"),[5] BSJI, and the FRBNY reached a variety of accommodations on the respective due dates of various compliance reports. Accordingly, K2 produced (i) the OFAC screening technical validation on June 14, 2021, (ii) the BSA/AML and OFAC compliance program assessment on June 16, 2021, and (iii) the BSA/AML transaction monitoring technical validation on June 29, 2021. While the reports were all submitted in June 2021, the end of the review period for the various subject matters ranged from April 30 through June 2021. HJV Decl. ¶ 22.

---

[5] K2 Integrity is a premier global risk advisory firm.

In light of the previous year's varying review periods, together with the fact that the FRBNY requires independent reports cover a 12-month period, BSJI and K2 concluded that it would be most appropriate to align the review periods going forward, and therefore to set the 2022 review period to be through and including June 30.  In this way, BSJI and K2 would ensure 12 months of non-overlapping data.

Consistent with the FRBNY's guidance to contact it in the event of any questions, and to ensure its understanding of the requisite requirements was correct, BSJI reached out to the FRBNY seeking guidance.  In an April 7, 2022 email to Claudette Bridgewater, BSJI advised the FRBNY that the contemplated review period would extend until June 30 and, consistent with the FRBNY Handbook's Frequently Asked Questions, the final reports would be prepared and submitted within 90 days from the end date of the review period.  ADL Decl. Ex. 3 pp. 9-10 (FRBNY, Frequently Asked Questions Concerning the Federal Reserve Bank of New York Account and Financial Services Handbook); HJV Decl. Ex. 1.

BSJI's outreach went unanswered.  Exercising diligence, BSJI followed up with a second correspondence, this time on June 3, 2022, to Ms. Bridgewater, again describing the scope of the review period and plan for submitting its report.  HJV Decl. Ex. 2.  The FRBNY again did not respond.  Hearing nothing, and in light of BSJI's close contacts with the FRBNY, BSJI reasonably believed the FRBNY had no concerns with BSJI's proposed submission date.

## IV.   THE FRBNY'S PRETEXTUAL BASIS FOR CLOSURE OF THE MASTER ACCOUNT AND ENSUING PAUSE OF THAT DECISION

Without warning, and despite BSJI's unanswered requests for guidance, in a letter dated July 18, 2022, the FRBNY advised BSJI that it was terminating BSJI's access to Federal Reserve services and its master account on September 15, 2022.  HJV Decl. Ex. 3.  According to the FRBNY, the three reports then being prepared by K2 should have been but were not submitted in June 2022.  *Id.*  The FRBNY told BSJI that it had concluded that BSJI posed an "undue risk to the New York Fed due to, among other things, this noncompliance."  *Id.*  The FRBNY offered no explanation of the purported "other things" or "noncompliance" to which it vaguely referred.  *Id.*

For BSJI, considering its recent, extensive history with the FRBNY, the FRBNY notification was a shock.  By letter dated July 19, 2022, BSJI's management reminded the FRBNY of its earlier requests for guidance that had gone unanswered and re-explained the process and thinking behind the K2 reports, which by then were already in the preparation stage.  HJV Decl. Ex. 4.  On an ensuing August 11, 2022 call between the parties, the FRBNY stated that its position would not change, insisting that the missed deadline for the reports was clear.  HJV Decl. ¶ 34. The FRBNY did not address its failure to respond to BSJI's earlier correspondence (other than to say it did not need to), and it declined to engage in any dialogue that would permit BSJI to retain access to the Federal Reserve services.

Throughout August 2022 and into September 2022, BSJI repeatedly attempted to engage in constructive dialogue with the FRBNY, but the FRBNY rebuffed such efforts.  Though the FRBNY extended the termination date two weeks, to September 29, 2022, it made clear that its decision had not changed.  The FRBNY likewise made no effort to identify to BSJI the "other things" it claimed caused the bank to be in "noncompliance," but rather reaffirmed that the "primary driver" of its decision was the purportedly missed phantom deadline.  HJV Decl. ¶ 39. Given that the FRBNY would not engage in any dialogue with BSJI, and recognizing that BSJI was confronting an existential threat, BSJI prepared to bring the issue to this Court and so advised the FRBNY.  In total transparency, on September 15, 2022, BSJI informed the FRBNY that, absent an amicable resolution, it would immediately file suit concerning the FRBNY's actions.  HJV Decl. Ex. 12.  Four days later, on September 19, 2022, the FRBNY responded that it would pause its termination of BSJI's account so that it could "consider" whether BSJI's filings – those that it claimed were delinquently submitted – impacted "its decision to terminate BSJI's master account." The FRBNY also advised that it would send BSJI a Request for Information ("RFI") the response to which the FRBNY could consider in its forward decision-making.  HJV Decl. ¶ 44.

## V.   THE BOARD'S VALIDATION OF THE FRBNY'S UNFETTERED CLAIMS TO DISCRETION

The FRBNY did not act alone when it decided to terminate BSJI's master account: the Board, which is the FRBNY's supervising authority, both empowered and approved this action. Beginning in May 2021 – conspicuously, shortly after multiple lawsuits challenged the authority of Federal Reserve Banks to deny master accounts to statutorily-eligible entities – the Board began developing proposed guidelines that purported to clarify both that the Federal Reserve Banks held discretionary authority to grant or deny master account requests and the factors that Federal Reserve Banks would assess in exercising this discretion. Rather than acknowledging the lack of a statutory basis for the power the Federal Reserve Banks claimed, the Board doubled down, finalizing "guidelines" – tellingly, not regulations – that were published in August 2022 (the "Guidelines") that purport to provide the Federal Reserve Banks with the "discretion" the FRBNY and the Board are now using to put BSJI out of business.

The Board likewise acted to validate the FRBNY's termination of BSJI's master account specifically. Facing an increasingly obstinate FRBNY, the former FDIC Chairman Bill Isaac, on behalf of BSJI, requested the Board's assistance in resolving the dispute amicably in August 2022, emphasizing that it was BSJI's desire for the parties to reach mutual agreement. The Board rejected BSJI's request and made clear that, while it had exercised its supervisory authority to engage the FRBNY in discussions concerning BSJI and its master account, it would not utilize that same authority to prevent the FRBNY from implementing their plainly improper termination decision. WMI Decl. Ex.1. The reason for this was just as BSJI feared: the FRBNY, according to the Board, held ultimate "discretion over BSJI's master account and access to Federal Reserve services." *Id*.

## VI.   THE FRBNY CONCOCTS ADDITIONAL PRETEXTUAL GROUNDS FOR CLOSING BSJI'S MASTER ACCOUNT

Throughout the remainder of 2022 and early 2023, BSJI continued to work diligently alongside the FRBNY. Despite the FRBNY having no supervisory or examination authority over BSJI, BSJI submitted additional reports that the FRBNY requested, timely responded to the

FRBNY's various RFIs, and prepared letters detailing various safeguards the Bank was implementing. BSJI even went so far as to volunteer for FRBNY supervision, so as to remove any shadow of a doubt concerning the robustness of BSJI's compliance programs and affording the FRBNY access to anything it might need. FA Decl. ¶ 48. During this six-month period, the FRBNY remained silent concerning the substance of BSJI's myriad submissions, providing neither feedback nor criticism. BSJI hoped that the adage "no news is good news" held true.

It did not. Without warning or an opportunity to be heard, by letter dated April 24, 2023, the FRBNY informed BSJI that it would be moving forward with its decision to close BSJI's master account on June 20, 2023. HJV Decl. Ex. 4. The FRBNY claimed that a "thorough" review of BSJI's submissions had revealed that the Bank somehow posed "an undue risk to the overall economy" and therefore violated Principle 5 of the Board's August 2022 Guidelines: a staggering conclusion concerning a bank that, at the time of the letter's issuance, had fewer than 20 retail clients. Even if one takes an extreme example and assumes that all of BSJI's transactions during the 2022 review period were "illicit," such activity would represent (i) only 0.000125 percent of the gross domestic product ("GDP") of the United States and (ii) only 0.000032 percent of GDP of the world. From a quantitative standpoint, the potential illicit activity flowing through BSJI's Fed account is entirely insignificant to the overall economy. Declaration of Christopher Laursen ("CL Decl.") ¶ 22.

BSJI issued an exhaustive response to the FRBNY's letter on May 19. HJV Decl. Ex. 19. While the FRBNY identified 16 concerns in its April 24, 2023 Closure letter, the FRBNY lifted 13 of them from K2's 2022 reports, which had identified these 13 as mere recommended "enhancements" to an already satisfactory compliance program. *Id*. The FRBNY disregarded K2's findings, inexplicably recharacterizing the 13 as programmatic "deficiencies." In its response, BSJI advised the FRBNY that BSJI, in the ordinary course, had *already* addressed these 13 observations so that the 13, however characterized, had been rendered moot. The FRBNY would have been well aware of these developments had it not ignored BSJI's requests for outreach.

BSJI's response also included a detailed, 15-page chart identifying responses to *all* of the FRBNY's concerns.  HJV Decl. Ex. 19.

But BSJI's efforts were to no avail, and the FRBNY once again changed course.  While the FRBNY elected not to engage BSJI before its determination to close the master account, it finally granted BSJI the courtesy of a call after BSJI's three post-April 24 submissions.  During that June 20, 2023 call between the parties, the FRBNY no longer relied upon its "forward-looking enhancements are deficiencies" rationale.  Rather, the FRBNY now hung its hat on the notion that BSJI entertains a high volume of transactions of "party-related" "shell companies" acting in "high-risk" jurisdictions.  But in consistent form, the FRBNY failed to identify a *single* specific transaction it deemed to illustrate this risk, which BSJI made clear in an ensuing June 27, 2023 letter.  HJV Decl. Ex. 22.  Indeed, *none* of BSJI's customers can fairly be characterized as a "shell company," nor has there been *any* indication of illicit activity.  *See* AML Rightsource Attestation. ¶¶ 4-8.  The FRBNY's "unspecified shell company" rationale simply lacked basis.  But none of this mattered because the FRBNY had already determined it would terminate BSJI's master account, and it informed BSJI by letter that it would close BSJI's master account on July 31, 2023. The FRBNY made that decision even though it did not actually send auditors to BSJI but instead required BSJI to hire (at great cost) nationally-recognized outside independent BSA/AML auditors, who actually *blessed* BSJI compliance program.

BSJI made repeated efforts to engage the FRBNY and to alleviate the urgency of this motion.  Most recently, counsel for BSJI had a call on July 10 with counsel for the FRBNY to try to work out a briefing schedule and obviate the need for a TRO.  The FRBNY was amenable to working out a schedule but informed counsel for BSJI on July 13 that it would not agree to suspend BSJI's account termination while BSJI sought a judicial determination of its rights.  Accordingly, BSJI has no choice but to now seek emergency relief in aid of its case.

## ARGUMENT

"[T]he purpose of a preliminary injunction is to maintain the *status quo ante* pending a full hearing on the merits."  *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025 (2d Cir. 1985), *overruled on*

*other grounds*, *United States v. Thorn*, 317 F.3d 107 (2d Cir. 2003).  To obtain such relief in this Circuit, a movant must show: (a) ""'(1) irreparable harm absent injunctive relief; (2) either a likelihood of success on the merits, or a serious question going to the merits to make them a fair ground for trial, with a balance of hardships tipping decidedly in the plaintiff's favor; and (3) that the public's interest weighs in favor of granting an injunction." *Red Earth LLC v. United States*, 657 F.3d 138, 143 (2d Cir. 2011).  "It is well established that in this Circuit, the standard for an entry of a TRO is the same as for a preliminary injunction." *Somoza v. NYC Dep't of Educ.*, No. 06 CIV. 5025 (VM), 2006 WL 1981758, at *3 (S.D.N.Y. July 10, 2006).

## I.   BSJI WILL SUFFER IRREPARABLE HARM

"[T]he showing of irreparable harm is the 'single most important prerequisite for the issuance of a preliminary injunction."' *Frank Brunckhorst Co. v. G. Neileman Brewing Co., Inc.*, 875 F. Supp. 966, 974 (E.D.N.Y. 1994) (citing *Bell & Howard: Co. v. Masel Supply Co. Corp.*, 719 F.2d 42, 45 (2d Cir. 1983)).  Irreparable harm is defined as "certain and imminent harm for which a monetary award does not adequately compensate," (*Wisdom Imp. Sales Co. v. Labatt Brewing Co.*, 339 F.3d 101, 113 (2d Cir. 2003)) and exists where the movant demonstrates that "but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied." *Brenntag Int'l Chem., Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999).

The impending termination of BSJI's master account presents a textbook example of irreparable harm: absent emergency relief, BSJI is almost certain to experience a terminal loss of business when access to its master account and Federal Services systems is ended.  *RxUSA Wholesale, Inc. v. Dep't of Health & Hum. Servs.*, 467 F. Supp. 2d 285, 301 (E.D.N.Y. 2006), (finding the potential destruction of plaintiffs' businesses constitutes irreparable injury); *Otero Sav. & Loan Ass'n v. Bd. of Governors of Fed. Rsrv. Sys.*, 497 F. Supp. 370, 371 (D. Colo 1980) (finding preliminary injunction warranted where Board's actions would result in irreparable harm as it would "interrupt banking services" for the savings and loan association's customers).  A master account is the gateway to Federal Reserve Bank payment services; access to those services

15

is essential for a depository institution to operate and service its clients. *See Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kansas City*, 861 F.3d 1052, 1069 (10th Cir. 2017) ("[A] nonmember depository institution … can operate only by obtaining its own master account or using a middleman that has a master account.") (Op. of Bacharach, J.); *see* Declaration of James C. Watkins ("JCW Decl.")  at ¶¶ 4.  By terminating BSJI's account, the FRBNY will not only foreclose direct access to these services, but likely those by any "middleman" financial institutions that have their own master accounts as such institutions roundly refuse to facilitate payment services for banks that have had their master accounts terminated by a Federal Reserve Bank. RJW Decl. ¶ 6; HJV Decl. ¶ 71; WMI Decl. ¶ 20.[6]

The inevitability of such harm is not speculation or hyperbole.  It is aptly evidenced by the consequence of the FRBNY's prior suspension of its master account, after which BSJI lost more than 90% of its client base.  HJV Decl. ¶ 64.  There is little question that having lost more than 90% of its client base the first time around, when the master account was merely suspended, BSJI is unlikely to survive another such blow. And a total loss of business is "well settled [to] constitute[] irreparable harm."  *RxUSA Wholesale, Inc.*, 467 F. Supp. 2d at 301.

It is equally recognized that a company's "loss of reputation, goodwill, and business opportunities" – even where that harm is not fatal to the company's business – warrants injunctive relief.  *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004); *see also Rex Med. L.P. v. Angiotech Pharm. (US), Inc.*, 754 F. Supp. 2d 616, 621 (S.D.N.Y. 2010).  Courts routinely find such irreparable harm where the loss of goodwill or business relationships has left a party unable to provide its product to its customers.  *See, e.g.*, *Reuters Ltd. v. United Press Int'l*, 903 F.2d 904, 909 (2d Cir. 1990) (concluding the harm to plaintiff's reputation and the loss of goodwill that resulted from its inability to supply its customers with the terminated product constitutes irreparable harm); *John B. Hull, Inc. v. Waterbury Petroleum Prods., Inc.*, 588 F.2d 24, 28-29 (2d

---

[6] In fact, two local banks that had provided BSJI correspondent services terminated those services in 2019 as a direct result of the FRBNY decision to suspend BSJI's master account.  RJW Decl. Ex.1 p. 7.

Cir. 1978) ("A threat to the continued existence of business can constitute irreparable injury.");
*Rex Medical*, 754 F. Supp. 2d at 621–22.

That BSJI has not recovered its losses since the December 2020 restoration of its master account reflects this reality.  Just as it was in the process of restoring its relationships and reputation from the FRBNY's prior actions and threats, termination now will deprive the Bank of the ability to carry out the routine banking services its customers rely upon, invariably resulting in a loss of goodwill from said customers and, in turn, their patronage.  Indeed, in light of the taint of the previous FRBNY account suspension, BSJI is particularly vulnerable, as other financial services institutions that would ordinarily provide help will not do so and the few customers who weathered the last storm may simply decide they can no longer tolerate the turbulence.  RJW Decl. ¶ 6.  Even if BSJI ultimately survives the FRBNY's action, the imminent loss of customer goodwill and reputational damage is alone sufficient to find irreparable harm.  *Broker Genius, Inc. v. Volpone*, 313 F. Supp. 3d 484, 496 (S.D.N.Y. 2018) (finding irreparable harm where movant demonstrated that it would "incur loss of reputation, good will, business opportunities, and customer relationships").

## II.    BSJI IS LIKELY TO SUCCEED ON THE MERITS OR, AT A MINIMUM, RAISES SERIOUS QUESTIONS THAT ARE FAIR GROUND FOR LITIGATION

A movant is entitled to a preliminary injunction if, in addition to showing irreparable harm, it can show a likelihood of success on the merits.  *Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 38 (2d Cir. 2010).  "To establish a likelihood of success, [a] plaintiff[] 'need not show that success is an absolute certainty.  [He] need only make a showing that the probability of [his] prevailing is better than fifty percent.'"  *Airbnb, Inc. v. City of New York*, 373 F. Supp. 3d 467, 480 (S.D.N.Y. 2019) (quoting *Eng v. Smith*, 849 F.2d 80, 82 (2d Cir. 1988)).  As an alternative to showing a likelihood of success on the merits, a party can show "sufficiently serious questions going to the merits to make them a fair ground for litigation

and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Citigroup*, 598 F.3d at 35 (internal citations ommitted).

As BSJI's Complaint demonstrates, the Board's and the FRBNY's actions will: (1) deprive BSJI of a statutory right, (2) violate the Administrative Procedure Act, (3) violate BSJI's right to due process, (4) breach the FRNBY's contractual duty of care, and (5) breach the implied covenant of good faith and fair dealing. To obtain a preliminary injunction, BSJI need only "show a likelihood of success on the merits of at least one of [their] claims." *L.V.M. v. Lloyd*, 318 F. Supp. 3d 601, 618 (S.D.N.Y. 2018) (quoting *Westchester Legal Servs., Inc. v. Westchester Cty.*, 607 F. Supp. 1379, 1382 (S.D.N.Y. 1985)). BSJI is entitled to a preliminary injunction under either standard.

## A.    Likelihood of Success on the Merits

### 1.    BSJI Has a Nondiscretionary Statutory Right to a Master Account

12 U.S.C. § 248a(c)(2) mandates that "[a]ll Federal Reserve bank services covered by the fee schedule *shall be available* to nonmember depository institutions." (Emphasis added.) Until recently, this statute was interpreted both by the Board and the Federal Reserve Banks as conferring nondiscretionary access to Federal Reserve payment services (which require a master account to facilitate these services) to *all* nonmember depository institutions. *Fourth Corner*, 861 F.3d at 1072 ("The Board of Governors' past interpretations of the statute are widely shared by officials of the regional Federal Reserve Banks, who join the chorus of officials recognizing that the [Deregulation Act] extends Federal Reserve services to all nonmember depository institutions.").

Given the previously uncontroversial nature of this right, the statute has been the subject of limited judicial review. Importantly, the only federal circuit court judge to interpret this provision in relation to master accounts recently found, in an exhaustive opinion, that "§ 248a(c)(2) unambiguously entitle[s] all nonmember depository institutions to a master account." *Fourth Corner*, 861 F.3d at 1070. In rendering this opinion, Judge Bacharach thoroughly examined not only the statute's language, but also past interpretations by the Board and officials with the regional Federal Reserve Banks, legislative history, and interpretations of § 248a(c)(2) by other circuit courts and academics. *Id.* at 1068-73. These findings compellingly illustrate BSJI's

statutory right to a master account; indeed, Judge Bacharach's analysis was deemed so compelling in ongoing litigation before a sister district court – which presents a near-identical issue concerning the Federal Reserve Banks' "discretionary" denials of master accounts – that the district court found there to be a triable issue "mostly based" on his opinion alone. *See Custodia Bank,* Dkt. 164 at 12.

The Federal Reserve payments system is a collection of services provided by the Federal Reserve Banks that are "indispensable for all financial institutions." *Fourth Corner*, 861 F.3d at 1064.[7] These services include the ability to clear checks and make wire transfers as well as currency and coin services. *See* 12 U.S.C. § 248a(b). Without those services, a "depository institution is nothing more than a vault." *Fourth Corner*, 861 F.3d at 1053 (Moritz, J.).

Context is helpful. Before 1980, the Federal Reserve payments system was an unequal regime. Large commercial banks that were members of the Federal Reserve established Automated Clearing House ("ACHs") networks through which they exercised effective monopoly control over access to the national electronic payments system, charging nonmember banks for access to the Federal Reserve System services they received for free.[8] In landmark legislation recognizing the importance of Federal Reserve System services, Congress passed what is now 12 U.S.C. § 248a(c)(2) as part of the Depository Institutions Deregulation and Monetary Control Act of 1980 (the "Deregulation Act") with the goal of giving "every nonmember depository institution" access "to Federal Reserve services." *See Fourth Corner*, 861 F.3d at 1073 (emphasis added).

The Deregulation Act requires the Board provide "a proposed schedule of fees . . . for Federal Reserve Bank services to depository institutions." 12 U.S.C. § 248a(a). The fee schedule explicitly covers numerous Federal Reserve Bank services – services essential to any depository institution, and all of which require a master account – as well as "any new services which the Federal Reserve System offers." *Id.* § 248a(b). Critically, the Deregulation Act provides that

---

[7] Unless otherwise indicated, all citations to *Fourth Corner* are to the opinion of Judge Bacharach.
[8] *See* A. Kuprianov, *The Monetary Control Act and the Role of the Federal Reserve in the Interbank Clearing Market*, Econ. Rev. (July/Aug. 1985),
https://www.richmondfed.org/media/richmondfedorg/publications/research/economic_review/1985/pdf/er710403.pdf.

"[a]ll Federal Reserve bank services covered by the fee schedule *shall be available to nonmember depository institutions . . . .*" 12 U.S.C. § 248a(c)(2) (emphasis added). [9]

The statute's language is clearly non-discretionary.  Congress's use of the word "shall" imposes "discretionless obligations."  *Lopez v. Davis*, 531 U.S. 230, 241 (2001).  Section 248a(c)(2) thus "is not ambiguous.  The plain text of § 248a(c)(2) indicates that nonmember depository institutions are entitled to purchase services from Federal Reserve Banks.  To purchase these services, a master account is required.  Thus, "nonmember depository institutions . . . are entitled to master accounts." *Fourth Corner*, 861 F.3d at 1071.  This language is consistent with congressional intent to afford all depository financial institutions access to essential Federal Reserve services. *See id.* at 1069.

Further, and as earlier discussed, the Board has until recently "uniformly interpreted the [Deregulation Act] to extend Federal Reserve services to all 'depository institutions.'" *Id.* at 1070-71 (citing policy publications by the Board); *see also* Bd. of Governors of the Fed. Reserve Sys., *Policies: Standards Related to Priced-Service Activities of the Federal Reserve Banks* (1984) (the Board of Governors understood that the Deregulation Act had "expanded the Federal Reserve's role by requiring the Federal Reserve to provide its services to all depository institutions on an equitable

---

[9] BSJI is a "nonmember depository institution" within the meaning of 12 U.S.C. § 248a(c)(2).  The term "depository institution" means "any insured bank as defined in Section 3 of the Federal Deposit Insurance Act of 1933, as amended [12 U.S.C. § 1813] (the "FDI Act") or any bank which is eligible to make application to become an insured bank under Section 5 of the FDI Act [12 U.S.C. § 1815]."  12 U.S.C. § 461(b)(1)(A)(i).  The term "bank," in turn, means "any insured or noninsured bank, as defined in Section 3 of the FDI Act [12 U.S.C. § 1813]."  *Id.* § 461(b)(1)(B).  Section 3 of the FDI Act defines "noninsured bank" as "any bank the deposits of which are not . . . insured," 12 U.S.C. § 1813(h), where "bank" means, as relevant here, "any bank, banking association, trust company, savings bank, industrial bank . . . , or other banking institution which—(A) is engaged in the business of receiving deposits, other than trust funds . . ; and (B) is incorporated under the laws of any State [or Puerto Rico] . . . ."  12 U.S.C. § 1813(a)(1)–(3).  BSJI is a banking institution engaged in the business of receiving deposits and is incorporated under the laws of Puerto Rico.  Declaration of Marcelino Bellosta Varady ("MBW Decl.") ¶ 6.

As such, it is eligible to become an insured bank under 12 U.S.C. § 1815 and is therefore a "depository institution" within the meaning of 12 U.S.C. § 248a(c)(2).

basis . . . .").[10]   The FRBNY itself has acknowledged that "services will be available equally to all depository institutions" in light of the Deregulation Act.[11]

The statute's legislative history also makes clear that BSJI has a right to a master account. The House Committee on Banking Finance and Urban Affairs, for instance, believed that "the wide access to Federal Reserve services for nonmember banks authorized by" the Deregulation Act would ensure "that a basic level of services is available *to all banks throughout this country on a nondiscriminatory basis*." *Fourth Corner*, 861 F.3d at 1072 (citing H.R. Rep. No. 95-1590, at 20 (1978)) (emphasis added). The joint conference report echoes this understanding. *See id.* at 1072–73 (citing 126 Cong. Rec. 6250 (1980) (Conf. Rep.)). As Judge Bacharach concluded, "the legislative history supports the widespread agreement that the [Deregulation Act] entitles *every nonmember depository institution to Federal Reserve services*." *Id.* at 1073 (emphasis added).

The Second Circuit has also addressed the broader question of equal access to Federal Reserve System services and expressly "interpreted § 248a(c)(2) to establish open access to Federal Reserve services." *Id.* (citing *Greater Buffalo Press, Inc. v. Fed. Reserve Bank of N.Y.*, 866 F.2d 38, 40 (2d Cir. 1989)). Academics likewise interpret "§ 248a(c)(2) to entitle all depository institutions to Federal Reserve services." *Id.* (citing Timothy K. Armstrong, *Chevron Deference and Agency Self-Interest*, 13 CORNELL J.L. & PUB. POL'Y 203, 231 n.148 (2004); Thomas C. Baxter, Jr. & James H. Freis, Jr., *Fostering Competition in Financial Services: From Domestic Supervision to Global Standards*, 34 NEW ENG. L. REV. 57, 70 (1999); Fred H. Miller, Robert G. Ballen, & Hal S. Scott, *Commercial Paper, Bank Deposits and Collections, and Commercial Electronic Fund Transfers*, 39 BUS. LAW. 1333, 1365 (1984)). That "no federal court has interpreted" the Deregulation Act to allow Federal Reserve Banks to deny depository

---

[10] http://www.federalreserve.gov/paymentsystems/pfs_standards.htm

[11] FRBNY, Annual Report: 1980 at 35 (1981), https://fraser.stlouisfed.org/files/docs/historical/frbny/1980_frb_newyork.pdf; *accord* Bd. Governors Fed. Reserve Sys., *Policies: The Federal Reserve in the Payments System* (1990) ("Federal Reserve payment services are available to all depository institutions."), http://www.federalreserve.gov/paymentsystems/pfs_frpaysys.htm

institutions access to a master account further supports a finding that BSJI is likely to succeed on the merits. *Fourth Corner*, 861 F.3d at 1073.

The impropriety of the FRBNY's and the Board's interpretation of their statutory authority is likewise aptly illustrated by the Supreme Court's recent decision in *Biden v. Nebraska*. *See supra* p. 4.  In *Nebraska*, the Court was confronted with an interpretation of statutory authority – the Secretary of Education's capacity to waive student debt – that, if accepted, would have expanded the Secretary's powers so greatly that it would have functionally introduced a "new [statutory] regime." *Nebraska*, 143 S. Ct. at 2371.  The court rejected this understanding and ruled that an interpretation, and corresponding exercise, of statutory authority cannot "distort the fundamental nature of the provision it alters." *Id.* at 143 S. Ct. at 2358.  As the Supreme Court held, a statute's interpretation cannot subvert its plain text. So too here. Section 248a(c)(2)'s plain text, which affords no regulatory or other discretion, requires that Federal Reserve Banks provide master account access on a non-discretionary basis.

### 2. The FRBNY and the Board Cannot Terminate Master Accounts on Arbitrary Grounds

Even if § 248a(c)(2) had been written to confer a degree of discretion to the FRBNY and the Board in determining the criteria for master account access, their decision to terminate BSJI's master account here does not withstand scrutiny.  As a federal agency, the FRBNY and the Board are subject to the strictures of the Administrative Procedure Act ("APA"), which prohibits such arbitrary and reasonless exercises of regulatory authority.  BSJI also is entitled to the protections of due process (plainly not afforded here) where the federal government seeks to deprive it of a property interest.  These statutory and constitutional rights militate in favor of granting injunctive relief.

### a. The FRBNY and the Board are each an "Agency" for Purposes of the APA

There is no question that the Board is an agency of the United States government.  The FRBNY likewise functions as an agency for purposes of the APA; it is therefore required to abide

by its statutory requirements in its decision-making process.  The APA defines an agency as "each authority of the Government of the United States, whether or not it is within or subject to review by another agency" (5 U.S.C. § 551(1)).  This definition has in turn been interpreted to encompass federal instrumentalities that "exercise substantial independent authority." *Dong v. Smithsonian Inst.*, 125 F.3d 877, 881-82 (D.C. Cir. 1997).

Such is the case here.  As federal courts have noted in finding the APA to apply to Federal Reserve Banks, the Federal Reserve Board – indisputably an agency – has "extensively delegated its functions and its authority to the Federal Reserve Banks."  *Lee Const. Co., Inc. v. Fed. Rsrv. Bank of Richmond*, 558 F. Supp. 165, 177-178 (D. Md. 1982) (finding the Federal Reserve Bank of Richmond to be an "agency" under the APA).  With this delegated power, Federal Reserve Banks act as the proverbial "sheriff's deputy" or gatekeeper to the federal banking system, wielding extensive decision-making authority over the United States' monetary policy, monetary system, supervision and regulation, and (of late) the institutions that are afforded access.  *Flight Int'l Group, Inc. v. Fed. Reserve Bank of Chicago*, 583 F. Supp. 674 (N.D. Ga. 1984), *vacated on other grounds*, 597 F. Supp. 462, 678-79 (N.D. Ga. 1984) (noting that the Federal Reserve Banks perform "important governmental functions and exercises powers entrusted to it by the United States government" in finding the Federal Reserve Bank of Chicago to be an "agency" under the APA).

### b.      The Decision to Terminate BSJI's Master Account Violates the APA

The APA directs reviewing courts to "hold unlawful and set aside agency action" found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  The APA thus "establishes a scheme of 'reasoned decision-making.' *Allentown Mack Sales & Serv., Inc. v. N.L.R.B.*, 522 U.S. 359, 374 (1998) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 52 (1983)).  "Not only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational." *Id.*

"Put simply, the APA requires that an agency's exercise of its statutory authority be reasonable and reasonably explained." *Mfrs. Ry. Co. v. Surface Transp. Bd.*, 676 F.3d 1094, 1096 (D.C. Cir. 2012). Determining whether agency decisions violate the APA "involves examining the reasons for agency decisions, or the absence of such reasons." *Judulang v. Holder*, 565 U.S. 42, 53 (2011). And it is a "foundational principle of administrative law that a court may uphold agency action only on the grounds that the agency invoked when it took the action." *Michigan v. E.P.A.*, 576 U.S. 743, 758 (2015).

The decision to terminate BSJI's master account cannot survive this scrutiny. As addressed above, the Board and the FRBNY are obligated to make master accounts available to statutorily eligible institutions on a non-discretionary basis. *See supra* pp. 18-22. It necessarily follows that their failure to do so with respect to BSJI violates their obligation to exercise their statutory authority in a reasonable manner.

But BSJI's entitlement to a master account does not rest solely on the non-discretionary nature of master account access. Even if the FRBNY and/or the Board are assumed to have discretion as to master account access, their actions here would still violate the APA. Most glaringly, the FRBNY's amorphous and ever-shifting rationale for terminating BSJI's master account lacks any rational basis. As the Court will see, BSJI has been made to play the arcade game of "Whack-A-Mole," as each successive interaction with the FRBNY raises new issues to beat down.

As to the "phantom deadline" the FRBNY initially relied upon, BSJI twice contacted the FRBNY, in light of the FRBNY's conflicting guidance concerning the requisite submission date of its 2022 compliance reports (including FRBNY's requirement for 12 months of content and the grant of an additional 90 days to prepare and finalize the report), both explaining its understanding of the relevant requirements and requesting further guidance. HPV Decl. Ex. 1-2. In both instances, BSJI's outreach went unanswered. Thereafter, without warning, in July 2022 – three months after BSJI initially asked the FRBNY for guidance – the FRBNY notified BSJI that it was "exercising our discretion to terminate BSJI's master account." The FRBNY did not acknowledge

BSJI's outreach, but instead asserted that the Bank was "noncompliant" with the very 2022 compliance reporting deadlines that were the subjects of BSJI's touchpoints with the agency.

The FRBNY's attempt to paper over the arbitrariness of this decision with the 2023 Closure Letters is equally inappropriate.  The 2023 Closure Letters are rife with inaccuracies and rely on outdated information – information which was readily available to the FRBNY had it sought it.  The purported issues the FRBNY identified also fail to account for BSJI's modest risk profile, deriving from its limited client base and transaction volume.  These undisputable facts, of which the FRBNY was well aware, render its conclusion that BSJI poses an "undue risk to the overall economy" of the United States nonsensical and unsupportable. With its tiny footprint, it cannot be that BSJI, which has never been charged with illicit activity and ███████████████████ ███████████████████ and by three independent audit firms, poses an "undue threat to the overall economy" when its *total* transactions are but a very small fraction of the total amount of a single global financial institution's Board-imposed *fines* (for AML and sanctions violations and other compliance failures) against that institution.   Unfairly to BSJI, the latter institution continues to hold a master account.  CL Decl. ¶¶ 28-30.

The FRBNY, however, simply shifted its rationale once, again, claiming that its decision was actually based on its "unspecified shell company" theory, even though the FRBNY has failed to identify a single customer or transaction at issue and notwithstanding that BSJI's customers do not include a single shell company.

The FRBNY's conjured rationales for depriving BSJI of its master account, and its unwillingness to engage with BSJI concerning its purported concerns, is far from the "reasoned decision making" required by the APA.  Equally, the Board's validation of the FRBNY's improper interpretation of the scope of its authority was a clear abdication of its responsibilities as the Federal Reserve Banks' supervisory authority, and itself violated the APA.  *See State Farm*, 463 U.S. at 42-43 (explaining agency action is arbitrary and capricious if it is not based on a "reasoned analysis" that indicates the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice

made" (citation and internal quotation marks omitted)); *United Techs. Corp. v. U.S. Dep't of Def.*, 601 F.3d 557, 562 (D.C. Cir. 2010) (stating that a court will "not defer to [an] agency's conclusory or unsupported suppositions"); *City of Brookings Mun. Tel. Co. v. FCC*, 822 F.2d 1153, 1169 & n.46 (D.C. Cir. 1987).

### 3.   Terminating the Master Account Would Violate BSJI's Right to Due Process

Under the Due Process Clause, government actors are prohibited from depriving property by means of a process "so standardless than it invites arbitrary enforcement." *Beckles v. United States*, 580 U.S. 256, 262 (2017) (quoting *Johnson v. United States*, 576 U.S. 591, 595, (2015). To state a due process claim, "a plaintiff must show that: (1) state action (2) deprived him or her of liberty or property (3) without due process of law." *Barrows v. Burwell*, 777 F.3d 106, 113 (2d Cir. 2015). These criteria are readily met here.

12 U.S.C. § 248a(c)(2) unequivocally establishes the right of nonmember depository institutions to access Federal Reserve services and a corresponding master account. *See supra* pps 18-22. Similarly, it is well-established that statutes like § 248a(c)(2), which "plac[e] substantive limitations on official discretion.... [generally] by establishing substantive predicates to govern official decision-making, and []by mandating the outcome to be reached upon a finding that the relevant criteria have been met," create a protected property interest on the statutory entitlement. *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 462 (1989); *Kapps v. Wing*, 404 F.3d 105, 113 (2d Cir. 2005) ("To [the] extent that state or federal law meaningfully channels the discretion of state or local officials by mandating an award of [a statutory entitlement] to applicants who satisfy prescribed eligibility criteria, plaintiff-applicants possess a property interest.") (internal quotations omitted). BSJI therefore has a protectable property interest in its master account.

The second and third elements of a due process claim are likewise clearly met. The FRBNY has already determined that BSJI's master account will be closed on July 31, 2023, depriving it of the aforementioned property right. As discussed *supra* (*see* p.24), the FRBNY's decision to ignore BSJI's requests for guidance for the 2022 report deadline, only to then announce a termination of

BSJI's master account based on non-compliance with its "phantom deadline," in combination with its recent disingenuous assessment of BSJI's compliance program, without giving BSJI a meaningful opportunity to be heard or cure any alleged violation, lacks any semblance of due process. The FRBNY and the Board are instead playing the Almighty, choosing who shall live and who shall die, regardless of the enormous investments and devotion of resources involved and the employees whose livelihood hangs in the balance. BSJI is thus likely to succeed on the merits of its due process claim.

### 4.   Terminating the Master Account Would Breach FRBNY's Contractual Duty of Care and the Duty of Good Faith and Fair Dealing

The FRBNY's termination of BSJI's master account would also give rise to a breach of its contractual duty of care and breach the covenant of good faith and fair dealing implied in every contract under New York law. BSJI's master account was opened on April 5, 2012 pursuant to a Foreign Banking Institution Account Agreement between BSJI and the FRBNY, which is governed by New York law. ADL Decl. Ex. 1.

Under Operating Circular No. 1, and independent of its statutory obligations, the FRBNY is contractually obligated to act with a duty of care, and it must exercise "good faith." ADL Decl. Ex. 2 ¶ 7.1. Likewise, "New York law implies a covenant of good faith and fair dealing, 'pursuant to which neither party to a contract shall do anything which has the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" *Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 407 (2d Cir. 2006) (quoting *M/A–COM Sec. Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir. 1990)).

BSJI entered into a contract (the Account Agreement) with the FRBNY to receive a master account. As discussed above, a "master account is required to purchase services that are indispensable for all financial institutions." *See Fourth Corner*, 861 F.3d at 1064. Because a master account is obligatory for a depository institution like BSJI to exist, BSJI reasonably expected when it entered into the Account Agreement that FRBNY would not arbitrarily terminate

the account.  Indeed, BSJI spent multiple years and more than $6 million developing internal controls and compliance measures based on the understanding that the FRBNY would act in good faith with respect to BSJI's access to Federal Reserve payment systems.

Termination based on arbitrary enforcement and improper assumptions (including, among other things, that Puerto Rican IBEs are connected to Venezuelan illicit activity) – and with no opportunity to address the FRBNY's specific concerns – is quintessential bad faith and wholly impairs the value of the contract for BSJI.  *See* MBW ¶ 10.  If the FRBNY and the Board retain unfettered discretion to terminate master accounts, they have a free hand to shut down entire financial institutions – big and small – at whim and without notice, not only in Puerto Rico but also in New York.  Both the express obligations of Operating Circular No. 1, and the implied covenant of good faith and fair dealing, protect a promisee like BJSI's reasonable expectations. *See TVT Recs. v. Island Def Jam Music Grp.*, 244 F. Supp. 2d 263, 278 (S.D.N.Y. 2003).

### B.    Serious Questions Present Fair Ground for Litigation

The preceding discussion likewise demonstrates that there are "sufficiently serious questions going to the merits to make them a fair ground for litigation," (*Citigroup*, 598 F.3d at 35) which alone is enough to afford BSJI relief without the Court having to consider the likelihood of success on the merits.  A preliminary injunction is warranted under the "serious questions" standard so long as the "balance of hardships tips decidedly toward the party requesting the preliminary relief." *Citigroup*, 598 F.3d at 35 (internal citation omitted).  Such circumstances manifest "in situations where it cannot determine with certainty that the moving party is more likely than not to prevail on the merits of the underlying claims, but where the costs outweigh the benefits of not granting the injunction." *Id.* (citing *F. & M. Schaefer Corp. v. C. Schmidt & Sons, Inc*., 597 F.2d 814, 815-19 (2d Cir.1979)).

Here, on the one side of the ledger, FRBNY's announced actions would almost certainly put BSJI out of existence.[12]  On the other side of the ledger, granting the injunction would merely

---

[12] "Without such access, a depository institution is nothing more than a vault." *Fourth Corner*, 861 F.3d at 1053 (Moritz, J.).

preserve the *status quo* pending litigation for a short period of time, permitting the Bank to continue to serve its customers with normal or even additional regulatory oversight. Afterall, the FRBNY was satisfied enough to allow the Bank to maintain its master account for 2 1/2 years since account access was restored in December of 2020. If the banking system was not threatened by the continuation of BSJI in this period, it will not be during the course of expedited litigation. And if the Board or the FRBNY have any evidence-based, articulable concerns, those concerns could be accommodated by the imposition of reasonable conditions on the grant of the Motion.

In all events, the balance of hardships therefore tips decidedly in BSJI's favor. *See, e.g.*, *Roso-Lino Beverage Distributors, Inc. v. Coca-Cola Bottling Co. of NY*, 749 F.2d 124, 126 (2d Cir. 1984) (reversing denial of preliminary injunction and finding equities tipped "decidedly" and "rather heavily" in favor of plaintiff-distributor who stood to "lose their business forever" without injunction where defendant-manufacturer would only need to continue to maintain eleven-year relationship "for a short while"); *Broker Genius, Inc.*, 313 F. Supp. 3d at 510 (finding balance of hardships favored injunction where movant would suffer "loss of reputation, good will, business opportunities, and customer relationships," and where non-moving party identified only one harm); *AIM Int'l Trading LLC v. Valcuine SpA.*, 188 F. Supp. 2d 384, 388 (S.D.N.Y. 2002) ("[T]he balance of equities tips firmly in plaintiffs' favor if the status quo is not preserved, their business will be wiped out.").

## III.   THE PUBLIC INTEREST FAVORS GRANTING AN INJUNCTION

The Court must also consider whether an injunction is in the public interest. *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015). "The public interest generally supports a grant of preliminary injunctive relief where . . . a plaintiff has demonstrated a substantial likelihood of success on the merits and a strong showing of irreparable harm." *A.T. by & through Tillman v. Harder*, 298 F. Supp. 3d 391, 417 (N.D.N.Y. 2018). That is the case here.

Temporarily enjoining the FRBNY and the Board from terminating BSJI's master account pending litigation is also in the public's interest in that also allow BSJI to continue to facilitate economic development and retain employees who will otherwise lose their jobs.

The public interest is also aptly illustrated by the FRBNY's own actions. Despite claiming that BSJI posed an "undue risk" to the Federal Reserve system, it has not identified a single material issue of activity that gives rise to such risk. CL Decl. ¶ 8-9. More pointedly, the FRBNY has itself found that BSJI's systems of controls render it at the "front of the line" and found as recently as 30 months ago that BSJI posed no undue risk so as to warrant BSJI's renewed access to Federal Reserve services. Nothing has happened in the intervening 30 months to justify a reversal of position. On the contrary, BSJI's business has been reviewed by K2, AML RightSource, credit card network VISA, and the Financial Industry Regulatory Authority ("FINRA"), each of whom found BSJI's business model satisfactory. FINRA, for example, is the self-regulatory organization in the United States that regulates and supervises securities broker dealers and is responsible for approving (or disapproving) prospective direct and indirect acquirors of 25% or more of the voting securities of a FINRA-member securities broker dealer. FINRA conducted an exhaustive assessment of BSJI and its sole stockowner, Mr. Marcelino Bellosta, in connection with BSJI's acquisition of a 40% interest in Intelligenics, Inc., a securities brokerage and financial services firm that has over $1,500 million in assets under management across the United States and Latin America. FINRA's rigorous analysis of BSJI and its owner lasted more than six months, and concluded when FINRA approved BSJI's acquisition, hardly a result that would have been reached had BSJI posed "an undue risk to the overall economy," as the FRBNY claims. Likewise, in 2020, the U.S. Department of Treasury's Office of Foreign Assets Control ("OFAC") conducted a civil investigation and audit of BSJI's OFAC compliance plan. OFAC closed that investigation without a single finding and BSJI's OFAC compliance plan has only been enhanced since then, demonstrating the fragility of the FRBNY's claims.

Equally, "[t]here is generally no public interest in the perpetuation of unlawful agency action. To the contrary, there is a substantial public interest in having governmental agencies

abide by the federal laws that govern their existence and operations." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (internal citations and quotations omitted). Finally, "[t]here is a well-recognized public interest in enforcing contracts and upholding the rule of law." *Bank of Am., N.A. v. Won Sam Yi*, 294 F. Supp. 3d 62, 81 (W.D.N.Y. 2018) (citations omitted).

Even if the FRBNY and the Board could divine some public interest in favor of their arbitrary action, this Court can act to protect such interest by conditioning its grant of the Motion on BSJI compliance with conditions reasonably designed to address such interests. *See, e.g.*, *Bhd. of Locomotive Eng'rs v. Missouri-Kansas-Texas R. Co.*, 363 U.S. 528, 531–32 (1960) (holding district courts can condition preliminary injunctions on the applicant undertaking a particular action).

## **CONCLUSION**

For all of the foregoing reasons, BSJI respectfully requests that the Court enter a temporary restraining order before July 31, 2023, and a preliminary injunction as soon thereafter as is practicable.

Dated: July 24, 2023                    By: *Abbe D. Lowell*

Abbe David Lowell
Kelly A. Librera
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166
ADLowell@winston.com
KLibrera@winston.com
T: 1-212 294-6700
F: 1-212-294-4700

*Counsel for Banco San Juan*
*Internacional, Inc.*

31