UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BANCO SAN JUAN INTERNACIONAL, INC.,<br><br>*Plaintiff*,<br><br>v.<br><br>THE FEDERAL RESERVE BANK OF NEW YORK AND THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM<br><br>*Defendants*. | Case No. 1:23-cv-06414-JGK |

**DECLARATION OF HÉCTOR J. VÁZQUEZ**

## DECLARATION OF HECTOR J. VAZQUEZ

I, Héctor J. Vázquez, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that to the best of my knowledge the following is true and correct:

### INTRODUCTION

1. I am over 21 years of age. I have personal knowledge of the facts and matters attested to in this Declaration, and I am competent to be a witness as to the facts and matters attested to in this Declaration.

2. Since the formation in 2011 of Banco San Juan Internacional, Inc. (BSJI or the Bank), an International Banking Entity (IBE) based in Guaynabo, Puerto Rico, I have occupied various position at BSJI. Presently, I am the Chief Executive Officer and a member of the Board of Directors of the Bank.

3. Before joining BSJI, I was the Chief Risk Officer of Eurobank, a publicly traded financial institution. Prior to Eurobank, I spent about 15 years with Moody's Analytics where I was in charge of Business Development of Central and South America. My responsibilities there included coordinating the development and implementation of credit risk assessment methodologies and tools for all types of commercial credit risk. In that capacity, I assisted innumerable financial institutions in Latin America in establishing a common credit culture utilizing best banking practices in commercial credit risk analysis. While at Moody's, I worked with a number of prestigious financial institutions, including Lloyds TSB Bank, HSBC, Banco Nacional de Costa Rica, BBVA, Banco Crédito Inversiones – Chile, and regularly attended conferences and otherwise stayed current on credit risk analysis in a variety of countries, including Chile, Mexico, and Peru.

4. Prior to joining Moody's, I worked as Senior Vice President of the largest leasing company in the Caribbean where I was responsible for, among other things, credit origination, administration and collections.

5. I started my career at KPMG, a Public Accounting firm, where I spent more than 10 years specializing in financial institutions (banks and savings & loans), working several years out of KPMG's Latin America Headquarters in New York.

6. I am a graduate of the Interamerican University of Puerto Rico, and I am a Certified Public Accountant and former member of the Board of Directors of Oriental Financial Group, a publicly traded financial institution and the Puerto Rico Electric Power Authority.

### BSJI HAS BEEN STEADILY ENHANCING ITS SYSTEMS AND CONTROLS FOR MORE THAN THREE YEARS

*Retention of Additional Personnel*

7. In April 2019, BSJI hired the former Chairman of the FDIC, William M. Isaac, and former compliance and ethics executive Richard J. Wolf, both of whom were associated with the global

consulting firm FTI at the time.[1] They were tasked with, among other things, reviewing and assessing the adequacy of the existing governance, risk management and compliance controls of BSJI. As set forth below, over the course of the next several months, FTI (and later the Secura-Isaac Group) built out a best of class system of internal controls that met or exceeded requirements of a bank the size and complexity of BSJI.  Mr. Isaac and Mr. Wolf continue to serve BSJI in their expert capacity today.

8. In July 2019, BSJI hired Francisco Aponte as BSA Compliance Officer, CAMS, CICA (to fill the vacancy left by the resignation of the former compliance officer).  At the time he joined BSJI, Mr. Aponte was 19 years in the banking industry as a BSA and Compliance Officer, having served at both local retail banks and international banking entities.

9. In February 2020, the Federal Reserve Bank of New York ("FRBNY") issued a new Account and Financial Services Handbook ("Handbook") with specific governance, risk management and compliance requirements for banks with access to FRBNY account services.  In response, BSJI retained K2 Integrity, a preeminent risk, compliance, investigations, and monitoring firm, to validate and tune its transaction monitoring and sanctions screening systems. The Bank also engaged Chain Bridge Partners LLC, an independent regulatory advisory firm led by Jerimiah Norton, a former director of the FDIC, to test and satisfy the operational risk management, resiliency, and continuity requirements of the Handbook.

10. Finally, in February 2021, BSJI retained Eric W. Bloom as its first in-house General Counsel. At the time he joined BSJI, Mr. Bloom was a 34-year veteran of the Washington, DC office of the international law firm of Winston & Strawn LLP. Mr. Bloom's substantial legal experience serves to underscore the importance of governance at BSJI.

*New Governance, Risk Management and Control Procedures*

11. BSJI has undertaken substantial measures to strengthen its governance, risk management and control procedures since February 2019.  Over the last 48 months, primarily at the direction of the team of specialized professionals, BSJI has enhanced its adherence to best practices and leading principles in the areas of governance, risk management and compliance.

12. In 2019, BSJI incurred extraordinary expense to have FTI conduct a comprehensive and detailed "lookback" in relation to BSJI's customer transactions over a one-year period to determine whether, among other things, any such transactions contained indicia of suspicious activity and whether any additional Suspicious Activity Reports should be filed ("Lookback").  The Lookback involved more than 5,500 professional service hours and required the distribution of more than 200 requests for information to accountholders to ensure that the reviewers had all relevant information needed to validate the activity in question. FTI certified to the FRBNY in real time that the Lookback found no evidence of illicit or suspicious transactions being passed through BSJI during that period.

13. Also in 2019, BSJI inventoried all bank policies and procedures and completed a compliance program gaps analysis. With the assistance of FTI and with the new BSA Officer's

---

[1] Messrs. Isaac and Wolf left FTI in 2020 and joined a newly created firm called Isaac-Milstein Group LLC, which is predecessor in interest to Secura-Isaac Group LLC, where Mr. Isaac is chairman and Mr. Wolf is managing director.

involvement, and added backup staff and resources to assist him, BSJI enhanced its overall system of compliance controls, including revised policies and procedures, and, critically, completed the implementation of the fully automated transaction-monitoring system. The process also yielded revised Bank Secrecy Act ("BSA")/anti-money laundering ("AML") policies and procedures assembled in a new AML/CFT Manual, which includes specific instructions and clear policy on the filing of Suspicious Activity Reports and a process for escalating questions regarding whether and when to file such a report. BSJI also updated the Know Your Customer program to risk-rate and evaluate BSJI's unique customer base specifically designed for heightened concerns regarding the region and market in which the Bank operates, including a customized risk-rating form to evaluate all customers during the initial due diligence and the enhanced due diligence processes.

14. In 2020, BSJI adopted new codes of business conduct and ethics for employees, officers, and directors. BSJI trains and tests all employees on BSJI policies regarding AML, sanctions, ethics, and AML. Importantly, BSJI has not only updated its policies and procedures, and automated its transaction monitoring system, but it actively strives to ensure that a culture of compliance permeates its every day decision-making process.

15. BSJI continues to further enhance its governance, risk management and compliance program by:

    - Implementing a new risk-based cybersecurity and information protection policy and procedures.

    - Conducting regular independent testing of BSA/AML and OFAC controls, including annual model validations, and make reports to regulatory agencies as appropriate.

    - Requiring ACAMS credentials and continuing compliance education coursework for all key bank personnel.

    - Enhancing the customized risk-rating form to evaluate all customers during the Initial Due Diligence and the Enhanced Due Diligence processes.

*Relations with our Regulator*

16. BSJI is regulated by ▬▬▬▬▬▬▬▬▬ with the Office of the Commissioner of Financial Institutions (OCFI) of Puerto Rico with which BSJI regularly consults and engages. There is no litigation of any kind threatened or pending against BSJI.

17. Over these last four years, we have retained, relied extensively and invested substantial resources on some of the most credentialed, market-recognized and experienced consultants precisely to ensure that our systems of controls and governance are effective under any objective measure. We afford them independence and support, and we regularly take their advice so that we can provide comfort to our local regulators, to the FRBNY, to our accountholders, and to the public. We have actively sought to be the "poster child" of what the FRBNY wishes for in an IBE.

3

18. The enhancement of BSJI's risk management, governance, and compliance programs is a process of continuous improvement. In short, BSJI relies on in-house and outside experts to establish best practices, conform with requirements from its regulator and the FRBNY, and ensure that it has the systems and tools in place to protect the institution and all those with whom it does business.

*Capitalization*

19. BSJI's capital is well over any US regulatory benchmark established by any federal regulator for a well-capitalized banking institution. As of March 31, 2023, total stockholder's equity represented over 32% of BSJI's total assets and over 91% of total assets is cash and due from banks.

## THE 2022 COMPLIANCE REPORTS AND THE FRBNY'S JULY 2022 CLOSURE LETTER TO BSJI

20. As noted previously, in 2020 we retained K2 Integrity, a well-known and top-of-the-line risk, compliance, investigations, and monitoring firm, to validate BSJI's transaction monitoring and sanctions screening systems.

21. In 2021, and most recently in 2022, we again reverted to K2 Integrity, but in these instances with the aim to ensure bank compliance with certain newly-issued requirements set forth in Factor 2 of the FRBNY Account and Financial Services Handbook ("Handbook"), which required an approved, independent third-party evaluation of the bank's compliance framework and transaction monitoring ("TM") and OFAC screening controls. K2 Integrity is elite in its field and known for its independence.

22. In the case of the 2021 engagement, we were still very much in the midst of the pandemic and so the FRBNY, BSJI and K2 Integrity reached a variety of accommodations on the timing of the submissions of the K2 Integrity reports. Accordingly, K2 Integrity produced three separate reports: (i) the OFAC screening technical validation on June 14, 2021; (ii) the BSA/AML and OFAC compliance program assessment on June 16, 2021; and (iii) the BSA/AML transaction monitoring technical validation on June 29, 2021.

23. In light of the varying review periods that were employed in the 2021 reports, in my initial conversations with K2 Integrity for 2022, K2 Integrity and BSJI agreed that the most sensible scope for K2 Integrity's 2022 review was for K2 Integrity to conduct the evaluations up to June 30, 2022, on each of the three areas subject to examination and that we employ this same review period every year moving forward. In this way, we would ensure 12 months of non-overlapping data from the previous review. The Handbook expressly required 12 months of data, and it would make no sense to include data that had previously been evaluated and included in a previous report to the FRBNY. Simply put, it would serve no one's purpose to include in the 12 months of data in the new report already-analyzed data from the prior year.

24. I thereafter communicated with the FRBNY to ensure that we were on the same page. The Handbook issued by the FRBNY advises that we can reach out to FRBNY should we have any questions, specifically providing the contact information of FRBNY. In this regard, by an April 7, 2022, email to Claudette Bridgewater of the FRBNY, I requested a bilateral call to discuss,

4

among others, the timing of the submissions due in 2022 under Factor 2 of the Handbook and to confirm the FRBNY's non-objection for BSJI to use K2 Integrity again as its independent consultant. In accordance with Supplemental Terms and Conditions Governing the Provision of Financial Services to High-Risk Customers, we made that request "within 30 calendar days of the proposed Independent Consultant or Auditor's engagement, but prior to the commencement of the engagement…." That email states in full as follows:

> BSJI is developing a work plan to ensure that all documentation required by the FRB-NY Handbook for the year ending December 31, 2022, is completed and submitted in a timely fashion. As part of the planning process, we would like to confirm our understanding of the steps to be followed and arrange a bilateral call with your group, at your earliest convenience, to ensure that we fulfill FRB-NY requirements. To facilitate such discussion, below please find a summary of our understanding of this year's process as follows:
>
> Factor 1
> - KYC Questionnaire and related documentation shall be available shortly after requested by FRB-NY. (BSJI will not submit any documentation until requested by the FRB-NY).
>
> Factor 2
> - BSJI is hiring K2 Integrity to provide a model validation and compliance program assessment, the Factor 2 Attestation for 2022. Their review period will cover [the] from May 2021 to June 30, 2022. (BSJI expects that field work and Attestation report be completed by the latter part of the third quarter of 2022).
>
> Factor 3
> - BSJI will continue working with Chain Bridge Partners to provide necessary support for our Security Attestation as required by Factor 3 of the Handbook and OC 5. (BSJI expects to file its OC 5 Attestation for the year ending December 31, 2022, by the end of the last quarter of the year. We need to clarify if a such third-party attestation will be required as part of our request for FedACH Services and Fedwire Fund Services.)
>
> Factor 4
> - Business Plan for the year ending December 31, 2022, approved by the Board of Directors, is currently available.
> - Audited financial statements and quarterly financial statements as of and for the year ended December 31, 2021, have been submitted to the FRB-NY.
>
> Also, we would like to ascertain which additional steps, if any, are required in connection with our request for access to FedACH Services and Fedwire Fund Services.
>
> We look forward to meeting with you at your earliest convenience.

5

25. A true and correct copy of this email is attached to my Declaration as Exhibit 1.

26. I never received a response from the FRBNY to this inquiry. Accordingly, on June 3, 2022, I instructed my colleague, Pedro Crespo, to follow up with Ms. Bridgewater. In this respect, on June 3, 2022, Mr. Crespo emailed Ms. Bridgewater and confirmed that:

> BSJI has engaged K2 Integrity, operating through K2 Intelligence, LLC, as an Independent Consultant to perform the BSA/AML and OFAC Program Assessment, Technical Validation, meeting the requirements of factor 2 of the FRB-NY Handbook. The scope of the review period will cover from May 1, 2021, to June 30, 2022. The inclusion of June 2022 in the review period is to align the review periods of both the Program Assessment and the Technical Validation and to ensure complete coverage of relevant internal controls for the current review.
>
> Pursuant to section 2.2.1(c) of the BSA/AML and OFAC Compliance Program Assessment of the New York Fed Supplemental Terms and Conditions Governing the Provision of Financial Services to High Risk Customers, we are enclosing a copy of the engagement letter.
>
> Should you have any questions, please let us know.

27. A true and correct copy of this correspondence is attached to my Declaration as Exhibit 2.

**FRBNY'S 2022 NOTICE TO TERMINATE FEDERAL RESERVE SERVICES TO BSJI AND ITS AFTERMATH**

28. With no prior notice, warning or even hint, after the conclusion of K2 Integrity's review period and while it was presumably in the drafting stages of the various reports, by letter dated July 18, 2022, the FRBNY advised me that it intended to terminate BSJI's access to Federal Reserve services, including to the master account, as of September 15, 2022. A true and correct copy of the FRBNY July 18, 2022, letter is attached as Exhibit 3 to this Declaration.

29. According to the FRBNY, each of the K2 Integrity reports should have been submitted in June 2022. Allegedly, the "missed deadline" caused the FRBNY to conclude that BSJI poses an "undue risk," notwithstanding that (i) BSJI twice corresponded with the FRBNY to ensure that the schedule we were operating on was acceptable to it; (ii) there was no indication that the K2 Integrity reports, once concluded, would support the FRBNY's conclusion that BSJI poses an undue risk to the FRBNY (or to anyone); (iii) BSJI had for the prior three years continually and substantially enhanced its system of controls and governance; and (iv) BSJI is exceedingly well capitalized.

30. Believing that the July 18, 2022 FRBNY letter had been a misunderstanding, I reminded the FRBNY by letter dated July 19, 2022 of BSJI's earlier correspondence that had gone unanswered. I honestly thought at the time that the FRBNY had simply made a mistake, that it would appreciate that BSJI had acted in good faith, that the error had been theirs both because

the FRBNY's interpretation of the timing deadline (in our view) made little sense and because it had failed to clarify its interpretation in response to either of our letters. A true and correct copy of my July 19, 2022 letter is attached as Exhibit 4 to this Declaration.

31. By letter dated August 9, 2022, and in advance of a bilateral call with the FRBNY set for two days later, I again advised the FRBNY of both our rationale in support of our proposed deadline and of BSJI's repeated efforts to obtain clarification from the FRBNY:

> You already have our letter dated July 19, 2022, in which we responded to the FRBNY's statement that BSJI poses "undue risk" because it has not yet submitted its 2022 independent assessment reports for technical model validations and BSA/AML and OFAC program assessment. As noted, we believe this decision is in error, as BSJI is completing assessments that cover a full twelve-month period (from June 30, 2021, to June 30, 2022), and that report is due within three months of the report conclusion date, or on or before September 30, 2022. These are timelines drawn from the FAQs to the FRBNY Handbook. We directly communicated with the FRBNY to clarify our understanding regarding the timing of and coverage period for its 2022 independent assessment and technical validations submissions.
>
> In short, we have specifically followed the guidance governing the submission of annual compliance assessments, which requires twelve months of content and submitted within 90 days of the completion of the review period. The obvious problem is that institutions could not do both, that is, to include a fully 12-month review period and submit the report simultaneously upon the conclusion of that review period. That was the reason for our correspondence seeking guidance. We reasonably interpreted your nonobjection as concurrence with our proposed timetable and acted in reliance on your silence. Had there been an objection, we would have complied with any instructions you provided, including instructions to have K2 Integrity, the independent vendor who conducted the review, shorten the review period and ensure compliance with any deadline you provided. K2 continues to work on the reports, which will be submitted in the manner we proposed in our correspondence and to which the FRBNY did not object. In the interim, K2 has preliminarily advised that, as of this date, its findings will be no different from last year's report, namely, that BSJI maintains an effective system of governance and controls.

32. In that same letter, I advised the FRBNY that BSJI has already undertaken concrete steps to seek an FDIC deposit insurance certificate, which, we presumed, would obviate the FRBNY's principal concern that BSJI is not *federally* regulated and therefore not *federally* examined.

> BSJI has begun to consult experts experienced in the FDIC licensing process, specifically, James Watkins, former Senior Deputy Director of the FDIC, whose responsibilities included the approval of de novo and change of control applications for state-licensed banks regulated federally by the FDIC. BSJI has also advised its regulator, OCFI of its plan to obtain federal deposit insurance from the FDIC. As you know, the most critical step is the

> creation of a robust, thorough, commercially reasonable and sound business plan that includes not only the objectives and the means by which we can achieve those objectives, but also identifies the management team, describes a sensible marketing plan and includes well-supported projections. While much work still needs to be done, we have already devoted substantial time developing in this effort. Notice of intent to terminate the master account has reinforced and expedited our efforts.
>
> \* \* \* \*
>
> Through our advisors, BSJI is the entity that proposed to the FRBNY that, while it could not directly supervise IBEs, it had the ability to affect the behavior of financial institutions by enhancing the contractual commitments governing the relationships. This was suggested to give you comfort that BSJI was meeting minimal requirements for a safe and sound financial institution. BSJI undertook significant efforts to achieve a strong foundation of compliance before the Handbook was published and was specifically advised by the former FRBNY General Counsel that BSJI was at "the front of the line" in terms of readiness for the Handbook's requirements. That statement did not come without the devotion of substantial resources and efforts. Indeed, BSJI expended over $6 million in the last three and a half years to raise the performance of the institution in all respects. That alone speaks of the commitment of the bank to do the right thing.

33. While I understood that the FRBNY's had become increasingly hostile toward IBEs and further understood from others that the FRBNY had been targeting IBE', I noted in my letter that BSJI's risk profile is materially different from that of other IBEs for a variety of reasons, including its rather small footprint, its high capital position, and its system of controls and governance. I added:

    > The FRBNY has worked with BSJI for the past three years and has seen the bank respond positively to an array of obligations; BSJI hit every benchmark to satisfy the FRBNY. It is impossible to conclude this bank requires immediate termination when just last year BSJI satisfied all its milestones and had proven itself worthy of maintaining a master account. With our limited retail business and the risk associated with it eliminated, we have only further improved our controls and governance. It cannot be that BSJI poses more risk than at the time the FRBNY reinstated all of our privileges. We are not just any IBE. We are, as the FRBNY [earlier] advised, "at the front of the line."
    >
    > As it stands, the risk profile of BSJI is very different from other institutions on the island. Our volume is modest; we have not sought to grow the institution since 2019 and indeed have shrunk our client base. <u>If necessary, BSJI would agree to additional limitations to maintain the account and provide updates to the FRBNY on a regular basis …..</u>

8

Emphasis added. A true and correct copy of my August 9, 2022, letter is attached as Exhibit 5.

34. On August 11, 2022, the one and only call we have had with the FRBNY in the last 12 months took place. We had hoped for a constructive dialogue, but the FRBNY essentially advised that (i) the die had been cast and (ii) it would close our master account on the appointed date the following month.

35. We nonetheless continued to send letters to the FRBNY, making our case, offering to satisfy whatever concerns it might have, and frequently pleading for an in-person meeting, as it simply made no sense to force account closure of the Bank given that (i) in three short years, BSJI had so thoroughly downsized and de-risked; (ii) while simultaneously investing huge resources to upgrade its compliances policies and processes.

36. In my letter dated August 12, 2022, a true and correct copy of which is attached as Exhibit 6, I closed by saying that "we are looking for a good faith, constructive dialogue so that we can achieve what is in the best interest of both the FRBNY and BSJI. As part of this process, if there is more we can do to ensure your comfort with BSJI, we would be happy to work with you to further reduce any potential concerns." In response, by letter dated August 17, 2022, the FRBNY advised, in the first heading, that "*The New York Fed Is Not Revisiting Its Decision to Close BSJI's Account.*" Nor did it respond to BSJI's request for a constructive dialogue. A true and correct copy of the FRBNY's August 17, 2022, letter is attached as Exhibit 7.

37. In my letter of August 19, 2022, I requested a meeting with senior FRBNY management because, it seemed apparent from our bilateral call, that the staff with whom we spoke were merely directed to carry out a policy rather than to engage the Bank based on the specific facts and circumstances we were presenting. A true and correct copy of my letter dated August 19, 2022, is attached as Exhibit 8. The FRBNY's letter of September 1, 2022 in response noted that it would "continue to stand by [its] decision" that BSJI posed an "undue risk," and it declined to respond at all to BSJI's request for a meeting. A true and correct copy of the September 1, 2022, letter is attached as Exhibit 9.

38. By letter dated September 6, 2022, BSJI again sought clarity by asking the FRBNY four questions:

> (1) Is the FRBNY declining our request for a further meeting? (2) Can the FRBNY confirm that there are no further appellate or ombuds rights in relation to the pending issues or that it will not otherwise extend such rights or courtesies to BSJI? (3) Is there an existing procedure and expected/expedited timeframe for decision in the event the Bank were to reapply for Federal Reserve services? And more particularly, (4) how is the new process any different from the process that BSJI went through, leading to reinstatement of its access to Federal Reserve services just over a year ago?"

> In a footnote, I observed that "BSJI's only prior experience losing access to the Federal Reserve services was catastrophic, with the institution losing more than 90 percent of its depositors and more than two-thirds of its total deposits. BSJI has not recovered. Dollar amounts of total deposits as of January 1, 2019, was $14.8 million; total deposits as of July 31, 2022, was $4.7

million.  BSJI cannot withstand a repeat event." A true and correct copy of my September 6, 2022, letter is attached as Exhibit 10.

39. The FRBNY responded by letter dated September 12, 2022, a true and correct copy of which is attached as Exhibit 11. In that letter, the FRBNY acknowledged that the "primary driver" for its determination that BSJI posed an undue risk was its finding that "BSJI missed" the annual assessment deadlines.

40. In direct response to my questions, in that same letter, the FRBNY "respectfully decline[d] my request for a meeting because it not believe "it would be productive," citing the single August 11, 2022 telephone call and the exchange of letters.  FRBNY also confirmed that there exists no "appellate or ombuds review of our decision," thus rendering its decision to close the master account as its final decision, asserting further that the FRBNY is free to close a master account "on written notice."  Finally, as to BSJI's questions regarding an institution's ability to apply again for a master account, the timing of such review, and how might that process differ from what BSJI had just gone through, the FRBNY responded only that it would "share information with new account applicants in the near future about next steps … ."

41. BSJI had invested **more than $4 million** to have FTI conduct a Lookback at every single transaction over a one year period in 2019 – 2020 to give the FRBNY comfort that no illegal transactions had passed through BSJI; invested substantial additional resources relying on some of the best outside consultants and former regulators to build a comprehensive compliance program; and was forced to hit a number of specified benchmarks before the FRBNY granted BSJI access to Federal Reserve services in December 2020.  As noted above, during this time, the FRBNY had suspended our master account, trapping our customers' money at the Federal Reserve, in some instances for almost a year.  The results were cataclysmic, with BSJI losing more than 90% of our customers.  Those who remained were loyal friends or family members of BSJI personnel.  But we were committed to launch a new business plan, and eventually and slowly grow the Bank.

42. BSJI could not withstand a master account closure a second time.

43. With the FRBNY's planned closure date of September 29, 2022 fast approaching, I sent a final letter to the FRBNY, this one dated September 15, 2022, a true and correct copy of which is attached as Exhibit 12.  In addition to addressing points raised in the FRBNY's letter of September 12, 2022, I candidly advised it that "we consider closure of BSJI's master account an existential threat to BSJI, absent a resolution, we intend to submit the immediate dispute to the court by the end of next week" and therefore requested answers to our questions by September 21, 2023.  Elsewhere I noted that "[t]here are obvious calendar issues, which is what makes resolution so challenging here" and that "we need to determine whether there is a willingness to resolve the matter before then."

44. Four days later, by letter dated September 19, 2022, the FRBNY notified BSJI that it was "suspending the planned September 29, 2022, closure of BSJI's master account and termination of its access to Federal Reserve financial services."  The FRBNY further advised that it would instead review K2 Integrity's reports—two of which had by that time already been submitted, with the third one in its end stages), and that the FRBNY would also send to BSJI a formal Request for Information.  I was of course gratified by the rescission of the master account

closure date but was concerned about the possibility that the FRBNY might be seeking new justifications to reach a preordained conclusion.

45. On October 5, 2022, the FRBNY did in fact send to BSJI its promised Request for Information. BSJI timely submitted its response on October 31, 2022. A true and correct copy of both the October 5, 2022 RFI and BSJI's October 31, 2022 response is attached as Exhibits 13 and 14. Being more than a little concerned that the FRBNY might be looking to backfill a predetermined conclusion, we advised the FRBNY that "[w]e welcome follow up dialogue" and that we "would be happy to provide such further information should there be any ambiguity or concerns" "relating to the subject transactions."

46. Like our previous requests for a meeting and dialogue, the FRBNY again chose not to engage us.

### THE FRBNY'S 2023 NOTICE OF INTENT TO CLOSE BSJI'S MASTER ACCOUNT

47. Three months later, on January 25, 2023, not having heard anything from the FRBNY, I sent the FRBNY another letter in which I recounted many of the enhancements the Bank had adopted over the preceding several years and our ongoing plans to continue to lead the way among IBE's to ensure top-notch compliance. Among other things, I said:

    In the last four years, BSJI has successfully taken numerous steps to reduce its risk profile and enhance controls as demonstrated by the results of independent assessments of BSJI's compliance and risk management programs. To begin, BSJI has reduced its inherent risk by reducing its size and activities. In June 2020, BSJI had approximately 270 customers in contrast to 56 as of June 2022. This significant reduction makes compliance and managing risk more straightforward. Despite that reduction in inherent risk, between 2019 and 2022, BSJI retained respected experts to review and enhance risk management. ***BSJI invested more than $6 million in these efforts.*** These experts include K2 Integrity; Chain Bridge Partners LLC ("CBP"), led by former FDIC official Jerimiah Norton; AML RightSource ("AMLRS"); FTI Consulting and Secura/Isaac Group, including former Chairman of the Federal Deposit Insurance Corporation ("FDIC"), William M. Isaac; and former Federal Reserve System officials, Richard Wolf and Chris Laursen. The results of the independent, expert assessments make resoundingly clear BSJI's commitment to appropriately address risk.

48. After setting out in detail so many of the enhancements the Bank had undertaken, I closed by again asking for a good faith dialogue with the FRBNY, specifically noting that BSJI would be amenable to an agreement of some kind to afford the FRBNY whatever additional comfort it still needed:

    In addition to the steps taken above, BSJI is prepared to take additional action in collaboration with the FRBNY, including, for example, by establishing a cap on master account activity, limiting the functionality of BSJI-provided accounts, or adopting capital requirements, all to address any perceived risk to the Reserve Bank associated with use of the master account.

A true and correct copy of my January 25, 2023 letter is attached as Exhibit 15.

49. Relatedly, BSJI's General Counsel, Eric Bloom, sent a separate letter to the FRBNY's General Counsel seeking a meeting "to discuss entering commitments to supervision by FRBNY at your earliest convenience." Among other things, Mr. Bloom noted: "We understand that IBEs generally have come under scrutiny in recent years, but, as our enhancements show, BSJI is committed to robust controls and governance. For avoidance of further doubt, BSJI seeks to become supervised by FRBNY. Alternatively, BSJI is willing to enter into a voluntary agreement with the FRBNY sufficient to afford the FRBNY yet additional comfort regarding BSJI's compliance program and any perceived risk BSJI may pose to the Federal Reserve System." A true and correct copy of the letter is attached as Exhibit 16.

50. The FRBNY again chose not to respond, either to my letter or to the letter of BSJI's General Counsel, that is, until it notified BSJI on April 24, 2023, that the FRBNY again determined that BSJI poses an "undue risk" and again intended to close BSJI's master account, this time on June 20, 2023. A true and correct copy of the April 24, 2023, letter is attached as Exhibit 17.

51. In the FRBNY's April 24, 2023, letter, the FRBNY asserts that it "has determined that continuing to provide a master account and financial services to BSJI poses undue risk to the overall economy by facilitating activities such as money laundering, economic or trade sanctions violations, or other illicit activities." To be clear, BSJI has never been charged, much less convicted of any such alleged activity. Nor is BSJI under investigation for any such alleged activity. To my knowledge, BSJI is not involved in any such activity, and if it came to my attention as BSJI's CEO, I would not tolerate it, and we would escalate it to appropriate stakeholders, as appropriate.

52. While the FRBNY contends that BSJI imposes a risk of facilitating "economic or trade sanctions violations," the U.S. Department of Treasury's Office of Foreign Assets Control conducted a civil investigation/audit of BSJI's OFAC compliance plan in 2020. OFAC subsequently closed that investigation without making any adverse findings. Given that the OFAC compliance plan has only been enhanced since then, the FRBNY's concern is misguided.

53. Further, to reach its conclusion that BSJI poses an "undue risk," the FRBNY had to discard K2 Integrity's findings, even though K-2 Integrity is known for its independence, expertise, and thoroughness, the FRBNY had right to object to the retention of K2 in the first place, and notwithstanding the hundreds of hours devoted by K-2—many on-site—to review the BSJI's processes in a holistic manner.

54. Nor is K-2 alone in its conclusion that BSJI is in compliance with all of the FRBNY Handbook requirements and does not pose an "undue risk" to the Federal Reserve System. To the contrary, AML Rightsource, another industry leading firm focused on AML/BSA and financial crimes compliance, audited BSJI for the period October 1, 2021 through September 30, 2022 and found the program "strong." And Kaufman Rossin & Co., P.A., at the request of a major credit card network (i.e., VISA) before approving grant of BSJI's request to employ its credit card (though only on the condition that BSJI have and maintain a master account), audited BSJI's BSA/AML/OFAC program for the period July 1, 2021 through June 30, 2022

12

In other words, the FRBNY substituted its conclusions for those offered by three separate, independent, well-credentialed, leading expert firms in the industry. True and correct relevant documents are attached as Exhibit 18.

55. Over the last year, the FRBNY has been reluctant to engage the institution in any kind of meaningful dialogue, thereby making it challenging to BSJI to address whatever legitimate concerns the FRBNY might have. After notifying us in July 2022 of its intent to close our master account two months later, the FRBNY granted us a single, 45-minute "bilateral call," which, as I indicated above, was devoid of any give and take. The focus of the call was instead on whether BSJI missed a deadline and, if so, whether that warranted the death sentence for the institution. The FRBNY representatives clearly had no desire to discuss broader, substantive issues. BSJI continued to ask the FRBNY for a meeting in response to the FRBNY letters reaffirming its decision to close BSJI's master account. In its September 12, 2022 letter, the FRBNY "respectfully declined" to meet with BSJI representatives because, in its view, such a meeting was not likely going to be "productive." BSJI again reached out to the FRBNY, on January 25, 2023, asking again for a meeting to discuss any concerns it might have and determine how best BSJI might be able to accommodate the FRBNY. We did not hear anything in return, that is, until April 24, 2023, when the FRBNY again advised BSJI of its intent to close BSJI's master account.

56. In response to that April 24, 2023 letter, BSJI, through regulatory counsel, submitted on May 19, 2023 detailed information in response to each and every point raised in the FRBNY letter demonstrating that (i) the points relied on by the FRBNY to justify closure of BSJI's master account were outdated, and (ii) any alleged deficiency in BSJI's compliance program had been addressed in the ordinary course of business. BSJI also submitted a detailed, 39-paragraph sworn declaration from K2 Integrity, standing by its BSJI reports and its opinions, concluding: "K2 evaluated BSJI while applying regulatory requirements and industry practices. K2 stands by its findings, recommendations and assessments as of the time of its review in the case of BSJI." A true and correct copy of BSJI's May 19, 2023, submission is attached as Exhibit 19.

57. On May 31, 2023, BSJI, again through regulatory counsel, submitted additional information to the FRBNY, including a sworn declaration from Richard Wolf, who served in a variety of legal and compliance roles, including periods of service as Senior Advisor for the Federal Reserve Bank of New York, Chief Ethics Officer for HSBC North America, and Global Head of Compliance and Ethics for Cendant Corporation, and a sworn declaration from me, which, in large part, covered the matters in the instant Declaration. By way of this May 31 submission, we advised the FRBNY that K2 Integrity's conclusions were effectively mirrored by two other BSA/AML/sanctions firms that reviewed BSJI's compliance program and operations largely over the same time period, and that the FRBNY's current position represented a unique opinion and was in fact an outlier. A true and correct copy of BSJI's May 23, 2023, submission is attached as Exhibit 20.

58. On June 2, 2023, BSJI, through regulatory counsel, submitted a Declaration from Christopher Laursen, who previously served as Manager of Risk Policy and Guidance for the Board of Governors of the Federal Reserve System, where he was responsible for the formulation and interpretation of Federal Reserve Board and federal interagency regulations, policies, and guidance that applied to financial companies operating in the United States. He also has served

as Head of Trading and Capital Markets Risk within the Market and Liquidity Section of the Federal Reserve Board. Mr. Laursen further served as an examiner for three separate Federal Reserve Banks and the Office of the Comptroller of the Currency for nearly 13 years. A true and correct copy of BSJI's June 2, 2023, submission is attached as Exhibit 21.

59. In his Declaration, Mr. Laursen noted that the FRBNY did not adhere to either its traditional practice or its own Guidelines, noting, among other things, that in his experience as a former U.S. banking agency examiner, "it was unusual to ignore the overall conclusions of a reputable independent risk evaluation firm's report." Further, Mr. Laursen affirmed: "Based on my training and experience during the many years I worked in the Federal Reserve System, I would have expected the FRBNY to respond to BSJI's requests for discussion. Furthermore, I would have expected the FRBNY to reach out to BSJI when it began to develop concerns that BSJI's activities may pose an 'undue risk to the U.S. economy' under Principle 5 of the Evaluation Standards. And to the extent the FRBNY had fact-based concerns, I would have expected it to afford BSJI an opportunity to remedy these concerns through dialogue and a remediation action plan."

60. Four business days later, on June 8, 2023, the FRBNY finally granted BSJI the opportunity to participate in a "bilateral call." The FRBNY controlled the agenda for the June 8, 2023 "bilateral call," stating: "During the meeting, we ask that BSJI focus on any points in those written materials that it would like to emphasize for consideration. We also ask that BSJI use the meeting as an opportunity to provide any other information it would like the New York Fed to consider." So while the FRBNY declined to grant BSJI any meeting or any opportunity to be heard prior to reaching its decision and forwarding to BSJI the FRBNY April 24, 2023 closure letter, the FRBNY chose to grant BSJI 45 minutes, by phone, after the fact.

61. The bilateral call occurred on June 20, 2023. As dictated by the FRBNY, I used our limited time to summarize BSJI's principal points—namely, that three different BSA/AML/sanctions firms reviewed and blessed our compliance plans as "effective", that we disagreed with the FRBNY's recharacterization of K2's recommendations as "deficiencies," but that these points are nonetheless moot because BSJI has addressed those recommendations. I also noted that K2 Integrity had already begun the validation process, which was due to be completed in July 2023. Even though the vast majority of the April 24, 2023 closure letter focused on BSJI's compliance program and K2 Integrity's evaluation of the same, I do not recall the FRBNY mentioning the compliance program or K2 Integrity's analysis at all. Instead, the FRBNY no longer was complaining that BSJI allegedly missed a deadline in 2022, or otherwise claiming that its compliance program was currently deficient. Rather, the only substantive comments by the FRBNY on the call reflected a generalized concern regarding so-called "party-related" "shell company" transactions in high-risk jurisdictions. It provided no specifics.

62. In response to these few comments, on June 27, 2023, BSJI provided the FRBNY yet one more submission in an effort to address the FRBNY's generalized concern about "related-parties" "shell companies" transactions, even though we did not know what transaction or transactions, if any, might in fact be causing the FRBNY concern. In that submission, we identified the businesses of each of BSJI's customers, the number, volume and purposes of transactions of each customer, and believed in good faith that such factual information should have demonstrated that not a single current customer of BSJI is a "shell company" or otherwise

14

engages in "high risk" transactions. A true and correct copy of BSJI's June 27, 2023, submission is attached as Exhibit 22.

63. Three days later, on June 30, 2023, the FRBNY reaffirmed its decision to terminate Federal Reserve services to BSJI. A true and correct copy of the FRBNY letter is attached as Exhibit 23. Regulatory counsel responded on July 6, 2023 to the FRBNY's letter; a true and correct copy is attached as Exhibit 24.

## BSJI'S CURRENT STATE OF AFFAIRS

64. For my part, BSJI has tremendously downsized and de-risked over the last four years. From December 31, 2018, to December 31, 2022, in just four years, BSJI went from 734 accountholders to just 19, from 739 accounts to just 20, from $14.8 million in total balance to just $1.4 million.

65. In calendar year 2018, BSJI had 4,322 incoming transactions in the aggregate amount of about $110 million. In calendar year 2022, BSJI had just 110 incoming transactions for a total amount of about $1.4 million. In calendar year 2018, BSJI had 6,072 outgoing transactions in the aggregate amount of about $98 million. Four years later, BSJI had just 862 transactions in the aggregate amount of about $17.2 million. Currently, there are so few transactions that BSJI's compliance team can and does review each and every one in real time in parallel with the automated monitoring system in use. At the same time, BSJI has built a compliance program on the backs and some of the best consultants and former regulators, with BSJI continually addressing recommendations from K2 Integrity and others, thereby making it stronger every year.

66. In 2019 and 2020, we engaged in serious dialogue with the FRBNY, relied on its formal and informal directives. It appears that the FRBNY representatives we dialogued with are no longer at the FRBNY or are in new positions. In 2022 and 2023, we have repeatedly asked for a dialogue with the FRBNY because we are confident that we can address any serious concern to its satisfaction. To date, we have been unable to secure that needed frank dialogue.

67. As in any business, BSJI needs an element of business stability to effectuate its business plan. The FRBNY continues to deny us that stability. As an example, BSJI spent literally years cultivating a business relationship with a Chicago-based brokerage firm with the understanding that, if BSJI could acquire an interest in that firm, BSJI would be able to cross sell financial products to its high net-worth clients. In 2022, after extensive negotiations and multiple drafts of the purchase and sale agreements, BSJI and the brokerage firm closed on the transaction, pursuant to which BSJI acquired a 40% interest. And on September 21, 2022, after about eight months since the application was filed, the Financial Industry Regulatory Authority (FINRA) granted approval to the transaction. Meanwhile, BSJI had applied for approval from a major credit cards for the right to employ the credit card, which itself required the expenditure of substantial resources and pursuant to which BSJI subjected itself to an audit by that company, ███████████████████████████████████████ On April 10, 2023, that credit card company granted approval, and the plan was to introduce the credit card to the brokerage firm's high net-worth customers by year end.

68. However, notwithstanding the multi-year efforts and substantial resources devoted to this business plan, and the fact that all of these efforts were just now bearing fruit, the FRBNY's planned closure of BSJI's master account will, absent a reversal, almost certainly will derail BSJI from executing on the business plan because access to the master account is a condition of the credit card's approval for use of their card.

69. There are many other dire (direct and indirect) effects of the FRBNY's planned action. For example, BSJI has been a plaintiff in ongoing litigation in which it has received a judgment against a foreign defendant in the amount of nearly $100 million. BSJI has since obtained an order preliminarily attaching assets to satisfy that judgment. Absent a master account, it is uncertain where BSJI might receive those funds.

70. Further still, BSJI has worked for about a year on seeking FDIC deposit insurance, either directly or through a sister bank—and thereby become federally regulated and federally examined. In this connection, BSJI had discussions with its local regulator, worked closely with one of its outside consultants, and prepared a preliminary application for FDIC deposit insurance. Just two days before a scheduled April 26, 2023 meeting between BSJI's consultant and the FDIC, the FRBNY emailed to BSJI its notice of intent to close the master account. The meeting proceeded nonetheless but those discussions cannot move forward given the reality that the FRBNY's findings effectively have closed the door to BSJI's efforts to obtain FDIC deposit insurance.

71. BSJI meanwhile is in search of a correspondent banking relationship that might mitigate the effects of the closure of its master account but, as one bank recently advised, it is most reticent to invite scrutiny on itself by entering into such a relationship with BSJI in light of the FRBNY's findings.

72. Closure of the master account not only threatens the viability of BSJI, but it also would mean that the funds of our few remaining customers might be trapped at the FRBNY, thereby subjecting BSJI to legal liability.

73. For my part, I cannot believe that a tiny bank in Puerto Rico with just 14 accounts and 13 customers, and with so few annual transactions, poses a risk management concern to the FRBNY, especially in light of the fact that three well-credentialed, independent, third-party BSA/AML firms—each of whom has done a deep dive into the BSJI's systems and processes—found that BSJI's compliance program (developed by top-of-the-line consultants and former regulators) to be effective.

74. I remain hopeful that the FRBNY will reconsider and agree to a constructive dialogue so that BSJI can both satisfy any reasonable concerns the FRBNY might have while permitting BSJI to serve its customers and rebuild the institution.

75. To this end, we have advised AML RightSource that BSJI would agree to have it perform a further analysis of the Bank's system of controls relative to any particular BSJI customer or transaction the FRBNY identifies at being at issue based on new information, if the FRBNY is open to such an analysis and would consider AML RightSource's conclusions and recommended remedial steps (if any) in reconsidering the FRBNY's current position. As already noted, BSJI has been subject to multiple audits and its compliance plan has always been

found comprehensive and effective. But like any responsible corporate citizen, we are always willing to do more if new information so warrants. As always, we are open to transparency and remain committed to a top-of-the-line compliance program commensurate with BSJI's risk profile.

|  |  |
|---|---|
| _____ | 07/21/2023<br>_____ |
| Héctor J. Vázquez | Date |