UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BANCO SAN JUAN INTERNACIONAL, INC., <br><br> *Plaintiff*, <br><br> v. <br><br> THE FEDERAL RESERVE BANK OF NEW YORK AND THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM <br><br> *Defendants*. | Case No. 1:23-cv-06414-JGK |

**DECLARATION OF WILLIAM M. ISAAC**

## DECLARATION OF WILLIAM M. ISAAC

I, William M. Isaac, declare:

1. I am Chairman of the Secura/Isaac Group, where I provide various services, including regulatory and risk management counseling, to financial institutions. Secura/Isaac Group is an independent business advisory firm headquartered in New York and Washington, D.C., dedicated to helping banks and other financial institutions comply with regulatory requirements and manage risks. I have been a regulatory and risk management consultant for thousands of financial institutions in the US and throughout the world since 1986. Prior to that role, I was appointed by President Carter and confirmed by the United States Senate in early 1978 to serve on the board of directors of the Federal Deposit Insurance Corporation. President Reagan appointed me as Chairman of the FDIC when he was elected in 1980, a position I held until the end of 1985. The 1980s witnessed massive banking problems with the FDIC handling thousands of problem banks and failed banks while successfully maintaining relative calm throughout the financial system. I also served as chairman of the Federal Financial Institutions Examination Council (1983–1985), as a member of the Depository Institutions Deregulation Committee (1981–1985), and as a member of the Vice President's Task Group on Regulation of Financial Services (1984). Prior to joining the FDIC in 1978, I was Vice President, General Counsel & Corporate Secretary of the largest banking company in Kentucky for four years, and prior to that I was a banking attorney at the law firm of Foley & Lardner LLP in Milwaukee, Wisconsin for five years. I earned my Bachelor of Business Administration degree from Miami University in Oxford, Ohio in 1966 and a Doctorate of Law (*summa cum laude*) from the Moritz College of Law at The Ohio State University in 1969.

2. I am over the age of 21, have personal knowledge of each of the facts stated herein, and any opinion I express is based on my professional experience in the banking and financial industries.

3. On April 12, 2019, my predecessor consulting firm, FTI Consulting, Inc. ("FTI") was retained to act as an independent consultant to assess and remediate, as appropriate, Banco San Juan Internacional, Inc.'s ("BSJI") Bank Secrecy Act and anti-money laundering ("BSA/AML") compliance program. Upon its retention, at my direction and under my leadership, FTI dispatched a team of several BSA/AML experts to the headquarters of BSJI in Guaynabo, Puerto Rico to assess BSJI's BSA/AML compliance program. My goal was to identify any gaps in the program, formulate a comprehensive plan to address any shortcomings, and remediate any noted deficiencies in a sustainable and lasting manner.

4. Our assessment of BSJI's BSA/AML compliance program addressed the five pillars associated with a successful program. We therefore focused on establishing a comprehensive customer identification/customer due diligence program; evaluating and strengthening the bank's other pillars associated with policies, procedures, and related controls; assisting the bank with recruiting a permanent and well-qualified BSA/AML compliance officer; implementing a thorough and ongoing compliance training program; and providing for periodic, risk-based, and independent testing of the compliance program. Further, members of our anti-money laundering team remained on site in Puerto Rico to fulfill the duties of BSJI's BSA/AML compliance officer until BSJI successfully recruited, with our help, a permanent BSA/AML compliance officer to replace a then-just-departed BSA/AML compliance officer.

5. Among other things, we conducted a detailed BSA/AML "lookback" review of customer transactions, from January 1, 2018, to March 30, 2019, using a risk-based approach. We

1

also conducted a know-your-customer due diligence review of all BSJI customers to ensure that no prohibited parties may have had access to the U.S. financial system through their accounts at BSJI.  At all times, my team and I committed ourselves to being fully transparent with the Federal Reserve Bank of New York ("FRBNY") with our findings and regularly provided the FRBNY with updates – frequently in person at the FRBNY's headquarters in New York City.

6. At no time has any principal, officer or employee of BSJI acted in a manner that impeded our independent function.  To the contrary, in the more than four years we have been engaged by BSJI, we have—every step of the way—been met with total transparency and cooperation by BSJI personnel.  Nor do I recall a single time over the last four years where BSJI rejected any of our suggestions in developing a robust compliance program.

7. In view of the FRBNY's prior suspension of BSJI's master account, and despite the FRBNY having no regulatory supervision or examination authority whatsoever over BSJI, BSJI was forced to reduce or "de-risk" its retail operation from about 680 accounts as of December 31, 2018, to about 20 as of March 31, 2023.  The risk profile of this institution today is therefore exceedingly modest, and, concomitantly, BSJI effects very few transactions as compared to financial institutions across the United States.  Based on my experience, this institution, relative to its size and lack of complexity, has devoted more resources toward enhancing its controls and governance over the last several years than perhaps any other institution of its size with which I have been associated.

8. The tiny footprint of this institution is critical in assessing risk.  Where an institution has so few customers, the compliance team likely knows each and every one of those customers and understands their businesses and the purposes of their transactions.  That BSJI has so few customers and transactions to monitor also permits it to pre-screen transactions before they happen

rather than having to rely on some kind of analytics after the fact. The institution certainly does not present or "create undue risk to the overall economy by facilitating activities such as money laundering, terrorism financing, fraud, cybercrimes, economic or trade sanctions violations or other illicit activities," the standard from the new account access rules cited by the FRBNY in its most recent correspondence stating its basis for terminating BSJI's master account.

9. Based on my experience with this institution, the policies and controls that are in place, the size of this institution, the commitment of BSJI's personnel to do things the right way, and the open and constructive dialogue it has had with the FRBNY over the last several years, I was stunned when I learned in July 2022 that the FRBNY had notified BSJI of its intent at that time to terminate BSJI's master account at the FRBNY.

10. In a 30-minute August 11, 2022 bilateral call with FRBNY representatives, I advised the FRBNY, truthfully, that never in my over 50 years in this business have I witnessed such mistreatment by a regulator (or government instrumentality or corporation) of a financial institution. I did not then, and do not now, believe that the FRBNY (or any governmental corporation, instrumentality or agency) should induce an institution to expend enormous resources on an array of measures over a period of years, provide that institution with a roadmap for success, praise its successes, and then turn around and effectively negate all that good work.

11. At that time, the FRBNY's alleged basis for terminating BSJI's master account was that the FRBNY interpreted a deadline differently from the institution, notwithstanding that BSJI twice advised the FRBNY of its interpretation of the particular deadline, the FRBNY twice chose not to respond, and then the FRBNY chose to use the purported missed deadline as the justification for its closure letter. On that August 11, 2022 bilateral call, and in subsequent letters—I reviewed

each of the letters by and between the FRBNY in real time, and the FRBNY repeatedly and emphatically reaffirmed its decision to close the master account.

12.     In a series of emails with legal counsel for the Board of Governors of the Federal Reserve System in Washington, D.C., people whom I respect, I asked for an "internal appellate avenue," noting further that "[a]s a practical matter, if the master account is closed, we currently see no plausible path to continue business in the United States, rendering moot FRBNY's offer that we can later 'reapply.'  Again, there is an enormous volume of fact-specific information we would like to provide in person to provide the necessary color, and are requesting that someone, whether in New York or in Washington, hear us out."  Counsel for the Board of Governors advised only that the Board of Governors had delegated authority over the matter to the FRBNY, offering that the FRBNY "has discretion over BSJI's master account and access to Federal Reserve services."  A true and correct copy of this email exchange is attached as Exhibit A to my Declaration.

13.     On September 15, 2022, BSJI advised the FRBNY of its intention to seek recourse in court absent an amicable resolution.  Only then did FRBNY agree to review the "late" reports that had served as the FRBNY's pretextual justification to close BSJI's master account, saying that "we are suspending the planned September 29, 2022 closure of BSJI's master account and termination of its access to Federal Reserve financial services (*i.e.*, BSJI's account and financial services access will not be terminated on that date).  At this time, we are not assigning a new planned closure date."   However, in the very next sentence, in what was an ominous warning of things to come, the FRBNY advised that it "will send to BSJI in the near future a request for information about transactions processed by BSJI that are indicative of high-risk activities."  To

4

me, it served as a warning that the FRBNY would search for different grounds to reach the same result.

14. On April 24, 2023, the FRBNY again sent a letter to BSJI, and adopted new alleged justifications to terminate BSJI's master account. It did so without affording BSJI the courtesy of a meeting or conversation to discuss whatever concerns the FRBNY might have had, a practice alien to me as a former regulator. To reach its result, the FRBNY had to discard the months-long analysis and detailed findings of K2 Integrity, a highly regarded independent evaluator of a financial institution's BSA/AML compliance programs. K2 Integrity is a tough, independent third-party evaluator and is respected in the industry. I was shocked that the FRBNY would so clearly disregard an independent evaluation by K2 Integrity given its reputation together with the fact that K2 presumably devoted tremendous resources, including on-site visits, to reach its meticulously-documented conclusions.

15. I separately find it disturbing that the FRBNY criticizes the very compliance program that my team helped design. My team has many decades of experience in this business; we know standard industry practices, and we understand the concept of risk. For its part, the FRBNY has assessed BSJI's risk without ever (i) conducting any of its own onsite BSA/AML compliance examination of BSJI or (ii) taking into consideration BSJI's extraordinary downsizing and the shedding of so many account holders. Finally, given all that is at stake for BSJI, I find it troubling that BSJI's multiple efforts to meet with the FRBNY have gone unanswered or flatly declined.

16. Only after BSJI submitted several letters and a fair volume of information for the FRBNY's consideration did the FRBNY grant BSJI an invitation to participate in a bilateral call, which took place on June 20, 2023. To my knowledge, this was the only verbal dialogue between

BSJI and the FRBNY pertaining to the FRBNY's April 24, 2023 Closure Letter. I had intended to participate but personal reasons prevented me from doing so.

17. As I now understand it, however, the FRBNY now focuses its justification for its proposed action on alleged "party-affiliated" transactions from so-called "shell companies" in "high-risk jurisdictions." In my opinion, if the FRBNY genuinely wanted to mitigate risk, it would have identified whatever transactions it is concerned about, if there actually are any, so that BSJI could take appropriate steps. But its practice of finding new justifications and systematically failing to provide any level of detail is not indicative of an intent to educate the bank so that it may mitigate its risk exposures.

18. As I noted above, I find the FRBNY's mistreatment of BSJI to be among the worst that I have seen in the industry, in light of BSJI's inordinate expenditure of resources and absolute commitment to satisfy the FRBNY's every concern. There is no reason why the FRBNY could not have identified any alleged new concerns and afforded BSJI a reasonable opportunity to remedy any purported shortcomings – which is what the guidelines published in August 2022 by the Board of Governors of the Federal Reserve System provide for *before* a Reserve Bank such as the FRBNY opts for account closure.

19. Termination of the master account would have profound impacts on BSJI. For some context, a "master account" affords depository institutions access to the Federal Reserve System's financial and account services, including its electronic payments and clearing systems. A depository institution can operate only by obtaining a master account with a Federal Reserve Bank or by using another financial institution that has a master account.

20. Financial institutions are not inclined to accept deposits from a prospective client that has been rejected by a Federal Reserve Bank. Indeed, I introduced BSJI to a financial

institution which I thought might be the exception, but it too declined given the circumstances. As a consequence, the FRBNY's decision, if carried out, will make it extremely difficult—probably impossible—for BSJI to provide banking services to its customers, thereby imminently threatening its very viability.

21. As a practical matter, if the FRBNY terminates BSJI's master account, it is unlikely BSJI would be able to service its remaining customers or continue to operate as a going concern, or otherwise successfully apply for and secure a membership with the FDIC, as is its current plan. The FRBNY's intended action instead may kill off a financial institution that I believe has acted prudently, appropriately, and in good faith at enormous financial cost for a bank of its size and lack of complexity.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 19 day of July, 2023.

By:_____
William M. Isaac