# FEDERAL RESERVE BANK *of* NEW YORK

33 LIBERTY STREET, NEW YORK, NY 10045-0001

**MICHAEL M. BRENNAN**
ASSISTANT GENERAL COUNSEL

July 26, 2023

VIA ECF

The Hon. John G. Koeltl
United States District Court
for the Southern District of New York
500 Pearl Street,
New York, NY 10007

    Re:    *Banco San Juan Internacional, Inc. v. Federal Reserve Bank of New York*,
              No. 23-cv-6414 (JGK)

Dear Judge Koeltl:

    I represent the Federal Reserve Bank of New York (the "New York Fed") and write in advance of today's telephonic conference to provide additional context relevant to plaintiff Banco San Juan Internacional, Inc.'s ("BSJI") proposed order to show cause seeking a temporary restraining order ("TRO") preventing the New York Fed from exercising its contractual right to close BSJI's master account on Monday, July 31, 2023.

    As the Court has recognized, preliminary injunctive relief "is one of the most drastic tools in the arsenal of judicial remedies, . . . and should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Joshi v. Trustees of Columbia Univ.*, 17-cv-4112, 2020 WL 5125435, at *4 (S.D.N.Y. Aug. 31, 2020) (citations omitted). To carry its burden here, BSJI must establish "(1) irreparable harm; (2) either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring" BSJI; "and (3) that a preliminary injunction is in the public interest." *Id.* (citation omitted). BSJI cannot carry its burden on any of these factors, let alone all of them, so there is no basis to interfere with the New York Fed's long-planned, well-documented and risk-based decision to close BSJI's account in accordance with the parties' contracts.

    As to the merits, the New York Fed's account relationship with BSJI is governed by agreements that expressly give the New York Fed the contractual right to take the very action BSJI now seeks to bar. BSJI's Complaint and TRO brief omit this critical fact, notwithstanding that BSJI has otherwise recognized these agreements' obligations for years and the New York Fed's closure letters expressly invoked the relevant provisions. Vazquez Decl. Ex. 17 (April 24, 2023 Closure Letter); Vazquez Dec. Ex. 23 (June 30, 2023 Follow-up Letter).[1]

---

[1] The one purported contract BSJI's papers cite, Lowell Decl. Ex. 1, is not even a contract because it is not fully executed and does not apply to entities like BSJI. This document also has a termination clause.

**FEDERAL RESERVE BANK *of* NEW YORK**

Hon. John G. Koeltl<br>
July 26, 2023<br>
2

BSJI has entered into two agreements with the New York Fed and the terms permitting the New York Fed to close BSJI's account here are clear. First, BSJI executed a Master Account Agreement at the outset of the account relationship, and that contract states that BSJI "agrees to the provisions of [Operating Circular 1 ("OC 1")]," which is published by the Federal Reserve and sets forth the terms under which a master account may be opened, maintained, and terminated, OC 1 at 1.[2] OC 1 provides that the New York Fed "may terminate a Master Account Agreement" . . . at any time by notice to the Account Holder," *id.* § 2.10.

Then, just three years ago, BSJI entered into another agreement (in the wake of the Federal Bureau of Investigation raiding its offices) that states: "to limit the Risks the Customer [BSJI] poses to the Bank [New York Fed], the Bank [New York Fed] may suspend or terminate the Customer's [BSJI] access to one or more Financial Services [and] close the Customer's account." Ex. A at 10 (Supplemental Terms and Conditions Governing the Provision of Services to High-Risk Customers, executed March 16, 2020). The term Risk is defined broadly as "the existence of, or the possibility of" any "harm" to the Bank, including harm related to compliance with applicable laws and regulations. *Id.* at 2.

BSJI cannot carry its burden of establishing a likelihood of success in the face of these agreements and the detailed closure letters expressing the New York Fed's well-founded and well-documented risk concerns warranting closure. Valid and unambiguous contracts like these must be enforced according to their terms. These facts not only foreclose the merits of BSJI's action; they show that the public interest warrants denying a TRO as well. *Empower Energies, Inc., v. SolarBlue, LLC*, No. 16-cv-3220 (DLC), 2016 WL 5338555, at *13 (S.D.N.Y. Sept. 23, 2016) (enforcing contracts in public interest; "[p]arties entering into contracts have a right to expect those contracts will be enforced").

*Second*, there is no irreparable harm that could justify blocking the New York Fed's contractually permitted planned closure. *Wareh v. Lesperance*, No. 16-CV-6210 (JGK), 2016 WL 5477784, at *5 (S.D.N.Y. Sept. 29, 2016) ("'Irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction. . . . [T]he moving party must first demonstrate that such injury is likely before other requirements for the issuance of an injunction will be considered."). BSJI's assertion that the closure of its account will force it out of business is factually wrong. Reserve Bank master accounts are not necessary for financial institutions to access the U.S. financial system. In fact, thousands of institutions without master accounts operate today, including the vast majority of institutions with BSJI's banking license type. Rather than holding an account at a Reserve Bank, these institutions operate through another

---

[2] https://www.frbservices.org/binaries/content/assets/crsocms/resources/rules-regulations/081621-operating-circular-1.pdf

FEDERAL RESERVE BANK *of* NEW YORK

Hon. John G. Koeltl
July 26, 2023
3

correspondent banking relationship, i.e., they maintain an account at a correspondent bank other than a Reserve Bank.

BSJI seeks to escape this clear lack of irreparable harm by asserting that the act of closure itself will cause it to be unable to secure a correspondent. But as noted, other institutions have shown that is not the case, and the only support BSJI can offer is speculation, because there is no evidence that BSJI ever actually pursued a correspondent in earnest. *Impax Media Inc. v. Northeast Advertising Corp.*, 17 Civ. 8272 (RWS), 2018 WL 358284, at *5 (S.D.N.Y. Jan. 10, 2018) ("'[i]nstead of presenting concrete data . . . plaintiff offers only the self-serving statement . . . that its business will collapse' without an injunction").[3] In fact, BSJI rejected the New York Fed's offer to extend its closure date so that it could do so, and has otherwise told the New York Fed that prior difficulty in securing and maintaining correspondent relationships was due to its *own* risk profile, making any asserted harm here self-inflicted. Wright & Miller § 2948.1 (3d ed.) ("[A] party may not satisfy the irreparable harm requirement if the harm complained of is self-inflicted.").

*Finally*, the New York Fed notes this closure decision was communicated to BSJI three months ago, on April 24, 2023. On June 30, the New York Fed told BSJI that no further closure date extensions would be granted (unless, for example, they were tied to efforts to secure an alternative correspondent relationship). BSJI's 11th hour request for emergency relief seeking to block the New York Fed's exercise of its contractual rights—in papers that conspicuously fail to mention those contracts—was a strategic choice, not a matter of practical necessity. The New York Fed also emphasizes the negative broader impact that injunctive relief would have here. The New York Fed relies on these and other agreements it enters into with sophisticated parties to manage and mitigate risks posed to itself and to the broader economy and financial system (swiftly, where necessary). Upending the rights at issue here would create significant uncertainty about the enforceability of these and other provisions, including in connection with critical risk-mitigation measures.

While there are many other aspects of BSJI's papers and arguments that are legally deficient and factually inaccurate, the New York Fed brings these points to the Court's attention at this time so that it has a balanced perspective of this dispute heading into today's conference.

Respectfully submitted,

/s/ Michael Brennan

---

[3] BSJI cites a single conclusory statement by an employee that "*one* bank" expressed "reticen[ce]" to partner with it (Vazquez Decl. ¶ 71) (emphasis added), and other unsupported speculation of two paid consultants (RJW Decl ¶ 6; WMI Decl. ¶ 20). *See* BSJI TRO Br. at 16.

# EXHIBIT A

# FEDERAL RESERVE BANK OF NEW YORK
# SUPPLEMENTAL TERMS AND CONDITIONS
# GOVERNING THE PROVISION OF FINANCIAL SERVICES TO
# HIGH-RISK CUSTOMERS

**ARTICLE 1. Introduction.**

**1.1** **Scope.** (a) As described in the *Federal Reserve Bank of New York Account and Financial Services Handbook* (as it may be amended, supplemented, or otherwise modified from time to time, the "**Handbook**"),[*] the Federal Reserve Bank of New York (the "**Bank**") assesses, manages, and mitigates the risks that arise in connection with its decision to provide, in its sole discretion, accounts or Financial Services to Financial Institutions.

(b) The Bank's provision of certain Financial Services to the Customer (as defined in Appendix A) may pose heightened Risks to the Bank. Consequently, the Customer's relationship with the Bank is subject to special risk-management measures. By signing **Appendix A** and in consideration of the Bank's provision of or continued provision of a Master Account and/or the Financial Services identified in **Schedule 1** to **Appendix A**, the Customer agrees to the following terms and conditions, which supplement the Bank's Operating Circular 1, *Account Relationships* (as amended, supplemented or otherwise modified from time to time, "**OC 1**"), and other relevant operating circulars.

**1.2 Definitions.**

For the purposes of this agreement, the following capitalized terms have the following meanings:

"**Beneficial Owner**" means each of the following:

(a) Each individual, if any, who, directly or indirectly, through any contract, arrangement, understanding, relationship or otherwise, owns 10 percent or more of the equity interests of a legal entity;

(b) A single individual with significant responsibility to control, manage, or direct a legal entity customer, including (i) an executive officer or senior manager (e.g., a Chief Executive Officer, Chief Financial Officer, Chief Operating Officer, Managing Member, General Partner, President, Vice President, or Treasurer); or (ii) any other individual who regularly performs similar functions; or

---

[*] The Handbook specifies the steps that a Financial Institution must take and the documents or other information that it must deliver to the Bank in connection with the Bank's review of whether the Financial Institution satisfies, in the sole discretion of the Bank, the factors set forth in the Handbook and any other factor that the Bank may determine, in its sole discretion, to be relevant. The Handbook is available at https://www.frbservices.org/forms/district-information/documentation.html.

Page 1

FRBNY Supplemental Terms and Conditions Governing the Provision of Financial Services to High-Risk Customers
Last Updated February 25, 2020

(c) If a trust owns directly or indirectly, through any contract, arrangement, understanding, relationship or otherwise, 10 percent or more of the equity interests of a legal entity, the beneficial owner for purposes of paragraph (a) of this definition shall mean the trustee.

"**Beneficially Own**" means to be a Beneficial Owner, and an individual has "**Beneficial Ownership**" when that individual is a Beneficial Owner,

"**Change in Beneficial Owner**" means a party acquires or ceases to have Beneficial Ownership of the Customer.

"**Red Flag**" means any activity or information that indicates that the Customer may pose a Risk to the Bank. Red Flags include, but are not limited to, the items identified in **Appendix B**.

"**Risk**" means the existence of, or the possibility of, financial, legal, compliance, operational, reputational, or other harm to the Bank or another Federal Reserve Bank ("**Reserve Bank**") posed by the Customer. Other harm includes, but is not limited to, harm arising from Customer's access to or use of Bank accounts or financial services that would cause the Bank or the Federal Reserve System to violate any applicable law or would frustrate any purpose, function, or policy mandate of the Bank or the Federal Reserve System.

The following terms are defined in the sections or documents listed below:

| Term | Location |
|---|---|
| **AML** | Section 2.2.2(a) |
| **Bank** | Preamble |
| **BSA** | Section 2.2.2(a) |
| **Change or Enhancement Implementation Review** | Section 2.2.7(b) |
| **Customer** | Preamble |
| **FCU Act** | Section 2.6.2(b)(ii) |
| **FDI Act** | Section 2.6.2(b)(ii) |
| **FDIC** | Section 2.6.2(b)(i) |
| **Financial Service** | Paragraph 2.2(d) of OC 1 |
| **Handbook** | Section 1.1(a) |
| **Independent Consultant or Auditor** | Section 3 of Part I of the Handbook |
| **Independent Reviewer** | Section 2.2.4(a) |
| **NCUA** | Section 2.6.2(b)(i) |
| **Non-Federally Insured Customer** | Section 2.6.2(b)(ii) |
| **OC 1** | Section 1.1(b) |
| **OFAC** | Section 2.2 |

Page 2

FRBNY Supplemental Terms and Conditions Governing the Provision of Financial Services to High-Risk Customers
Last Updated February 25, 2020

| | |
|---|---|
| **Real-Time Transaction Monitor** | Section 2.2.3(a) |
| **Request for Information** | Section 2.5(a) |
| **Reserve Bank** | Definition of Risk in Section 1.2 |
| **Security Attestation** | Section 2.2.5(a) |
| **Transaction Review** | Section 2.2.4(a) |
| **Transaction Review Report** | Section 2.2.4(a) |
| **Waiting Period** | Section 2.5(a) |

Capitalized terms that are not defined in this agreement (including its appendices) have the meanings given to them in OC 1.

1.3 **Other Agreements.** To the extent this agreement (including its appendixes) expressly sets forth terms that differ from terms of a Bank operating circular, the terms of this agreement apply. To the extent this agreement (including its appendixes) expressly sets forth terms that differ from the Handbook, the terms of this agreement apply. To the extent that an appendix to this agreement expressly sets forth terms that differ from other provisions of this agreement, the terms of the agreement apply.

**ARTICLE 2. Risk Management Measures.**

**2.1 Customer Due Diligence and Monitoring.**

    **2.1.1 Ongoing Monitoring.** The Bank may monitor the Customer's use of Financial Services for any reason, including for Red Flags, as the Bank deems appropriate.

    **2.1.2 Know-Your Customer Questionnaire.** Within one month of the Bank's request, the Customer shall respond to a Bank-issued know-your-customer questionnaire.

    **2.1.3 Submission of Requested Documents.** Within 30 calendar days of the Bank's request, the Customer shall provide the Bank with information and documents that the Bank deems relevant in assessing Risks posed by the Customer's activities. This information and documentation may include, but is not limited to, the information and documents required to be submitted pursuant to the Handbook.

    **2.1.4 Notice of Regulatory or Criminal Investigations, Actions or Proceedings.** Unless prohibited by law, the Customer shall promptly (and, in no event, no less than two calendar days following the occurrence of an event specified in this section 2.1.4) notify the Bank in writing of any formal or informal regulatory or criminal investigations, actions, or proceedings against (i) the Customer, (ii) any of its affiliates, (iii) any entity that is Beneficially Owned by an employee, officer, director or other person (or group of persons) that, directly or indirectly, Beneficially Owns the Customer or its affiliates, or (iv) any employee, officer, director of the Customer or any other person (or group of persons) or entity that, directly or indirectly,

Page 3

FRBNY Supplemental Terms and Conditions Governing the Provision of Financial Services to High-Risk Customers
Last Updated February 25, 2020

Beneficially Owns the Customer or any of its affiliates, in each case, in any jurisdiction, and the Customer shall provide the Bank with information sufficient to understand the nature of the investigation, action, or proceeding.

**2.2 Independent Assessments.**

**2.2.1 Minimum Qualifications; Engagement Letter; Statement of Independence.** (a) Any Independent Consultant or Auditor that the Customer is required to engage pursuant to this agreement must, at a minimum, meet the qualifications set forth in the definition of the term "Independent Consultant or Auditor" in section 3 of the Handbook.

(b)     Without the Bank's prior consent, the Customer shall not engage the same firm to act as the Independent Consultant or Auditor to deliver a BSA/AML and OFAC Compliance Assessment pursuant to 2.2.2, to act as the Real-Time Transaction Monitor pursuant to section 2.2.3, or to act as the Independent Reviewer pursuant to section 2.2.4.

(c)     So that the Bank may determine whether the proposed Independent Consultant or Auditor meets the minimum qualifications and whether a proposed scope of engagement meets the Bank's specifications, within 30 calendar days of the proposed Independent Consultant or Auditor's engagement, but prior to the commencement of the engagement, the Customer shall deliver to the Bank a copy of the engagement letter, including the elements set forth in **Appendix C**, and any other information that the Bank may request.

(d)     Any Independent Consultant or Auditor's assessment, report or other document setting forth its findings or recommendations delivered to the Bank shall include an evaluation by the Independent Consultant or Auditor that the work it performed for the Customer was done with a high level of objectivity such that the results of the engagement are free of any potential bias and the work was based on the Independent Consultant or Auditor's own independent and expert judgment.

**2.2.2 BSA/AML and OFAC Compliance Program Assessment.** (a) Unless otherwise agreed by the Bank (in its sole discretion), the Customer shall deliver (or cause to be delivered) to the Bank on or before the date of this agreement and annually thereafter (or other period specified by the Bank) an assessment of an Independent Consultant or Auditor of the Customer's Bank Secrecy Act ("**BSA**")/anti-money laundering ("**AML**") and Office of Foreign Asset Control ("**OFAC**") compliance programs addressing the elements and meeting the requirements set forth in factor 2 of the Handbook, including the details of any findings of its evaluation and any recommended changes or enhancements to the Customer's BSA/AML and/or OFAC compliance programs (such assessment, the "**BSA/AML and OFAC Compliance Program Assessment**").

Page 4

FRBNY Supplemental Terms and Conditions Governing the Provision of Financial Services to High-Risk Customers
Last Updated February 25, 2020

(b) In those cases where the Bank did not to require a BSA/AML and OFAC Compliance Program Assessment to be delivered on or before the date of the Agreement, the Customer shall deliver (or cause to be delivered) to the Bank within six months (or other period specified by the Bank) of the Bank's request and annually thereafter (or other period specified by the Bank), a BSA/AML and OFAC Compliance Program Assessment.

2.2.3 **Real-Time Transaction Monitor.** (a) Within 60 calendar days of the Bank's request, the Customer shall engage an Independent Consultant or Auditor for a period specified by the Bank to review, on a real-time basis, the Customer's transactions for compliance with BSA/AML and OFAC laws and regulations (an Independent Consultant or Auditor acting in such capacity, a "**Real-Time Transaction Monitor**"). The scope of the Real-Time Transaction Monitor's review, including the types and natures of transactions to be reviewed, shall be specified by the Bank.

(b) If the Bank has required the Customer to engage a Real-Time Transaction Monitor, the Customer understands and agrees that it shall not submit any transactions to the Bank, and the Bank may elect not to process any of the Customer's transactions, unless and until they have been reviewed and approved by the Real-Time Transaction Monitor for compliance with BSA/AML and OFAC laws and regulations. The Bank may request documentation from the Customer or the Real-Time Transaction Monitor demonstrating that transactions have been reviewed and approved by the Real-Time Transaction Monitor.

(c) The Real-Time Transaction Monitor shall commence its real-time transaction review no later than 30 calendar days from the date of its engagement. If in the scope of its engagement, the Real-Time Transaction Monitor identifies any material deficiencies in the Customer's BSA/AML and/or OFAC compliance programs and/or processes, the Real-Time Transaction Monitor shall promptly (and in no event, no less than two business days of identifying a material deficiency) notify the Bank and provide reasonable details regarding the material deficiency.

(d) Within 30 calendar days of completing its transaction review engagement or, if the specified review period is longer than six months, every three months starting three months after the review period began, the Real-Time Transaction Monitor shall deliver to the Customer and the Bank a written report detailing any findings of its evaluation and any recommended changes or enhancements to the Customer's BSA/AML and/or OFAC compliance programs.

2.2.4 **Independent Transaction Review.** (a) Within 60 calendar days of the Bank's request, the Customer shall engage an Independent Consultant or Auditor to review the Customer's past transaction activity for a period to be specified by the Bank to determine whether such transactions complied with BSA/AML and OFAC laws and regulations (the "**Transaction Review**", and an Independent Consultant or Auditor acting in such capacity, an "**Independent Reviewer**") and to prepare and deliver to

Page 5

FRBNY Supplemental Terms and Conditions Governing the Provision of Financial Services to High-Risk Customers
Last Updated February 25, 2020

the Bank a written report detailing the Independent Reviewer's findings and any recommended changes or enhancements to the Customer's BSA/AML and OFAC compliance programs (the "**Transaction Review Report**"). The scope of the Independent Reviewer's evaluation shall be specified by the Bank in writing.

(b) The Transaction Review shall commence no later than 30 calendar days from the date of the engagement of the Independent Reviewer, and within 45 calendar days of commencing the review, the Independent Reviewer shall deliver to the Customer and the Bank the Transaction Review Report. Based on the Bank's evaluation of the Transaction Review Report, the Bank may direct the Customer to engage the Independent Reviewer to conduct a review for additional time periods. A request for a review covering additional time periods is in addition to any other actions available to the Bank under this Agreement.

2.2.5 **Security Assessment.** (a) Unless otherwise agreed by the Bank (in its sole discretion), if the Customer accesses (or will access) a Financial Service using FedLine Advantage®, FedLine Command®, or FedLine Direct® the Customer shall deliver (or cause to be delivered) to the Bank on or before the date of this agreement and annually thereafter (or other period specified by the Bank), an attestation in the form of Appendix B to the Handbook (the "**Security Attestation**").

(b) In those cases where the Bank did not to require a Security Attestation to be delivered on or before the date of the Agreement, the Customer shall deliver (or cause to be delivered) to the Bank within six months (or other period specified by the Bank) of the Bank's request and annually thereafter (or other period specified by the Bank), a Security Attestation.

2.2.6 **Other Independent Consultant Reviews.** Within six months (or other period specified by the Bank) of the Bank's request, the Customer shall deliver to the Bank a report of an Independent Consultant covering any other matters as specified by the Bank in writing (such request, a "**Consultant Review Request**").

2.2.7 **Implementation and Review of Independent Consultant Recommendations; Follow-on Assessments.** (a) The Customer shall adopt any recommendations made and correct any deficiencies identified by an Independent Consultant or Auditor within a reasonable time period as specified by the Bank; *provided*, that, if the Customer notifies the relevant Independent Consultant or Auditor and the Bank that a recommendation is unduly burdensome, inconsistent with law or regulation, impractical, unduly costly or otherwise inadvisable, the Customer, subject to the approval of the relevant Independent Consultant or Auditor and Bank, may implement an alternative policy, procedure or system designed to achieve the same purposes as the relevant recommendation.

(b) If an Independent Consultant or Auditor recommends any changes or enhancements as contemplated by section 2.2.7(a), the Customer, within three months

Page 6

FRBNY Supplemental Terms and Conditions Governing the Provision of Financial Services to High-Risk Customers
Last Updated February 25, 2020

of the Bank's request, shall engage an Independent Consultant or Auditor to undertake follow-up reviews and deliver an assessment as specified by the Bank to evaluate the effectiveness of the changes or enhancements implemented by the Customer as they relate to Independent Consultant or Auditor's recommendations (such follow-on review, a "**Change or Enhancement Implementation Review**"). A Change or Enhancement Implementation Review shall, at a minimum, address whether the Customer has implemented the changes or enhancements recommended by the Independent Consultant or Auditor or the alternative changes or enhancements agreed to by the Independent Consultant and the Bank.

(c)   If an Independent Consultant or Auditor identifies material deficiencies in the Customer's BSA/AML and OFAC compliance programs or if the Bank, in its sole discretion, determines that an assessment or report delivered pursuant to this agreement is unsatisfactory, the Bank may request a follow-on assessment or report that is satisfactory to the Bank and/or that addresses any material deficiencies identified in the earlier assessment or report. A request for a follow-on assessment or report is in addition to any other actions available to the Bank under this Agreement.

**2.3   Alert Reporting.** If requested by the Bank, the Customer shall provide, on a schedule to be specified by the Bank, to the Bank one or more reports covering such matters as specified by the Bank in writing.

**2.4   Bank Reviews; Access to Records.** At any time and in its sole discretion, the Bank may conduct a review of the Customer's operations and records as they relate to the Customer's use of its Master Account and/or Financial Services, including with respect to any or all of the factors set forth in the Handbook. The Customer shall make all records related to the foregoing (including customer files, customer risk ratings, transaction-monitoring systems and results, and internal and external assessments of the Customer's BSA/AML and OFAC compliance programs) available for review by the Bank and provide the Bank with access to all relevant operations. The Customer shall provide the Bank (including its employees and agents) with the access to records and operations wherever they are located and in whatever form they are kept or performed within 10 business days after written request by the Bank. Such access must be provided for a reasonable time, but, in any event, for not less than five business days.  The Customer shall also facilitate interviews for the Bank with Customer personnel for purposes of discussing matters pertinent to the performance of this agreement. The Bank shall conduct reviews during normal business hours unless otherwise agreed with the Customer, and the Customer shall provide appropriate workspace to the Bank during those reviews. The Bank shall use reasonable efforts to conduct its review in a manner that limits disruption to the Customer's operations. The Customer shall bear the expense of compiling records for the Bank's review, and the Customer shall allow the Bank to make copies of any records the Bank deems necessary or useful to support its findings subject to appropriate redactions required to address privacy concerns. Otherwise, the Bank shall conduct reviews at the Bank's expense.

Page 7

FRBNY Supplemental Terms and Conditions Governing the Provision of Financial Services to High-Risk Customers
Last Updated February 25, 2020

**2.5** **Investigating Red Flags.** (a) Notwithstanding anything else in this agreement, the Bank may request, orally or in writing, explanations of any Red Flags the Bank has identified (such a request, a "**Request for Information**"). If the Bank requests an explanation of a Red Flag, the Customer shall answer the request to the Bank's satisfaction within 10 business days (the "**Waiting Period**"). The Bank may, in its sole discretion, extend the Waiting Period to give the Customer additional time to respond to the Bank's request, including if (i) the Bank believes it is reasonable to give the Customer that additional time, (ii) the Bank has not identified any additional Red Flags, or (iii) the Customer has made a good-faith effort to respond to the Bank's initial request.

(b)     If a Customer fails to respond to a Request for Information or if, upon review of an explanation submitted in response to a Request for Information, the Bank determines that the Risks posed by the Red Flags identified by the Bank remain, in each case, the Bank may take any action contemplated by this agreement, including, but not limited to, the steps set forth in article 3.

(c)     Nothing in this section shall limit the right of the Bank to take action under this agreement, including, not limited to, those set forth in article 3, during the Waiting Period, if the Bank, in its sole discretion, determines that such action is necessary.

**2.6** **Notice of New Service Requests; Required Notifications.**

   **2.6.1** **Bank Authorization Required to Maintain Accounts or Access Financial Services.** Except as described in this section, before submitting to the Bank or to any other Reserve Bank forms or agreements to obtain Financial Services or in the case of Customers that do not maintain accounts, to maintain an account with the Bank, the Customer shall seek the Bank's authorization to obtain such Financial Services or maintain an account by submitting written notice to the Bank in accordance with section 6.1. Such a notice must be submitted even if the Customer intends to use the Financial Services in question by settling through another Reserve Bank account holder or by transmitting items, instructions, orders, or other information through a service provider or other agent. Upon receiving such notice, the Bank will assess the Risks posed by such request, taking into account the factors set forth in the Handbook, and, based on its assessment, will either approve or deny the Customer's request to obtain such other Financial Services. If the Bank approves the request, the Bank may, in its sole discretion, impose risk-management measures as a condition for allowing the Customer to obtain such other Financial Services. The Customer is not required to seek the Bank's authorization under this section for (i) Financial Services authorized by the Bank and listed in **Appendix A**, or (ii) Financial Services, such as Accounting Information Services (as defined in paragraph 4.3 of OC 1), that (a) would not provide the Customer with a means to send or receive items, cash orders or deposit notices, payment orders, or other payment or transfer instructions to and from a Reserve Bank (whether directly or through a service provider or other agent) or (b) would not involve settlement by a Reserve Bank of obligations related to or arising from such items, cash orders or notices, payment orders, or other instructions

Page 8

FRBNY Supplemental Terms and Conditions Governing the Provision of Financial Services to High-Risk Customers
Last Updated February 25, 2020

(whether the obligation is settled in an account of the Customer at the Bank or through another Reserve Bank account holder).

2.6.2 **Required Notifications.** (a) The Customer shall provide FRBNY with written notice as soon as possible (and, in no event, no less than 10 business days) in advance of any of the following:

(i) a material change to the Customer's business activities, including as a result of a merger with, acquisition by or of, or disposition of assets to another entity;

(ii) the Customer seeking to become licensed to engage in activities for which it is not currently licensed;

(iii) the Customer establishing a relationship to act as a correspondent bank for a financial institution;

(iv) a Change in Beneficial Owner;

(v) a change to the Customer's entity type, including a change from a corporation to a limited liability company; or

(vi) a material change to the means used by the Customer to send or receive items, cash orders or deposit notices, payment orders, or other payment or transfer instructions to and from the Reserve Banks, including but not limited to the Customer's establishment of a new relationship or termination of an existing relationship with a Service Provider (as defined in paragraph 1.1(e) of the Bank's Operating Circular 5, *Electronic Access*, or paragraph 2.13 of the Federal Reserve Banks' Operating Circular 6, *Funds Transfers through the Fedwire® Funds Service*).

In each case, the notice shall include reasonable details of the proposed transaction.

(b) The Customer shall provide FRBNY with written notice immediately upon the occurrence of any of the following:

(i) if, at the time of signing this agreement, the Customer is insured by the Federal Deposit Insurance Corporation ("**FDIC**") or the National Credit Union Administration ("**NCUA**"), the Customer ceases to be insured by either the FDIC or the NCUA, as applicable; or

(ii) in the case of a Customer whose legal eligibility to maintain an account with or receive Financial Services from a Reserve Bank is predicated on the Customer being eligible to make application to become insured under section 5 of the Federal Deposit Insurance Act (12 U.S.C. § 1815) ("**FDI Act**") or section 201

Page 9

FRBNY Supplemental Terms and Conditions Governing the Provision of Financial Services to High-Risk Customers
Last Updated February 25, 2020

of the Federal Credit Union Act (12 U.S.C. § 1781) (the "**FCU Act**") (any such Customer, a "**Non-Federally Insured Customer**"),[†] the occurrence of any event that impugns the Customer's eligibility to make application to become insured pursuant to section 5 of the FDI Act or section 201 of the FCU Act, including, but not limited to:

> (1) the Customer making a material change to its certificate of incorporation, certificate of formation, operating agreement, bylaws, or other organizational documents; or

> (2) in the case of a Customer whose legal eligibility to maintain an account with or receive Financial Services from a Reserve Bank is predicated on the Customer being eligible to make application to become insured under section 5 of the FDI Act, the Customer ceasing to be engaged in the business of receiving deposits other than trust funds (including if Customer ceases to maintain one or more nontrust deposit accounts in the minimum aggregate amount of $500,000).

**ARTICLE 3. Suspensions, Modifications, and Terminations of Accounts or Financial Services.**

In addition to the Bank's rights under OC 1 and other operating circulars, to limit the Risks the Customer poses to the Bank, the Bank may suspend or terminate the Customer's access to one or more Financial Services, close the Customer's Master Account, impose conditions that must be satisfied before the Bank will process certain or all types of Financial Services transactions, or restrict or otherwise adopt risk-management measures with respect to Financial Services or the Customer's Master Account at any time by giving written notice to the Customer. The Bank will endeavor to give the Customer not less than five business days' prior notice of any such action. If, however, the Bank determines, in its sole discretion, that the Customer's access to a Financial Service poses undue Risk to the Bank or another Reserve Bank, the Bank may immediately and without prior notice take any of the measures described in this section.

**ARTICLE 4. Limitation of Liability.**

The Bank is not liable to the Customer for any losses or damages other than those payable under the Bank's operating circulars. In taking actions under this agreement, so long as the Bank acts in good faith, the Bank is not liable to the Customer for any losses or damages (including special, incidental, consequential, or punitive damages) resulting from the Bank's acts or omissions, even if such losses or damages were foreseeable or the Bank had been informed of the possibility of such damages.

---

[†] Such institutions include the following to the extent they do not have FDIC insurance: state chartered commercial banks, Puerto Rican-licensed international banking entities, Puerto Rican-licensed international financial entities, U.S. Virgin Island-licensed international financial service entities, and Puerto Rican-chartered cooperativas.

Page 10

FRBNY Supplemental Terms and Conditions Governing the Provision of Financial Services to High-Risk Customers
Last Updated February 25, 2020

**ARTICLE 5. Communications with Supervisor and Other Relevant Authorities.**

In its discretion, the Bank may communicate at any time with the Customer's prudential regulator or supervisor or other relevant authorities, such as law enforcement, in connection with the Customer's use of Financial Services. Nothing in this article 5 limits any rights the Bank may have under the Bank's operating circulars.

**ARTICLE 6. Representations and Warranties.**

**6.1** **Truthfulness and Accuracy of Statements and Documents.** The Customer represents and warrants to the Bank that any statement, report, document, or other information is or shall be, as applicable, true and correct in all respects on the date such statement, report, document or information is made or furnished to the Bank.

**6.2** **Eligibility for Federal Insurance.** To the extent the Customer is or becomes a Non-Federally Insured Customer, the Customer represents and warrants that it shall not take or cause to be taken any action that would impugn the Customer's eligibility to make application to become insured pursuant to section 5 of the FDI Act or section 201 of the FCU Act.

**ARTICLE 7. General.**

**7.1** **Notices.** (a) Any communication intended to affect a party's legal rights or contractual obligations under the agreement, including, without limitation, notices of breach, requests for consent, amendment, or waiver, the exercise of any option, and any other notice to which the other party has a limited time to respond, are to be given in writing and delivered by hand or by commercial overnight carrier and by email if an email address for notice is provided. Notices will be deemed given when received. Notice is received when delivered, if by hand, on the next business day after deposit with an overnight carrier if the notice is marked for overnight delivery and delivery is acknowledged by a signature of the receiving party, or when it enters the recipient's email system in a form capable of being processed by that system (or on the following business day if it enters the system after the recipient's normal business hours).

(b)    Notices are to be sent to the parties at the addresses set forth below or to such other address as a party may designate in writing and send as provided in this section:

(c)    Notices to the Customer shall be sent to the address set forth in Appendix A

(d)    Notices to the Bank:

Federal Reserve Bank of New York
Attention: Administrative Reserve Bank, Financial Services Group
33 Maiden Lane
New York, NY  10045

Page 11

With copies sent to email address:

financial.services@ny.frb.org

and

Legal.Notice@ny.frb.org

**7.2** **Routine Communications.** The parties do not intend the formalities of section 7.2 to inhibit their routine communication about the subject matter or administration of the agreement. The parties may communicate about routine matters in any manner they determine to be efficient and effective, including telephone and email subject to any Bank requirements for secure communication.

**7.3** **Documents in English.** In order to facilitate its review, the Bank requires that all documents delivered to it be in English. The Customer agrees that it will provide all documents to the Bank in English, and that the Customer will be solely responsible for any costs or expenses related to translating any document into English.

**7.4** **No Waiver of Rights.** No failure or delay by the Bank to exercise any right or remedy it may have under this agreement waives that right or remedy. A waiver by the Bank of the Customer's compliance with any provision of this agreement is limited to the particular instance and circumstances for which it is given unless the waiver expressly provides otherwise.

**7.5** **Termination of Agreement; Right to Amend Agreement, including Appendices.** The Bank may terminate this agreement for any reason at any time by giving written notice to the Customer, though the Bank will endeavor to give the Customer not less than five business days' prior notice. The Bank reserves the right to amend, modify or supplement this agreement, including the appendices hereto, at any time without prior notice. By using its account and/or Financial Services after the effective date of an amendment, the Customer agrees to such amendment.

**7.6** **Governing Law.** Paragraph 7.4 (Governing Law and Actions) of OC 1 is incorporated, *mutatis mutandis*, by reference into this amendment.

Page 12

FRBNY Supplemental Terms and Conditions Governing the Provision of Financial Services to High-Risk Customers
Last Updated February 25, 2020

# APPENDIX A
# TO
# FEDERAL RESERVE BANK OF NEW YORK
# SUPPLEMENTAL TERMS

**ARTICLE 1. Supplemental Terms**. In consideration of the provision or the continued provision by the Federal Reserve Bank of New York (the "**Bank**") of a Master Account and/or the Financial Services identified in **Schedule 1ss** to this **Appendix A**, the institution named below (the "**Customer**") agrees to the Bank's Supplemental Terms and Conditions Governing the Provision of Financial Services to High-Risk Customers (the "**Supplemental Terms**"). The Customer understands and agrees that the Supplemental Terms supplement the Bank's Operating Circular 1, *Account Relationships* (as amended, supplemented or otherwise modified from time to time), and other relevant operating circulars. The Customer agrees that the Supplemental Terms amend and restate any existing Supplemental Terms, if any, between the Bank and the Customer.

| Customer: | Banco San Juan Internacional, Inc. |
| --- | --- |
| Routing (ABA) Number: | 021502286 |
| Street Address: | B5 Calle Tabonuco Suite 207 |
| City: | Guaynabo |
| State & Zip Code: | Puerto Rico, 00968 |

**ARTICLE 2. Notices.** Notices required pursuant to section 7.1 of the Supplemental Terms are to be sent to the Customer at the address set forth below or to such other address as the Customer may designate in writing and send to the Bank as provided in section 7.1 of the Supplemental Terms.

| Customer: | Banco San Juan Internacional, Inc. |
| --- | --- |
| Customer Contact Name: | Héctor J. Vázquez |
| Street Address: | B5 Calle Tabonuco Suite 207 |
| City: | Guaynabo |
| State & Zip Code: | Puerto Rico, 00968 |

**AGREED BY:**

| | |
| --- | --- |
| **CUSTOMER NAME:** | **Banco San Juan Internacional, Inc.** |
| **SIGNATURE***: | [signature] |
| **NAME OF SIGNATORY:** | Héctor J. Vázquez |
| **TITLE OF SIGNATORY:** | CFO |
| **DATE:** | MAR-16-2020 |

---

* Appendix A must be signed by someone on the Customer's Official Authorization List.

**SCHEDULE 1**
**TO**
**APPENDIX A**
**TO**
**FEDERAL RESERVE BANK OF NEW YORK**
**SUPPLEMENTAL TERMS**

**Authorized Financial Services**
**(To be Completed by the Federal Reserve Bank of New York)**

**Master Account**: As of the date of the agreement, the Bank:

- ☒ has authorized the Customer to maintain a Master Account with the Bank.
- ☐ has not authorized the Customer to maintain a Master Account with the Bank

**Financial Service:** As of the date of the agreement, the Bank has authorized the Customer to use the following Financial Services:

- ☐ FedCash® Services
- ☒ Check Services
- ☐ FedACH® Services
- ☒ Fedwire® Funds Service (Offline Only)
- ☐ Fedwire® Securities Service
- ☐ National Settlement Service
- ☒ FedMail®
- ☐ FedLine Advantage®
- ☐ FedLine Command®
- ☐ FedLine Direct®
- ☒ FedLine Web®

"FedCash", "FedACH", "Fedwire", "FedMail", "FedLine", "FedLine Advantage", "FedLine Command" "FedLine Direct", and "FedLine Web" are registered marks of the Federal Reserve Banks. A complete list of marks owned by the Federal Reserve Banks is available at www.frbservices.org.

# APPENDIX B
# TO
# FEDERAL RESERVE BANK OF NEW YORK
# SUPPLEMENTAL TERMS

## Red Flags

- Failures by the Customer to abide by the terms and conditions of any agreement with the Bank or Other Reserve Banks, including any operating circular and this agreement.

- Failure, as determined by the Bank in its sole discretion, by the Customer to satisfy one or more of the factors set forth in the Handbook.

- Any matter or circumstance that is the subject of a reporting requirement under this agreement or the Agreement Establishing One or More Collateral Accounts between Customer and the Bank, as each may be amended from time to time, if the matter or circumstance indicates that the Customer may pose a Risk to the Bank.

- Unusual or potentially suspicious activity, such as the Red Flags identified in Appendix F of the Federal Financial Institutions Examination Council's Bank Secrecy Act/Anti-Money Laundering Examination Manual and activity underlying an alert or exception identified by the Customer under section 2.3.

- If the Customer is using the Fedwire Funds Service, a significant variation (as determined by the Bank) in the total number or value of Payment Orders (as defined in the Bank's Operating Circular 6 (as amended from time to time)) sent or received by the Customer over the Fedwire Funds Service in a calendar quarter as compared to the immediately preceding calendar quarter. Such a variation will not be a Red Flag if, before the start of the calendar quarter in which the variation occurs, (i) the Customer provides the Bank with written notice that the Customer expects a significant variation in the number or value of Payment Orders it sends or receives over the Fedwire Funds Service over the coming quarter and (ii) the Customer documents in the notice to the Bank's satisfaction a business rationale for the expected variation.

- If the Customer appears to be providing incomplete or misleading information or documentation, or has failed to provide material updates to the Bank where the Customer is under an obligation to do so.

- The occurrence of any event for which notice would be required under Section 2.1.4.

# APPENDIX C
# TO
# FEDERAL RESERVE BANK OF NEW YORK
# SUPPLEMENTAL TERMS

**Engagement Letter of Independent Consultant or Auditor**

The engagement letter described in section 2.2.1 of this agreement must address the following:

(i) the Independent Consultant or Auditor's qualifications;

(ii) the scope of the Independent Consultant or Auditor's engagement with the Customer;

(iii) any existing or prior relationship between the Customer and the Independent Consultant or Auditor (including relationships between the Customer's parent, affiliates, managers, officers, and directors);

(iv) any potential or actual conflict of interest between the Independent Consultant or Auditor and the Customer, including whether the opinion covers any work the Consultant had previously performed for the Customer; and

(v) whether, as part of the Independent Consultant or Auditor's review, it intends to reply in recent, previous work completed by it or another Independent Consultant or Auditor.