N7Q3BSJC – REDACTED

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
 3   BANCO SAN JUAN INTERNACIONAL,
     INC.,
 4
                    Plaintiff,              New York, N.Y.
 5
               v.                           23 Civ. 6414(JGK)
 6
 7   THE FEDERAL RESERVE BANK OF
     NEW YORK and THE BOARD OF
     GOVERNORS OF THE FEDERAL
 8   RESERVE SYSTEM,
 9                  Defendants.
10   ------------------------------x      Motion (Telephonic)
11                                        July 26, 2023
                                          5:00 p.m.
12
     Before:
13
                         HON. JOHN G. KOELTL,
14
                                          District Judge
15
16
                              APPEARANCES
17
18
     WINSTON & STRAWN, LLP
19        Attorneys for Plaintiff
     BY:  ABBE D. LOWELL
20          KELLY A. LIBRERA
21   MICHAEL BRENNAN
          Attorney for Defendant The Federal Reserve Bank of New
22   York
23   JOSHUA CHADWICK
          Attorney for Defendant The Board of Governors of the
24   Federal Reserve System
25
```

1                (The Court and counsel appearing telephonically)

2                LAW CLERK:  This is Banco San Juan Internacional, Inc.

3      v. The Federal Reserve Bank of New York, et al., 23 CV 6414.

4                THE COURT:  Who is on the line for the plaintiff,

5      please?

6                You have to unmute.  Anyone on the line for the

7      plaintiff?

8                MR. LOWELL:  Sorry, sorry.  This is Abbe Lowell of

9      Winston & Strawn on behalf of BSJI.  Also on the line is Kelly

10     Librera also of Winston for BSJI.

11               THE COURT:  Okay.  Thank you.  Who is on the line for

12     the Federal Reserve Bank of New York?

13               MR. BRENNAN:  Michael Brennan here for the Federal

14     Reserve Bank of New York, your Honor.

15               THE COURT:  And who is on the line for the Board of

16     Governors of the Federal Reserve?

17               MR. CHADWICK:  Good afternoon, your Honor.  Joshua

18     Chadwick for the Federal Reserve Board.

19               THE COURT:  Thank you.  Okay.

20               I've received the papers from the plaintiff asking for

21     a temporary restraining order and essentially a schedule for

22     the preliminary injunction.  I received a letter from the

23     Federal Reserve Bank of New York.

24               I have several observations based on the papers.  Of

25     course I'll give you a schedule for the preliminary injunction.

1    The question with respect to the temporary restraining order

2    raises various questions.  Among the questions is whether the

3    parties wish to enter into some form of agreement that holds

4    the status quo under any one of a number of circumstances.  For

5    example, the Federal Reserve Bank of New York has indicated

6    that throughout the papers that it was prepared to give another

7    extension for purposes of, I'll say BSJI, the plaintiff,

8    establishing a correspondent relationship with another bank.

9            So, it is also possible that the Federal Reserve Bank

10   would be prepared to enter into some other form of standstill

11   until the preliminary injunction could be decided.  There have

12   been a lot of delays over the years where Federal Reserve Bank

13   of New York indicated that it would not continue the BSJI's

14   master account.  The question is whether the Federal Reserve

15   Bank of New York would be prepared to do that again, while the

16   preliminary injunction was being decided.

17           Throughout its papers, BSJI says they would be

18   prepared to, you know, enter into any conditions, I assume,

19   reasonable conditions, that the Federal Reserve Bank of New

20   York wanted to accomplish their desires for protection.  There

21   are obvious mechanisms, if in fact the offers by BSJI are

22   accurate.  There could be a federal monitor to assure that

23   there are no improper transactions that occur while the

24   preliminary injunction is being considered.

25           On the other hand, there are a couple of things that I

N7Q3BSJC - REDACTED

1    should bring to your attention.  One is, in the letter from the

2    Federal Reserve Bank of New York today, the Federal Reserve

3    Bank actually set out a standard for the preliminary injunction

4    which would also apply to the TRO, which is actually less

5    exacting than the standard that would have to be applied,

6    because this is an injunction, and a TRO that's being sought by

7    the government and under -- in the public interest -- someone

8    took themselves off mute.  Thank you.

9           Under those circumstances, the alternative of serious

10   questions going to the merits doesn't apply.

11          Also, with respect in particular to the TRO, and also

12   with respect to the preliminary injunction, there is a concern

13   that the Federal Reserve Bank of New York has been indicating

14   that it intended to withdraw the master account status for

15   months.  It did it back in 2022, it did it on September 15,

16   2022, and it certainly did it on April 24, 2023.  So, the

17   Federal Reserve Bank of New York is right to say, papers,

18   particularly papers seeking a temporary restraining order,

19   could have been brought months ago, and certainly earlier than

20   about four or five days before the Federal Reserve Bank of New

21   York said it would revoke the master account status.

22          Another item that I just bring to your attention is in

23   reviewing the moving papers, you get no sense, really, of the

24   ultimate reasons that the Federal Reserve Bank of New York was

25   relying on to revoke the master account status.

N7Q3BSJC — REDACTED

1          The concerns about abuse of the account, the failure

2   to update the reports, the dangers of using the account for

3   illicit purposes, and the failure to file any SARs, one gets no

4   sense of that from reading the papers in support of the TRO and

5   the preliminary injunction.

6          So, these are preliminary observations.  Plainly I

7   will give you a schedule for the preliminary injunction.

8   Plainly I'll listen to the parties for anything they would like

9   to tell me with respect to the TRO or otherwise.  And in

10  particular, I would certainly welcome the parties' thoughts as

11  to whether there is a way that you all can work out something

12  to moot the TRO.  If not, of course, I have a request for a TRO

13  before me and I'll decide.

14         So those are my preliminary observations on the

15  papers.

16         Mr. Lowell.

17         MR. LOWELL:  Yes, Judge.  Thank you.

18         I've been taking notes.  Let me see if I can address

19  your points in the order that you made them.

20         You began as you ended with the concept of would we be

21  able to do something that was more orderly.  And the answer

22  from BSJI is that, indeed, we can, and offered to do that.  I

23  think your observation, based on the letter or the argument of

24  the defendants that why is this all happening in the crisis

25  moment it is, really doesn't set out a couple of points which

N7Q3BSJC – REDACTED

 1    the Court should also take into consideration.

 2            This could not have been done months ago.  It could

 3    have only been done at the earliest, if you think about it

 4    given the chronology of what we've set out in our papers,

 5    somewhere at the end of June.  Because by June 20, we were

 6    still engaged in what we called the back and forth where we

 7    would answer a question, they would then come up with a

 8    different reason, we'd answer the question.  And it was only on

 9    June 30 where that process finally ended and they said those

10    backs and forths are done.

11            We then had the conversation with them as to, okay,

12    you're leaving us no choice but to move forward.  We offered,

13    therefore, at that point the idea of doing it in a more orderly

14    fashion, with a agreed-upon schedule for a preliminary

15    injunction and not TRO.  We had a lovely conversation about the

16    possibility with one of the counsels on the call, and we did

17    that on July 7.  Then on July 10 -- I offered that on the 7th.

18    On the 10th we got a call in which we made that proposal, and

19    it took the Fed three days to come back and say we'll agree to

20    a schedule, but we won't agree to stay the closure of your

21    account while we go on for the next month or so.  Of course

22    that would have made the whole point of this moot.

23            If the Court has this impression, I'd like to turn

24    that impression on the other side, and to turn it on the other

25    side, I want to point out the obvious.  Which is, as you

1    already pointed out, the idea that we couldn't today go back to

2    what we offered them a few weeks ago, to set out a more orderly

3    schedule, makes no sense.  We are the bank operating today and

4    as the next week as we play this out, the same bank with every

5    day, more compliance programs than the day before, for months,

6    when they allowed this bank to continue on.  As you pointed

7    out, this starts in June of 2022, at least in the newest

8    iteration.  In which in June of 2022, they say this is the

9    reason we are going to close you down, you missed a deadline, a

10   deadline our papers point out don't really exist.  So we went

11   back and forth on that.  The bank is operating in that period

12   of time.  It is operating to September when we have the next

13   back and forth.  It is operating in January of 2023 when we

14   write back and say what's going on.  It operates in February,

15   March and April when we have the April letter.  It operates in

16   April, May and June until they call it.

17            The idea that some emergency that wouldn't allow an

18   orderly schedule for them to respond to our papers and us to

19   then have that reply and then to put it before you, honestly,

20   Judge, makes no sense.  We have not delayed.  We are not

21   inventing the crisis.  We have been in good faith even as

22   recently as the end of June thinking we might get somewhere.

23            Remember our history.  When we've answered questions

24   for them and told them that our answers are complete, and if

25   they still want to take action, they are going to leave us no

N7Q3BSJC – REDACTED

1    choice to go to court, they have rescinded us and given us the

2    next operation to operate.

3            We didn't generate the crisis.  As to why we wouldn't

4    be able to impose the order you are suggesting, we should

5    definitely do that.  I don't know they wanted to concede, the

6    other day when we talked, that their issues of concern against

7    us are so minimal they could wink and say, okay, we'll let you

8    operate for the next four or five weeks while we play this out.

9    But I think it is exactly what should have happened and it

10   still should happen.  I think you're on to something.  And I

11   also think the history of what happened here should indicate

12   that's what should happen.

13           As to whether or not there could be some additional

14   protection to maintain the status quo, which was your next

15   point, we kept in every conversation with them asking for

16   specifics, so we could address the specifics rather than what

17   you said in one of your points later, which you are not really

18   sure what the grounds are at this point for them when they say

19   generalities like deficiencies.  Let's use that one for

20   example.

21           In April of this year, when they decided to turn our

22   very able outside experts, who have been opining on the

23   compliance and the safety of our bank, and said these are

24   things that we recommend for future compliance or future

25   enhancement, let's put it that way, they then said, okay, that

1    shows you have all these deficiencies.  When you get down to

2    it, those deficiencies have already been addressed.

3             I guess what I am saying about your point on

4    conditions.  We have met them.  I don't know the concept of --

5    you used the word monitor.  If you understand how the bank

6    operates now, given the few accounts, relatively few, I mean,

7    this is important for us to maintain our bank and maintain our

8    customers and the services we provide.  We are monitoring in

9    real time the transactions, which is what we have told them,

10   and what the experts who have opined on our safety and

11   soundness and our compliance with anti-money laundering, etc.

12   have all told them.

13            This idea that somebody else could join in and have a

14   desk next to the desks that are there, I think that's possible.

15   I'm sure there are other things we could do in the interim

16   that's -- but I think your point is, sure, if they would have

17   engaged us at the end of June, if they engaged us when I spoke

18   to them on July 10, if they engaged us with a specific as to

19   what is the problem that makes us so unsafe and sound that we

20   are going to be a risk to the entire banking system in this

21   little bank with few people, we would have addressed it.

22            So if there is the ability to do that on this call,

23   let's do it.

24            One of the things you said as another example is a

25   correspondent bank.  That is in effect sort of the illusory

1    possibility that they've said in their letter.  Think about it.

2    If we are suspended, and given the history between us and the

3    Fed, there is not a correspondent bank that we've started to

4    talk to that thinks this is something they want to do it.  And

5    the cost of doing it would be so prohibitive it would be the

6    death knell in any event.

7         There are other things we can do in the interim which

8    don't need to have your Honor in the middle of it.  As to their

9    stating in their letter something about the standard, you

10   pointed it out, so I want to address it.  Not exactly the way I

11   understand the way the law would apply here.  They may get some

12   more leeway if they are expressing that they are in their

13   regulatory hat, regulatory mode, operating as an agency in

14   doing that in something they'll call public interest.

15        But those cases that would dilute either the standard

16   for success on the merits, or, in our case, for a TRO, more

17   likely the serious question issue which you raised, only

18   applies if you look at the context are those threats to the

19   public's interest that are not indicated by the same set of

20   things I pointed out, which is the amount of time we have

21   operated in our backs and forths with the Fed here and the

22   defendants, without there being a concern enough they had to do

23   it the day after tomorrow.

24        So those cases would not apply to then get us back to

25   the normal three, four point standard of a TRO.  And I don't

1    think anybody will seriously contest that we meet the first

2    one.  This is irreparable harm.  If on Monday they shut us

3    down, we are shut down.  The master account is too critical to

4    the operation of a financial institution to be able to operate

5    without it.

6            So then we get to the issue of the success on the

7    merits.  And when the harm is as great as it would be, you know

8    as well I do, you probably do TROs and preliminary injunctions

9    every other week if not more than that.  That's when the scale

10   goes to you can get to the point of being at least 50 percent

11   and if -- in the success on the merits, on the serious

12   question, look -- look at the serious questions they pose back

13   to us in the letter which was filed right before we came on

14   with your Honor.  There's a lot of issues, for example, if they

15   think that there is a contract issue that supersedes the

16   statute, when the law says a statute that give us a right or

17   gives a person a right, it definitely trumps a contract that

18   would try to take it away.  Those are things we should address.

19   I can't address it in detail because I only got it 30 minutes

20   ago.

21           I think on the serious question, given the issues

22   we've raised about the non-discretionary aspect of their

23   authority, the issue of when they are wearing their regulatory

24   hat, what you have already pointed out, which is if you are not

25   sure on today's call what is the specific ground that they are

N7Q3BSJC - REDACTED

1    using to now justify the closure of the master account, you are

2    not alone.  And that itself would indicate that we have a more

3    than credible way to present to your Honor the issue of they're

4    acting in an arbitrary and capricious fashion.

5            On that, the last point I think you made was -- I

6    think that was the last point you made frankly in my note.

7            So let me recap before we hand it over to them to say

8    we are very willing to enter a schedule, we had one in mind, I

9    think we offered it to the Fed on that July 10 call until they

10   said but you have to close down for us to do this.  And we

11   would be very willing to recreate that with them.  If you're

12   saying or if they are saying what would it take, you used the

13   word reasonable conditions, we are amenable to reasonable

14   conditions.  Of course "reasonable" has to be defined.

15           So, I think what we are saying is, we ought to be able

16   to work this out.  But if they say nope, we're not going to

17   accommodate either the specificity that the judge said or what

18   you're asking for, and therefore we can't come up with

19   conditions that were reasonable, then we'll have no choice but

20   to have this TRO hearing, whether it be today or tomorrow or

21   whenever you want to do it.

22           THE COURT:  Okay.  Thank you.

23           Mr. Brennan?

24           MR. BRENNAN:  Yes, your Honor.  Happy to provide a

25   response here.  And there has been discussion about of a

1    preliminary injunction schedule.  I guess I want to be clear

2    from the New York Fed's perspective, is we don't think the

3    standard for a TRO has been met, so there is no real need to

4    get to that stage.  And the foremost factor here is irreparable

5    harm.

6            THE COURT:  Whoa, whoa.  I'm not sure I follow that.

7    The plaintiff asks for a temporary restraining order and a

8    preliminary injunction.  The temporary restraining order is

9    there for a maximum of 14 days, can be renewed for another 14

10   days.  Plaintiff is entitled to a schedule and a hearing on the

11   preliminary injunction.

12           So, the temporary restraining order is immediate and

13   temporary relief until preliminary injunction can be decided,

14   and has to be decided within at least 28 days.  So, there are

15   two separate issues.

16           And often times, the parties work out some modus

17   vivendi with respect to the TRO.  So, and irrespective of what

18   happens on the TRO, you all have to brief and I have to decide

19   the preliminary injunction.  Because the TRO, one way or

20   another, doesn't moot the preliminary injunction, despite what

21   Mr. Lowell just said.  BSJI operated for over a year without

22   the master account.  And you all say in your letter that it is

23   just not right that denying the master account would mean that

24   the bank would have to close.

25           So, the TRO is not, at least as I read the papers, the

1   be all and end all.  There is a motion for a preliminary

2   injunction that has to be briefed and decided.  Go ahead.

3            MR. BRENNAN:  Judge --

4            THE COURT:  And my -- and part of my initial statement

5   was the question whether the parties could not resolve the

6   issue of the TRO while the preliminary injunction was briefed.

7            MR. BRENNAN:  Thank you, your Honor.  This is Michael

8   Brennan for the New York Fed.  So thank you for that

9   explanation.

10           In terms of reaching an arrangement, I think there is

11  extreme hesitancy on the New York Fed's side, and an emphatic

12  support of a rejecting the TRO here, because, as your Honor

13  mentioned, there has been reference to abuse of the account,

14  and our compliance function, our Financial Intelligence Unit

15  have done a thorough review over a six-month period of activity

16  going through this account.  And they identified high-risk

17  activity.  We asked BSJI for responses about it to try to get

18  some comfort, and the responses did not provide that comfort,

19  and, if anything, caused only more concern.

20           And BSJI keeps saying you are not giving me enough

21  details.  I can give one example.  So, what we see are entities

22  controlled by relatives of the owner of BSJI transferring funds

23  to each other, and BSJI tells us that those are financial

24  instruments.  So we said, can you please send me the

25  documentation supporting those.  And then we looked at that.

N7Q3BSJC – REDACTED

1    And they don't resemble financial instruments at all.  For

2    example, there is bonds that lack an event of default.  The

3    interest rate doesn't make sense.  So, it looks like these very

4    well may not be financial instruments, and that causes

5    significant concern in our compliance group, in our Financial

6    Intelligence Unit, that there could be illicit financial

7    activity going on.  And that is a big driver in the reluctance

8    to provide an extension.

9         And on top of that, three years ago, when the FBI

10   raided BSJI's office, we did an immediate suspension of the

11   services, because at that point the risk was so high to us, we

12   couldn't have that exposure.  And over the course of the year,

13   there were discussions with BSJI back and forth about the terms

14   under which they could get access to their account back, and

15   part of that was them signing an agreement that expressly says

16   in literal terms the New York Fed has the right to close this

17   account and terminate our access to services.

18        So, we expect that this contract, it means what it

19   says.  We have a contractual right to take this action.  It was

20   something that the BSJI did to regain access to its accounts.

21   That is where a big part of the reluctance to engage in any

22   sort of arrangement with BSJI's coming from.  And coupling that

23   with just what we view as the complete lack of irreparable

24   harm.

25        I understand your Honor noted that there is also a

1   request for a preliminary injunction in place.  But, in order

2   to even get there, there needs to be a TRO, and the standard

3   for a TRO is generally same as for the preliminary injunction.

4   If so, if they can't show irreparable harm at this stage, then

5   that's it.

6          THE COURT:  Stop, stop.  That's just not right.  It is

7   just not right.  There is an initial question about whether to

8   grant the TRO.  The TRO is temporary relief that is available

9   for a maximum of 14 days, and can be extended for another 14

10  days.  The plaintiff has the right to seek a preliminary

11  injunction.

12         You say if you decide that there is no irreparable

13  injury for purposes of the TRO, they don't get the preliminary

14  injunction, so we don't, you know, we don't have to worry about

15  briefing a preliminary injunction.  That's not right.  It

16  happens that a TRO gets denied, and you move on to the issue of

17  a preliminary injunction.  Irreparable injury for purposes of

18  the TRO is, is there going to be irreparable injury over the

19  next 14 days, for a maximum of 28 days.  Preliminary injunction

20  asks is there irreparable injury before there is a decision on

21  the merits.  Should the status quo be maintained until there is

22  a decision on the merits.  The preliminary injunction lasts

23  until there is a final decision on the merits.

24         You know, you can't simply say, gee, we won a

25  temporary restraining order, therefore, we can forget the

N7Q3BSJC – REDACTED

1   preliminary injunction.  It's not just right.

2          So, you argue that there is no irreparable injury in

3   connection with the temporary restraining order because the

4   bank will not go out of business if it loses its master

5   account.  But, that's a question of will it go out of business

6   in the next 14 days?  28 days?  That's a temporary restraining

7   order.  And we'll see.  If the temporary restraining order is

8   denied, the papers indicate that there are, as I said before,

9   the bank has lost its master account for over a year, it lost a

10  lot of clients as a result of that, but it kept the clients

11  that it presently has.  And it plainly is a relatively small

12  bank, held by a single person, with relatively few accounts.

13  Under those circumstances, will the bank go out of business

14  over the next 14 days?  It didn't go out of business for over a

15  year.  That's the TRO.

16         You don't get out of the requirements for briefing and

17  my deciding a preliminary injunction, unless, which is highly

18  unlikely, the plaintiff simply goes away.  So I don't sort of

19  understand your argument.

20         MR. LOWELL:  Judge, before he responds, it is such an

21  important point.  This is Abbe Lowell.  To address your point

22  that you've said twice about what happened the last time

23  without a master account.  When it is appropriate, I'd like to

24  answer that for you.

25         THE COURT:  Okay.

1         MR. LOWELL:  Since I've interrupted, maybe I should do

2    it now.

3         THE COURT:  No.

4         MR. LOWELL:  I think the Court is not quite then given

5    all the facts as to what happened to get us to here and what

6    would happen to the remaining people, even in 14 or 28 days.

7    But I'll wait when you tell me I can answer what you said and

8    what he said.

9         THE COURT:  Thank you.

10        So, Mr. Brennan, do you follow what I said?

11        MR. BRENNAN:  Yes, your Honor.

12        THE COURT:  There is going to have to be briefing on

13   the preliminary injunction and a decision on the preliminary

14   injunction, unless the parties reach some agreement on the

15   ultimate relief that's being sought.  There is a temporary

16   restraining order, there is a request for a TRO, there is a

17   request for a preliminary injunction, and then presumably,

18   there's an ultimate trial, unless the parties agree to merge

19   the preliminary injunction with the trial on the merits.

20   That's the way it works.

21        So, you can't send me a three-page letter and say, ha,

22   we think we'll prevail on the TRO and that will end this case.

23   It doesn't work that way.

24        So, the question on the temporary restraining order,

25   which I will have to decide unless the parties reach some

1    agreement, which they often do, is whether there is any

2    agreement that can be reached to resolve the TRO.  If not, then

3    I would have to decide the TRO.

4            By the way, to underline something that I said at the

5    outset, the papers submitted by the plaintiff BSJI were

6    deficient in that you could read all of those papers -- unless

7    you read the exhibits also -- and not have an understanding of

8    the problems that the Federal Reserve Bank of New York found

9    with respect to BSJI.  You wouldn't know that the Federal

10   Reserve Bank was concerned over the failure to submit any SARs.

11   You wouldn't know that the concerns were about illicit

12   activities and money laundering and the like.  You would think

13   that it's simply a question of failure to submit reports on

14   time.

15           Now, Mr. Brennan, you begin to lay out for me some of

16   the things that can be gleaned from some of the exhibits, but

17   of course, those weren't in your letter either.  And it may

18   well be that I ask you to put in an affidavit in response to

19   the TRO.  I mean, I have to decide the TRO.  It is only good

20   for 14 days, extended for another 14 days.  But, a three-page

21   letter is usually not the way in which a TRO gets resolved.

22           MR. BRENNAN:  Yes, your Honor.  Michael Brennan for

23   the New York Fed.  And we just sent that letter today to give

24   you some context.  We are happy to provide a more fulsome

25   submission, and we can do that.

N7Q3BSJC - REDACTED

1          THE COURT:  Okay.  So I return then to the questions

2     that I posed initially, which were, usually in a case like

3     this, the parties work out some sort of agreement, at the very

4     least to let the parties intelligently brief and the Court to

5     decide the temporary restraining order.  I mean, this case

6     cries out for something like that.

7          The parties have been talking to each other over a

8     long period of time.  I appreciate what I didn't get from the

9     plaintiff's brief, and which I've tried to indicate that I have

10    an understanding of, with respect to the defendant's concern

11    about the use of the bank.  It's why I suggested a monitor,

12    someone else who sits there who look at the accounts to assure

13    that the accounts are not being used for an illicit purpose,

14    but that's only one suggestion.

15         The papers suggest that, at least the papers by the

16    Federal Reserve Bank of New York, that it's possible to get a

17    correspondent bank.  Plaintiff says no, can't do that.  I don't

18    know the answer to that question.

19         So the question is the parties have been talking for a

20    long time, so one wonders why they can't talk for somewhat

21    more, whether to allow me to decide the TRO, or to decide the

22    preliminary injunction.

23         Go ahead, Mr. Brennan.

24         MR. BRENNAN:  Yes, your Honor.  I just want to say

25    that I hear you, and we will consult internally.  You make some

1    good recommendations, and we will consult with the business

2    areas and we will try to see if we can get to an arrangement

3    with BSJI as suggested.

4          THE COURT:  All right.  Today is July 26.  The date to

5    close the account is I think July 31.  So, you've got to give

6    me your response, whether it's your response to the TRO or some

7    agreement, some standstill, some conditions, some discussion

8    with the plaintiff about how to proceed from here with respect

9    to whether it is the TRO, or the preliminary injunction.

10   You've got to give me that by Friday morning at 10, and then

11   I'll decide where to go from there.  Okay?

12         MR. BRENNAN:  Thank you, your Honor.  Understood.

13         MR. LOWELL:  Judge, this is Abbe Lowell.

14         THE COURT:  I was going -- I was coming back to you.

15   Please.

16         MR. LOWELL:  Okay.  I knew you didn't forget.

17         THE COURT:  No, no.  I didn't.  Okay.

18         So, Mr. Lowell.

19         MR. LOWELL:  Going with the last point backwards to

20   save time.  If in fact they will go back to their business

21   group, and talk, we will talk with them.  And as you have made

22   clear, we have hopefully dovetailed with you making it clear,

23   it seems impossible that whatever their, quote, real concern,

24   end quote, is, while we do an orderly recitation of our

25   positions for the Court to decide, for example, the preliminary

N7Q3BSJC – REDACTED

1    injunction, given the history of our backs and forths, as you

2    pointed out, should occur.

3              It is just unfathomable to me there is not something

4    we couldn't agree with that is reasonable that allows this, as

5    you say, to use your phrase, this is a case that cries out for

6    such a way to proceed, and we have been willing for months.  I

7    want to just point out a couple of things while we're waiting

8    for their response.

9              THE COURT:  Can I stop you for a moment.

10             MR. LOWELL:  Sure.

11             THE COURT:  It is a matter of concern to me that your

12   papers downplayed or ignored the concerns that the Federal

13   Reserve Bank has with respect to the operations of the bank,

14   including the lack of SARs, and the concerns by the compliance

15   people that the bank was being used for illicit activities.

16   And that while compliance audits were done, they weren't --

17   putting aside whether they were timely or not, I appreciate the

18   dispute -- they didn't resolve ongoing problems, so that the

19   compliance people at the bank were concerned and the bank was

20   sufficiently concerned about the existence of illicit

21   activities that it made the decision to terminate the account.

22             One, you know, one didn't get that from your papers.

23   And that was plainly, in going over the papers, a concern that

24   I had.

25             So, in talking about going forward, if there is to be

1    some modus vivendi until there is a decision by the Court, the

2    question is, how can there be assurance that the bank is not

3    used for illicit purposes?  And I mean, the one remedy that

4    came to my mind was the suggestion of a federal monitor, only

5    because federal monitors seem to be used more often these days.

6    This is a, you know, it is a small bank with small accounts.

7    100 percent held.

8                How many accounts does the bank have?

9                MR. LOWELL:  13, Judge.  14 accounts, 13 customers.

10               THE COURT:  Okay.  Should be possible to monitor that.

11   So, go ahead.  I interrupted you.

12               MR. LOWELL:  Thank you.  Your interruption was well

13   taken, because what is in your head, when you are pondering

14   where we end up with this TRO, is exactly what I need to

15   respond to.

16               I will do all the points you made, but I'll do it in

17   the order now in reverse, because that's the one you came to.

18               First want to address this illicit transaction,

19   illicit concern.  I do want to point out to the Court, just

20   please remember, that that is the latest iteration of their

21   concern which started with you failed to file your report on

22   time, to what your great outside consultants indicate might be

23   ways that you can even further improve what's already been

24   proved.  And highlighted 13 things, which is not the ones they

25   are saying have been done and they are not, because you can

1    always make improvements, remember that all of those

2    consultants had also stated that the compliance conditions and

3    the ability to be a safe and sound institution under any

4    objective standard were well met by BSJI at the time which the

5    New York Fed unsuspended our account, December of 2020, forward

6    to the time that our experts have been involved, our

7    consultants have been involved.

8         So I just want to start by saying, when they said now

9    what we mean is there are illicit transactions, and then they

10   say something about, quote, shell companies, end quote.  You do

11   have to track that back to see where that began in terms of

12   that's the reason why we need to put them out of business.  So

13   let's start there, but let me address that issue.

14        First let me address the issue that, contrary to what

15   they say in the pejorative of the use of shell companies, your

16   Honor is much more sophisticated to know that is something that

17   people say that puts people on their heels.  But shell

18   companies by themselves are in no way improper.  But more

19   importantly for us, as the attachments and the experts I'll

20   come back to what you said about where you have to read to know

21   what we are saying.  I have opined there are no shell

22   companies.  They're not shell companies.  Putting aside that

23   that wouldn't be the end-all-be-all if they were.

24        In terms of the illicit transactions, the one example

25   they've provided we addressed, and I think they are talking

N7Q3BSJC - REDACTED

1  about an issue of a bond where they say that what is listed as

2  such and then redeemed as such didn't match in some fashion.

3  There is the declaration of Mr. Aponte in part of what we have

4  done which explains, this as we explained it to them when it

5  was first raised.  And when we did explain to them, that the

6  timing and amount of the transactions resulted from contractual

7  obligations to the bondholders, they did not come back to us

8  and say, oh, now we don't get it or now we do get it, which is

9  the pattern that's occurred.

10          So I don't want to leave the conversation today with

11  having the Court have the impression that by uttering the

12  phrase "illicit transactions," there might be any meat to that

13  hollow phrase.

14          Secondly, you have mentioned twice now the issue of

15  SARs, and I would be remiss if I didn't make sure that before

16  we leave this call, I think if the defendants know our

17  position, the Court doesn't.  Remember, Judge, once we lost the

18  amount of customers and accounts we did, the amount of business

19  and customer went such extraordinarily down that in a normal

20  institution that routinely has to worry about filing SARs that

21  occurs after the fact, the folks at BSJI are on the ground and

22  they know the transactions in real time.  And therefore, if

23  there was a need, the transaction might not have occurred to

24  begin with.

25          The idea that you don't file a SARs is in and of

1   themselves a reflection of some unsafe or unsound practice is

2   only possible if there is a whole lot of SARs and you didn't do

3   it.

4          Here, they have never to this moment pointed out a

5   transaction that they have now seen that a SARs should have

6   been filed for, let alone the SARs just being the beginning of

7   the process.

8          That's why I'm saying that there are a lot of more

9   intricacies that they've thrown at the wall at us for you to

10  get a misimpression about words like "illicit" or "shell

11  company."

12         They're telling us in this latest round, and you

13  picking up on that phrase, they are the only entity of entities

14  that have come to that accusation.  Remember, BSJI has a

15  supervisor in Puerto Rico, the OCIF.  ███████████████████

16  ███████████████████████████████████████

17  ███████████████████████████  We have had the

18  scrutiny of seeking a new financial product and a credit card

19  by a company that works with Visa.

20         This is not just us saying so.  These are very

21  important obligations that the entities that actually have been

22  on the ground.  The Fed has not been there, so I don't know

23  what they're basing their conclusions on.

24         But all of my saying this is only to the point of

25  saying it is a lot more substantive and complicated than simply

1     them saying, oh, now we are talking about illicit transactions

2     and for you to pick up on that phrase.

3          On that point, if we were deficient, as you said our

4     pleadings were, because you can't tell that we are addressing

5     each successive point they've made without looking at the

6     attachments.  And I think the attachments do that, but I can't

7     quarrel with you that if there was a way to take the essence of

8     Mr. Aponte saying that the bond transaction is explainable in

9     the following way, or Hector Vazquez explaining why they know

10    about transactions in real time for which a SAR, there is no

11    doubt in the many pages we filed, that it's not possible to do

12    better.  We can always do that better.

13         But I think the Court's concern is correct to state,

14    but the record that we provided the Court should allay any real

15    concerns that either you or the Fed have for the reasons I've

16    said, both by pointing out the change of circumstance, the

17    change of reasons to, for example, the specific answer as to

18    SAR, the specific answer as to the bond, the specific answer

19    for them to now say, oh, it is illicit transactions, when we

20    have three other -- two other supervisors and lots of others

21    that scrutinize us.

22         As to the one thing that I said I would -- and I

23    interrupted the flow when I did that because it is such an

24    important issue in this first period of time, on the issue of

25    irreparable harm, even in 14 days.

1          Look, Judge, I am not going to tell you that if the

2     account is closed -- as opposed to suspended, by the way -- on

3     Monday, that on Tuesday morning at 9 o'clock every one of our

4     customers leaves.  I don't know that and I wouldn't say that.

5     But I can tell you if past is prologue, we know what's going to

6     happen.  We lost hundreds of accounts after the last episode

7     with the Fed, and it's only been -- of course COVID got in the

8     way as well -- the ability to set the ship right in which now

9     we are at a posture to be able to extend and grow and do so

10    with the blessing up until the last month of the Fed.  In

11    compliance with the experts that have now day to day, including

12    the former chair of the FDIC who you have the affidavit or the

13    declaration for, to be able to be that.

14         But even if these people have stuck with us through

15    this part, they need services, they need their checks to be

16    cleared, they need the ability to have bank-to-bank transfers.

17    If that's gone, no matter whether they know the owner of this

18    bank or not, they are not going to suspend, and if past is

19    prologue, I can't tell you, Judge, and I'm telling you the

20    opposite, there is much more of a risk that this next hit would

21    be the death knell.  Now they say you are never going to end up

22    getting it straight with these folks so we are going to go

23    elsewhere.  So it is irreparable harm or at least the threat of

24    it is so severe given the past.

25         Look at what we were in 2020 and look at what the bank

1    is in 2023.  We can't take this hit.  In this situation, we

2    don't get three strikes, your Honor, we get two.  And the

3    second one would be an out if it happened to us.  So, I needed

4    to address the irreparable harm issue as well.

5            And so finally, in terms of where that leaves us, in

6    terms of what you said, I think what you earlier said, this

7    case cries out for some interim possibility.  I don't have an

8    objection -- I say I -- the bank doesn't have an objection, and

9    I'm sure we could figure out if what the Fed comes back and

10   says to us after talking to their compliance people,

11   notwithstanding everything that we provided them, that some

12   form of additional monitoring of the activity of the bank on a

13   day-to-day basis is what they need to hear from us to be able

14   to have the orderly process schedule that you said, I'm sure

15   we'd do it.  We just have to figure out terms of that.  I don't

16   want that to be the only possibility, because I suspect if they

17   talk to them in good faith and we them, whatever allowed them

18   to go forward in January to April when we gave them information

19   and they came back and said what about this one and this one of

20   the 13, quote, deficiencies, to then following in June where we

21   talked about the new issue.  Whatever allowed this to continue,

22   where their concern about that one transaction was not

23   yesterday, it was not two weeks ago, it was in that same

24   period.  Whatever allows that to happen would allow this to

25   happen for the next 28 days.  It just would.  Without there

1    being a risk to the system or any particular concern that could

2    not be addressed.

3            So, I think I've answered your question about why

4    would there be irreparable harm this time, if it had been

5    suspended.  Remember when you have a suspension, maybe at that

6    point, given the good will of our customers and clients,

7    suspension means, okay, they are going to work it out.  Maybe

8    it got worked out longer than it hoped.  When it's closed after

9    suspension, nobody would understand the nuance, and I don't

10   blame them.

11           I think I've answered your question about their

12   concerns about abuse of accounts and high-risk activity, by

13   what I have addressed.  I want to make sure I've done all you

14   asked.  And I think the issue of them making the statement in

15   light of the other agencies that are in fact the supervisors,

16   is something the Court should take into consideration.

17           And then in terms of even things like if there is an

18   issue, do they take issue with what we are saying about we

19   can't readily find a correspondent bank, is certainly something

20   in our papers that address that too.

21           So I think I have addressed what we said.  And not

22   to -- the last point I think maybe everybody understands what

23   it is to suspend.  When you suspend, we actually then trap our

24   clients' funds, and they didn't do anything that suggests that

25   they should do this.  That goes back to which of these accounts

1    do you think is the problem.  If it is a single account, let's

2    deal with it.  You can't just say, oh, you have illicit

3    questions.

4             What I conclude is I think under any fair reading of

5    what TRO means, we are prepared to ask you to rule and grant us

6    that.  And we are only doing that because the defendants refuse

7    to find an interim arrangement that would make that

8    unnecessary.

9             So, I come back to where I started or where you

10   started however long ago we started.

11            THE COURT:  Okay.  Mr. Brennan, anything you'd like to

12   add?

13            MR. BRENNAN:  Thank you, your Honor.  I guess I would

14   note that we disagree on almost every point that was just made.

15   Irreparable harm -- yes.

16            THE COURT:  Go ahead.

17            MR. BRENNAN:  On irreparable harm, there is an

18   asserted loss of customers.  They have, as they noted, 13

19   customers at this point largely related to the owner.  I don't

20   think there is going to be a loss of good will between the

21   owner and his relatives.

22            In terms of establishing irreparable harm, you

23   generally have to show, and they have to show they're

24   profitable, which they can't do.

25            In terms of the third-party consultants and the

N7Q3BSJC - REDACTED

1    supervisors, it certainly is not clear to us that any of those

2    consultants or the parties that are signing off on anything

3    that they are doing, have taken a look at their actual

4    transactions.  They look at their compliance programs.  We

5    don't think they're doing a good enough job at that.  But the

6    concerns we have about the transactional activity, the experts

7    are not weighing in on.

8         In terms of the lack of SARs, I think part of what the

9    issue is here is there are independence concerns.  So if you

10   have a bank that's controlled by a son, and there is a

11   potentially suspicious transaction between his parents, is he

12   going to alert FinCEN?  There's a lack of SARs, and there are

13   independence concerns related to the customers and the owner.

14        THE COURT:  Let me stop you on that.  If there is a

15   concern about the fact that the bank has never filed a SARs,

16   there should be a way to identify the transactions for which a

17   SARs should have been filed, and was not.  It shouldn't be

18   sufficient to simply say the bank has never filed a SARs.  And

19   so the bank now has 13 customers.  Presumably the compliance

20   people can look at the accounts for the 13 customers and say

21   here's a transaction on which a SARs should have been filed.

22        But as I listen to the other side, they say, they've

23   never pointed out the transactions to us as to which there

24   should have been a SARs.

25        MR. BRENNAN:  Yes, your Honor.  I appreciate that, the

1   question.  So we are -- we do not supervise them, and we don't

2   have the obligation to file a SAR or tell them to file a SAR.

3   And I think the combination of the lack thereof and we did send

4   them a request for information.  It concerned a number of

5   specific transactions.  And so we directed them to some of the

6   issues that we're concerned about.  There's a fairly detailed

7   requests of a number of questions that we have for them about

8   very specific transactions.

9          So, there have been transactions flagged and we've

10  gotten specific.

11         THE COURT:  Are any of those transactions, have you

12  all concluded that there should have been a SARs filed?

13         MR. BRENNAN:  I don't think compliance views their

14  role as having to do that -- or not just having to do it, but

15  opining or instructing a bank that they should have given or

16  filed a SAR in this circumstance.

17         THE COURT:  So let me ask then a related question.  I

18  appreciate that the Federal Reserve Bank of New York is not the

19  regulator so to speak for BSJI.  But if the transactions at

20  BSJI are such that that is what is of concern to the Federal

21  Reserve Bank of New York, I come back to my suggestion of

22  having a monitor, if you will, which would increase the

23  compliance in order to give satisfaction or a modicum of

24  satisfaction to the Federal Reserve Bank of New York.

25         As I hear the other side, they would be prepared to

N7Q3BSJC - REDACTED

1   have a monitor.  Usually monitors are paid for by the

2   monitoree.  So, if the bank is concerned over transactions,

3   have someone, even though the Federal Reserve Bank of New York

4   is not the supervisor, have the BSJI pay for a monitor to

5   provide satisfaction to the Federal Reserve Bank of New York.

6           I just -- hold on.  I just suggest that because I

7   understand your position with respect to the different role

8   that the Federal Reserve Bank of New York have.

9           You all on both sides are far more expert about this

10  than I am.  I'm simply making these suggestions as a way that

11  you all might -- might -- be able to resolve some of the

12  interim issues.

13          MR. BRENNAN:  Yes, your Honor.  I appreciate that.

14  And I will be talking to my compliance area, Financial

15  Intelligence Unit.  And I guess I want to be clear that we very

16  well may be able to agree to some sort of interim risk

17  mitigation measure.  In terms of the long-term, the conclusion,

18  based on the review, is that the risk cannot be mitigated long

19  term.

20          So, but I hear you on interim measure that we can

21  certainly discuss internally and meet and confer with BSJI on

22  that point.

23          THE COURT:  Okay.

24          MR. LOWELL:  This is Abbe Lowell.  We'll be glad to do

25  it and do it soon with them, as soon as they can.

1    But, I do need, because we will leave you with

2    whatever impressions we can provide you with this one hearing.

3    Just as Mr. Brennan said when he first responded, I can't -- I

4    don't agree with anything that was just said, I have to point

5    out that what he said you shouldn't accept as exact information

6    either.

7    Let me give you just a few examples and then maybe

8    what we can do is agree with Mr. Brennan and his colleague when

9    we will talk and figure out the schedule that we set.

10    But for example, it is not right to say that there

11    have been no SARs.  That is just not right.  On the advice of

12    these independent auditors, like K2 or FTI, these are the

13    equivalent of independent auditors, SARs were done.  They may

14    not have been in the last year, which doesn't mean they should

15    have been done in the last year, which goes back to the last

16    point.

17    I didn't want the Court to leave the call thinking

18    there's never been a SARs filed.  Of course we can't provide

19    the details of what SARs were filed and when, because the law

20    prohibits that.  But I can say what I just said comfortably.

21    Mr. Brennan says that they have no basis to believe,

22    for example, that these independent auditors are doing anything

23    other than looking at compliance programs.  He knows or the

24    material we provided would certainly indicate to him that's not

25    true either.  That, for example, AML RightSource has looked at

1    the majority of the accounts transactions as a sample, not just

2    a few, to make their conclusion which you have, that is a safe,

3    sound, not acting in bad ways, in, quote, illicit transactions.

4         So, third, when they say that they have no basis to

5    believe that the supervisor in this case, OCIF, has actually

6    looked at transactions, there's no basis to say that either.

7    It is not they are saying you have a program.  They have

8    actually looked at the transactions.

9         And so, I just needed to make sure I corrected that or

10   at least put our 2 cents on the record for that, which may have

11   to get fleshed out when I hear him say we have concluded that

12   in the long term there are no conditions that would mitigate

13   the risk.  That seems, again, sort of hard to understand given

14   the size.  And again, cleaning up the notion we know the people

15   that are our customers isn't something that indicates that we

16   turn away to wrongdoing.  That's a presumption that's not

17   merited by either who the owner of this bank is or his

18   accomplishments or his pedigree or how he has run this

19   institution or what has happened after 2019.

20        We do want to point out that after the Fed sort of

21   shot first and aimed second after there was a media account of

22   the FBI activity at the bank over financial transactions in

23   specific, and not all, over that long period of time, we

24   convinced and showed that there was no merit to that.  And not

25   only no merit, remember, the authorities involved gave the bank

1    a non-prosecution statement for no wrongdoing, and returned all

2    the money that had been taken.

3            So, the idea that there's a relationship of customer

4    and owner means there is something bad, it doesn't do that.  It

5    quite might do the opposite by recognizing why there might be

6    only one or two SARs in a given period of time.

7            All that said, when I have the chance to at least let

8    the Court know what we think about the things that Mr. Brennan

9    said about those subjects, still leads us to what the Court

10   asked for, which, as I understand it, is we will talk to

11   Mr. Brennan and others, hopefully satisfy them in the near term

12   that there is something that can be done.  Obviously, one says

13   the word "monitor," maybe that's the best solution, but what

14   does that mean?  You already talked about the cost.  I don't

15   know what, given the size of the bank, its number of customers,

16   we will allow conversation about all of that.  So we just

17   need -- if that's the best solution, we are amenable.  If there

18   is another solution, because we've had folks like the

19   independent auditors that look at transactions and are there,

20   we can figure that out.

21           I guess what I'd say is I think you've indicated you'd

22   like them to get back to you by Friday morning.  I guess that

23   would be, if we can work something out, you'll hear from both

24   of us.  If we cannot and you still want their response on the

25   papers we filed, then given that Monday is the day of closure,

N7Q3BSJC - REDACTED

1   and we would get their response on the merits, I would like to

2   figure out if we could get the Court a reply to what they say

3   before the magic moment at the close of business on Monday.

4           THE COURT:  If there is a necessity for a reply, you

5   could give me the reply by 5 o'clock on Friday.

6           MR. BRENNAN:  Okay.  We'll work to do it.  I hope we

7   don't need it, but I had to ask for a placeholder.

8           THE COURT:  Okay.  All right.  Thank you, all.

9           MR. LOWELL:  Thank you for your time, Judge.

10          THE COURT:  Okay.

11          MR. BRENNAN:  Thank you, your Honor.

12          THE COURT:  All righty.  Bye now.

13          (Adjourned)

14

15

16

17

18

19

20

21

22

23

24

25