**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| BANCO SAN JUAN INTERNACIONAL, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 1:23-cv-6414 |
| FEDERAL RESERVE BANK OF NEW YORK and BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM, | ) ) ) ) ) | |
| Defendants. | ) ) | |

**DEFENDANT BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM'S
OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

Mark Van Der Weide, General Counsel
Richard M. Ashton, Deputy General Counsel
Joshua P. Chadwick (JC9369), Senior Special Counsel
Yvonne F. Mizusawa (YM5081), Senior Counsel
Nicholas Jabbour (*pro hac vice*), Senior Counsel
Board of Governors of the Federal Reserve System
20th Street and Constitution Avenue, N.W.
Washington, D.C. 20551
(202) 263-4835
joshua.p.chadwick@frb.gov

*Counsel for Defendant Board of Governors of the
Federal Reserve System*

# <u>TABLE OF CONTENTS</u>

**<u>Page</u>**

TABLE OF AUTHORITIES ..................................................................................................... iii

INTRODUCTION ..................................................................................................................... 1

STATEMENT OF FACTS ......................................................................................................... 2

I.      The Federal Reserve System And Master Accounts ............................................................ 2

II.     The Board's Guidelines Affirming Reserve Bank Discretion To Deny Master Accounts . 4

III.    FRBNY's Communications With The Board Regarding FRBNY's Decision To Close
BSJI's Master Account ..................................................................................................... 5

ARGUMENT .............................................................................................................................. 6

I.      BSJI Lacks Standing To Seek A Preliminary Injunction Against The Board ................... 6

II.     BSJI Cannot Establish Any Of The Factors Required For A Preliminary Injunction ...... 10

      A.     BSJI Cannot Establish Irreparable Harm Because It Cannot Demonstrate
That Its "Loyal" Customers, Who Are "Friends Or Family Members," Will
Be Forever Lost ................................................................................................... 11

      B.     BSJI Cannot Show A Likelihood Of Success Against The Board ...................... 13

            1.     BSJI Is Unlikely To Succeed On Its APA Claim Because The Board Is
Neither Required Nor Able To Provide A Master Account To BSJI ....... 13

                a.     12 U.S.C. § 248a Does Not Entitle BSJI To A Master Account .. 13

                b.     The Board Is Not A Proper Party For A Claim Concerning
The Discretion Exercised With Respect To BSJI's Master
Account ...................................................................................... 19

            2.     BSJI Is Unlikely To Succeed On Its Mandamus Claim ............................ 19

            3.     BSJI Is Unlikely To Succeed On Its Claim Seeking A Declaration
Concerning The Interpretation Of 12 U.S.C. § 248a ............................... 20

4.    BSJI Is Unlikely To Succeed On Its Claim Seeking A Declaration That Master Account Termination Would Violate The Due Process Clause ................................................................................... 20

C.    The Public Interest And Balance Of Equities Weigh In Favor Of Deferring To FRBNY's Determination Pursuant To Federal Guidelines ................................. 21

CONCLUSION ........................................................................................................ 23

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

**TABLE OF AUTHORITIES**

**Pages**

<u>Cases</u>

*Benzman v. Whitman*,
    523 F.3d 119 (2d Cir. 2008)............................................................................. 19

*Biden v. Texas*,
    142 S. Ct. 2528 (2022).................................................................................... 15

*Billings Utility Co. v. Advisory Committee, Board of Governors*,
    135 F.2d 108 (8th Cir. 1943) ......................................................................... 16

*CG3 Media, LLC v. Belleau Technologies, LLC*,
    2023 WL 2456640 (S.D.N.Y. Mar. 1, 2023) ................................................. 13

*Cheney v. U.S. District Court for D.C.*,
    542 U.S. 367 (2004)....................................................................................... 19

*Clementine Company, LLC v. Adams*,
    74 F.4th 77 (2d Cir. 2023) ............................................................................... 6

*Curry-Malcolm v. Rochester City School District*,
    835 F. App'x 623 (2d Cir. 2020) ..................................................................... 7

*Custodia v. Federal Reserve Board of Governors*,
    No. 1:22-cv-00125 (D. Wy. June 8, 2023) .................................................... 17

*DTC Energy Group, Inc. v. Hirschfeld*,
    912 F.3d 1263 (10th Cir. 2018) ..................................................................... 12

*Farmers' & Merchants' Bank v. Federal Reserve Bank of Richmond*,
    262 U.S. 649 (1923)....................................................................................... 15

*FBME Bank Ltd. v. Mnuchin*,
    249 F. Supp. 3d 215 (D.D.C. 2017) ............................................................... 21

*Fourth Corner Credit Union v. Federal Reserve Bank of Kansas City*,
    861 F.3d 1052 (10th Cir. 2017) ..................................................................... 18

*Franklin Savings Association v. Director, Office of Thrift Supervision*,
    934 F.2d 1127 (10th Cir. 1991) ..................................................................... 22

*Golden Pacific Bancorp v. Clarke*,
    837 F.2d 509 (D.C. Cir. 1988) ........................................................................ 22

*Goldstein v. Hochul*,
    2023 WL 4236164 (S.D.N.Y. June 28, 2023) ................................................ 11

*Grand River Enterprise Six Nations, Ltd. v. Pryor*,
    481 F.3d 60 (2d Cir. 2007) .............................................................................. 11

*Henderson v. Shinseki*,
    562 U.S. 428 (2011) ........................................................................................ 17

*Investment Company Institute v. FDIC*,
    815 F.2d 1540 (D.C. Cir. 1987) ...................................................................... 22

*Jet Courier Services, Inc. v. Federal Reserve Bank of Atlanta*,
    713 F.2d 1221 (6th Cir. 1983) ........................................................................ 14

*Johnson v. City of Annapolis*,
    2023 WL 3390823 (D. Md. May 11, 2023) .................................................... 10

*JSG Trading Corp. v. Tray–Wrap, Inc.*,
    917 F.2d 75 (2d Cir. 1990) .............................................................................. 12

*Junel Food Center Corp. v. United States*,
    1997 WL 634175 (S.D.N.Y. Oct. 15, 1997) .................................................... 9

*Kuck v. Danaher*,
    822 F. Supp. 2d 109 (D. Conn. 2011) .............................................................. 8

*Kwan Software Engineering, Inc. v. Foray Technologies, LLC*,
    551 F. App'x 298 (9th Cir. 2013) .................................................................... 12

*Libertarian Party of Erie County v. Cuomo*,
    970 F. 3d 106 (2d Cir. 2020), *abrogated on other grounds, New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022) ............................................ 8

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) .......................................................................................... 7

*Marino v. Town of Branford*,
    2018 WL 691715 (D. Conn. Feb. 2, 2018) ...................................................... 9

*Medtronic, Inc. v. Mirowski Family Ventures, LLC*,
    571 U.S. 191 (2014) ........................................................................................ 20

*Merit Management. Group, LP v. FTI Consulting, Inc.*,
      138 S. Ct. 883 (2018) ........................................................................................ 14

*Nken v. Holder*,
      556 U.S. 418 (2009) .......................................................................................... 11

*Progressive Credit Union v. City of New York*,
      889 F.3d 40 (2d Cir. 2018) ................................................................................ 20

*Raichle v. Federal Reserve Bank of New York*,
      34 F.2d 910 (2d Cir. 1929) ................................................................................ 16

*Simon v. Eastern Kentucky Welfare Rights Organization*,
      426 U.S. 26 (1976) .............................................................................................. 9

*Syncx LLC, v. Kimedics, Inc.*,
      2023 WL 5127834 (S.D.N.Y. Aug. 10, 2023) ................................................... 13

*TNB USA Inc. v. Federal Reserve Bank of New York*,
      2020 WL 1445806 (S.D.N.Y. Mar. 25, 2020) ................................................... 18

*Town of Castle Rock, Colorado v. Gonzales*,
      545 U.S. 748 (2005) .......................................................................................... 20

*United States v. Martin*,
      320 F.3d 1223 (11th Cir. 2003) ........................................................................ 21

*Warth v. Seldin*,
      422 U.S. 490 (1975) .......................................................................................... 10

*We The Patriots USA, Inc. v. Hochul*,
      17 F.4th 266 (2d Cir. 2021) .............................................................................. 10

*Whitman v. American Trucking Associations, Inc.*,
      531 U.S. 457 (2001) .......................................................................................... 17

## **Statutes**

12 U.S.C. § 221 *et seq* ................................................................................................. 2

12 U.S.C. §§ 241-252 ................................................................................................. 17

12 U.S.C. § 248(j) ......................................................................................................... 3

12 U.S.C. § 248a ....................................................................... 1, 13, 14, 17, 18, 19, 20

12 U.S.C. § 248a(a)........................................................................................................ 14

12 U.S.C. § 248a(c)........................................................................................................ 14

12 U.S.C. § 248c .................................................................................................... 17, 18

12 U.S.C. § 248c(b)(1) .......................................................................................... 16, 17

12 U.S.C. §§ 341-361 ......................................................................................... 2, 9, 17

12 U.S.C. § 342 ...................................................................................................... *passim*

12 U.S.C. § 343 ................................................................................................................ 2

12 U.S.C. § 347 ................................................................................................................ 2

12 U.S.C. § 347c .............................................................................................................. 2

12 U.S.C. § 347d .............................................................................................................. 2

12 U.S.C. § 348 .............................................................................................................. 16

12 U.S.C. § 355(1) ........................................................................................................... 2

28 U.S.C. § 1361 ........................................................................................................... 19

28 U.S.C. § 2201 ........................................................................................................... 20

**Regulatory Materials**

Guidelines for Evaluating Account and Services Requests,
    87 Fed. Reg. 51,099 (Aug. 19, 2022) (Guidelines)..................................... 4, 5

**Other Authorities**

Chester Morrill, Secretary, Board of Governors of the Federal Reserve System,
    Letter X-9187 (Apr. 26, 1935), *available at* https://fraser.stlouisfed.org/archival-
    collection/mimeograph-letters-statements-board-4957/letter-secretary-morrill-re-
    nonmember-bank-clearing-accounts-505912 ................................................. 16

Federal Reserve Banks Operating Circular 1, Account Relationships (Jan. 2, 1998),
    web.archive.org/web/20000116011948/http://www.frbservices.org/
    Industry/pdf/Oc1.pdf........................................................................................ 3

Federal Reserve Banks Operating Circular 1, Account Relationships
     (Aug. 16, 2021), https://www.frbservices.org/binaries/content/assets/crsocms/
     resources/rules-regulations/081621-operating-circular-1.pdf.............................................. 4

Office of the Comptroller of the Currency, Bank Secrecy Act,
     https://www.occ.treas.gov/topics/supervision-and-examination/bsa/index-bsa.html....... 21

Reserve Maintenance Manual, https://www.federalreserve.gov/monetarypolicy/reserve-
     maintenance-manual-account-structure.htm....................................................................... 3

Defendant Board of Governors of the Federal Reserve System ("Board") respectfully submits this opposition to the motion by Plaintiff Banco San Juan Internacional, Inc. ("BSJI") seeking a preliminary injunction preventing Defendant Federal Reserve Bank of New York ("FRBNY") and the Board from "closing BSJI's master account and terminating BSJI's access to Federal Reserve System services." ECF 7 at 1.

## **INTRODUCTION**

BSJI's motion seeking a preliminary injunction suffers from a fatal flaw with respect to the Board: decisions about opening and closing BSJI's master account lie with FRBNY as a matter of law and contract, not with the Board. Tellingly, the Complaint in this case contains no factual allegations about any actions taken by the Board with respect to the April 2023 decision to terminate BSJI's master account, because that decision was made by FRBNY. *See, e.g.*, Complaint ¶¶ 14-27 (describing actions taken only by FRBNY). Because any injury claimed by BSJI is fairly traceable only to FRBNY, there is no standing to pursue a lawsuit against the Board, and BSJI's motion for preliminary relief should be denied as to the Board on this basis alone.

However, even if the Court were to proceed with an analysis of the preliminary injunction factors, BSJI cannot satisfy any of them:

- BSJI's claimed irreparable harm – the loss of customers – is entirely speculative in light of the fact that these customers are principally or entirely family or friends of BSJI's owner.

- BSJI is unlikely to succeed on the merits of its claims against the Board, all of which rise or fall on the contention that it is has an inviolate entitlement to a master account under 12 U.S.C. § 248a. The plain text of that provision does not

say anything about master accounts, much less create an automatic and absolute
right to one.

- The public interest and balance of equities weigh against granting the injunction,
as money laundering poses significant risks to the safety and soundness of the
banking system, and deference should be accorded to the judgment of the
contracting Reserve Bank, acting in accordance with federal regulatory guidance,
as to when an institution presents undue risk.

Accordingly, the Board respectfully requests that the Court deny BSJI's motion for a preliminary
injunction.

## STATEMENT OF FACTS

### I.    The Federal Reserve System And Master Accounts

The Federal Reserve System, the nation's central bank, was established in 1913 by the
Federal Reserve Act, 12 U.S.C. § 221 *et seq* ("FRA"). It consists of the Board, the Federal Open
Market Committee, and twelve regional Federal Reserve Banks that serve financial institutions
in their respective districts. Reserve Banks serve as "bankers' banks" and are authorized by
statute to provide various banking services. *See generally* 12 U.S.C. §§ 341-61. The Board, a
federal agency and not a bank, has neither the ability nor statutory authority to receive deposits
or carry out activities such as check clearing, wire transfers, automated clearing house services,
and other services appurtenant to the business of banking that Congress vested in the Reserve
Banks. *See, e.g.*, 12 U.S.C. §§ 342, 343, 347, 347c, 347d, 355(1).

The Reserve Banks offer depository services through master accounts, which are
accounts maintained by a depository institution at its regional Reserve Bank. A master account
"is both a record of financial transactions that reflects the financial rights and obligations of an

2

account holder and of the Reserve Bank with respect to each other, and the place where opening and closing balances are determined."[1] As deposit accounts, master accounts are governed by 12 U.S.C. § 342, which provides that "[a]ny Federal reserve bank may receive from any of its member banks, or other depository institutions . . . deposits of current funds in lawful money[.]" In providing general oversight of the activities of the Reserve Banks, the Board may issue guidance with regard to master accounts, but the Board has no ability to open or terminate a master account and does not handle the administration of any institution's master account. *See* 12 U.S.C. §§ 248(j), 342.

Operating Circulars, issued by Reserve Banks beginning in 1998, govern the relationship between a Reserve Bank and a master account holder. These circulars make clear that a master account creates a contract between a depository institution and the Reserve Bank, to which the Board is not a party, and which the Reserve Bank can terminate at any time. For example, the 1998 Operating Circular 1 "establish[es] the terms for opening, maintaining, and terminating master accounts with the Federal Reserve Bank," and does not list the Board as a party to the account relationship or state that Board approval is necessary.[2]  In addition, the Circular states that "[a]ll master accounts are subject to Reserve Bank approval," and notes that the Reserve Bank "may close your master account . . . at any time but will endeavor to give at least five

---

[1] Reserve Maintenance Manual, https://www.federalreserve.gov/monetarypolicy/reserve-maintenance-manual-account-structure.htm.

[2] Operating Circular 1, Account Relationships (Jan. 2, 1998) ¶ 1.1, web.archive.org/web/20000116011948/http://www.frbservices.org/Industry/pdf/Oc1.pdf.

business days' prior notice."[3] Both of these provisions are substantively similar to the comparable provisions in the most recent operating circular, reflecting the longstanding practice in which decisions about master accounts are made by Reserve Banks in accordance with the authority provided to them by Congress in the Federal Reserve Act.[4]

## II.   The Board's Guidelines Affirming Reserve Bank Discretion To Deny Master Accounts

On August 19, 2022, following two rounds of public notice-and-comment, the Board's "Guidelines for Evaluating Account and Services Requests" became effective. 87 Fed. Reg. 51,099 ("Guidelines"). The Guidelines were issued "to increase the level of transparency and consistency of the process used by Reserve Banks to evaluate institutions' access to Reserve Bank accounts and services." *Id.* at 51,106. The Guidelines set forth six principles for Reserve Bank use in decisions regarding access to Reserve Bank master accounts and services. Pertinent to this case, Principle 5 states that "[p]rovision of an account and services to an institution should not create undue risk to the overall economy by facilitating activities such as money laundering, terrorism financing, fraud, cybercrimes, economic or trade sanctions violations, or other illicit activity." *Id.* at 51,109.

The Guidelines also create a three-tiered review framework that "is meant to serve as a guide to the level of due diligence and scrutiny to be applied by Reserve Banks to different types of institutions." *Id.* The Guidelines note that, "[a]lthough institutions in a higher tier will on

---

[3] *Id.* ¶¶ 2.3, 2.8.

[4] *See* Operating Circular 1, Account Relationships (Aug. 16, 2021) ¶¶ 1.1, 2.6, 2.10, https://www.frbservices.org/binaries/content/assets/crsocms/resources/rules-regulations/081621-operating-circular-1.pdf.

average face greater due diligence and scrutiny than institutions in a lower tier, a Reserve Bank

has the authority to grant or deny an access request by an institution in any of the three proposed

tiers . . . on a case-by-case, risk-focused basis[.]" *Id.* The three tiers are: "Tier 1: Eligible

institutions that are federally insured"; "Tier 2: Eligible institutions that are not federally insured

but are subject (by statute) to prudential supervision by a federal banking agency"; and "Tier 3:

Eligible institutions that are not federally insured and are not considered in Tier 2." *Id.* at 51,109-

10. With respect to Tier 3 (which includes institutions such as BSJI), the Board noted that

"detailed regulatory and financial information regarding Tier 3 institutions may not exist or may

be unavailable," and, "[a]ccordingly, Tier 3 institutions will generally receive the strictest level

of review." *Id.* at 51,110.

The Board noted that its function is to ensure the consistent application of the Guidelines:

"The Board expects the Reserve Banks to engage in consultation with each other and the Board,

as appropriate, on reviews of account and service requests, as well as ongoing monitoring of

accountholders, to ensure that the guidelines are implemented in a consistent and timely

manner." *Id.* at 51,106. Consistent with 12 U.S.C. § 342, however, the Board "ma[d]e clear that

legal eligibility does not bestow a right to obtain an account and services." 87 Fed. Reg. at

51,106. Rather, the Board emphasized that "Reserve Banks . . . retain the discretion to deny a

request for access to accounts and services where, in the Reserve Bank's assessment, granting

access to the institution would pose risks that cannot be sufficiently mitigated." *Id.* at 51,102.

## III.    FRBNY's Communications With The Board Regarding FRBNY's Decision To Close BSJI's Master Account

On April 6, 2023, FRBNY sent an email message to Matthew Eichner, a Board Division

Director, "notifying [him] of the intent of [FRBNY] to terminate the access of Banco San Juan

Internacional ("BSJI") to [FRBNY] accounts and services." Brennan Declaration, Exhibit T. The

5

email message attached two memoranda documenting the reasons for FRBNY's decision to close BSJI's account and summarized these memoranda as follows: "Through its ongoing risk monitoring of BSJI, [FRBNY] has concluded that BSJI does not meet principle 5 of the Guidelines because it poses undue risk to the overall economy by facilitating activities such as money laundering, economic or trade sanctions violations, or other illicit activity." *Id.* The email indicated that, "[g]iven the undue risk posed by BSJI under principle 5," FRBNY "intends to exercise its contractual rights to terminate BSJI's access to [FRBNY] accounts and services." *Id.*

In response, Mr. Eichner wrote: "Board staff have reviewed [FRBNY's] record documenting application of the Guidelines in evaluating the risks of BSJI's access. We have no concerns with [FRBNY's] application of the Guidelines to BSJI and with it moving forward with its intended action to terminate BSJI's access based on this analysis." *Id.*

Consistent with these communications, and as the Complaint alleges, the decision to terminate BSJI's account was made only by FRBNY, which communicated the decision to BSJI in an April 24, 2023 letter. *See, e.g.,* Complaint ¶¶ 14-27 (recounting four years of events that only involved FRBNY). Yet in this litigation, BSJI has taken the extraordinary step of suing and seeking preliminary injunctive relief against the Board.

## ARGUMENT

## I.   BSJI Lacks Standing To Seek A Preliminary Injunction Against The Board

A preliminary injunction should not be issued against the Board because BSJI lacks standing to seek relief from the Board. BSJI's burden to demonstrate standing for purposes of a preliminary injunction "is equivalent to that required for summary judgment, at which point a plaintiff cannot rest on such mere allegations, as would be appropriate at the pleading stage." *Clementine Co., LLC v. Adams*, 74 F.4th 77, 83 n.1 (2d Cir. 2023) (quotation omitted). Here,

BSJI cannot carry this heavy burden because BSJI cannot demonstrate that its claimed injury is "fairly . . . trace[able]" to conduct by the Board. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (quotation omitted).

The record in this case demonstrates that, to the extent BSJI has any injury, it is traceable only to FRBNY, which alone possesses the discretion to open or close BSJI's master account. The Board's role was a general supervisory function in which the Board validated that FRBNY had undertaken a sufficient analysis under the Guidelines in reaching its decision. *See* Brennan Declaration, Exhibit T. Indeed, the Complaint and BSJI's moving papers (including ten declarations with extensive exhibits) are all totally devoid of any evidence that the decision to terminate BSJI's account was made by the Board. As the Complaint indicates in the few factual allegations that actually address the Board, the Board is being sued for no other reason than the fact that it promulgated the Guidelines. *See* Complaint ¶¶ 9, 101.[5] BSJI does not allege that the Board opened or closed its master account, because it could not plausibly support that allegation: the FRA only indicates that a "*Federal reserve bank* may receive from any of its member banks,

---

[5] The Complaint contains an allegation that the decision was "squarely in the Board's bailiwick" because it concerned BSJI's "legal eligibility." Complaint ¶ 103. But "legal eligibility" is Principle 1 of the Guidelines, and the Complaint acknowledges that "FRBNY predicated its decision to terminate BSJI's master account expressly upon Princip[le] 5." Complaint ¶ 104. The record contains no evidence that the termination was in any way based on legal eligibility and BSJI's stray, unsupported allegation concerning eligibility should not be credited. *See, e.g.*, *Curry-Malcolm v. Rochester City Sch. Dist.*, 835 F. App'x 623, 626 n.3 (2d Cir. 2020) ("speculative allegations are insufficient to support any . . . causes of action").

or other depository institutions . . . deposits of current funds in lawful money[.]"  12 U.S.C. §

342 (emphasis added).

Tellingly, prior to this lawsuit, BSJI tried to draw the Board into BSJI's dispute with

FRBNY, and the Board declined to become involved. As the Complaint recounts, BSJI's outside

consultant explicitly asked the Board to intervene in an effort to stop FRBNY from closing

BSJI's master account. Complaint ¶ 105. Yet the Board declined, noting that the decision was

FRBNY's to make. *Id.* As that consultant details:

> In a series of emails with legal counsel for the Board of Governors of the Federal
> Reserve System in Washington, D.C., people whom I respect, I asked for an
> "internal appellate avenue," [but] . . . Counsel for the Board of Governors advised
> . . . that the FRBNY "has discretion over BSJI's master account and access to
> Federal Reserve services."

ECF 11 ¶ 12. Thus, the Complaint lacks any proper justification for naming the Board as a

defendant.

Where, as here, a process "is statutorily vested to the control and authority" of one entity,

a plaintiff lacks standing to sue a different entity. *Kuck v. Danaher*, 822 F. Supp. 2d 109, 138 (D.

Conn. 2011) (holding that there was no standing to sue a state department of public safety over

denial of a gun permit where the denial decision was made by the state board of permit

examiners). That is because any injury is only "fairly traceable" to the entity that has decision-

making power under the applicable "statutory framework." *Id.*  In accordance with this principle,

the Second Circuit has held that "the only defendants to whom [plaintiffs'] alleged injuries were

fairly traceable were the [state officials] who denied their respective applications," and not state

officials with general law enforcement responsibilities by virtue of their positions. *See*

*Libertarian Party of Erie Cty. v. Cuomo*, 970 F. 3d 106, 122 (2d Cir. 2020), *abrogated on other*

*grounds, New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022).

BSJI's ability to sue the Board is foreclosed by this case law. There is no basis for standing against the Board because the Board does not have the ability to close BSJI's master account. *See, e.g.*, *Marino v. Town of Branford*, 2018 WL 691715, at *2 (D. Conn. Feb. 2, 2018) (holding that plaintiff must seek relief only from "the party with the power to suspend and revoke the plaintiff's license"); *Junel Food Ctr. Corp. v. United States*, 1997 WL 634175, at *1 (S.D.N.Y. Oct. 15, 1997) (noting that "the Court denied the injunction and dismissed the complaint because [plaintiff] had sued the wrong entity"). The power to open and close master accounts is provided for by 12 U.S.C. § 342, which appears in subchapter IX of the FRA, 12 U.S.C. §§ 341-61, entitled "Powers of the Federal Reserve Banks." Consistent with this fact, the Complaint focuses almost exclusively on actions by the FRBNY, recounting in extensive detail all of the actions taken by FRBNY with respect to BSJI's master account since 2019. *See, e.g.*, Complaint ¶¶ 14-27. Thus, the decision being challenged in this case is the decision *by FRBNY* to terminate BSJI's master account. *See, e.g.*, Complaint ¶ 27 (referring to "FRBNY's decision to close BSJI's master account" and claiming that "FRBNY is determined to deny master [account] access to Puerto Rican [international banking entities]").

Relatedly, BSJI cannot show that the decision to revoke its master account would have been different absent Board involvement. In fact, the record shows the exact opposite: FRBNY reached its decision on its own. *See* Brennan Declaration, Exhibit T. Even though FRBNY notified the Board pursuant to the Guidelines, that does not change that the decision was made by FRBNY, a fact validated by the Complaint itself. *See* Complaint ¶¶ 14-27. Under these circumstances, it is pure speculation that BSJI's situation would have been different absent the FRBNY's notification to the Board. *See, e.g.*, *Simon v. E. Kentucky Welfare Rts. Org.*, 426 U.S. 26, 45 (1976) (noting that respondents did not have standing when "[s]peculative inferences

[were] necessary to connect their injury to the challenged actions of petitioners"); *Warth v. Seldin*, 422 U.S. 490, 507 (1975) (finding petitioners did not have standing when "they rel[ied] on little more than the remote possibility, unsubstantiated by allegations of fact, that their situation might have been better had respondents acted otherwise"); *Johnson v. City of Annapolis*, 2023 WL 3390823, at *13 (D. Md. May 11, 2023) (finding no standing against HUD because, "[a]lthough HUD had the *ability* to wield regulatory enforcement tools . . . , whether such an intervention would have materially improved [public housing units] remains 'purely speculative'"). Indeed, BSJI's entire theory of the case is that the termination is the result of a long chain of events that began in 2019, long before the Guidelines came into existence and well before any notification to the Board pursuant to the Guidelines was even a concern. *See, e.g.*, Complaint ¶¶ 24-27 (claiming that FRBNY has "targeted" BSJI since 2019).

Because BSJI's claimed injuries cannot be fairly traced to the Board, BSJI lacks standing to seek a preliminary injunction against the Board.

## II.    BSJI Cannot Establish Any Of The Factors Required For A Preliminary Injunction

Even if BSJI had standing to sue the Board, BSJI cannot meet the strict standard necessary to obtain a preliminary injunction against the Board. Issuance of a preliminary injunction is an "extraordinary and drastic remedy" that is "never awarded as of right" and "should not be routinely granted." *We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 279 (2d Cir. 2021) (quotations omitted). To obtain a preliminary injunction that "will affect government action taken in the public interest pursuant to a statute or regulatory scheme," BSJI must demonstrate "(1) irreparable harm absent injunctive relief, (2) a likelihood of success on the merits, . . . (3) public interest weighing in favor of granting the injunction . . . [and] the balance

of equities supports the issuance of an injunction." *Id.* at 279-80 (quotations omitted).[6] Here, none of these factors supports enjoining the Board.

### A.   BSJI Cannot Establish Irreparable Harm Because It Cannot Demonstrate That Its "Loyal" Customers, Who Are "Friends Or Family Members," Will Be Forever Lost

BSJI has not established that it will suffer "an injury that is neither remote nor speculative, but actual and imminent" if its master account is closed. *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (quotation omitted). As such, it is not entitled to the drastic remedy of a preliminary injunction.

Here, BSJI's self-serving claim that it "is almost certain to experience a terminal loss of business" (ECF 7 at 15) is both factually questionable and legally insufficient. As a factual matter, it strains credulity to believe that BSJI's unique customer base will abandon it forever if its master account is terminated during this litigation. Specifically, BSJI appears to be unsure how many customers it has, but claims that the number is either 13 customers or 19 customers. *Compare* ECF 10 ¶ 64 ("From December 31, 2018, to December 31, 2022, in just four years, BSJI went from 734 accountholders to just 19, from 739 accounts to just 20"); *with id.* ¶ 73 (stating that the bank has "14 accounts and 13 customers"). These 13 or 19 customers are not ordinary individuals; rather, they are all "friends or family members of BSJI personnel." ECF 10 ¶ 41. Indeed, all of BSJI's "recent transaction activity is on behalf of entities controlled by 'close relatives' of BSJI's owner." ECF 14 ¶ 12. And by BSJI's own admission, this small group of

---

[6] The "public interest" and "balance of equities" factors "merge when the Government is the opposing party." *Goldstein v. Hochul*, 2023 WL 4236164, at *18 (S.D.N.Y. June 28, 2023) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

customers who stayed with BSJI, even after the FBI raided the bank, did so because they are "loyal friends or family members[.]" ECF 10 ¶ 41; *see also* ECF 14 ¶ 12 ("[BSJI is] left with accountholders close to the owner"). BSJI cannot demonstrate that these "loyal" customers are "likely" to forever abandon BSJI. *See JSG Trading Corp. v. Tray–Wrap, Inc.*, 917 F.2d 75, 79 (2d Cir. 1990) ("Likelihood sets, of course, a higher standard than 'possibility.'").

Legally, a claim of irreparable harm cannot survive where it is based on nothing more than speculation about possible loss of customers. While BSJI claims that the loss of many customers after the FBI raid is a harbinger as to what will happen if the master account is suspended (ECF 7 at 16), the case law does not permit such guesswork. Any loss of customers that has already occurred is a past harm and is not a basis for awarding a preliminary injunction. *See DTC Energy Grp., Inc. v. Hirschfeld*, 912 F.3d 1263, 1271 (10th Cir. 2018) ("[N]ot all plaintiffs who have already suffered lost customers . . . can show a sufficient probability of future irreparable harm to warrant a preliminary injunction."). And with all of the current accountholders being close relatives or friends of the owner, it is highly speculative that these customers will forever leave the bank if the master account is terminated while this case is being litigated. *See, e.g.*, *Kwan Software Eng'g, Inc. v. Foray Techs., Ltd. Liab. Co.*, 551 F. App'x 298, 299 (9th Cir. 2013) (declaration by a company president that customers might be lost was "only speculative evidence").[7]

At bottom, BSJI cannot rely on self-serving statements from its employees that it will

---

[7] The cases that BSJI cites (ECF 7 at 15-17) are distinguishable because none involved a situation where the business only has customers that are friends and family members of the owner.

lose customers. *Syncx LLC, v. Kimedics, Inc.*, 2023 WL 5127834, at *18 (S.D.N.Y. Aug. 10, 2023) ("self-serving declarations that [plaintiff's] relationship with [its] clients is fragile" do not suffice to show irreparable harm). BSJI's "imprecise and unsubstantiated assertions of irreparable harm do not move the needle" toward showing irreparable harm, and its request for a preliminary injunction should fail on this basis alone. *CG3 Media, LLC v. Belleau Techs., LLC*, 2023 WL 2456640, at *9 (S.D.N.Y. Mar. 1, 2023).

### B.    BSJI Cannot Show A Likelihood Of Success Against The Board

BSJI's Complaint contains four claims against the Board. BSJI is not likely to succeed on any of them.

#### 1.    BSJI Is Unlikely To Succeed On Its APA Claim Because The Board Is Neither Required Nor Able To Provide A Master Account To BSJI

In Count I of its Complaint, BSJI brings a claim under the APA alleging that, under 12 U.S.C. § 248a, "[t]he FRBNY and the Board are mandated . . . to provide Federal Reserve bank services, including access to a master account, to all eligible 'depository institutions' on a non-discretionary basis," but that "even assuming that the FRBNY and the Board possess some level of discretion concerning master account access, their actions here are patently improper." Complaint ¶¶ 114, 115; *see also* ECF 7 at 18-26. However, 12 U.S.C. § 248a does not say anything about the granting of master accounts (much less mandate that they be awarded in every instance), and the Board is not a proper party for a claim concerning the discretion exercised with respect to BSJI's master account.

##### a.    12 U.S.C. § 248a Does Not Entitle BSJI To A Master Account

BSJI's contention that 12 U.S.C. § 248a requires the Board to grant it a master account (Complaint ¶ 114) does not withstand scrutiny. Section 248a does not speak to master accounts, and therefore it does not prevent Reserve Banks from terminating them. In contrast, 12 U.S.C.

§ 342 – the statutory provision that does address deposit accounts – affirms that Reserve Banks have discretion with respect to their account relationships.

Specifically, Section 248a, titled "Pricing of services," instructs the Board to "put into effect a schedule of fees" for certain services. 12 U.S.C. § 248a(a). In setting this schedule, the Board must consider certain principles, among them the understanding that "Federal Reserve bank services covered by the fee schedule shall be available to nonmember depository institutions" – prior to enactment of this provision in 1980, services had been limited to member institutions and free of cost – and that "such services shall be priced at the same fee schedule applicable to member banks." *See* 12 U.S.C. § 248a(c) ("The schedule of fees . . . shall be based on the following principles: . . ."). In effect, Section 248a serves as an anti-price discrimination provision. It establishes a schedule of fees for certain services so that a nonmember bank that has access to the Federal Reserve System will pay the same for those services as a member bank. But it makes no reference to master accounts, much less commands the Board to direct the opening of a master account for every institution that wants one regardless of risk. *See Jet Courier Servs., Inc. v. Fed. Reserve Bank of Atlanta*, 713 F.2d 1221, 1227 (6th Cir. 1983) (holding that the law establishing Section 248a provided that nonmember banks could receive Reserve Bank services "at the same fees charged member banks"). The title of Section 248a, "Pricing of Services," further indicates that it concerns *principles for setting prices* rather than mandatory availability of services. *See Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 138 S. Ct. 883, 893 (2018) (section headings "supply cues as to what Congress intended" (quotation omitted)).

Master accounts are governed by 12 U.S.C. § 342, which empowers, but does not require, Reserve Banks to open such accounts. Section 342 provides that "[a]ny Federal reserve bank *may* receive from any of its member banks, or other depository institutions, . . . deposits[.]"

12 U.S.C. § 342 (emphasis added). "'[M]ay' does not just suggest discretion, it *clearly* connotes it." *Biden v. Texas*, 142 S. Ct. 2528, 2541 (2022) (quotation omitted). Reserve Banks' discretion to receive deposits includes the discretion to decline to receive deposits from an institution. Thus, while Reserve Banks have the authority to accept deposits – and therefore, to grant accounts to depository institutions – the FRA does not require them to do so.

This reading is consistent with judicial interpretations of Section 342. Addressing Section 342 shortly after its enactment in 1913, the Supreme Court rejected an argument similar to BSJI's that "the Federal Reserve Bank of Richmond is obliged to receive for collection any check upon any North Carolina state bank." *Farmers & Merchs. Bank v. Fed. Rsrv. Bank of Richmond*, 262 U.S. 649, 662 (1923). Interpreting Section 342's language that, "solely for the purposes of collection," a Reserve Bank "may receive from any nonmember bank . . . deposits of checks . . . payable upon presentation," the Court held that "neither [Section 342], nor any other provision of the Federal Reserve Act, imposes upon reserve banks any obligation to receive checks for collection." *Id*. The Court noted that Congress had from time to time enlarged "[t]he class of cases" to which the Reserve Banks' authority under Section 342 applied, "[b]ut in each amendment, as in [Section 342], the words used were 'may receive' – words of authorization merely." *Id*.

The Court further observed that the FRA "appears to have been drawn with great care. Throughout the act the distinction is clearly made between what the [B]oard and the Reserve Banks 'shall' do and what they 'may' do." *Id.* at 663. The Court listed twenty-one provisions of the original FRA where both "may" and "shall" were used, and another seven where only "shall" was used, to illustrate the precision Congress took in distinguishing actions the Board or Reserve Banks were allowed to take from those they were required to take. *Id.* at 663 n.6; *see also*

*Billings Utility Co. v. Advisory Comm. Bd. of Governors*, 135 F.2d 108, 111 (8th Cir. 1943)

(listing provisions of the FRA in which Congress distinguished what a Reserve Bank "may" do

from what it "must" do, and holding that the "may" provisions "seem so clearly to be permissive

as to make any other construction of them by interpretation or construction judicial legislation");

*Raichle v. Fed. Reserve Bank of N.Y.*, 34 F.2d 910, 914 (2d Cir. 1929) (interpreting the phrase

"[a]ny Federal Reserve Bank may . . . discount notes, drafts, and bills of exchange" in 12 U.S.C.

§ 348, and noting that these words "are wholly permissive").[8]

Further, Congress recently recognized that Reserve Banks may (and do in fact) deny

requests for master accounts. In December 2022, Congress amended the FRA to require the

Board to "create and maintain a public, online, and searchable database" that includes "a list of

every entity that submits an access request for a reserve bank master account and services . . .

including whether . . . a request was approved, *rejected*, pending, or withdrawn." 12 U.S.C.

---

[8] Consistent with these authorities, both the Board and Reserve Banks have long

recognized that account-opening discretion was afforded to Reserve Banks by Congress pursuant

to Section 13 of the Federal Reserve Act (12 U.S.C. § 342) and is fundamental to their account

relationships. *See* Chester Morrill, Secretary, Bd. of Governors of the Fed. Rsrv. Sys., Letter X-

9187 (Apr. 26, 1935) (surveying Reserve Banks regarding limited clearing accounts available to

non-member banks prior to 1980 and expressing "the Board's view that requests for the

establishment of clearing accounts by non-member banks *should be passed upon by your

directors in the light of all the circumstances surrounding each application*" (emphases added)),

*available at* https://fraser.stlouisfed.org/archival-collection/mimeograph-letters-statements-

board-4957/letter-secretary-morrill-re-nonmember-bank-clearing-accounts-505912.

§ 248c(b)(1) (emphasis added). It strains logic to assume that Congress would contemplate that master account requests by depository institutions may be "rejected" in Section 248c, while ignoring just two sections away (in Section 248a) a purported requirement that they be granted in every instance. The fact is that neither Section 248a, nor any other provision, says anything about a master account being an automatic right, but Section 342 (bolstered by Section 248c) says the opposite.

Moreover, Section 248a appears in subchapter II of the FRA, 12 U.S.C. §§ 241-52, titled "Board of Governors of the Federal Reserve System," which generally sets out powers and duties of the Board, and requires the Board to publish a fee schedule. By contrast, Section 342 appears in subchapter IX, 12 U.S.C. §§ 341-61, titled "Powers and Duties of Federal Reserve Banks." *Cf., e.g.*, *Henderson v. Shinseki*, 562 U.S. 428, 439 (2011) (placement of time limit in subchapter titled "Procedure" and not subchapter titled "Organization and Jurisdiction," indicates that Congress regarded it as nonjurisdictional). It makes no sense – as BSJI alleges – that Congress meant Section 248a, enacted in 1980 as part of a section titled "Pricing of Services," which sets out a "pricing principle[]" used to establish a "Schedule of fees," to overturn the discretion permitted the Reserve Banks since 1913 to accept deposits by requiring them to open master accounts for all comers regardless of risk. "Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions – it does not, one might say, hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 468 (2001).

Despite this unambiguous statutory text, a federal district court within the Tenth Circuit recently denied a motion to dismiss a complaint alleging that the Board has a nondiscretionary duty to grant all master accounts. *See Custodia v. Federal Reserve Bd. Of Govs.*, No. 1:22-cv-00125, Doc. 164 (D. Wy. June 8, 2023). The decision was "based mostly" on the opinion of a

17

single judge of the Tenth Circuit, which the court found "may plausibly be the law on this matter" at the motion to dismiss stage. *Id.* at 10, 12 (citing *Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kansas City*, 861 F.3d 1052 (10th Cir. 2017)). That Tenth Circuit judge's opinion, which held that a credit union serving the cannabis industry was entitled to a master account (*Fourth Corner*, 861 F.3d at 1064-80), suffered from a misreading of the plain text of Sections 248a and 342, and was authored before the more recent issuance of the Board's Guidelines and enactment of Section 248c. Notably, however, two other judges on the *Fourth Corner* panel appear to have implicitly rejected the notion that every depository institution is automatically entitled to a master account under Section 248a, authoring opinions indicating that the credit union's complaint should have been dismissed. 861 F.3d at 1053-64. And a judge of this Court similarly appears to have rejected the idea that there is an automatic entitlement to a master account, granting FRBNY's motion to dismiss a case concerning alleged delay on it deciding a master account application. *See TNB USA Inc. v. FRBNY*, 2020 WL 1445806, at *4 (S.D.N.Y. Mar. 25, 2020).

In sum, the unambiguous text of 12 U.S.C. § 342 makes clear that Reserve Banks are *authorized* to accept deposits – and therefore open deposit accounts – but are not *required* to do so. The language of Section 248a says nothing to the contrary.[9]

---

[9] Even if the law were otherwise, there would still be no basis for injunctive relief against the Board because it is beyond dispute that the Board does not take deposits or open, maintain, or close master accounts. For this reason, the Board is not a party to the relevant contracts and does not address the threshold contract arguments here.

      **b.**      **The Board Is Not A Proper Party For A Claim Concerning The Discretion Exercised With Respect To BSJI's Master Account**

As an alternative to its claim that Section 248a requires the automatic grant of a master account, BSJI claims that, to the extent any exercise of discretion is allowed, the Board and FRBNY abused that discretion. Complaint ¶ 115. But, as previously discussed, the Board does not make decisions regarding the opening or closing of master accounts. Rather, that function is performed solely by the Reserve Banks. *See* 12 U.S.C. § 342. Not surprisingly, the Complaint does not point to any discretionary acts undertaken by the Board with respect to reaching the decision to terminate BSJI's master account. To the contrary, the Complaint alleges action by FRBNY alone resulting in the decision to terminate BSJI's account. *See* Complaint ¶¶ 14-27.

### 2.      BSJI Is Unlikely To Succeed On Its Mandamus Claim

In Count II of the Complaint, BSJI brings a claim for relief under the Mandamus Act. However, BSJI is unlikely to succeed on this claim against the Board because BSJI cannot show that there is a "duty owed" to it by the Board, which is a prerequisite to relief under the Act. 28 U.S.C. § 1361.

Mandamus is "a drastic and extraordinary remedy reserved for really extraordinary causes." *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 380 (2004) (quotation omitted). A plaintiff must establish that: "(1) there is a clear right to the relief sought; (2) the Government has a plainly defined and peremptory duty to perform the act in question; and (3) there is no other adequate remedy available." *Benzman v. Whitman*, 523 F.3d 119, 133 (2d Cir. 2008). Here, there is no statute that imposes upon the Board a duty to enforce the opening of a master account notwithstanding BSJI's contention that it "is entitled by law to a master account" under 12 U.S.C. § 248a. Complaint ¶ 122. To the contrary, the Board has fulfilled its responsibilities

under Section 248a by publishing the required pricing principles and schedule of fees with the understanding that accounts and services are generally available to both member and nonmember banks. That statute requires nothing more of the Board. In particular, because the Board does not have the ability to grant access to Federal Reserve Bank master accounts, the Board cannot be compelled to "intervene to FRBNY's unlawful conduct and to resolve [BSJI's] dispute [with FRBNY] amicably." Complaint ¶ 123.

### 3. BSJI Is Unlikely To Succeed On Its Claim Seeking A Declaration Concerning The Interpretation Of 12 U.S.C. § 248a

In Count III of the Complaint, BSJI seeks a declaration, pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, that "[t]he FRBNY and the Board are mandated by [Section 248a] to provide Federal Reserve bank services, including access to a master account." Complaint ¶ 128. This claim merely restates the same issue of statutory interpretation raised in the APA and mandamus claims, and is not an independently viable claim. *See Medtronic, Inc. v. Mirowski Fam. Ventures, LLC*, 571 U.S. 191, 199 (2014) (Declaratory Judgment Act is "only procedural" and "leav[es] substantive rights unchanged" (quotations omitted)). Accordingly, it fails for the same reasons that the APA claim fails.

### 4. BSJI Is Unlikely To Succeed On Its Claim Seeking A Declaration That Master Account Termination Would Violate The Due Process Clause

BSJI's due process claim, set forth in Count IV of the Complaint, is unlikely to succeed because BSJI lacks a property interest in a master account, which is a prerequisite to the attachment of due process rights. *Progressive Credit Union v. City of New York*, 889 F.3d 40, 51 (2d Cir. 2018). BSJI contends that it has a property interest in a master account, but as discussed above, it has no automatic right to a master account, and therefore lacks an interest subject to due process protections. *See Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 748, 756 (2005)

(noting that, for due process purposes, "a benefit is not a protected entitlement if government officials may grant or deny it in their discretion").

### C.    The Public Interest And Balance Of Equities Weigh In Favor Of Deferring To FRBNY's Determination Pursuant To Federal Guidelines

The last factor necessary for preliminary injunctive relief – the public interest and balance of equities – weighs against granting a preliminary injunction because suspected money laundering is a serious issue, and deference should be accorded to actions taken in the public interest in accordance with federal regulatory guidelines addressing the integrity of the banking system. While BSJI bristles at the notion that possible money laundering is a serious issue if a bank is small – *see* ECF 7 at 13 ("From a quantitative standpoint, the potential illicit activity flowing through BSJI's Fed account is entirely insignificant to the overall economy."); *id.* at 25 ("With its tiny footprint, it cannot be that BSJI . . . poses an 'undue threat to the overall economy'") – there is no *de minimis* exception to money laundering.

As the OCC states, "[m]oney laundering poses significant risks to the safety and soundness of the U.S. financial industry. With the advent of terrorists who employ money-laundering techniques to fund their operations, the risk expands to encompass the safety and security of the nation."[10] Given the profound risks associated with money laundering, the public interest lies in protecting the integrity of our banking system. *See, e.g., FBME Bank Ltd. v. Mnuchin*, 249 F. Supp. 3d 215, 230 (D.D.C. 2017) (noting the "public's interest in protecting the U.S. financial system from illicit activity such as money laundering"); *United States v. Martin*, 320 F.3d 1223, 1227 (11th Cir. 2003) ("[t]he harm from . . . a [money-laundering] transaction

---

[10] OCC, *Bank Secrecy Act*, https://www.occ.treas.gov/topics/supervision-and-examination/bsa/index-bsa.html.

does not generally fall upon an individual, but falls upon society in general") (quotation omitted).

Consistent with the need to protect our financial system from illegal activity, courts have recognized that it is appropriate to defer to the judgment of banking authorities as to when questionable activity – such as suspected money laundering – presents undue risk or rises to the level of an unsafe or unsound banking practice. *See, e.g., Investment Co. Inst. v. FDIC*, 815 F.2d 1540, 1550 (D.C. Cir. 1987). This is because "[w]hether a financial institution is in an unsafe or unsound condition is largely a predictive judgment (i.e., what may happen if this practice continues), and reviewing courts should be particularly deferential" to expert judgement in such cases. *Franklin Savs. Ass'n v. Director, Office of Thrift Supervision*, 934 F.2d 1127, 1145-46 (10th Cir. 1991); *accord Golden Pac. Bancorp v. Clarke*, 837 F.2d 509, 512 (D.C. Cir. 1988) ("The Comptroller, incident to his responsibilities, must make innumerable subtle judgments in describing the content of safe and sound bank practices – judgments that draw upon a mix of law, accounting, bank custom, and policy."). Accordingly, at this preliminary stage of this litigation, the public interest lies in deferring to the expertise of Reserve Bank officials acting in the public interest consistent with federal regulatory guidelines concerning the determinations they made with respect to BSJI's operations.

Contrasted with the public interest in preventing illegal banking activity and the strong equities supporting deference on risk determinations, BSJI returns to its speculation about possible future outcomes, foreboding that "FRBNY's announced actions would almost certainly put BSJI out of existence." ECF 7 at 28. But given that BSJI has been able to survive with only 13 or 19 customers, with total account balances of $1.4 million and 110 incoming transactions in the most recent year (ECF 10 ¶¶ 64, 65), it is difficult to understand how BSJI has been financially viable to date. In light of this lack of transparency regarding BSJI's business model,

the Court should not accept at face value BSJI's assertions that it is forever doomed if its master account is terminated.

When BSJI's unsupported assertions of impending harm are weighed against the compelling interest of preventing possible money laundering, it is not a close call: the balance weighs strongly in favor of allowing FRBNY's closure of BSJI's master account to proceed.

## **CONCLUSION**

For the foregoing reasons, the Board respectfully requests that the Court deny BSJI's motion for a preliminary injunction.

\*          \*          \*          \*          \*          \*

## **CERTIFICATE OF COMPLIANCE**

In accordance with Section II.D of the Court's Individual Practices, the foregoing brief contains 6977 words, excluding the cover page, table of contents, table of authorities, and this certificate of compliance. The foregoing brief also complies with the formatting rules set forth in Section II.D of the Court's Individual Practices.

Dated: August 22, 2023

Respectfully submitted,

_/s/ Joshua P. Chadwick_
Mark Van Der Weide, General Counsel
Richard M. Ashton, Deputy General Counsel
Joshua P. Chadwick (JC9369), Senior Special Counsel
Yvonne F. Mizusawa (YM5081), Senior Counsel
Nicholas Jabbour (_pro hac vice_), Senior Counsel
Board of Governors of the Federal Reserve System
20th Street and Constitution Avenue, N.W.
Washington, D.C. 20551
(202) 263-4835
joshua.p.chadwick@frb.gov

_Counsel for Defendant Board of Governors of the_
_Federal Reserve System_

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 22, 2023, I electronically filed the foregoing using the

court's CM/ECF system, which will send notification of such filing to all parties of record.

By:    <u>/s/ *Joshua P. Chadwick*</u>
Joshua P. Chadwick

*Counsel for Defendant Board of Governors
of the Federal Reserve System*

25