UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------X

BANCO SAN JUAN INTERNACIONAL, INC.,    :

    :

                Plaintiff,    :

    :

    -against-    :

    :    Civ No.: 1:23-cv-6414-JGK

FEDERAL RESERVE BANK OF NEW YORK,    :

BOARD OF GOVERNORS OF THE FEDERAL    :

RESERVE SYSTEM    :

    :

                Defendants.    :

---------------------------------------------------------------------X

## DEFENDANT FEDERAL RESERVE BANK OF NEW YORK'S MEMORANDUM OF LAW IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

Carmine D. Boccuzzi, Jr.
Caroline Soussloff
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

Michael M. Brennan
Michele Kalstein
Federal Reserve Bank of New York
33 Liberty Street
New York, New York 10045
*Counsel for Defendant*
*Federal Reserve Bank of New York*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................iii

PRELIMINARY STATEMENT ..........................................................................................1

STATEMENT OF FACTS ...................................................................................................2

    A.  Federal Reserve Bank Master Accounts and the Functioning of a Safe
        Payment and Settlement System ...............................................................................2

    B.  The FRBNY Must Assess Account Applicants and Holders for Risks to the
        Federal Reserve and the Financial System ..............................................................4

    C.  Contracts Govern the Relationship Between the FRBNY and Account
        Holders, Including BSJI, and Expressly Permit Closure ..........................................5

    D.  BSJI Is a Financial Institution That Poses High Inherent Money
        Laundering Risk........................................................................................................7

    E.  In 2019, BSJI Is Raided by the FBI and Fined $1 Million In a Federal
        Investigation; To Maintain Its Account BSJI Agrees to Additional Risk-
        Mitigation Requirements and Affirms the FRBNY's Right to Close Its Account ....9

    F.  After a Comprehensive Review, FRBNY determines BSJI's Account Poses ..........
        Undue Risk of Facilitating Illicit Activity and Invokes Its Contractual
        and Statutory Rights to Close BSJI's Account ........................................................10

ARGUMENT ......................................................................................................................14

I.       BSJI'S ASSERTED IRREPARABLE HARM IS SPECULATIVE AND
        WOULD IN ANY EVENT BE SELF-INFLICTED .................................................15

II.      BSJI CANNOT ESTABLISH A LIKELIHOOD OF SUCCESS ............................17

    A.     The FRBNY Has the Contractual Right to Close BSJI's Account ................17

    B.     BSJI Cannot Establish a Likelihood of Success on Its Claims Based
           on Its Purported "Right" to an Account ........................................................18

        a)  Reserve Banks Are Authorized by the FRA to Close Accounts..............19

        b)  BSJI Waived and Is Equitably Estopped from Asserting Any
             "Right" to Its Account By Agreeing That the FRBNY Can Close It ......22

        c)   The Claims Through Which BSJI Asserts Its "Right" to an Account Are Deficient.................................................................................... 23

           i.   Discretionary Action Is Not Subject to APA Review, Nor is the FRBNY an "Agency"..............................................................23

           ii.   BSJI's Mandamus, DJA, and DPC Claims Asserting a Right to an Account Are Defective..............................................26

C.    BSJI Cannot Succeed on Its Contractual Claims Challenging the Closure Decision .............................................................................27

D.    BSJI's APA "Arbitrary and Capricious" Claim Is Subject to 12(b)(1) Dismissal..............................................................................28

III.    THE PUBLIC INTREST AND EQUITIES DO NOT SUPPORT A PRELIMINARY INJUNCTION ................................................................29

A.    The Public Interest Favors Protecting the Financial System ........................29

B.    An Injunction Would Burden the FRBNY by Compelling It to Expend Resources Seeking to Mitigate Risk It Has Determined Cannot Be Sufficiently Mitigated ...................................................................30

CONCLUSION..................................................................................31

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adler v. U.S. D.O.J.*,
No. 18-CV-2188 (PAC), 2018 WL 4571677 (S.D.N.Y. Sept. 24, 2018) ...............................29

*Agudath Israel of Am. v. Cuomo*,
983 F.3d 620 (2d Cir. 2020)......................................................................................................15

*Alvarez-Marquez v. Wolf*,
No. 19-CV-11773 (PGG), 2020 WL 10053218...........................................................................14

*Am. Bankers Ass'n v. United States*,
932 F.3d 1375 (Fed. Cir. 2019)...................................................................................................3

*Biden v. Texas*,
142 S. Ct. 2528 (2022)..............................................................................................................19

*Bos. Consulting Group, Inc. v. NCR Corp.*,
No. 19-CV-10156 (LGS), 2020 WL 5731963 (S.D.N.Y. Sept. 20, 2020) ...........................28

*Chevron Corp. v. Naranjo*,
667 F.3d 232 (2d Cir. 2012)......................................................................................................27

*Clubside, Inc. v. Valentin*, 468 F.3d 144, 154 (2d Cir. 2006) ......................................................27

*Columbus Park Corp. v. Dep't of Hous. Pres. & Dev. of the City of New York*,
586 N.Y.S.2d 554 (N.Y. 1992) ..................................................................................................23

*Dexter 345, Inc. v. Cuomo*,
663 F.3d 59 (2d Cir. 2011)........................................................................................................15

*Dong v. Smithsonian Inst.*,
125 F.3d 877 (D.C. Cir. 1997)...................................................................................................25

*ELBT Realty, LLC v. Mineola Garden City Co.*,
42 N.Y.S.3d 304 (2nd Dep't. 2016)........................................................................................18,19

*Empower Energies, Inc., v. SolarBlue, LLC*,
No. 16-CV-3220 (DLC), 2016 WL 5338555 (S.D.N.Y. Sept. 23, 2016)...............................30

*Farmers & Merch. Bank of Monroe, N.C. v. Fed Rsrv. Bank of Richmond*,
262 U.S. 649 (1923)..................................................................................................................19

*FBME Bank Ltd. v. Mnuchin*,
249 F.Supp.3d 215 (D.D.C. 2017) ............................................................................................29

*F.D.I.C. v. Four Star Holding Co.,*
No. 97-CV-4184 (JFK), 2000 WL 256146 (S.D.N.Y. Mar. 7, 2000),
*vacated on other grounds*, 271 F.3d 75 (2d Cir. 2001)........................................................... …23

*Fed. Rsrv. Bank of Bos. v. Comm'r of Corps. & Tax'n,*
499 F.2d 60 (1st Cir. 1974)........................................................................................20

*First Nat'l City Bank* v. *Banco Para el Comercio Exterior de Cuba*,
462 U.S. 611 (1983)........................................................................................24

*Flight Int'l Group, Inc. v. Fed. Rsrv. Bank of Chi.,*
583 F.Supp. 674 (N.D.Ga. 1984), *vacated by* 597 F.Supp. 462 (N.D.Ga. 1984) ...............25,26

*Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kan. City,*
861 F.3d 1052 (10th Cir. 2017) (op. of Bacharach, J.)........................................22, 23

*Grand River Enter. Six Nations, Ltd. v. Pryor*,
481 F.3d 60 (2d Cir. 2007)........................................................................................14

*Greater Buffalo Press, Inc. v. Fed. Rsrv. Bank of New York*,
866 F.2d 38 (2d Cir. 1989)........................................................................................22

*Greenfield v. Philles Records, Inc.*, 750 N.Y.S.2d 565 (2002)..................................18

*In re Hoag Ranches,*
846 F.2d 1225 (9th Cir. 1988) ..................................................................................26

*Impax Media Inc. v. Ne. Advert. Corp.*,
No. 17-CV-8272 (RWS), 2018 WL 358284 (S.D.N.Y. Jan. 10, 2018) ...............................16

*Int'l Creative Mgmt., Inc. v. Abate*,
No. 07-CV-1979 (PKL), 2007 WL 950092 (S.D.N.Y. 2007) ...................................17

*Int'l Shoppes, Inc. v. Holder*,
No. 99-CV-4638 (SJ), 1999 WL 993719 (E.D.N.Y. Sept. 6, 1999)..........................17

*JSG Trading Corp. v. Tray-Wrap, Inc.*,
917 F.2d 75 (2d Cir.1990)........................................................................................15

*JTH Tax, LLC v. Agnant*,
62 F.4th 658 ........................................................................................15

*Kargo, Inc. v. Pegaso PCS, S.A. de C.V.*,
No. 05-CV-10528 (CSH)(DFE), 2008 WL 4579758 (S.D.N.Y. Oct. 14, 2008) ...............27, 28

*U.S. ex rel. Karlin v. Noble Jewelry Holdings Ltd.*,
No. 08-CV-7826 (JGK)(KNF), 2012 WL 1228199 (S.D.N.Y. Apr. 9, 2012)
(Koeltl, J) ........................................................................................26

*King v. Burwell*,
    576 U.S. 473 (2015)..................................................................20

*Kosakow v. New Rochelle Radiology Assocs., P.C.*,
    274 F.3d 706 (2d Cir. 2001).......................................................24

*Lee Constr. Co., Inc. v. Fed. Rsrv. Bank of Richmond*,
    558 F.Supp. 165 (D. Md. 1982).............................................25,26

*N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*,
    883 F.3d 32 (2d Cir. 2018)..........................................................14

*New York v. Atl. States Marine Fisheries Comm'n*,
    609 F.3d 524 (2d Cir. 2010)..........................................................5

*Quintanilla v. WW Int'l, Inc.*,
    541 F. Supp. 3d 331 (S.D.N.Y. 2021).........................................28

*Reuters Ltd. v. United Press Int'l, Inc.*,
    903 F.2d 904 (2d Cir. 1990).......................................................15

*S.E.C. v. Jett*,
    514 F.Supp.2d 532 (2d Cir. 2007) .............................................27

*Scott v. Fed. Rsrv. Bank of Kan. City*,
    406 F.3d 532 (8th Cir. 2005) (Reserve Banks are "not a department,
    commission, administration, authority, or bureau of the federal government")............3, 24, 25

*SeaAir NY, Inc. v. City of N.Y.*,
    250 F.3d 183 (2d Cir. 2001).......................................................20

*Spectrum Dynamics Med. Ltd. v. Gen. Elec. Co.("Spectrum")*,
    No. 18-CV-11386 (VSB), 2022 WL 16707829 (S.D.N.Y. Sept. 27, 2022) .....................15, 17

*Starr Int'l Co. v. Fed. Rsrv. Bank of N.Y.*,
    906 F.Supp.2d 202 (S.D.N.Y. 2012), *aff'd*, 742 F.3d 37 (2d Cir. 2014) ..................................3

*Texas Dep't of Hous. and Cmty. Affs. v. Inclusive Cmtys. Project*,
    135 S. Ct. 2507 (2015)................................................................22

*Thor Equities, LLC v. Factory Mutual Ins. Co.*,
    531 F.Supp.3d 802 (S.D.N.Y. 2021)...........................................17

*U.S. ex rel. Karlin v. Noble Jewelry Holdings Ltd.*,
    No. 08-CV-7826 (JGK)(KNF), 2012 WL 1228199 (S.D.N.Y. Apr. 9, 2012).................... 26

*United States ex. rel. Kraus v. Wells Fargo & Co.*,
    943 F.3d 588 (2d Cir. 2019)..................................................................3, 26

*U.S. v. Int'l Bhd. of Teamsters*,
    No. 88-CV-4486 (DNE), 1998 WL 477969 (S.D.N.Y. Aug. 14, 1998)..................................15

*Vantico Holdings S.A. v. Apollo Mgmt., LP*,
    247 F. Supp. 2d 437 (S.D.N.Y. 2003) (Koeltl, J.) ..................................17

*Whitman v. Am. Trucking Ass'ns*,
    531 U.S. 457 (2001)..................................................................20

*Wickapogue 1 LLC v. Blue Castle (Cayman) Ltd.*,
    No. 23-CV-561 (HG), 2023 WL 2071291 (E.D.N.Y. Feb. 17, 2023) ....................30

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)..................................................................14, 29, 30

*Zheng v. Reno*
    166 F. Supp. 2d 875 (S.D.N.Y. 2001) (Koeltl, J.) ..................................24

**Statutes**

5 U.S.C. § 551(1)..................................................................24

5 U.S.C. § 701(a)(2)..................................................................24

5 U.S.C. § 701(b)(1)..................................................................24

12 U.S.C. 1361..................................................................26

12 U.S.C. §§ 241-252..................................................................20

12 U.S.C.§ 248(j)..................................................................5

12 U.S.C. § 248(k)..................................................................25

12 U.S.C. § 248a..................................................................20, 21, 22, 23

12 U.S.C. § 248a(b)..................................................................4

12 U.S.C. § 248a(c)..................................................................21, 22

12 U.S.C. § 248a(c)(2)..................................................................20

12 U.S.C. § 248c(b)(1)..................................................................19

12 U.S.C. §321..................................................................21

12 U.S.C. §§ 341-361 ....................................................................................................3

12 U.S.C. § 342.........................................................................................2, 3, 5, 19

28 U.S.C. § 248a(a).....................................................................................................20

31 U.S.C. 5311,............................................................................................................6

**Rules & Regulations**

11A, Wright & Miller, Federal Practice and Procedure § 2948.1 (3d ed.)....................................15

31 C.F.R. § 1020.320 (a)(2) .........................................................................................9

Act. No. 52 of 1989 ......................................................................................................7

Act No. 273 of 1989......................................................................................................7

Pub. L. 96-221, 94 Stat. 132 (1980).......................................................................21,22

**Other Authorities**

2016 International Narcotics Control Strategy Report, Volume II: Money Laundering
    and Financial Crimes (Curacao),
        https://2009-2017.state.gov/j/inl/rls/nrcrpt/2016/vol2/253394.htm. ................................8,9

BSJI & USAO-PR Press Release (Feb. 11, 2020)
        https://tinyurl.com/34uwd6b3 .................................................................................30

Federal Financial Institutions Examination Council, National Information Center Data Download,
        https://www.ffiec.gov/npw/FinancialReport/DataDownload.................................................4

Fedwire Funds Service Principles for Financial Market Infrastructure Disclosure,
    7, https://www.frbservices.org/binaries/content/assets/crsocms/financial-
    services/wires/funds-service-disclosure.pdf ..........................................................................4

FinCEN Advisory: Updated Advisory on Widespread Public Corruption in Venezuela
(May 3, 2019), https://tinyurl.com/4wr53heb...............................................................8

FinCEN, History of Anti-Money Laundering Laws,
https://www.fincen.gov/history-anti-money-laundering-laws.....................................30

FinCEN Money Laundering and Terrorist Financing Red Flags,
        https://bsaaml.ffiec.gov/manual/Appendices/07...................................................11

Letter from C. Kenney to J. Risch & M. McCaul (July 3, 2023),
        https://www.gao.gov/assets/gao-23-105668.pdf...................................................8

Reserve Maintenance Manual, FederalReserve.gov (Nov. 19, 2018),
    https://bit.ly/3QnjMUl ...........................................................................................................3

The Fed Explained, *available at*
    https://www.federalreserve.gov/aboutthefed/files/the-fed-explained.pdf ...............................3

What Is Money Laundering, https:/www.fincen.gov/what-money-laundering .............................4

**List of Exhibits Attached to Brennan Declaration**

| | |
|---|---|
| A | Guidelines for Evaluating Account and Services Requests, published by the Board of Governors of the Federal Reserve System, August 22, 2022 |
| B | Master Account Agreement, Executed by BSJI on November 18, 2011 |
| C | Federal Reserve Banks Operating Circular 1: Account Relationships, Effective August 16, 2021 |
| D | Federal Reserve Bank of New York Supplemental Terms and Conditions Governing the Provision of Financial Services to High-Risk Customers, Executed by BSJI on March 16, 2020 |
| E | Federal Reserve Bank of New York Account and Financial Services Handbook, dated February 25, 2020 |
| F | U.S. Department of the Treasury National Money Laundering Risk Assessment, February 2022 |
| G | Certificate of Registry of Banco Internacional de San Juan, Inc., dated February 18, 2011 |
| H | BSJI Audit and Legal Compliance Committee Minutes, dated September 22, 2022 |
| I | Letter from C. Armstrong to J. Williams, dated June 30, 2023 |
| J | Email from H. Vazquez to C. Bridgewater, dated May 8, 2020, Attaching Supplemental KYC Responses |
| K | New York Fed KYC Questionnaire Completed by BSJI, dated March 5, 2020 |
| L | New York Fed KYC Questionnaire Completed by BSJI, dated May 12, 2021 |
| M | BSJI Financial Statement Excerpts, 2021 through Q2 2023 |
| N | Memorandum from E. Silva to S. Benvenuto, C. Bridgewater, and M. Saxenian, dated March 31, 2023 |
| O | Letter from S. Benvenuto to H. Vazquez and P. Crespo, dated July 18, 2022 |
| P | Letter from C. Bridgewater to H. Vazquez and P. Crespo, dated August 17, 2022 |
| Q | Letter from C. Armstrong to H. Vazquez and P. Crespo, dated September 19, 2022 |
| R. | New York Fed Request for Information to BSJI Concerning High-Risk Transaction Activity, dated October 5, 2022 |
| S | Memorandum from M. Saxenian and C. Bridgewater to C. Armstrong, dated April 1, 2023 |
| T | Email from M. Eichner to C. Armstrong dated April 12, 2023 |
| U | Letter from C. Armstrong to H. Vazquez and P Crespo, dated April 24, 2023 |

Defendant Federal Reserve Bank of New York (the "FRBNY") submits this memorandum of law in opposition to Plaintiff Banco San Juan Internacional's ("BSJI") motion for a preliminary injunction, filed July 25, 2023 (the "Motion").

## PRELIMINARY STATEMENT

The FRBNY's ability to close master accounts is an essential risk management tool, and it is crucial where there are concrete concerns that an account is being used for illicit activity. That is the case with BSJI, whose business consists entirely of processing transactions for and among close family members of its owner, all of whom are located in offshore jurisdictions associated with money laundering. After an FBI raid in 2019 and a warning from U.S. Treasury in 2022 about the risk posed by entities like BSJI, the FRBNY conducted a thorough review of BSJI's account and anti-money laundering ("AML") programs and identified both concerning transactions suggestive of illicit activity and program deficiencies. Based on that review, the FRBNY determined that BSJI's continued account access exposes the FRBNY and the U.S. financial system to unacceptable risk of facilitating illicit activity and that closure is necessary. The Court should reject BSJI's Motion, which seeks to override the FRBNY's reasoned decision and to force the FRBNY and the financial system to endure this ongoing risk.

*First*, BSJI has failed to make the requisite showing of imminent irreparable harm. The FRBNY is not shutting down BSJI. It is closing BSJI's master account, which is not necessary to access the U.S. financial system. Thousands of banks, including the majority of entities with BSJI's banking license, have never had a master account. They access the financial system through other means, including correspondent relationships with commercial banks. BSJI cites no evidence that it even pursued such a relationship, and the record shows that any difficulty it might have in securing one would be due to BSJI's *own* risk profile, not any action of the

FRBNY.

*Second*, BSJI cannot show that it is likely to succeed on the merits of its claims, most of which assert a non-existent "right" to an account under the Federal Reserve Act, 12 U.S.C. § 221 *et seq*., ("FRA").  Reserve Banks are authorized to close master accounts by Section 13 of the FRA, 12 U.S.C. § 342, which expressly permits them to reject deposits.  This statutory authority is consistent with the multiple agreements BSJI executed, which also give the FRBNY the contractual right to close BSJI's account (and which would have waived any "right" to an account, even if there were one).  While BSJI may disagree with the closure decision, neither its collection of paid consultants nor its conspiratorial hyperbole is a basis to disturb it.  The FRBNY engaged with BSJI on its serious concerns and they were not resolved by BSJI's responses; it is now necessary for the FRBNY to move forward with closure.

*Third*, the public interest and equities support rejecting BSJI's requested relief because the FRBNY, an operating arm of the nation's central bank, is taking this action to mitigate its own risk and to carry out the Federal Reserve's statutory mandate to promote the safety and stability of the U.S. financial system.  Blocking the closure of BSJI's account would bar the FRBNY from protecting that system from illicit activity and burden the FRBNY by compelling it to continue to expend significant resources in an effort to mitigate risk it has already determined cannot be sufficiently mitigated.

The Court should deny BSJI's Motion.

## STATEMENT OF FACTS

### A.    Federal Reserve Bank Master Accounts and the Functioning of a Safe Payment and Settlement System

Pursuant to the FRA, Congress established the Federal Reserve System, the nation's central bank, "to oversee banking operations and promote [] greater economic stability."  *Am.*

*Bankers Ass'n v. United States*, 932 F.3d 1375, 1378 (Fed. Cir. 2019).  The system includes the Board of Governors of the Federal Reserve System ("Board of Governors"), the Federal Open Market Committee, and twelve regional Federal Reserve Banks.  The Federal Reserve Banks are federal instrumentalities, incorporated pursuant to the FRA, that carry out the central bank's operations.  *United States ex. rel. Kraus v. Wells Fargo & Co.*, 943 F.3d 588, 592 (2d Cir. 2019).  By deliberate design, they serve the interests of, but stand apart from, the sovereign.  *Id.* at 597; *see also Scott v. Fed. Rsrv. Bank of Kan. City*, 406 F.3d 532, 536 (8th Cir. 2005) (Reserve Banks are "not a department, commission, administration, authority, or bureau of the federal government").

     Among other things, Federal Reserve Banks serve the public interest by promoting a stable financial system and by implementing monetary policy.  *Starr Int'l Co. v. Fed. Rsrv. Bank of N.Y.*, 906 F.Supp.2d 202, 232 (S.D.N.Y. 2012), *aff'd*, 742 F.3d 37 (2d Cir. 2014).  A safe and effective U.S. and global payment and settlement system is vital to the U.S. economy, and the Federal Reserve plays an important role in advancing those objectives.  The Fed Explained, https://www.federalreserve.gov/aboutthefed/files/the-fed-explained.pdf.

     Congress authorized Federal Reserve Banks to carry out certain banking functions, 12 U.S.C. §§ 341-361, including by authorizing them to accept or reject deposits from depository institutions, 12 U.S.C. § 342 ("Any Federal reserve bank may receive from any of its member banks, or other depository institutions . . . deposits").  Federal Reserve Banks maintain such deposits in accounts called master accounts held in the name of the financial institutions.  Reserve Maintenance Manual, FederalReserve.gov (Nov. 19, 2018), https://bit.ly/3QnjMUl.  Federal Reserve Banks also provide various financial services, including payment, clearing, and settlement functions, such as clearing checks and operating the Fedwire Funds Service® (which

effectuates funds transfers).  12 U.S.C. § 248a(b) (listing services).

Importantly, depository institutions do not need a master account to access the U.S. financial system or various financial services.  Thousands of depository institutions that access the U.S. financial system do not have master accounts.[1]  Depository institutions without master accounts can establish correspondent relationships with commercial banks, including those with master accounts, and access the U.S. financial system through those relationships.

**B.**     **The FRBNY Must Assess Account Applicants and Holders for Risks to the Federal Reserve and the Financial System**

Accepting deposits from and providing financial services to a financial institution exposes Federal Reserve Banks and the financial system to risk.  The deposits themselves are liabilities on the balance sheet of the Federal Reserve.  Effectuating transactions creates financial, legal, compliance, and reputational risks for Federal Reserve Banks and could harm the U.S. financial system or interfere with the implementation of monetary policy.  One such risk to the financial system stems from facilitating money laundering.  The U.S. Department of the Treasury's ("Treasury") Financial Crimes Enforcement Network ("FinCEN") has warned that money laundering "has devastating social consequences" and "can erode the integrity of our nation's financial systems."  "What Is Money Laundering," https:/www.fincen.gov/what-money-laundering.  Federal Reserve Banks manage such risks by limiting or denying access to accounts and services, where necessary.

To promote consistency and transparency in account decisions, in August 2022, the

---

[1] Over 9,500 depository institutions are in operation; less than 5,000 have master accounts.  *Compare* Fedwire Funds Service Principles for Financial Market Infrastructure Disclosure, 7, https://www.frbservices.org/binaries/content/assets/crsocms/financial-services/wires/funds-service-disclosure.pdf (there are "[o]ver 4,700 customers" of Fedwire; an institution must have a master account to become a Fedwire customer) *with* Federal Financial Institutions Examination Council, National Information Center Data Download, https://www.ffiec.gov/npw/FinancialReport/DataDownload (identifying over 9,500 operational depository institutions as of August 1, 2023).

Board of Governors published Guidelines for Evaluating Account and Service Requests (the

"Guidelines"), which provide a risk-based framework for Reserve Banks to apply when

considering account access.  Ex. A at 33.[2]  Under the Guidelines, if "obligations, limitations, or

controls are" breached or "ineffective in mitigating the risks" associated with that access," a

"Reserve Bank . . . may close the account."  Ex. A at 32.[3]  The Guidelines enumerate six

categories of risk to consider and state that financial institutions:

1) must be legally eligible for an account and services, and have a clear, transparent and enforceable legal basis for its operations, including having services that are not designed to impede customer compliance with sanctions programs and AML requirements;

2) should not present or create undue credit, operational settlement cyber, or other risks to the Reserve Bank, including demonstrating the ability to comply with Reserve Bank agreements and operating circulations;

3) should not present or create undue credit, liquidity, operational, settlement, cyber or other risk to the overall payment system;

4) should not pose undue risk to the stability of the U.S. financial system;

5) should not create undue risk to the overall economy by facilitating activities such as money laundering, terrorism financing, fraud, cybercrimes, economic or trade sanctions violations, or other illicit activity; and

6) should not adversely affect the Federal Reserve's ability to implement monetary policy. *Id.* at 34-46.

Institutions not federally insured and not subject to federal prudential supervision, like

BSJI, are subject to the strictest level of review because they operate outside the robust

supervisory framework applied by federal banking agencies (the Federal Reserve, the Office of

---

[2] All exhibits are attached to the Declaration of Michael M. Brennan, dated August 22, 2023.  Prior to the publication of the Guidelines, Reserve Banks considered risks when assessing account relationships according to their own individual policies and procedures.

[3] The Board of Governors issued the Guidelines after notice and comment pursuant to its general supervision authority over the operations of the Reserve Banks. 12 U.S.C.§ 248(j).  Decisions on individual requests for access to accounts and services are left to the discretion of the applicable Reserve Bank. 12 U.S.C. § 342.

the Comptroller of the Currency, or the Federal Deposit Insurance Corporation).  *Id.* at 48.

C.   **Contracts Govern the Relationship Between the FRBNY and Account Holders, Including BSJI, and Expressly Permit Closure**

Master account relationships are governed by contract.  At the outset, account holders execute a Master Account Agreement ("MAA"), as BSJI did here.  Ex. B.  The MAA states that the account holder "agrees to the provisions of Operating Circular 1 [("OC 1")]," which is published by the Federal Reserve and sets forth the terms under which a master account may be opened, maintained, and terminated, *see* Ex. C, as well as "all operating circulars of each Federal Reserve Bank from which the [account holder] obtains services," Ex. B.  Consistent with the FRBNY's statutory rights under the FRA, OC 1 provides that the FRBNY "may terminate a [MAA] . . . at any time by notice to the Account Holder but will endeavor to give not less than five business days prior notice."  Ex. C at 7.[4]

A subset of high-risk FRBNY account holders, including BSJI, have agreed to enhanced risk-mitigation provisions in the Supplemental Terms and Conditions Governing the Provision of Financial Services to High Risk Customers ("Supplemental Terms").  Ex. D.  The Supplemental Terms require institutions to provide annually independent assessments of their Bank Secrecy Act ("BSA")/AML and Office of Foreign Assets Control ("OFAC") compliance programs.[5]  *Id.* at 4 (Article 2.2.2); Ex. E at 8-9.  These institutions also agree that, "to limit the Risks the customer poses to the [FRBNY], the [FRBNY] may suspend or terminate the Customer's access

---

[4] Similarly, the operating circulars that govern the various services provided by Federal Reserve Banks, to which BSJI has separately agreed, expressly permit termination of access to those services.  *See, e.g.*, Federal Reserve Operating Circular 6 at 9 (Federal Reserve Banks may terminate access to Fedwire Funds Service), https://tinyurl.com/h95rcp7w.

[5] Financial institutions must comply with the BSA, 31 U.S.C. § 5311, *et seq*. ("BSA"), which imposes recordkeeping and reporting obligations that seek to fight money laundering; they must also have programs to ensure compliance with U.S. economic sanctions programs imposed by OFAC.

to one or more Financial Services [or] close the Customer's Master Account . . . at any time by giving written notice to the Customer." *Id.* at 10 (Article 3).  Risk is defined as "the existence of, or the possibility of, financial, legal, compliance, operational, reputational, or other harm to the Bank . . . posed by the Customer." *Id.* at 2 (Article 1.2).

### D.  BSJI Is a Financial Institution That Poses High Inherent Money Laundering Risk

Puerto Rican law provides for the establishment of International Banking Entities ("IBEs"), Act. No. 52 of 1989, and International Financial Entities ("IFEs"), Act No. 273, which are precluded from servicing most residents of Puerto Rico.  Ex. F at 68.  They inherently present elevated money laundering risk because they service offshore customers and foreign entities, including in jurisdictions associated with elevated risk of corruption and other illicit activity.  *Id.* IBEs and IFEs carry out these offshore activities with minimal physical presence in Puerto Rico and are neither federally supervised nor federally insured.  *Id.* at 68-69.

IBEs and IFEs have a local territorial regulator, the Office of the Commissioner of Financial Institutions ("OCIF"), but Treasury recently noted that OCIF has "severe resource constraints" and has "relatively few examiners and supervisory staff" to effectuate its supervisory program.  *Id.* at 69.  ███████████████████████████████████ Federally supervised institutions are examined every 12 to 18 months; ████████████████ ██████████████████████████████████████████████████████.  Ex. N at 4 n.16.

For these reasons, the National Money Laundering Risk Assessment ("NMLRA") issued by Treasury in 2022 warned that IBEs and IFEs are "attractive money laundering vehicles, potentially allowing nefarious actors to misuse them to facilitate illicit financial activity."  Ex. F at 69.  Treasury stated that IBEs and IFEs "present money laundering vulnerabilities to the U.S.

financial system" and are "of particular concern because of their offshore banking business model." *Id.* For the same reasons, IBEs and IFEs pose heightened risk to the FRBNY, because their access to accounts could cause the FRBNY to facilitate illicit activity.

BSJI is an IBE that does not accept deposits from any U.S. person. Ex. G at 1-2. Until recently, BSJI's customers were primarily located in Venezuela, Ex. K at 12, which FinCEN reports has "widespread public corruption" that involves money laundering schemes and sanctions evasion. FinCEN Advisory: Updated Advisory on Widespread Public Corruption in Venezuela (May 3, 2019) (describing money laundering schemes using "shell companies to layer and obfuscate financial transactions"), https://tinyurl.com/4wr53heb; Letter from C. Kenney to J. Risch & M. McCaul (July 3, 2023) ("between 2017 and 2022" Department of State "has consistently determined that Venezuela is a major money laundering country"), https://www.gao.gov/assets/gao-23-105668.pdf.

As of June 2023, BSJI informed the FRBNY that its customer base consisted of 13 individuals and entities primarily located in Curacao. Decl. of Suzanne Benvenuto ("SBD") ¶ 10, Aug. 22, 2023. The U.S. Department of State has expressed significant money laundering concerns about this jurisdiction as well. 2016 Int'l Narcotics Control Strategy Report, Money Laundering and Financial Crimes (Curacao) ("Money laundering organizations take advantage of the availability of U.S. dollars, banking secrecy, offshore banking, and incorporation systems"), https://20092017.state.gov/j/inl/rls/nrcrpt/2016/vol2/253394.htm.

In addition to these risk factors, BSJI is unique in that it is owned by a single individual, Marcelino Bellosta-Varady, and its customer base is almost exclusively comprised of his close family members and offshore entities they control. SBD ¶ 10. When coupled with BSJI's high-risk transaction activity suggestive of illicit activity, described *infra* at 11-12, this familial

connection to its customer base raises significant concerns about BSJI's ability to mitigate money laundering risk and objectively assess and report suspicious transactions to the U.S. government as required by law.  Ex. I at 2 (noting concerns); Ex. N at 11-16.[6]

### E.  In 2019, BSJI Is Raided by the FBI and Fined $1 Million In a Federal Investigation; To Maintain Its Account BSJI Agrees to Additional Risk-Mitigation Requirements and Affirms the FRBNY's Right to Close Its Account

On February 6, 2019, the FBI raided BSJI's offices in connection with a federal investigation into BSJI's transactions and its compliance with  Bank Secrecy Act requirements, including policies and procedures with respect to the filing of SARs.  SBD ¶ 6; BSJI & USAO-PR Press Release (Feb. 11, 2020), https://tinyurl.com/34uwd6b3; *compare* Br. at 6 (dismissing investigation as "paper thin 'media reports'").  The United States District Court for the District of Puerto Rico issued a seizure warrant that instructed the FRBNY to transfer a substantial portion of the funds in BSJI's account to the U.S. Marshals Service.  SBD ¶ 6.

The FRBNY immediately suspended BSJI's account access to mitigate the significant risk to the FRBNY and financial system.  *Id.*  As the federal investigation proceeded, ███

███████████████████████████████████████████████████████████ ██████████████████ Ex. J at 6. ███████████████████████████████ ██████████████████████████████████. Ex. K at 17.  On February 11, 2020, the United States Attorney's Office for the District of Puerto Rico ("USAO-PR") announced that BSJI had agreed to pay a $1 million fine and improve its AML policies and compliance with money laundering regulations.  BSJI & USAO-PR Press Release (Feb. 11,

---

[6] BSJI is required to file Suspicious Activity Reports with FinCEN for any transaction that BSJI "knows, suspects, or has reasons to suspect" involve possible illegal activity and which meet certain other threshold requirements. 31 C.F.R. § 1020.320 (a)(2) (SAR reporting requirement for banks).  FinCEN shares these reports with law enforcement authorities and they are used to detect crimes.  Financial Crimes Enforcement Network, What We Do, https://www.fincen.gov/what-we-do.

2020), https://tinyurl.com/34uwd6b3.

Leading up to that settlement, BSJI had retained a host of advisors, including present counsel, who engaged in discussions with the FRBNY seeking restoration of BSJI's account access.  As part of those efforts, on March 16, 2020, BSJI executed the Supplemental Terms mandating enhanced risk-mitigation measures and reconfirming the FRBNY's right to close BSJI's account.  Ex. D at 10.  In reliance on that agreement, the FRBNY fully restored BSJI's account access in December 2020.  SBD ¶ 7.  █████████████████████████ ██████████████████████████████████████████████████████  Ex. L at 18.

### F.  After a Comprehensive Review, FRBNY Determines BSJI's Account Poses Undue Risk of Facilitating Illicit Activity and Invokes Its Contractual and Statutory Rights to Close BSJI's Account

In June 2022 (within months of the February 2022 Treasury NMLRA report), BSJI breached the Supplemental Terms by failing to submit three mandated annual independent consultant assessments attesting to the effectiveness of its BSA/AML and OFAC compliance programs.  *Id.*.  In addition, the FRBNY had identified concerning high-risk transaction activity in BSJI's account.  Ex. N at 3.  The FRBNY informed BSJI on July 18, 2022 that it was noncompliant with the Supplemental Terms and that it would be closing BSJI's account in September 2022.  Ex. O; Ex. P.

Prior to the September closure date, BSJI belatedly submitted its required reports.  Ex. Q at 1.  The FRBNY suspended closure and told BSJI that the FRBNY would review the reports and seek additional information about the concerning transactions it had identified.  *Id.*  The FRBNY thereafter sent BSJI requests for information ("RFIs") about the legitimacy and nature of the transactions, Ex. R, and BSJI provided its responses on November 3, 2022.

After receiving this information, AML specialists in the FRBNY's Compliance Function ("Compliance") evaluated the risks posed by BSJI's continued account access, including under Principle 5 of the Guidelines (which speaks to risk related to the facilitation of money laundering and other illicit activity).  Ex. N at 5.  With input from the FRBNY's Financial Intelligence and Investigations Unit, Compliance comprehensively reviewed the identified high-risk transaction activity and BSJI's RFI responses.  *Id.* at 11-16.  Compliance also reviewed the belated assessments.  *Id.* at 6-11.

The transaction review confirmed the existence of numerous concerning transactions involving millions of dollars in funds transfers that had multiple red flags for money laundering or other illicit activity.  Much of the concern relates to transactions among BSJI's owner's family members.  *Id.* at 11-16.  In many instances, in rapid succession, entities controlled by family members located in high-risk money laundering jurisdictions transferred funds to the same or other family members, who in turn transferred the funds on to another related party.  *Id.* at 12-15. This pattern is consistent with efforts to obscure the true source of the funds, a common component of money laundering.  *Id.* at 14 (███████████████████████████).  These characteristics alone pose significant money laundering concerns.  FinCEN Money Laundering and Terrorist Financing Red Flags (red flags for money laundering include "unusual transfers of funds . . . among accounts that involve the same or related principals;" "customers conducting business in higher-risk jurisdictions;" and incoming transfers that are "almost immediately" wired out), https://bsaaml.ffiec.gov/manual/Appendices/07.

BSJI's RFI responses raised the level of concern even further.  BSJI's explanation for much of the activity was that it reflected payments on, or purchases of, loans and bonds.  *E.g.,* Ex. N at 11.  But the debt documentation BSJI provided did not align with the amounts of the

transactions, and so provided no comfort as to their legitimacy.  *Id.* at 12 (█████████

███████████).[7]  More fundamentally, █████████████████████████████

███████████████████████████████████████████████████████████████

█████████████████████████  *Id.* at 12; FinCEN Money Laundering and Terrorist

Financing Red Flags ("loans that lack a legitimate business purpose" are suggestive of money

laundering).  On top of this, ████████████████████████████████████

████████████████████████████████████████████████

█████████████.  *Id.* at 15-16; *see also* █████████████████████████

████████████████████████████████████████████████████████.  In

Compliance's view, the lack of support for the transactions' legitimacy, the transactions' other

high-risk qualities, and the association with a bribery and corruption investigation poses an

unacceptable level of risk that BSJI's use of its account is facilitating illicit activity.  *Id.* at 11.

These concerns were compounded by the annual assessments BSJI submitted, which

identified over a dozen concerns with BSJI's AML programs, some of which had persisted for

years.  *Id.* at 6-11.  In particular, the BSA/AML Technical Validation Report—which assessed

the effectiveness and accuracy of BSJI's AML platform in identifying suspicious transactions—

had five open issues and one partially open issue.  Ex. N at 6.  Compliance viewed these and the

many other concerns it identified as █████████████████████████████████████

██████████████████████████ and as likely contributing to the fact that BSJI did not

submit a single Suspicious Activity Report on the high-risk transactions reviewed by its

---

[7] BSJI vaguely states that certain "debt" was "renegotiated and restructured" and suggests that these transactions are payments that align with those restructured terms.  Aponte Decl. ¶ 63(c), Dkt. 13.  No such restructured instruments have ever been provided to the FRBNY, nor (even if they exist) would they otherwise explain the velocity of the transactions or provide comfort on their related-party nature or the fact that the initial debt appears to lack a legitimate business purpose.  Neither BSJI nor its consultants, which have filed hundreds of pages in this action, acknowledge these fundamental issues.

consultants in 2021 or 2022, despite abundant indicia of high-risk activity. *Id.*

Based on the totality of these concerns and BSJI's overall risk profile, Compliance

determined that BSJI poses undue risk under Principle 5 of the Guidelines and that this risk

cannot be effectively mitigated with additional controls ████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████ *Id.* at 16-17.  The FRBNY's Reserve Bank Account Services ("RBAS") staff agreed with

that determination and further concluded that the risk of facilitating illicit activity poses undue

risk to the FRBNY itself.  Ex. S at 1-4.[8]  The FRBNY thus decided to exercise its contractual and

statutory rights to close BSJI's account.  *Id.* at 4.  The FRBNY informed the Board of Governors

of its intent to close, Ex. T, and then, in a detailed letter dated April 24, 2023, communicated the

decision and its grounds to BSJI.  Ex. U.

Over the next several weeks, BSJI sent the FRBNY multiple letters and voluminous

materials, much of which it has filed in this action, claiming that BSJI does not pose undue risk.

*E.g.*, HJV Decl. Exs. 18-22, Dkt. 10.  The FRBNY extended BSJI's closure date to review those

materials and hold a discussion with BSJI, which took place on June 20, 2023.  SBD ¶ 11.  As

detailed in a follow-up letter to BSJI dated June 30, 2023, neither the additional materials nor the

discussion allayed the FRBNY's serious risk concerns, including because BSJI largely ignored

or otherwise failed to provide comfort on the high-risk, related-party transactional activity.  Ex. I.

The FRBNY thus informed BSJI it was moving forward with closure on July 31, 2023.  *Id.* at 1.

Notably, the FRBNY told BSJI it would consider extending the closure date if BSJI

needed time to wind down its account use, *id.* at 2, which would allow BSJI to seek a

---

[8] Prior to reaching this conclusion, the FRBNY contacted BSJI's supervisor OCIF.  ███████████████████
████████████████████████████████████████████████████████████████.

correspondent commercial banking relationship to continue operations.  The majority of IBEs and IFEs access the U.S. financial system through means other than a master account, including through such a correspondent relationship.  *Compare* Ex. F at 68 (77 IBEs and IFEs operating as of November 2021) *with* SBD ¶ 14 (only 14 IBEs and IFEs maintained master accounts at the FRBNY at that time).  Rather than pursue that opportunity, BSJI brought this action.

## ARGUMENT

A preliminary injunction is "one of the most drastic tools in the arsenal of judicial remedies" and the bar for obtaining one is high.  *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (citing *Hanson Trust PLC v. SCM Corp.*, 774 F.2d 47, 60 (2d Cir. 1985)).  Preliminary injunctive relief is "never awarded as of right," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008), and cannot "be granted unless the movant, by a *clear showing*, carries the burden of persuasion."  *Alvarez-Marquez v. Wolf*, No. 19-CV-11773 (PGG), 2020 WL 10053218, at *1 (citation omitted) (emphasis added).

To prevail, BSJI must show, at a minimum: "(1) irreparable harm; (2) either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party; and (3) that a preliminary injunction is in the public interest."  *N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018) (citation omitted).  If BSJI were correct that the FRBNY is a United States "agency," Compl. ¶ 30, the bar would be even higher, and would require BSJI to demonstrate a "likelihood of success" on the merits.  *Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 631 (2d Cir. 2020).[9] BSJI cannot establish any of these factors, let alone all of them.

---

[9] "When 'a preliminary injunction will affect government action taken in the public interest pursuant to a statute or regulatory scheme, the moving party must demonstrate (1) irreparable harm absent injunctive relief, (2) a likelihood of success on the merits, and (3) public interest weighing in favor of granting the injunction.'" *Id.* (citation omitted).

I.    **BSJI'S ASSERTED IRREPARABLE HARM IS SPECULATIVE AND WOULD IN ANY EVENT BE SELF-INFLICTED**

Irreparable harm is an "injury that is not remote or speculative but actual and imminent, and for which a monetary award cannot be adequate compensation." *Dexter 345, Inc. v. Cuomo*, 663 F.3d 59, 63 (2d Cir. 2011) (citation and internal quotation marks omitted). This factor is "the 'single most important prerequisite'" for the issuance of a preliminary injunction. *JTH Tax, LLC v. Agnant*, 62 F.4th 658, 672 (citation and internal quotation marks omitted). "The moving party must first demonstrate such injury is *likely* before other requirements for an injunction will be considered." *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d Cir. 1990) (emphasis added); *see also JSG Trading Corp. v. Tray-Wrap, Inc.*, 917 F.2d 75, 79 (2d Cir.1990) ("Likelihood sets, of course, a higher standard than 'possibility.'") (citation omitted).

To satisfy this standard, BSJI must identify documented, factual support for actual harm; self-serving speculation does not suffice. *Spectrum Dynamics Med. Ltd. v. Gen. Elec. Co.*, No. 18-CV-11386 (VSB), 2022 WL 16707829, at *6 (S.D.N.Y. Sept. 27, 2022) ("self-serving speculation . . . . without concrete and reliable data[] cannot support a claim for irreparable harm") (citation omitted). Nor does "self-inflicted" harm qualify as irreparable harm; the facts must show that the asserted harm would be caused by the FRBNY's actions. *U.S. v. Int'l Bhd. of Teamsters*, No. 88-CV-4486 (DNE), 1998 WL 477969, at *2 (S.D.N.Y. Aug. 14, 1998) ("self-inflicted" nature of asserted injury "undermines" claim of irreparable harm); 11A, Wright & Miller, Federal Practice and Procedure § 2948.1 (3d ed.) ("Not surprisingly, a party may not satisfy the irreparable harm requirement if the harm complained of is self-inflicted.").

*First*, BSJI cannot meet this strict standard because its claimed harm consists solely of speculation that it will be forced out of business if its master account is closed. Br. at 15-16. BSJI's self-serving assertion is unsupported by any "concrete and reliable data," *Spectrum*, 2022

16

WL 16707829, at *6, and is directly contradicted by the fact that a master account is not a prerequisite for financial institutions to operate.  Indeed, thousands of institutions—*including the majority of IBEs and IFEs*—operate without such an account.  *Supra* at 4 n.1, 13-14.

BSJI claims it knows with certainty that it will be unable to secure a correspondent banking relationship.  Br. at 16.  But BSJI declined the FRBNY's offer to extend the closure date so BSJI could pursue one, Ex. I at 2, and there is no evidence that BSJI ever actually took concrete steps to do so.  *Id.* (citing single conclusory statement by BSJI that "*one* bank" expressed "reticen[ce]" to partner with it (HJV Decl. ¶ 71, Dkt. 10) and other unsupported speculation of its paid consultants (RJW Decl. ¶ 6, Dkt. 18; WMI Decl. ¶ 20, Dkt. 11)).  This Court rejects such speculative harm as insufficient.  *Impax Media Inc. v. Ne. Advert. Corp.*, No. 17-CV-8272 (RWS), 2018 WL 358284, at *5 (S.D.N.Y. Jan. 10, 2018) ("'[i]nstead of presenting concrete data . . . plaintiff offers only the self-serving statement . . . that its business will collapse' without an injunction").

*Second*, any purported harm BSJI might suffer would be self-inflicted, because the record shows that any inability to secure a correspondent relationship would be due to BSJI's *own* elevated risk profile.  Well before the FRBNY communicated its closure decision, from 2019 through 2021, ████████████████████████████████████████████████ ████████████████████████████████████████████████████, not due to any action by the FRBNY.  Exs. J, K, L.  In BSJI's view, the FRBNY must continue to bank BSJI, notwithstanding its conclusion that BSJI poses unacceptable risk, because BSJI presumes that commercial banks will reach the same conclusion.  That is not a basis for equitable relief. Federal Reserve Banks were created to promote and protect the financial system, not to permit

threats to that system or to bear the burden of being tied to the riskiest financial institutions.[10]

*Third*, BSJI's assertion that it would be irreparably harmed due to "a loss of reputation, goodwill, and business opportunities," Br. at 16-17, ███████████████████████████ ██████████████████████. Ex. M at 2; *Spectrum*, 2022 WL 16707829, at *6 (plaintiff's "argument that it will be irreparably harmed when it has historically operated at a net loss is conclusory and lacks factual support"); *Int'l Shoppes, Inc. v. Holder*, No. 99-CV-4638 (SJ), 1999 WL 993719, at *5 (E.D.N.Y. Sept. 6, 1999) (no irreparable harm due to loss of opportunity or good will where plaintiff operated at "net loss").  Moreover, BSJI's customers consist of 13 individuals and entities related to its owner; those are hardly the "significant long-term client relationships" that could give rise to a loss of goodwill.  *Int'l Creative Mgmt., Inc. v. Abate*, No. 07-CV-1979 (PKL), 2007 WL 950092, at *3 (S.D.N.Y. 2007) (plaintiff "has not demonstrated that it has significant long-term client relationships and associated goodwill that merit protection").[11]

## II.  BSJI CANNOT ESTABLISH A LIKELIHOOD OF SUCCESS

### A.  The FRBNY Has the Contractual Right to Close BSJI's Account

"'[A] written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms.'" *Thor Equities, LLC v. Factory Mutual*

---

[10] BSJI also ignores that any such harm is not imminent, as demonstrated by the fact that it remained a going concern while its account access was suspended for 22 months in the wake of the FBI raid.  *Vantico Holdings S.A. v. Apollo Mgmt., LP*, 247 F. Supp. 2d 437, 454 (S.D.N.Y. 2003) (Koeltl, J.) (denying preliminary injunction because "there is no risk of immediate insolvency").

[11] BSJI blames the suspension of its account following the FBI raid for the reduction in its customer base. But BSJI's own documents show BSJI *proactively* "downsized and de-risked" its customers.  HJV Decl. ¶ 64, Dkt. 10; Ex. H at 2 ███████████████████████████████████████████ ; Leung Decl. ¶ 20, Dkt. 12 (███████████████████████████████████ ); *see also* Ex. K (███████████████████████ ).

*Ins. Co.*, 531 F.Supp.3d 802, 807 (S.D.N.Y. 2021) (citing *Greenfield v. Philles Records, Inc.*, 750 N.Y.S.2d 565, 569 (2002).  Because the agreements BSJI entered into with the FRBNY plainly give it the right to close BSJI's account, BSJI's claims are not only unlikely to succeed—they are foreclosed even at this preliminary stage.

*First*, the MAA BSJI executed prior to obtaining its account gives the FRBNY an unrestricted right of closure.  The agreement states that BSJI "agrees to the provisions of [OC 1]," Ex. B, which provides that the FRBNY "may terminate a [MAA] . . . at any time by notice to" BSJI.  Ex. C § 2.10.  The FRBNY provided thar notice.  Exs. U, I.

*Second*, just three years ago, during a period when it was represented by present counsel, BSJI executed the Supplemental Terms expressly reconfirming the right to close and terminate BSJI's access to services to "limit the Risks" BSJI poses to the FRBNY.  Ex. D at 10; *see also id.* at 2 ("Risk" means "possibility" of any "harm" to FRBNY).  This provision plainly gives the FRBNY the right to close BSJI's account under the circumstances here.  *Id.* at 10 (If "the Bank determines, *in its sole discretion*, that the Customer's access to a Financial Service poses undue risk to the Bank . . . the Bank may immediately and without prior notice take any of the measures described in this section.") (emphasis added); *ELBT Realty, LLC v. Mineola Garden City Co.*, 42 N.Y.S.3d 304, 306 (2nd Dep't. 2016) (term permitting termination in party's "sole discretion" was that party's "decision . . . alone and did not need to be accompanied by any specific justification").

### B. BSJI Cannot Establish A Likelihood of Success on Its Claims Based on Its Purported "Right" to an Account

BSJI seeks to evade its contractual commitments by claiming it has a statutory right to a master account under the FRA.  Br. at 18-22.  The FRA itself does not itself provide a cause of action, so BSJI seeks to raise one through various other vehicles, including the Administrative

Procedure Act ("APA"), 5 U.S.C. § 706 (Count I), the Mandamus Act, 28 U.S.C. § 1361 ("MA") (Count II), the Declaratory Judgment Act, 28 U.S.C. § 2201(a) (Count III), and the Due Process Clause of the Fifth Amendment to the U.S. Constitution ("DPC") (Count IV).  BSJI cannot succeed on any these claims tied to a "right" to an account because the FRA vests Reserve Banks with the authority to close accounts and BSJI otherwise would have waived any such "right."

### a.   Reserve Banks Are Authorized by the FRA to Close Accounts

Master accounts are governed by Section 13 of the FRA, 12 U.S.C. § 342, which expressly empowers, but does not require, Reserve Banks to open such accounts.  Section 13 states that a Reserve Bank "*may* receive from any of its member banks, or other depository institutions, . . . deposits[.]" 12 U.S.C. § 342 (emphasis added); *Biden v. Texas*, 142 S. Ct. 2528, 2541 (2022) ("'May' does not just suggest discretion, it clearly connotes it.").  The Supreme Court has recognized that this permissive text does not "impose[] upon reserve banks any obligation to receive" deposits; it merely "confers authority to do so."  *Farmers & Merch. Bank of Monroe, N.C. v. Fed Rsrv. Bank of Richmond*, 262 U.S. 649, 662 (1923).

This authority to receive or reject deposits necessarily carries with it the authority to deny or close master accounts.  The FRA is otherwise silent on deposit accounts and it would be nonsensical to read into that silence a requirement for Federal Reserve Banks to maintain empty accounts that serve no purpose.  *SeaAir NY, Inc. v. City of N.Y.*, 250 F.3d 183, 186 (2d Cir. 2001) (rejecting statutory interpretation that "would render the statute nonsensical").  In fact, Congress recently confirmed this discretion by amending the FRA in 2022 to require the Board of Governors to create an online database of "every entity that submits an access request for a reserve bank master account and services . . . including whether . . . a request was approved, *rejected*, pending, or withdrawn."  12 U.S.C. § 248c(b)(1) (emphasis added).  If the FRA

mandated the provision of master accounts, Congress would not have included this language to the contrary.

The discretion to close accounts is consistent not just with the text of Section 13, but with the FRA's statutory scheme overall. *King v. Burwell*, 576 U.S. 473, 492 (2015) (statutes should be construed in light of the "remainder of the statutory scheme [to favor readings with] a substantive effect that is compatible with the rest of the law"). Congress charged the Federal Reserve with ensuring the safety and reliability of the nation's payment system and operating "in furtherance of the national fiscal policy," *Fed. Rsrv. Bank of Bos. v. Comm'r of Corps. & Tax'n*, 499 F.2d 60, 62 (1st Cir. 1974), and with "facilitate[ing] the implementation of monetary policy," 94 Stat. 132. If Reserve Banks lacked discretion to deny account access, their ability to carry out that mandate would be significantly undermined, as demonstrated here.

Ignoring Section 13 entirely, BSJI asserts a "right" to an account based on a later-enacted, inapposite provision in the FRA, 12 U.S.C. § 248a(c)(2). Br. at 18-20. Section 248a is directed only to the "Board of Governors []," 12 U.S.C. §§ 241-252, and says nothing about what Federal Reserve Banks may or must do. *See, e.g.,* 28 U.S.C. § 248a(a) ("the Board shall publish for public comment a set of pricing principles"); *id.* ("the Board shall . . . put into effect a schedule of fees for such services"). It would be anomalous for Congress to hide a requirement for Federal Reserve Banks to provide master accounts to all depository institutions, irrespective of the risks presented, in a provision not even addressed to Reserve Banks that is silent on deposits. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) (courts should interpret statutes with a recognition that Congress does not "hide elephants in mouseholes").

Section 248a, titled "Pricing of services," instructs the Board of Governors to "put into effect a schedule of fees," 12 U.S.C. § 248a(a), for an enumerated list of financial services (that

does not include the provision of master accounts) and requires those services to be made available to member and nonmember banks at the same price, so long as the nonmembers meet criteria that the Board has set for members. *See* 12 U.S.C. § 248a(c).[12] While Section 248a says that "all Federal Reserve bank services shall be available to nonmember depository institutions," *id.*, it says nothing about whether a depository institution is entitled to a master account in the first instance.

Nor does Section 248a state that services must be provided to *all* nonmember institutions. Notably, Section 13's text authorizing Reserve Banks to reject deposits was included the FRA when it was enacted in 1913, and Congress left it intact six decades later when it added Section 248a as part of the Monetary Control Act of 1980 (the "MCA"), Pub. L. 96-221, 94 Stat. 132, 139 (1980). Congress is thus presumed to have "accepted and ratified" the Supreme Court's reading of Section 13 as discretionary. *Texas Dep't of Hous. and Cmty. Affs. v. Inclusive Cmtys. Project*, 135 S. Ct. 2507, 2520 (2015).

In support of its misplaced assertion that Section 248a entitles it to an account, BSJI cites a nonprecedential opinion issued by a single Tenth Circuit judge. Br. at 18-20 (citing *Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kan. City*, 861 F.3d 1052, 1067-74 (10th Cir. 2017) (op. of Bacharach, J.). That opinion misreads the FRA in several critical ways. First, despite acknowledging that the "may receive" language in Section 13 "indicates that Reserve Banks have discretion," Judge Bacharach erroneously concluded that "this discretion does not encompass the issuance of master accounts," *Fourth Corner,* 861 F.3d 1052 at 1073-74,

---

[12] Nonmember depository institutions are depository institutions that are not members of the Federal Reserve System. This includes state-chartered institutions, like IBEs and IFEs, that are either ineligible for or elect not to pursue membership. *See* 12 U.S.C. §321. The cited provision was added to the FRA in the Monetary Control Act of 1980 to make clear that, going forward, nonmember institutions could seek access to financial services (previously only member institutions could seek such access).

notwithstanding that logic mandates that the authority to reject deposits encompasses the authority to deny account access. Forcing the FRBNY to accept BSJI's deposits is precisely what BSJI seeks to do here—in direct contravention of the express text of Section 13.

Judge Bacharach also misinterpreted Section 248a by concluding that it compels the provision of covered services to *all* nonmember depository institutions, *Fourth Corner,* 861 F.3d 1052 at 1068-70, despite the fact that the word "all" is conspicuously absent as a modifier for "depository institutions." 12 U.S.C. § 248a(c). Further, Judge Bacharach incorrectly looked beyond the text of the FRA and misconstrued past statements by the Board of Governors and Reserve Banks noting that the MCA made Federal Reserve Bank services available to nonmember depository institutions as well as member depository institutions. *Fourth Corner,* 861 F.3d 1052 at 1070-73.[13] Accordingly, BSJI cannot demonstrate any "right" to an account.

### b. BSJI Waived and Is Equitably Estopped from Asserting Any "Right" to Its Account By Agreeing That The FRBNY Can Close It

Even if Section 248a gave BSJI a "right" to an account—which it does not—BSJI voluntarily and intentionally waived any such "right" when it expressly agreed that the FRBNY has the right terminate its account relationship. Parties to a contract waive a statutory right when the agreement shows that they "have clearly intended that effect." *Columbus Park Corp. v. Dep't of Hous. Pres. & Dev. of the City of New York*, 586 N.Y.S.2d 554 (N.Y. 1992) (owners of state-sponsored housing developments waived statutory right to exit program after 20 years by agreeing to stay in program for longer periods of time); *see also F.D.I.C. v. Four Star Holding Co.*, No. 97-CV-4184 (JFK), 2000 WL 256146, at *3 (S.D.N.Y. Mar. 7, 2000) ("As a general

---

[13] BSJI also cites *Greater Buffalo Press, Inc. v. Fed. Rsrv. Bank of New York*, 866 F.2d 38, 40 (2d Cir. 1989). That decision does not address the issue of whether a Reserve Bank may be compelled to open a master account; rather, it mentions the undisputed fact that the MCA expanded the types of customers to which Reserve Banks could provide financial services to include nonmember institutions.

rule, a contractual waiver of a statutory right need not be express so long as it is clearly intentional.") *vacated on other grounds*, 271 F.3d 75 (2d Cir. 2001).

Here, there can be no question that the intended effect of BSJI entering into agreements explicitly confirming the FRBNY's right to close BSJI's account would be to override any claimed "right" to keep it open.  The language in the FRA on which BSJI relies for its purported right, 12 U.S.C. § 248a, was enacted in the MCA over 40 years ago, decades before BSJI executed contracts permitting closure.  And the non-precedential opinion of a single judge that BSJI cites as support was published in 2017, three years *before* it executed the Supplemental Terms and confirmed the FRBNY's right to close its account.  *See Fourth Corner Credit Union*, 861 F.3d 1052 at 1067.  As a sophisticated financial entity advised by counsel, BSJI cannot be heard now to claim that it never intended to be bound by the express terms of its contracts.

BSJI not only waived that purported right, BSJI is equitably estopped from asserting it. *Kosakow v. New Rochelle Radiology Assocs., P.C.*, 274 F.3d 706, 725 (2d Cir. 2001).  "[A] party may be estopped from pursuing a claim or defense where: 1) the party to be estopped makes a misrepresentation of fact to the other party with reason to believe that the other party will rely upon it; 2) and the other party reasonably relies upon it; 3) to her detriment."  *Id.*  That is precisely what happened here.  In executing the Supplemental Terms: (1) BSJI misrepresented that it was confirming the FRBNY's closure rights; (2) BSJI knew the FRBNY relied on that representation when restoring BSJI's account access after the FBI raid; and (3) that reliance was to the FRBNY's detriment because it continued to expose the FRBNY to the risks associated with that access.  For all these reasons, BSJI cannot show a likelihood of success on these claims.

    **c.  The Claims Through Which BSJI Asserts a "Right" to an Account Are Deficient**

        **i.  Discretionary Action Is Not Subject to APA Review, Nor is the**

**FRBNY an "Agency"**

BSJI cannot succeed on its APA claim because even if the FRBNY were a "agency" under the statute (which it is not), the APA precludes review of "agency action" that is "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). Courts have no subject matter jurisdiction to review an action where, as here with Section 13 of the FRA, "the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Zheng v. Reno, 166 F. Supp. 2d 875, 879 (S.D.N.Y. 2001) (Koeltl, J.)* Because Section 13's "may receive" language provides no such meaningful standard, APA review is unavailable.

The FRBNY is also not an "agency" under the APA. The APA defines "agency" as an "authority of the Government of the United States." 5 U.S.C. § 701(b)(1); *see also* 5 U.S.C. § 551(1) (same). To meet this standard, an entity must "exercise substantial independent authority" on behalf of the government or, in other words, be the "center of gravity in the exercise of administrative power." *Dong v. Smithsonian Inst.*, 125 F.3d at 881-82 (D.C. Cir. 1997). This definition is "restrictive." *New York v. Atl. States Marine Fisheries Comm'n*, 609 F.3d 524, 531 (2d Cir. 2010) (inquiry "examine[s] structure, function, and mandate" of entity).

Reserve Banks are not executive "agencies;" they are federal instrumentalities chartered pursuant to the FRA as corporations "formally separate . . . from the government." *Scott*, 406 F.3d at 534.By deliberate design, Reserve Banks are "independent entit[ies] independently run by [their] own board of directors. . . . not by the Federal Reserve Board of Governors or any other part of the executive branch." *Id.* at 535. *See also First Nat'l City Bank* v. *Banco Para el Comercio Exterior de Cuba* ("*Bancec*"), 462 U.S. 611, 626–27 (1983) ("instrumentalities established as juridical entities distinct and independent from their sovereign should normally be treated as such"); *Kraus*, 943 F.3d at 598 ("Congress has considered the status of the [Reserve

Banks] on multiple occasions and decided not to convert them formally into government agencies.").

Unlike most agencies, Reserve Banks cannot promulgate regulations with the force of law, *see Scott*, 406 F.3d at 536, nor engage in rulemaking, because that authority is vested in the Board of Governors and may not be delegated. 12 U.S.C. § 248(k).   Moreover, while Reserve Banks are empowered by federal statute to perform banking services and to make account decisions, that it not enough to make them agencies under the APA.  *Dong v. Smithsonian Inst.*, 125 F.3d at 881 (D.C.Cir. 1997) ("that an organization makes decisions does not always mean that it is a government agency").

BSJI points to two 40-year-old, out-of-circuit district court decisions, one of which was vacated.  Br. at 23 (citing *Lee Const. Co., Inc. v. Fed. Rsrv. Bank of Richmond*, 558 F.Supp. 165 (D. Md. 1982); *Flight Int'l Group, Inc. v. Fed. Rsrv. Bank of Chi.*, 583 F.Supp. 674 (N.D.Ga. 1984), *vacated by* 597 F.Supp. 462, 678-79 (N.D.Ga. 1984).  The since-vacated decision did not apply any standard at all and instead simply announced that the Federal Reserve Bank of Chicago is an agency because other courts have found it to be an instrumentality.  *Flight Int'l Group, Inc.*, 583 F.Supp. 674 at 678 (collecting cases).  But "[m]any financial institutions are federally chartered and regulated and are considered federal instrumentalities, without attaining the status of government agencies within the meaning of federal procedural rules."  *In re Hoag Ranches*, 846 F.2d 1225, 1227 (9th Cir. 1988).

Nor is the lone surviving authority persuasive.  The district court in that case heavily relied on the fact that the Board of Governors "has delegated substantial decision-making authority to the Reserve Banks."  *Lee Const. Co., Inc.*, 558 F. Supp. at 178.  Unlike in *Lee*, a Reserve Bank's discretion over master account decisions is not delegated by the Board of

Governors but derives directly from the FRA itself.

### ii. BSJI's Mandamus, DJA, and DPC Claims Asserting a Right to an Account Are Defective

As an initial matter, BSJI does not even argue that it is likely to succeed on the merits of its Mandamus Act claim (Count II) or Declaratory Judgment Act claim asserting a right to an account (Count III), which alone warrants the denial of a preliminary injunction on these claims. *U.S. ex rel. Karlin v. Noble Jewelry Holdings Ltd.*, No. 08-CV-7826 (JGK)(KNF), 2012 WL 1228199, at *4 (S.D.N.Y. Apr. 9, 2012) (Koeltl, J.) ("'Arguments may not be made for the first time in a reply brief.'") (citation omitted).

Regardless, the Mandamus Act only permits courts to "compel an officer or employee of the United States or any agency thereof to perform a duty owed to plaintiff." 12 U.S.C. § 1361. FRBNY personnel are not "officers or employees of the United States," and the FRBNY is not part of any "executive . . . agency." , 943 F.3d 588, 596-597 (2d Cir. 2019). Further, the DJA is "procedural only" and "does not create an independent cause of action." *Chevron Corp. v. Naranjo*, 667 F.3d 232, 244-45 (2d Cir. 2012) (dismissing DJA claim where invoked statute did "not create an affirmative cause of action"). The FRA creates no such cause of action.

BSJI is also unlikely to succeed on its procedural DPC claim. First, BSJI lacks a requisite property interest in a master account. *Clubside, Inc. v. Valentin, 468 F.3d 144, 154 (2d Cir. 2006) (no property interest exists where decision maker has discretion to deny application)*. Further BSJI is also unlikely to prevail because it was provided with "notice and opportunity for hearing appropriate to the nature of the case." *S.E.C. v. Jett*, 514 F.Supp.2d 532, 536 (2d Cir. 2007). The FRBNY informed BSJI of its closure decision under the  Guidelines and the grounds on which it was based, and then over the course of two months BSJI submitted voluminous information, the FRBNY reviewed that information, held a discussion with BSJI, and sent a

further letter explaining why the information BSJI had provided did not warrant revisiting the closure decision.  Ex. I.  That sequence of events more than meets any due process protections that could apply here.  *Id.* (all that is required is "an opportunity to present . . . objections").

### C.  BSJI Cannot Succeed on Its Contractual Claims Challenging the Closure

BSJI also cannot establish likelihood of success on its contractual claims that the FRBNY's decision breached a purported New York-law based contractual duty of good care (Count V) and implied covenant of good faith and fair dealing (Count VI).  BSJI's contractual claims fail because they do not rest upon a valid contract, but on a form of agreement that applies to foreign banking institutions—not U.S.-based institutions such as BSJI—that the FRBNY never countersigned or declared "effective," as contemplated by the form.  Dkt. No. 8-1.  *Kargo, Inc. v. Pegaso PCS, S.A. de C.V.*, No. 05-CV-10528 (CSH)(DFE), 2008 WL 4579758, at *6 (S.D.N.Y. Oct. 14, 2008) ("if the parties to an agreement do not intend it to be binding upon them until it is . . .  signed by both of them, they are not bound . . . until it has been . . . signed.").

BSJI's "duty of good care" claim also fails because the provision on which it relies contains no such duty.  Compl. ¶ 137-141; Br. at 27.  It is a limitation of liability clause that shields the FRBNY from liability except "actual damages incurred by [BSJI] and proximately caused by [the FRBNY's] lack of good faith and failure to exercise ordinary care." Ex. C at 14.

BSJI's implied covenant of good faith and fair dealing claim is further subject to dismissal because it is not "based on allegations different from those underlying [a] breach of contract claim."  *Bos. Consulting Group, Inc. v. NCR Corp.*, No. 19-CV-10156 (LGS), 2020 WL 5731963, at *5 (S.D.N.Y. Sept. 20, 2020) (implied covenant claim may not be pleaded in the alternative); Compl. ¶ 144 (same alleged conduct "breaches" both "the contractual duty of care" and amounts to implied covenant breach).  This claim is also defective because it would "nullify

28

other express terms of" the MAA and Supplemental Terms permitting closure.  *E.g.,* Ex. D at 10; *Quintanilla v. WW Int'l, Inc*., 541 F. Supp. 3d 331, 352 (S.D.N.Y. 2021) ("implying a duty in the [contract] that precluded [defendant] from . . . discontinuing . . . services without facing contractual liability would conflict with the provision . . . authorizing [defendant] to do just that").  Regardless, the FRBNY's closure decision is not based on "improper assumptions" made without giving BSJI the "opportunity to address;" Br. at 28.  The extended back and forth between the parties shows that the FRBNY acted in good faith and considered BSJI's views before confirming it needed to move forward with closure.

### D.  BSJI's APA "Arbitrary and Capricious" Claim Is Defective and Subject to 12(b)(1) Dismissal

BSJI is wrong that its APA claim could survive even if the FRBNY is "assumed to have discretion as to master account access."  Br. at 24; *supra* at 23-25.  Regardless, that review is "highly deferential and presume[s] the [FRBNY's] action to be valid."  *Adler v. U.S. D.O.J.*, No. 18-CV-2188 (PAC), 2018 WL 4571677, at *3 (S.D.N.Y. Sept. 24, 2018).  The Court's role would be to determine only "whether the agency has 'considered the pertinent evidence, examined the relevant factors, and articulated a satisfactory explanation for its action."  *Id.*  The Court cannot "weigh or substitute its judgment for that of the agency."  *Id.* The well-documented and comprehensive grounds for closing BSJI's account due to the unacceptable risk of facilitating illicit activity easily satisfies this deferential standard.

### III.  THE PUBLIC INTREST AND EQUITIES DO NOT SUPPORT A PRELIMINARY INJUNCTION

BSJI cannot show that the "the public interest" or the "balance of equities" weigh in its favor.  *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 32 (2008) ("An injunction is a matter of equitable discretion; it does not follow from success on the merits as a matter of course.").

### A.  The Public Interest Favors Protecting the Financial System

BSJI's requested injunction runs contrary to the "public's interest in protecting the U.S. financial system from illicit activity such as money laundering."  *FBME Bank Ltd. v. Mnuchin*, 249 F.Supp.3d 215, 230 (D.D.C. 2017); *see also* Ex. F (Treasury warning that "[t]he United States is particularly vulnerable to all forms of illicit finance because of the size of the U.S. financial system and the centrality of the U.S. dollar in the payment infrastructure supporting global trade.").  For decades, U.S. law enforcement authorities have recognized the threats posed by money laundering and are uniform in their support of efforts to curb the associated risks.  *See, e.g.,* FinCEN, History of Anti-Money Laundering Laws, https://www.fincen.gov/history-anti-money-laudnering-laws ("The BSA was established in 1970 and has become one of the most important tools in the fight against money laundering.  Since then, numerous other laws have enhanced and amended the BSA to provide law enforcement and regulatory agencies with the most effective tools to combat money laundering.").

The FRBNY's decision to close BSJI's account was made in direct furtherance of this interest—the FRBNY has serious concerns that BSJI's account access facilitates money laundering, and it plans to close BSJI's account to protect itself and the economy from those risks.  BSJI suggests that, even if its account facilitates illicit activity, BSJI is too small to pose meaningful risk.  Br. at 13.  But any amount of money laundering erodes the integrity of the financial system.  The Court should not compel the FRBNY to sit idle and permit illicit transactions to flow through an account so long as they fall under some unspecified  dollar threshold.

The public interest also supports denying an injunction because it would override BSJI's contractual commitments the FRBNY relied upon in restoring BSJI's account access in 2020.

30

*Empower Energies, Inc., v. SolarBlue, LLC*, No. 16-CV-3220 (DLC), 2016 WL 5338555, at *13

(S.D.N.Y. Sept. 23, 2016) (enforcing contracts is in public interest because "[p]arties entering

into contracts have a right to expect that those contracts will be enforced"); *Wickapogue 1 LLC v.*

*Blue Castle (Cayman) Ltd.*, No. 23-CV-561 (HG), -- F.Supp.3d ---, 2023 WL 2071291, at *5

(E.D.N.Y. Feb. 17, 2023) ("denial of a preliminary injunction serves the public interest by

holding the parties to their contractual obligations").

### B. An Injunction Would Burden the FRBNY by Compelling It to Expend Resources Seeking to Mitigate Risk It Has Determined Cannot Be Sufficiently Mitigated

In assessing the balance of the equities, the Court "should pay particular regard for the

public consequences of employing the extraordinary remedy of injunction" and recognize that

the "policy against" preliminary injunctions "becomes more significant when there is reason to

believe that the decree will be burdensome." *Winter*, 555 U.S. at 27. The public consequences

detailed above support denial. The burdens on the FRBNY warrant the same. An injunction

would burden the FRBNY with the legal, reputational, compliance and other risks associated

with BSJI's transaction activity. It would also bind the FRBNY to a counterparty with whom its

wishes to terminate its relationship, and would force the FRBNY to continue expending

substantial resources trying to mitigate risks it has already determined cannot be sufficiently

mitigated. (At present, FRBNY staff expend a significant amount of time and resources

attempting to mitigate the risks associated with BSJI's account access. SBD ¶ 15.) By contrast,

denying BSJI's Motion would only put BSJI is the same position as the majority of other IBEs

and IFEs that do not have master accounts. For all of these reasons, the public interest and

equities support rejecting BSJI's requested relief.

### CONCLUSION

For the foregoing reasons, the Court should deny BSJI's Motion.

Dated:   August 22, 2023
          New York, New York

Respectfully submitted,

FEDERAL RESERVE BANK OF NEW YORK

_____
Carmine D. Boccuzzi, Jr.
Caroline Soussloff
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999


Michael Brennan
Michele Kalstein
33 Liberty Street
New York, NY 10045
T: (212) 720-8235
F: (212) 720-8709
michael.brennan@ny.frb.org
*Counsel for Defendant*
*Federal Reserve Bank of New York*