**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

BANCO SAN JUAN INTERNACIONAL, INC.,

*Plaintiff,*

v.

THE FEDERAL RESERVE BANK OF NEW YORK
and THE BOARD OF GOVERNORS OF THE
FEDERAL RESERVE SYSTEM

*Defendants.*

Case No. 1:23-cv-06414 (JGK)

---

## REPLY MEMORANDUM OF LAW IN SUPPORT OF BSJI'S MOTION FOR PRELIMINARY INJUNCTION

## **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT................................................................................................ 1

ARGUMENT ........................................................................................................................... 4

I.      BSJI Will Suffer Irreparable Harm in the Absence of Injunctive Relief ........................... 4

II.     BSJI Is Likely to Succeed on the Merits and Presents Serious Questions That Are
        Fair Grounds for Litigation ............................................................................................ 5

        A.      BSJI Has a Statutory Right to a Master Account ................................................... 6

        B.      BSJI Did Not Waive Its Statutory Right to an Account, nor Is It Estopped
                from Asserting That Right ................................................................................. 10

        C.      BSJI Is Likely to Succeed on, or Has Presented Serious Questions
                Concerning, Its APA Claim ................................................................................ 12

        D.      BSJI Is Likely to Succeed on, or Has Presented Serious Questions
                Concerning, Its Mandamus Claim ...................................................................... 17

        E.      BSJI Is Likely to Succeed on, or Has Presented Serious Questions
                Concerning, Its Due Process Claim .................................................................... 17

        F.      BSJI Is Likely to Succeed on, or Has Presented Serious Questions
                Concerning, Its Contractual Claims.................................................................... 17

III.    The Public Interest Favors Granting an Injunction........................................................ 18

CONCLUSION...................................................................................................................... 18

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Airbnb, Inc. v. City of New York*,
   373 F. Supp. 3d 467 (S.D.N.Y. 2019)........................................................................5

*Alexander v. Gardner-Denver Co.*,
   415 U.S. 36 (1974).......................................................................................................11

*Anderson v. Bowen*,
   881 F.2d 1 (2d Cir. 1989) ...........................................................................................17

*Bionpharma Inc. v. CoreRx, Inc.*,
   582 F. Supp. 3d 167 (S.D.N.Y. 2022)........................................................................4

*Brooklyn Sav. Bank v. O'Neil*,
   324 U.S. 697 (1945)....................................................................................................12

*Brotherhood of R. R. Trainmen v. Balt. & O.R. Co.*,
   331 U.S. 519 (1947).....................................................................................................8

*Cedeno v. Argent Tr. Co.*,
   No. 20-cv-9987, 2021 WL 5087898 (S.D.N.Y. Nov. 2, 2021)..................................11

*Citigroup Glob. Mkts., Inc. v. VCG Special Opps. Master Fund Ltd.*,
   598 F.3d 30 (2d Cir. 2010)..........................................................................................5

*City of New York v. Heckler*,
   742 F.2d 729 (2d Cir. 1984).......................................................................................17

*Columbus Park Corp. v. Dep't of Hous. Pres. & Dev. of the City of New York*,
   586 N.Y.S.2d 554 (N.Y. 1992) ..................................................................................11

*Custodia Bank, Inc. v. Fed. Rsrv. Bd. of Governors*,
   640 F. Supp. 3d 1169 (D. Wyo. 2022)....................................................................8, 9

*Custodia Bank, Inc. v. Fed. Rsrv. Bd. of Governors*,
   1:22-CV-00125-SWS (ECF No. 151) (D. Wyo. April 20, 2023).............................9

*Custodia Bank, Inc. v. Fed. Rsrv. Bd. of Governors*,
   1:22-CV-00125-SWS (ECF No. 164) (D. Wyo. June 8, 2023)................................9

*Dong v. Smithsonian Inst.*,
   125 F.3d 877 (D.C. Cir. 1997)..................................................................................12

ii

*Farmers' & Merchs.' Bank of Monroe v. Fed. Rsrv. Bank of Richmond*,
     262 U.S. 649 (1923)............................................................................................................7

*F.D.I.C. v. Four Star Holding Co.*,
     No. 97-CV-4184 (JFK), 2000 WL 256146 (S.D.N.Y. Mar. 7, 2000)....................................11

*Flight Int'l Group, Inc. v. Fed. Rsrv. Bank of Chicago.*,
     583 F. Supp. 674 (N.D. Ga. 1984), *vacated*, 597 F. Supp. 462 (N.D. Ga. 1984)...................13

*Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kansas City*,
     861 F.3d 1052 (10th Cir. 2017) ................................................................................8, 9, 10

*Haitian Ctrs. Council, Inc. v. McNary*,
     969 F.2d 1326 (2d Cir. 1992)............................................................................................6

*I.N.S. v Cardoza-Fonseca*,
     480 U.S. 421 (1987)........................................................................................................6

*Ky. Dep't of Corr. v. Thompson*,
     490 U.S. 454 (1989)......................................................................................................17

*Lee Constr. Co., Inc. v. Fed. Rsrv. Bank of Richmond*,
     558 F. Supp. 165 (D. Md. 1982)......................................................................................13

*Locafrance U.S. Corp. v. Intermodal Sys. Leasing, Inc.*,
     558 F.2d 1113 (2d Cir. 1977)..........................................................................................11

*Morris v. New York City Employees' Ret. Sys.*,
     129 F. Supp. 2d 599 (S.D.N.Y. 2001)...............................................................................12

*Nature's Entprs, Inc. v. Pearson*,
     No. 08 CIV 8549 (JGK), 2008 WL 4700547 (S.D.N.Y. Oct. 24, 2008) .................................4

*Otoe-Missouria Tribe of Indians v. N.Y. State Dep't of Fin. Servs.*,
     769 F.3d 105 (2d Cir. 2014)..............................................................................................6

*Perry v. U.S.*,
     294 U.S. 330 (1935).......................................................................................................17

*Rivera v. New York City Dep't of Educ.*,
     No. 21-cv-6134, 2023 WL 2563665 (E.D.N.Y. Feb. 3, 2023) ..............................................11

*Roeder v. J.P. Morgan Chase & Co.*,
     523 F. Supp. 3d 601 (S.D.N.Y. 2021), *aff'd*, 2022 WL 211702 (2d Cir. Jan.
     25, 2022) ......................................................................................................................12

*TNB USA Inc. v. Fed. Rsrv. Bank of N.Y.*,
     No. 1:18-CV-7978, 2020 WL 1445806 (S.D.N.Y. Mar. 25, 2020).........................................10

iii

*trueEX, LLC v. MarkitSERV Ltd.*,
    266 F. Supp. 3d 705 (S.D.N.Y. 2017)........................................................................4

*Wilson v. Malca-Amit USA, LLC*,
    No. 06-CIV.-4623 (KMW), 2007 WL 9815638 (S.D.N.Y. Nov. 6, 2007)..........................12

*Wisdom Imp. Sales Co. v. Labatt Brewing Co.*,
    339 F.3d 101 (2d Cir. 2003).......................................................................................4

**Statutes**

5 U.S.C. § 551(1) ...........................................................................................................12

12 U.S.C. § 248(k) ......................................................................................................8, 13

12 U.S.C. § 248a ..................................................................................................... *passim*

12 U.S.C. § 342........................................................................................................6, 7, 13

28 U.S.C. § 1361 ............................................................................................................16

**Other Authorities**

12 C.F.R. § 265.20 .........................................................................................................13

*Federal Reserve Board,* Press Release (Jul 19, 2023), *available at*
    https://www.federalreserve.gov/newsevents/pressreleases/enforcement202307
    19a.htm#:~:text=First%2C%20the%20Board%20issued%20a,and%20anti%2
    Dmoney%20laundering%20controls ...............................................................................15

## PRELIMINARY STATEMENT

It is said that vaulting ambition overleaps itself.  Here, Defendants not only overleap themselves, but also a clear statutory directive, the plain intent of Congress, and legions of courts, academics, and past Federal Reserve statements.  Driven by a shotgun approach aimed at controlling the proliferation of novel, non-depository financial institutions (and misdirected at BSJI)[1], Defendants now assert they have unfettered authority over who gets (and keeps) a master account—the gateway to the U.S. financial system.

As to BSJI, Defendants reverse-engineered their preordained conclusion that BSJI, a small institution in Puerto Rico, represents a threat to the overall economy, requiring its master account to be closed while Defendants apply substantially more lenient standards to larger institutions with actual (and serious) compliance violations.

BSJI is statutorily entitled to a master account.  But even under the Defendants' erroneous legal interpretation of the Federal Reserve Act, Defendants cannot evade the strictures of Administrative Procedure Act review and their obligations to act with diligence and in good faith. The record demonstrates that they cannot satisfy even these low bars because they have done nothing of the kind, reaching conclusions without reasonable review or discussing with auditors who know this bank best.

BSJI's experience underscores the dangers of the standardless, boundless discretion the Defendants claim to have. Despite Defendants' assertion that "[t]he extended back and forth between the parties shows that the FRBNY acted in good faith," (FRBNY Opp'n at 28) the facts show otherwise:

---

[1] Capitalized terms used but not otherwise defined herein are as defined in BSJI's Motion for Temporary Restraining Order and Preliminary Injunction ("BSJI Mt."), ECF No. 7.

o  In April and June 2022, BSJI, in light of the particular circumstances surrounding the prior year's reports, twice sought, in writing, confirmation from the FRBNY that BSJI could file certain annual reports by September 30, 2022.  There was no "extended back and forth."  The FRBNY ignored (in retrospect, likely deliberately) both of BSJI's correspondence and surprised BSJI by advising on July 18, 2022 that it would close BSJI's master account (a closure decision the FRBNY now claims was "nonfinal") based on missing the "deadline."

o  On October 1, 2022, the FRBNY sent a Request for Information to BSJI.  Given that there was no dialogue that accompanied the RFI, BSJI provided the requested information and begged the FRBNY to discuss any questions or concerns.  In January 2023, BSJI again asked for communication.  In April, again with no warning, and surely no "back and forth," BSJI received another closure letter, just as baseless as in 2022.[2]

o  The FRBNY claims to disagree with the on-the-ground auditor—K2 Integrity—whom the FRBNY itself blessed in 2020, 2021 and 2022.  K2 Integrity found BSJI's compliance program comprehensive and effective, and recommended some additional possible enhancements.  Because K2 Integrity's conclusion was at odds with the FRBNY's goal of eliminating BSJI's master account, the FRBNY, by fiat, recharacterized the proposed add-on enhancements as "deficiencies."  Perhaps most striking is that, in doing so, it broke with the practice of its own examiners who would never overrule an on-the-ground auditor without a dialogue with that auditor.  If the FRBNY had been acting in good faith, or was exercising proper procedures, it would have had that discussion with K2 Integrity to determine the source of the disagreement.  Further still, the FRBNY would have conferred with BSJI, in which case it would have learned that BSJI had been implementing all of K2 Integrity's recommendations, all of which have been implemented and now validated by K2 Integrity, thereby rendering even that so-called concern moot.

o  In a transparent attempt to poison this proceeding, the FRBNY repeats the term "money laundering" 46 times.  But the suggestion of money laundering

---

[2] The *only* dialogue granted to BSJI in connection with the 2023 closure letter came after the April 24, 2023 closure determination was made.  The FRBNY granted BSJI that call only after three submissions by BSJI, *the last of which included a declaration from former Fed official Christopher Laursen who advised that such communication was legally required*.  *See* Supp. CL Decl. at ¶¶ 4, 7.  This single 2023 call was nothing more than a made-for-litigation, defensive measure.

2

is false in all respects.  Notwithstanding its assertion that its Financial Intelligence and Investigations Unit-Compliance "comprehensively" reviewed the "high-risk transaction activities and BSJI's RFI responses," that review was nothing close to "comprehensive."  BSJI retained the auditing firm AML RightSource ("AMLRS") on August 4, 2023, and, in just *four* weeks, AMLRS, relying on documents the FRBNY never even sought in its "comprehensive" review, found that the ████████████████

No court has ever adopted Defendant's current position that they have absolute, or even some, discretion concerning master account access.  Legislative history and comprehensive academic analyses affirm that depository institutions are statutorily entitled to master accounts. Most tellingly, the Board and the Reserve Banks themselves have, for decades, publicly recognized that such a right exists.  The Board's own website *still* declares that the governing statute requires that the Federal Reserve "provide its services to *all depository institutions*."

For BSJI to succeed on this motion, it needs to satisfy the preliminary injunction analysis for a single one of its claims.  It has readily surpassed that standard, as reflected in its moving papers and by the fact that multiple courts have positively opined on substantially identical claims. Defendants have also functionally abdicated any argument that their actions were reasonable by proffering *de minimus*, easily-rebutted evidence on the closure process and decision; their plea that this Court should blindly defer to their discretion does not suffice.

The issues BSJI raises are of substantial importance, and the threat posed by Defendants' termination decision is existential.  By contrast, Defendants are unable to show *any* risk of harm to them, or to the public, if BSJI's requested relief is granted, since (1) BSJI's compliance plan repeatedly has been found comprehensive and effective ████████ and three independent audit firms, and (2) BSJI consents to maintaining the independent transaction monitor retained at the Court's suggestion for the duration of these proceedings.  For all these reasons, BSJI's motion should be granted.

## ARGUMENT

### I.   BSJI Will Suffer Irreparable Harm in the Absence of Injunctive Relief

Without a preliminary injunction, BSJI will suffer imminent irreparable harm that is neither remote nor speculative, for which a monetary award cannot compensate. *Wisdom Imp. Sales Co. v. Labatt Brewing Co.*, 339 F.3d 101, 113-15 (2d Cir. 2003).

This Circuit has rejected Defendants' argument that a claim of irreparable harm must be based on concrete evidence of customer loss. *See trueEX, LLC v. MarkitSERV Ltd.*, 266 F. Supp. 3d 705, 726-27 (S.D.N.Y. 2017) (it is "well settled" that "a threatened loss of good will and customers, both present and potential" "can constitute irreparable injury"); *see also Nature's Entprs, Inc. v. Pearson*, No. 08 CIV 8549 (JGK), 2008 WL 4700547, at *3 (S.D.N.Y. Oct. 24, 2008) (granting preliminary injunction where plaintiff was "in imminent danger of losing customers"). Moreover, BSJI *has* provided evidence of the debilitating customer loss it experienced after the 2019 suspension. BSJI Mt. at 15-17, *see also* Supplemental Declaration of Hector J. Vazquez ("Suppl. HJV Decl.") ¶¶ 11-18.

Defendants assert that no additional harm will come to BSJI, given its relation to current account holders. But even loyal customers can be lost. In light of current circumstances, ███ ████████████████████████████████████████████████████ *See* Suppl. HJV Decl. ¶ 10. Defendants further argue that BSJI can easily avoid customer loss by securing a correspondent banking relationship—a curious proposition given their bald claim that BSJI launders money and needs to be barred from the U.S. financial system. Regardless, the theoretical possibility of obtaining alternative services does not negate a finding of irreparable harm. *Bionpharma Inc. v. CoreRx, Inc.*, 582 F. Supp. 3d 167, 175 (S.D.N.Y. 2022) (finding irreparable harm where "even in the event that [Plaintiff found] an alternative supplier, customers may … refuse to return to [Plaintiff], because of its lack of dependability"). The evidence conclusively establishes that

correspondent banks pose no viable alternative for BSJI: financial institutions will not facilitate banking services for banks that have had their master accounts terminated, especially when the Defendants claim the bank poses an "undue risk to the overall economy."  RJW Decl. ¶6; HJV Decl. ¶71; WMI Decl. ¶20.  Despite its best efforts, BSJI has not been able to secure correspondent services, nor would one expect it to given Defendants' accusations.  Suppl. HJV Decl. ¶¶ 2-7.

Finally, Defendants argue that because BSJI has ███████████████, it cannot suffer a loss of business opportunity.  BSJI earned in excess of $80 million in 2017 and 2018.  ███████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████  Suppl. HJV Decl. ¶¶ 11-18.

In contrast, Defendants have no plausible claim that they will suffer harm if a preliminary injunction is granted, especially if the Court agrees to condition grant of the motion on maintenance of the transaction monitor currently reviewing all transactions.

## II.   BSJI Is Likely to Succeed on the Merits and Presents Serious Questions That Are Fair Grounds for Litigation

To substantiate its likelihood of success on the merits, a movant is not required to show that success on its complaint is an absolute certainty, but rather that the probability it will prevail is "better than fifty percent."  *Airbnb, Inc. v. City of New York*, 373 F. Supp. 3d 467, 480 (S.D.N.Y. 2019).  Under the "more flexible" serious questions analysis, a movant must demonstrate that there are "sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Citigroup Glob. Mkts., Inc. v. VCG Special Opps. Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010).

Although this Court correctly observed that challenges to certain government actions render the "serious questions" doctrine inapplicable to requests for injunctive relief (July 26, 2023

Hr'g Tr. at 4:1-10), those circumstances are not present here. A movant cannot invoke the "serious questions" standard where the challenged governmental action was taken (1) in the public interest *and* (2) pursuant to a statutory or regulatory scheme. *Otoe-Missouria Tribe of Indians v. N.Y. State Dep't of Fin. Servs.*, 769 F.3d 105, 105 (2d Cir. 2014); *Haitian Ctrs. Council, Inc. v. McNary*, 969 F.2d 1326, 1339 (2d Cir. 1992). As BSJI has shown (*see* BSJI Mt. at 18-22), Defendants violated their statutory obligations and acted contrary to the public interest in improperly deciding to terminate BSJI's master account. The serious questions standard is therefore applicable.

Where an agency's current interpretation of a statute conflicts with its own prior interpretations, it is "entitled to considerably less deference" than a consistently held agency view. *I.N.S. v Cardoza-Fonseca*, 480 U.S. 421, 447, n. 30 (1987). Defendants' position in this litigation plainly conflicts with their past and present interpretation of master account access (BSJI Mt. at 20-22) thereby denying Defendants the deference they seek or an exception grounded in the application of that deference.

A.    **BSJI Has a Statutory Right to a Master Account**

Defendants assert that because the FRBNY is purportedly authorized to terminate BSJI's master account by statute, Counts I-IV are unlikely to succeed. This argument is undermined by the clear statutory language, past interpretations by the Board and officials with the regional Federal Reserve Banks, legislative history, and interpretations of the relevant law by other circuit courts and academics. As BSJI has demonstrated, it is entitled to a master account under 12 U.S.C. § 248a. *See* BSJI Mt. at 18-22. Once recognized, the conclusion that it is likely to succeed on the merits with respect to all four of these claims—or, at minimum, has shown serious questions that are fair ground for litigation—follows.

Defendants contend that master account access is governed by 12 U.S.C. § 342 ("Section 13"), which states that Reserve Banks "may receive from any of [their] member banks,

or other depository institutions, and from the United States, deposits of current funds in lawful money, national-bank notes, Federal reserve notes, or checks, and drafts, payable upon presentation or other items."   Section 13 says nothing about master account access.   It merely provides Reserve Banks with discretion over the *types* of deposits they may accept: the statute provides that Reserve Banks "may receive … deposits of currents funds in lawful money, national-bank notes, Federal reserve notes, or checks, and drafts, payable upon presentation or other items." *See Farmers' & Merchs.' Bank of Monroe v. Fed. Rsrv. Bank of Richmond*, 262 U.S. 649, 655, 662 (1923) ("neither section 13, nor any other provision of the Federal Reserve Act, imposes upon reserve banks any obligation to receive checks for collection").   This says nothing as to the antecedent question of *which* institutions are entitled to master accounts.

Defendants look to the preliminary clauses of Section 342 to fill this silence, claiming that the language "may receive from any of its member banks, or other depository institutions, … deposits" serves as a congressional delegation of master account discretion.   But this recitation of Section 13 cuts it just short.   Section 13 then places the "United States" on an equivalent playing field as "member banks" and "other depository institutions," with each having the capacity to deposit funds at Reserve Banks.   If, as Defendants contend, Reserve Banks' discretion over master accounts springs from the list of institutions contained in Section 13, it would necessarily follow that a Federal Reserve Bank could singlehandedly block *the United States* from a master account, just as it can purportedly block BSJI.

Defendants' efforts to interpret § 248a into irrelevancy fare no better.   Defendants initially object that § 248a makes no mention of master accounts and merely governs "principles for setting prices."   Were the lack of express reference to master accounts dispositive, Defendants' interpretation of Section 13 would also fail.   Section 248a is also not silent as to master accounts.

Section 248a articulates an enumerated list of Reserve Bank services to which member banks and nonmember depository institutions are entitled. That list includes "any new service which the Federal Reserve system offers, including but not limited to payment services to effectuate the electronic transfer of funds." 12 U.S.C. 248a(b)(8). The Reserve Banks' current master account structure, implemented in 1998 to "effectuate the electronic transfer of funds," squarely fits into this definition of a "new service." *Id.*

As the statute employs the non-discretionary term "shall" to mandate that such "new service[s] … be available to nonmember depository institutions," it necessarily follows that BSJI, like nonmember depository institutions generally, is entitled to a master account. This conclusion stands even if master accounts are not deemed a covered "new service," for "all services offered by the Federal Reserve System are conditioned on the issuance of master accounts." *Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kansas City*, 861 F.3d 1052, 1069 (10th Cir. 2017) (Bacharach, J.).

Defendants focus on the fact that § 248a is housed in a subchapter titled "Board of Governors of the Federal Reserve System" and suggest that Congress would not have mandated the Reserve Banks to issue master accounts through a provision seemingly directed at the Board. But 12 U.S.C. § 248(k) permits the Board to delegate "any of its functions," save discrete actions not relevant here, to the Reserve Banks. That the Board has delegated responsibility does not mean that the Reserve Banks are permitted to circumvent Congressional directives. Nor can the title of a statute "undo or limit that which the text makes plain." *Brotherhood of R. R. Trainmen v. Balt. & O.R. Co.*, 331 U.S. 519, 529 (1947); *see Custodia Bank, Inc. v. Fed. Rsrv. Bd. of Governors*, 640 F. Supp. 3d 1169 (D. Wyo. 2022) ("[T]he title of Subchapter II … likely offer[s] relatively little toward refuting [the fact that § 248a mandates master account access].").

The FRBNY also contends that the absence of the term "all" preceding "nonmember depository institutions" in § 248a necessarily limits the provision's scope.  As Judge Bacharach correctly recognized, the term "all" is superfluous when used with a plural noun such as "nonmember depository institutions;" the plural noun is inherently inclusive absent a restrictive modifier.  *Fourth Corner*, 861 F.3d at 1069.

Defendants' claim that "Congress recently recognized" Reserve Banks' unfettered discretion over master accounts in an amendment to the Federal Reserve Act (the "Amendment") is borderline frivolous.  Board Opp'n at 24; *see also* FRBNY Opp'n at 19-20.  The Board lodged the identical argument in *Custodia* (although the plaintiff there has only applied for an account while BSJI has held one for twelve years).  The sponsor and principal drafter of the amendment rebuked the argument in an *amicus curiae* brief, stating that the Board had:

> misconstrue[d] the Amendment as recognizing or bolstering their discretion to reject master account applications from statutorily eligible depository institutions. As its text makes clear—and as the Board knows from conversations with legislative staff during its drafting—the Amendment was exclusively a transparency measure....

*Amicus Curiae Brief of Former Senator Patrick J. Toomy in Support of Neither Party, Custodia*, 1:22-CV-00125-SWS, April 20, 2023 (ECF No. 151) at 2-3.  The *Custodia* court thereafter *rejected* the Board's argument, finding that "Section 248c does not, expressly or impliedly, carry the statutory construction load the Board of Governors asserts it does."  *Custodia*, 1:22-CV-00125-SWS, "Order on Defendants' Motions to Dismiss Amended Complaint" (ECF 164) at 12.

Discussing *Fourth Corner*, the Board claims that two members of the Tenth Circuit panel—Judge Moritz and Judge Matheson—"implicitly rejected the notion that every depository institution is automatically entitled to a master account under Section 248a."  Board Opp'n at 18. Not so.  Judge Moritz said she would dismiss the case without deciding the issue, while Judge

Matheson concluded that the case should be dismissed on ripeness grounds. *Fourth Corner*, 861 F.3d at 1058-59. And the *TNB* court declined to reach the issue. *TNB USA Inc. v. Fed. Rsrv. Bank of N.Y.*, No. 1:18-CV-7978, 2020 WL 1445806, at *4 (S.D.N.Y. Mar. 25, 2020).

The Board also contends that it is not a proper defendant here. Yet the Board acknowledges its supervisory authority over the FRBNY's decision-making process and admits that it "validated" FRBNY's decision to terminate BSJI's master account. Board Opp'n at 7. The limited documentary evidence already shows that the Board itself referred to the FRBNY closure analysis as merely "pre-decisional," and explicitly offered its non-objection before the FRBNY could act. *See* Second Supplemental Declaration of Christopher Laursen ("2d Suppl. CL Decl.") ¶¶ 34-36; Ex. B. Even before discovery, this one email is sufficient to implicate the Board in the decision-making process. Simply put, the Board is statutorily obligated to supervise the actions of the FRBNY, has been long-involved in this dispute, and has adopted and acted on an improper interpretation of the statutory regime governing master account access.

### B. BSJI Did Not Waive Its Statutory Right to an Account, nor Is It Estopped from Asserting That Right

The FRBNY claims that even if BSJI possesses a statutory right to a master account, that right has been waived by BSJI's acquiescence to two contracts that purportedly provide the FRBNY with unfettered authority to terminate master account access. Those contracts are a condition of master account access not only for BSJI, but for all institutions wanting master accounts. Though the FRBNY cabins its discussion to BSJI's contracts, the FRBNY is effectively asking this Court to sanction its efforts to prospectively strip *every* master account holder of its statutory rights through a contract master account holders have no choice but to sign. That is not the law.

"The Supreme Court has stated that prospective waivers of statutory rights are impermissible." *Cedeno v. Argent Tr. Co.*, No. 20-cv-9987, 2021 WL 5087898, at *5 (S.D.N.Y. Nov. 2, 2021). "Prospective waivers" are waivers that exist prior to the accrual of a cause of action. *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 52 (1974) (while a plaintiff "may waive his cause of action" concerning a statutory right in a "voluntarily settlement," that right "may not be waived prospectively"). Whether based on Operating Circular No. 1—which BSJI has been subject to since 2012—or the Supplemental Terms BSJI entered into in 2020, BSJI's current cause of action had yet to accrue. The FRBNY's efforts to prospectively contract away master account holders' statutory rights are patently impermissible.

The FRBNY's cases are inapposite. BSJI's claims, which the FRBNY argues are waived, are brought under federal law; it "is well established that federal law governs all questions relating to the validity of and defenses to purported releases of federal statutory causes of action." *Locafrance U.S. Corp. v. Intermodal Sys. Leasing, Inc.*, 558 F.2d 1113, 1115 (2d Cir. 1977); *see Rivera v. New York City Dep't of Educ.*, No. 21-cv-6134, 2023 WL 2563665, at *7 n.12 (E.D.N.Y. Feb. 3, 2023) (applying *Locafrance* in the waiver context). The FRBNY relies upon cases applying New York state law, which has developed an entirely separate body of precedent governing waivers. *See Columbus Park Corp. v. Dep't of Hous. Pres. & Dev. of the City of New York*, 586 N.Y.S.2d 554 (N.Y. 1992) (applying the New York state waiver standard); *see also F.D.I.C. v. Four Star Holding Co.*, No. 97-CV-4184 (JFK), 2000 WL 256146, at *3 (S.D.N.Y. Mar. 7, 2000) (same).

It is worth reiterating the breathtaking scope of the FRBNY's position: it adopts the stunning position that, leveraging its unequal bargaining power, it may shield *every* termination decision it has made, and *every* termination decision it will make in the future, from judicial review, thereby effectively circumventing the plain intent of Congress and stripping banks of their

11

statutory rights.  *See Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 704 (1945) (finding waivers of statutory rights that thwart legislative policy invalid).  And the FRBNY claims to accomplish this through a contractual provision that is silent as to the fact it purportedly operates as a waiver of all statutory, constitutional, or contractual rights.  *See Morris v. New York City Employees' Ret. Sys.*, 129 F. Supp. 2d 599, 609 (S.D.N.Y. 2001) (invalidating waiver where government did not make clear the specific rights purportedly waived).

The FRBNY's equitable estoppel argument also fails.  "Equitable estoppel is an extraordinary remedy, that is to be invoked sparingly and only under exceptional circumstances."  *Roeder v. J.P. Morgan Chase & Co.*, 523 F. Supp. 3d 601, 616 (S.D.N.Y. 2021), *aff'd*, 2022 WL 211702 (2d Cir. Jan. 25, 2022).  It surely is inapplicable here, where the FRBNY's grant of a master account to BSJI is statutorily required (with or without a contract).  Regardless, "[w]hether equitable estoppel applies in a given case is ultimately a question of fact."  *Wilson v. Malca-Amit USA, LLC*, No. 06-CIV.-4623 (KMW), 2007 WL 9815638, at *2 (S.D.N.Y. Nov. 6, 2007).  The FRBNY has provided nothing but conclusory statements in support of the doctrine here.

### C.    BSJI Is Likely to Succeed on, or Has Presented Serious Questions Concerning, Its APA Claim

Defendants lodge only two substantive defenses to BSJI's APA claim: that the APA precludes review of agency action "committed to agency discretion by law," and that the FRBNY is not an agency for APA purposes.  Having disposed of the former (*see supra* Section II.A), all that remains is the argument the FRBNY is not a federal agency.  Defendants fail to persuade.

Federal instrumentalities that "exercise substantial independent authority" are agencies as defined by the APA.  *Dong v. Smithsonian Inst.*, 125 F.3d 877, 881 (D.C. Cir. 1997) (stating that an "agency" under the APA "by law has authority to take final and binding action affecting the rights and obligations of individuals"); 5 U.S.C. § 551(1).  The FRBNY's possession of such

authority is made plain by Defendants' opposition papers, both of which boast of the independent authority the FRBNY claims to possess over master accounts.  Board Opp'n at 5; FRBNY Opp'n at 5 n.1, 18.  The FRBNY cannot simultaneously assert and disclaim unilateral control over master account access.  Its exercise of this purported authority means it is an agency subject to APA review.

Imagine a contrary result.  The Board—indisputably an agency—has the statutory authority to delegate "any of its functions, other than those relating to rulemaking or pertaining principally to monetary and credit policies" to the Reserve Banks.  12 U.S.C. § 248(k).  These delegated powers include those concerning master account access, as well as myriad other functions Reserve Banks have been delegated.  *See* 12 C.F.R. § 265.20.  Under Defendants' interpretation, the mere act of delegating these functions operates as a complete bar to APA review.  Such an absurd and easily exploitable loophole is not what Congress envisioned in enacting a statute designed to bring accountability and transparency to the administrative process.

The FRBNY points out that *Flight Int'l Group, Inc. v. Fed. Rsrv. Bank of Chicago.*, 583 F. Supp. 674 (N.D. Ga. 1984), was later vacated, but that was due to settlement, not legal error.  597 F. Supp. 462 (N.D. Ga. 1984).  The FRBNY's criticism of *Lee Constr. Co., Inc. v. Fed. Rsrv. Bank of Richmond*, 558 F. Supp. 165 (D. Md. 1982), hinges, and falls, on its incorrect reading of Section 13.  *See supra* Section II.A.  Defendants do not (and cannot) cite a single case in which the Reserve Banks were determined not to be agencies for APA purposes.

Through these proceedings we have learned that there is not a single, internal memorandum justifying the 2022 closure decision. In stark terms, the FRBNY, with the blessing of the Board, decided to terminate BSJI's master account (and its livelihood) without so much as a thought as to whether that decision was supported by logic or fact.  WMI Decl. Ex.1.  Since then, the FRBNY

has tried to distance itself from the 2022 closure decision by saying it was "nonfinal," ECF No. 34 at 2 n.1, despite a mountain of evidence to the contrary.  BSJI Mt. at 9-11.

Defendants also now push the narrative that a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ FRBNY Opp'n at 11-12; *see* Declaration of Abbe D. Lowell ("Suppl. ADL Decl.") Ex. A.  But AMLRS performed a comprehensive evaluation of these same transactions, engaged in dialogue with BSJI, and requested information the FRBNY did not care to request.  It concluded the transactions ▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮ AML RightSource Independent Review Audit Report Att. Ex. A at 11; *cf.* 2d Suppl. CL Decl. Ex. A.

The FRBNY's claim that BSJI somehow poses an "undue risk" to the "overall economy" under Principle 5 of the Guidelines, is likewise unreasonable.  Suppl. ADL Decl. Exs. A, B.  As BSJI previously observed, even taking an extreme example and assuming that *all* of BSJI's transactions during the 2022 review period were "illicit," such activity would represent only 0.000125 percent of the US GDP and 0.000032 percent of world GDP.  From a quantitative standpoint, the potential illicit activity flowing through BSJI's Fed account is entirely insignificant to the overall economy.  BSJI Mt. at 13.  The Board asserts that there is no "de minimis" exception to money laundering.  Board Opp'n at 21.  That is a non-sequitur.  A bank's regulator, and law enforcement authorities, may investigate and take actions against any illicit conduct.  None has found that with BSJI, now or ever.

The Board adopted Guidelines that it argues permit closure upon reasoned findings that a bank poses an undue risk to the overall economy.  Defendants fail their own standard.  *See* 2d Suppl. CL Decl. ¶¶ 3-33.  Compare BSJI's conduct with Deutsche Bank's: BSJI's compliance

program and transactions have been studiously examined by outside auditors for years without a single finding of impropriety and BSJI stands to lose its master account.  Deutsche Bank, by contrast, has been told by the FRBNY since 2015 to tighten its anti-money laundering controls, to fix "unsafe and unsound practices," and was just recently fined $186 million dollars.[3]  It retains its master account.

The following chart provides an overview of the unsound closure decision process to date.

---

[3] *See Federal Reserve Board,* Press Release (Jul 19, 2023), *available at*

https://www.federalreserve.gov/newsevents/pressreleases/enforcement20230719a.htm#:~:text=First%2C%20the%20Board%20issued%20a,and%20anti%2Dmoney%20laundering%20controls

| Stated Reason for Suspension/Closure | Flawed Process | A Reasoned Approach/ Conclusion |
|---|---|---|
| • 2/27/2019 FRBNY Letter – policy of denying Puerto Rico IBEs master accounts | • Broad brush decision without regard to risk | • IBEs are entitled to master accounts just as other depository institutions are |
| • 2/2019 Suspension | • Knee-jerk reaction to media reports | • Diligence by the FRBNY/Board would have concluded, just as others did, that the transactions were lawful |
| • 7/18/22 Letter - BSJI "missed" a deadline for filing annual reports | • Twice ignored BSJI's written requests for clarification; <br> • Conducted no internal analysis as to whether termination was appropriate; <br> • Sent an unannounced closure letter | • BSJI's reasonable queries should have been answered; <br> • Internal analysis should have been conducted; <br> • BSJI provided complete filings |
| • 1/30/23 FRBNY decision to "finalize and document a review of BSJI under Principle 5 of the Guidelines" | • No effort to work with BSJI despite BSJI's repeated entreaties; <br> • No follow-up on October 2022 RFIs | • Dialogue with BSJI and its outside auditors would have eliminated or minimized concerns |
| • 4/24/23 letter - BSJI posed "an undue risk to the overall economy" | • Did not engage with outside auditors or OCIF and ignored their conclusions; <br> • Reframed "enhancements" as "deficiencies" <br> • Generally pointed to bond transactions as problematic | • BSJI's compliance program is/has been strong and is constantly improving; <br> • No basis for "undue risk to the overall economy" |
| • 07/26/23 TRO Hearing – The FRBNY provides specifics concerning the bond transactions | • Identified for the first time concerns that the bond transactions lack a default date and have a non-market interest rate | • Had the FRBNY raised these specific issues earlier, they could have been addressed and resolved as non-issues <br> • AMLRS concludes █████ ████████████ |

**D.     BSJI Is Likely to Succeed on, or Has Presented Serious Questions Concerning, Its Mandamus Claim**

To succeed on a claim for a writ of mandamus pursuant to 28 U.S.C. § 1361, a plaintiff must show: "(1) a clear right in the plaintiff to the relief sought; (2) a plainly defined and peremptory duty on the part of the defendant to do the act in question; and (3) no other adequate remedy available." *Anderson v. Bowen*, 881 F.2d 1, 5 (2d Cir. 1989).  The first two criteria have already been met, and BSJI has no other adequate remedy available. *See supra* Sections I-II.A.  That BSJI seeks this remedy through separate claims does nothing to negate the viability of its mandamus claim.  *See City of New York v. Heckler*, 742 F.2d 729, 739 (2d Cir. 1984) (mandamus jurisdiction is an "alternate source of the District Court's authority").

**E.     BSJI Is Likely to Succeed on, or Has Presented Serious Questions Concerning, Its Due Process Claim**

It is well-recognized that a property interest arises in relation to a statutory right.  *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 462 (1989).  For that matter, the very contract Defendants seek to rely on to water down BSJI's rights gives rise to a "property" interest that may not be eviscerated absent due process.  *See Perry v. U.S.*, 294 U.S. 330, 350-351 (1935).

**F.     BSJI Is Likely to Succeed on, or Has Presented Serious Questions Concerning, Its Contractual Claims**

Having vehemently, and incorrectly, argued that BSJI's other claims were all waived based on its existing contractual obligations to the FRBNY, Defendants turn face and assert that a contract the FRBNY required BSJI to sign has no effect.  But Defendants cannot have it both ways.  All parties agree that BSJI and the FRBNY are subject to Operating Circular No. 1.  Board Opp'n at 3; FRNY Opp'n at 6.  Paragraph 7 of Operating Circular No. 1 contains a provision entitled "Duty of Care" that details the FRBNY's liability for actual damages stemming from its "lack of good faith and failure to exercise ordinary care."  BSJI has alleged and presented substantial evidence of how

17

Defendants failed to meet this standard, as well as the fact that an implied duty of good faith and fair dealing is read into every contract governed by New York law.  BSJI Mt. at 6, 27-28; 2d Suppl. CL Decl. ¶¶ 3-33.  Defendants do not dispute this.  *See supra* Section II.C.

## III.    <u>The Public Interest Favors Granting an Injunction</u>

According to Defendants, BSJI engages in or facilitates money laundering; preventing money laundering by a master account holder is costly; and the public interest associated with preventing such activity counsels against granting an injunction.  But Defendants' irresponsible accusations are hollow, and it is inherently troublesome that they are comfortable lobbing such inflammatory accusations without offering a shred of substantive proof.  BSJI has conclusively disposed of these claims.  Had Defendants engaged with BSJI in good faith discussions, we would not be here today.  This is a suit of Defendants' own making, and they cannot claim any public interest in their own violations of law.  *See* BSJI Mt. at 30-31.[4]

Critically, even if Defendants could claim dominion over some aspect of the public interest based on claims of purported illicit activity, BSJI has retained an independent transaction monitor, approved by Defendants, during the preliminary injunction proceedings.  BSJI is willing to continue to employ this independent monitor, thus negating Defendants' already-dubious assertion that continued bank activity poses an "undue risk" to the "overall economy."

<u>CONCLUSION</u>

For the foregoing reasons, BSJI respectfully requests that this Court grant its Motion for Preliminary Injunction.

---

[4] BSJI is confident that discovery will further prove the validity of its claims in these proceedings.

Dated:  September 6, 2023                    By:        */s/ Abbe D. Lowell*

                                        Abbe David Lowell
                                        Kelly A. Librera
                                        WINSTON & STRAWN LLP
                                        200 Park Avenue
                                        New York, NY 10166
                                        T: 1-212 294-6700
                                        F: 1-212-294-4700
                                        ADLowell@winston.com
                                        KLibrera@winston.com

                                        *Counsel for Banco San Juan Internacional, Inc.*

**CERTIFICATE OF COMPLIANCE**

In accordance with Section II.D of the Court's Individual Practices, excluding the cover page, table of contents, table of authorities, and this certificate of compliance, Plaintiff's Reply Memorandum of Law in Support of BSJI's Motion for Preliminary Injunction ("Reply") contains 5,593 words, including footnotes. The Reply complies with the formatting rules set forth in Section II.D of the Court's Individual Practices.

Dated:  September 6, 2023                    By:     */s/ Abbe D. Lowell*
                                                        Abbe David Lowell