UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
────────────────────────────────

BANCO SAN JUAN INTERNACIONAL, INC.,

                     Plaintiff,          23-cv-6414 (JGK)

        - against -            MEMORANDUM OPINION AND
                                          ORDER

THE FEDERAL RESERVE BANK OF NEW
YORK, ET AL.,

                     Defendants.
────────────────────────────────

JOHN G. KOELTL, District Judge:

     The plaintiff, Banco San Juan Internacional, Inc. ("BSJI"),
a Puerto Rico international banking entity, seeks a preliminary
injunction to require the Federal Reserve Bank of New York
("FRBNY") and the Board of Governors of the Federal Reserve
System ("Board") to maintain the Master Account of BSJI with the
FRBNY pending a final judgment in this case.

     BSJI filed this action together with its motion for a
preliminary injunction pursuant to Federal Rule of Civil
Procedure 65 on July 24, 2023. ECF Nos. 1, 5. BSJI contends that
closing BSJI's Master Account and terminating access to the
Federal Reserve System's services would cause BSJI irreparable
harm. ECF No. 7. Because BSJI has failed to meet the
requirements for obtaining a preliminary injunction against the
FRBNY, the motion is **denied.** See Monserrate v. New York State
Senate, 599 F.3d 148, 154 (2d Cir. 2010). And because BSJI
cannot demonstrate that its claimed injury "will be redressed by

a favorable disposition" with respect to the Board, BSJI's motion seeking relief from the Board is **dismissed as moot**. See Lujan v. Defenders of Wildlife 504 U.S. 555, 560 (1992).[1] The Court now makes the following findings of fact and reaches the following conclusions of law pursuant to Federal Rules of Civil Procedure 52(a)(2) and 65.

## I.

The following facts, drawn from the complaint and the parties' affidavits on this motion, constitute the Court's findings of fact. See Park Irmat Drug Corp. v. Optumrx, Inc., 152 F. Supp. 3d 127, 132 (S.D.N.Y. 2016) ("In deciding a motion for preliminary injunction, a court may consider the entire record including affidavits and other hearsay evidence.").

## i.

The Federal Reserve System was established in 1913 by the Federal Reserve Act. 12 U.S.C. § 221 et seq ("FRA"). It consists of the Board, the Federal Open Market Committee, and twelve regional Federal reserve banks that serve financial institutions in their respective districts. Id. § 222. Federal reserve banks, including the FRBNY, are federal instrumentalities, incorporated pursuant to the FRA. 12 U.S.C. § 221; United States ex rel.

---

[1] Unless otherwise noted, this Memorandum Opinion & Order omits all alterations, citations, footnotes, and internal quotation marks in quoted text.

<u>Kraus v. Wells Fargo & Co</u>., 943 F.3d 588, 592 (2d. Cir. 2019) ("<u>Kraus</u>"). Congress authorized Federal reserve banks to carry out certain banking functions, 12 U.S.C. §§ 341-361, including the authority to accept or reject deposits from depository institutions, <u>id.</u> § 342. Federal reserve banks maintain such deposits in accounts called "Master Accounts" held in the name of the financial institutions. As deposit accounts, Master Accounts are governed by 12 U.S.C. § 342, which provides that "[a]ny Federal reserve bank may receive from any of its member banks, or other depository institutions . . . deposits of current funds in lawful money[.]"

Federal reserve banks issue Operating Circulars, which govern the relationship between a reserve bank and a Master Account holder. Brennan Decl., Ex. 3, ECF No. 52-3 (Operating Circular No. 1). Pursuant to the terms of Operating Circular No. 1, account holders create a Master Account by executing a Master Account Agreement("MAA"). <u>Id.</u>; Brennan Decl., Ex. 2, ECF No. 52-2 (MAA for BSJI). The MAA sets the terms under which a Master Account can be operated, including the Federal reserve bank's right to terminate a Master Account "at any time." Brennan Decl., Ex. 3, ECF No. 52-3 at 11.

In addition to the terms set forth in Operating Circular No. 1, a subset of high-risk account holders, including BSJI, agree to enhanced risk-mitigation provisions. Brennan Decl., Ex.

3

4, ECF No. 52-4. BSJI agreed that "to limit the Risks the customer poses to the [FRBNY], the [FRBNY] may suspend or terminate the Customer's access to one or more Financial Services [or] close the Customer's Master Account at any time by giving written notice to the Customer." Id. at 11. Risk, in this context, is defined as the "the existence of, or the possibility of, financial, legal, compliance, operational, reputational, or other harm to the Bank . . . posed by the Customer." Id. at 3.

**ii.**

In contrast to the powers vested in the Federal reserve banks, the Board does not have the authority to provide services relevant to banking. See, e.g., 12 U.S.C. §§ 342, 343, 347, 347c, 347d, 355(1). Instead, the Board provides general oversight of the activities of the reserve banks, including guidance with respect to Master Accounts. In providing this guidance, the Board is not authorized to open or terminate a Master Account and does not handle the administration of any institution's Master Account. See 12 U.S.C. §§ 248(j), 342. Rather, the Board sets forth principles to guide "the level of due diligence and scrutiny to be applied by reserve banks to different types of institutions." 87 Fed. Reg. 51109.

In August 2022, the Board published Guidelines for Evaluating Account and Service Requests ("Guidelines"), enumerating six categories of risk. 87 Fed. Reg. 51099. The

Board issued these Guidelines after public Notice and Comment, based on its general supervision authority over the operations of the Federal reserve banks. 12 U.S.C. § 248(j). According to these Guidelines, institutions not federally insured and that operate outside the scope of the federal banking agencies' supervisory framework -- such as BSJI -- are subject to the strictest level of review. 87 Fed. Reg 51110.

### iii.

Puerto Rican law provides for the establishment of International Banking Entities ("IBEs"), Act No. 52 of 1989, and International Financial Entities ("IFEs"), Act No. 273. BSJI is an IBE that does not accept deposits from any person in the United States. Brennan Decl., Ex. 4, ECF No. 52-4 (BSJI Certificate of Registry). BSJI is owned by Marcelino Bellosta-Varady, id., Ex. 14, ECF No. 52-15 at 17, and its customer base is almost exclusively comprised of his close family members and offshore entities they control, Benvenuto Decl., ¶ 10, ECF No. 51. In May 2023, BSJI had 14 account holders that maintained a total of 15 deposit accounts. Laursen Decl., ¶ 33, ECF No. 10-21.

BSJI opened a Master Account with the FRBNY in April 2012. Brennan Decl., Ex. 14, ECF No. 52-14 at 2-3. Because BSJI is not federally insured, nor subject to prudential federal supervision, BSJI is subject to the strictest level of review

under the Board's Guidelines in addition to its obligation to
adhere to the FRBNY's Account and Financial Services Handbook
(the "Handbook"). Id. at 3. For continued account access, BSJI
must demonstrate that it has implemented an effective compliance
program through "the submission of independent consultants'
assessment reports of BSJI's compliance program" that meet the
Handbook's requirements. Id. To satisfy these requirements, BSJI
retained an independent consultant, K2 Integrity ("K2"), to
complete the assessment reports. Id. at 7.

### iv.

On February 6, 2019, the Federal Bureau of Investigation
("FBI") investigated BSJI's transactions and its compliance.
Benvenuto Decl., ¶ 6, ECF No. 51. The United States District
Court for the District of Puerto Rico issued a seizure warrant
that instructed the FRBNY to transfer a substantial portion of
the funds in BSJI's account to the United States Marshals, id.,
and the FRBNY suspended BSJI's account, id.

On February 11, 2020, the United States Attorney's Office
for the District of Puerto Rico announced that BSJI had agreed
to pay a fine and improve its anti-money-laundering policies. On
March 16, 2020, BSJI and the FRBNY executed the "Supplemental
Terms," requiring enhanced risk-mitigation measures and
reconfirming the FRBNY's right to close BSJI's account. Brennan
Decl., Ex. 4, ECF No. 52-4 at 11. BSJI agreed as follows:

> In addition to the Bank's rights under OC 1 and other
> operating circulars, to limit the Risks the Customer poses
> to the Bank, the Bank may suspend or terminate the
> Customer's access to one or more Financial Services, close
> the Customer's Mater Account, impose conditions that must
> be satisfied before the Bank will process certain or all
> types of Financial Services transactions, or restrict or
> otherwise adopt risk-management measures with respect to
> Financial Services or the Customer's Master Account at any
> time by giving written notice to the Customer.

Id. at 11. Pursuant to the settlement agreement, the FRBNY

restored BSJI's account access in December 2020. Benvenuto

Decl., ¶ 7, ECF No. 51.

Then, in July 2022, the FRBNY notified BSJI that BSJI had

breached the Supplemental Terms by failing to submit on time

three mandated assessments attesting to the effectiveness of its

compliance programs. Brennan Decl., Ex. 15, ECF No. 52-15 at 2.

The FRBNY explained: "Consistent with the New York Fed's

practices of assessing, managing, and mitigating risk under the

Handbook . . . we have concluded BSJI poses undue risk to the

New York Fed due to, among other things, this noncompliance."

Id. For this reason, the FRBNY informed BSJI that it would be

closing BSJI's account in September 2022. Id.

In response, BSJI submitted its required reports, id. Ex.

17, ECF No. 52-17 at 2, and the FRBNY suspended closure, id. at

2-3. In the months that followed, the FRBNY sent BSJI requests

for information, BSJI provided its responses, and anti-money-

laundering specialists, including the FRBNY's Compliance

7

Function ("Compliance"), evaluated the risks posed by BSJI's continued account access. Id. Ex. 14, ECF No. 52-14 at 12-17.

In 2023, the FRBNY's "first-line of defense" -- the Reserve Bank Accounts and Services Function ("RBAS") -- requested that Compliance provide its views on the compliance risks posed by BSJI. On March 31, 2023, Compliance provided a thorough report of these risks, including a review of BSJI's compliance reports and the observations by K2, BSJI's consultant. See id. In that report, Compliance noted that BSJI did not file any Suspicious Activity Reports ("SARs") on any transaction activity reviewed by K2, id. at 7, which was particularly concerning given the "large inflows from shell companies in high-risk jurisdictions, owned by related parties of BSJI's owners," id. at 13, inconsistent documentation regarding large payments to various individuals, id. at 15, 16-17, missing account information, id., and BSJI's failure to provide an explanation for suspicious wire transfers, id. at 16.

Compliance ultimately determined that BSJI posed undue risk under Principle 5 of the Board's Guidelines and that this risk could not be effectively mitigated with additional controls. Id. at 17-18.[2] After reviewing transactions among BSJI's owner's

---

[2] Principle 5 of the Guidelines states that the "provision of an account and services to an institution should not create undue risk to the overall economy by facilitating activities such as money laundering, terrorism financing, fraud, cybercrimes,

family members, id. at 13-18, BSJI's responses, id. at 12, and inconsistencies in reporting transactions, id. at 13, Compliance concluded as follows:

> Given the programmatic weaknesses in BSJI's compliance program, as evidenced by the serious and persistent issues identified in K2's reports, the significant number of red flags identified in BSJI's transaction activity, and the high concentration of suspicious transactions with parties related to BSJI, Compliance does not believe that additional controls would be an effective way of managing the undue risk posed by BSJI.

Id. at 17-18.

On April 1, 2023, RBAS agreed with Compliance's views that BSJI "does not meet principle 5 of the Guidelines and has determined that, because BSJI poses undue risk under principle 5, BSJI poses undue risk to the New York Fed." Id., Ex. 19, ECF No. 52-19 at 4. After considering numerous controls to "manage the undue risk posed by BSJI," id., RBAS concluded that "the risk controls that BSJI had supposedly implemented in recent years have not been effective in addressing the deficiencies in BSJI's compliance program or reducing the high-risk nature of BSJI's transaction activity." Id. at 4-5. RBAS reached this conclusion after enumerating several limitations of the potential controls, and explaining why these controls would not

---

economic or trade sanctions violations, or other illicit activity." 87 Fed. Reg. 51109.

mitigate the full scope of programmatic weaknesses. Id. at 4 n.6.

Thereafter, RBAS consulted with the Board regarding its closure decision. Id. at 5. On April 12, 2023, having reviewed the FRBNY's pre-decisional analyses of BSJI's existing access, the Board advised the FRBNY: "We have no concerns with the Reserve Bank's application of the Guidelines to BSJI's [access] and with it moving forward with its intended action to terminate BSJI's access based on this analysis." Id., Ex. 20, ECF No. 52-20, at 2. By letter dated April 24, 2023, the FRBNY informed BSJI that its account and access to financial service would be terminated on June 20, 2023. Id., Ex. 21, ECF No. 52-21. The letter explained that the FRBNY was "exercising its contractual rights to close [BSJI's] master account and terminate its access to the New York Fed financial services . . . upon notice to BSJI under both the Supplemental Terms . . . as well as the applicable operating circulars." Id. at 2. The letter included three pages of compliance deficiencies that led the FRBNY to conclude that "continuing to provide a master account and financial services to BSJI poses undue risk to the overall economy by facility activities such as money laundering, economic or trade sanctions violations, or other illicit activities." Id. at 5.

On June 30, 2023, the FRBNY informed BSJI that the FRBNY
was moving forward with closing BSJI's Master Account on July
31, 2023. Id., Ex. 9, ECF No. 52-9. The FRBNY explained that it
had reviewed a June 27, 2023 letter from BSJI as well as prior
communications, including a June 20, 2023 telephone call, but
was unpersuaded. The FRBNY explained that in the telephone call
it:

> . . . provided a detailed explanation of our significant
> [Anti-Money Laundering] concerns related to BSJI's
> transaction activity. We noted our observations that much
> of BSJI's transaction activity consists of the rapid
> movement of funds on behalf of high-risk entities located
> in high-risk jurisdictions that are controlled by close
> relatives of BSJI's owner. . . . These transactions often
> lack a clear business purpose and in some instances are
> suggestive of layering.

Id. at 2-3. The FRBNY told BSJI it would consider extending the
closure date if BSJI needed time to wind down its account use,
id. at 3, which would provide BSJI with an opportunity to seek a
correspondent commercial banking relationship to continue
operations. Rather than pursue this opportunity, on July 25,
2023, BSJI moved for a temporary restraining order and a
preliminary injunction. ECF Nos. 1, 6. On July 26, 2023, this
Court held a conference on BSJI's motions, providing the parties
with an opportunity to reach an agreement that would obviate the
need for the Court to rule on BSJI's motion for a temporary
restraining order prior to its decision on BSJI's motion for a

preliminary injunction. ECF No. 24.[3] On July 28, 2023, the FBRNY agreed to keep BSJI's Master Account open through this Court's resolution of BSJI's motion for a preliminary injunction, and BSJI agreed to retain a transaction monitor subject to the FRBNY's approval. ECF No. 25.

## II.

The Court reaches the following conclusions of law. To succeed on its motion for a preliminary injunction enjoining the FRBNY and the Board from terminating its Master Account access, BSJI must show: "(1) irreparable harm; (2) either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party; and (3) that a preliminary injunction is in the public interest." N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc., 883 F.3d 32, 37 (2d Cir. 2018); Plaza Health Laboratories, Inc. v. Perales, 878 F.2d 577, 580 (2d Cir. 1989).

Moreover, "where the moving party seeks to stay governmental action taken in the public interest pursuant to a statutory or regulatory scheme, the district court should not apply the less rigorous fair-ground-for-litigation standard and

---

[3] At that hearing on July 26, 2023, BSJI represented that BSJI had 14 accounts and 13 customers. See ECF No. 27 at 23. At the hearing for the preliminary injunction on October 16, 2023, counsel for BSJI represented that one customer may withdraw from BSJI, leaving 12 customers remaining. See Hearing Tr., at 7, 11.

should grant the preliminary injunction only if the moving party establishes, along with irreparable injury, a likelihood that he will succeed on the merits of his claim." <u>Plaza Health Laboratories</u>, 878 F.2d at 580.

BSJI's motion seeks to enjoin government action taken for the public interest: the Board is an independent agency of the United States government, <u>see</u> 12 U.S.C. § 241, and the FRBNY is a federal instrumentality. <u>See</u> <u>Kraus</u>, 943 F.3d at 592; 12 U.S.C. § 391. The FRBNY determined to close BSJI's Master Account to mitigate risk to the "overall economy." <u>See</u> Brennan Decl., Ex. 21, ECF No. 52-21, at 2, 5. Accordingly, this Court may grant the preliminary injunction, only if BSJI establishes, along with irreparable injury, a likelihood of success on the merits of its claim. <u>See</u> Plaza Health Laboratories, Inc., 878 F.2d at 580; <u>see also</u> <u>Molloy v. Metropolitan Transp. Authority</u>, 94 F.3d 808, 811 (2d Cir. 1996) (finding that "a likelihood of success on the merits" standard applied when the plaintiffs sought a preliminary injunction enjoining the Metropolitan Transit Authority from implementing a staff reduction plan). In any event, as explained below, the plaintiff has also failed to show a serious question on the merits.

**A.**

Irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction." <u>Faiveley Transp. Malmo AB v. Wabtec Corp.</u>, 559 F.3d 110, 118 (2d Cir. 2009). A movant must show that, absent a preliminary injunction, the movant "will suffer an injury that is neither remote nor speculative, but actual and imminent and one that cannot be remedied if a court waits until the end of trial to resolve the harm." <u>Freedom Holdings, Inc. v. Spitzer</u>, 408 F.3d 112, 114 (2d Cir. 2005). BSJI contends that such relief is necessary, but its arguments are based on unsubstantiated claims.

BSJI alleges that it will lose its customers without the existence of a Master Account, <u>see</u> ECF No. 7 at 17, but BSJI's predictions about whether BSJI would continue to exist is based on speculation. <u>See</u> <u>Impax Media Inc. v. Ne. Advert. Corp.</u>, No. 17-cv-8272, 2018 WL 358284, at *5 (S.D.N.Y. Jan. 10, 2018) ("instead of presenting concrete data . . . plaintiff offers only the self-serving statement . . . that its business will collapse without an injunction"); <u>DTC Energy Grp., Inc. v. Hirschfeld</u>, 912 F.3d 1263, 1271 (10th Cir. 2018) ("[N]ot all plaintiffs who have already suffered lost customers . . . can show a sufficient probability of future irreparable harm to warrant a preliminary injunction."); <u>Kwan Software Eng'g, Inc. v. Foray Techs., LLC</u>, 551 F. App'x 298, 299 (9th Cir. 2013)

(declaration by a company president that customers might be lost
was "only speculative evidence").

BSJI relies on the 22-month period in which the FRBNY
suspended BSJI's access to its Master Account as proof of this
irreparable harm, see ECF No. 7, at 6-7, alleging that its loss
of Master Account access caused "enormous reputational and
financial harm," and that BSJI now retains "two percent of the
depositors it had prior to the suspension of its access to these
services." Id. at 16. But a substantial reason for BSJI's
reduction in its customers' accounts was strategic. Indeed, BSJI
determined to reduce its retail client base to address its high-
risk profile. See Vazquez Decl., ECF No. 10, ¶¶ 33, 35 (noting
that BSJI had "thoroughly downsized and de-risked" to avoid
account closure); id., ECF No. 10-5, at 4 ("We have not sought
to grow [BSJI] since 2019 and indeed have shrunk our retail
client base"). In any event, BSJI's current small customer base
consists of 14 account holders comprised almost exclusively of
close family members of the owner and the offshore entities they
control.[4] That this account base is so closely allied with the
bank's owner and has been prepared to remain with the bank

---

[4] At the October 16, 2023 hearing on BSJI's motion for a
preliminary injunction, counsel for BSJI represented that BSJI
currently had 14 accounts and 13 customers. BSJI asserted one
customer may be leaving BSJI. Hearing Tr. at 7, 8, 11. See
supra, n. 4.

despite its prior lengthy existence without access to a Master Account undercuts the speculative argument that BSJI would cease to exist without access to a Master Account. While the owner now says BSJI will lose its current customers, that allegation is self-serving speculation. See ECF No. 73, at 9.

**B.**

As to the merits, BSJI asserts that there is a statutory right to have a Master Account, ECF No. 7, Br. at 18-22, and that the FRBNY's actions violate the Administrative Procedure Act ("APA"), id. at 22-26, the Due Process Clause, id. at 26-27, and the FRBNY's contractual obligations, see id. at 27-28. For the reasons discussed below, these claims are not likely to succeed on the merits, and none present serious questions. See N. Am. Soccer League, LLC, 883 F.3d at 37.[5]

**i.**

BSJI's statutory claim fails because 12 U.S.C. § 342 makes clear that Federal reserve banks are authorized to maintain

---

[5] BSJI also seeks relief under the Mandamus Act and a declaratory judgment asserting BSJI's right to a Master Account. ECF No. 1. However, BSJI did not raise either claim in its Opening Brief, see ECF No. 7, and only addresses grounds for Mandamus relief in its Reply, see ECF No. 73 at 17. BSJI has thus abandoned these bases for the claimed preliminary injunction. United States ex rel. Karlin v. Noble Jewelry Holdings Ltd., No. 08-cv-7826, 2012 WL 1228199, at *4 (S.D.N.Y. Apr. 9, 2012)("Arguments may not be made for the first time in a reply brief."). In any event, neither claim would succeed on the merits because BSJI has no clear right to a Master Account under 12 U.S.C. § 248a(c).

Master Accounts, but are not required to do so. Moreover, the FRBNY executed a Master Account Agreement and Supplemental Terms agreement with BSJI, see ECF Nos. 52-2, 52-4, both of which give the FRBNY the contractual right to close BSJI's Master Account.

Master Accounts are governed by Section 13 of the FRA. 12 U.S.C. § 342. Section 342 appears in subchapter IX, entitled "Powers and Duties of Federal Reserve Banks," and provides Federal reserve banks with the authority to receive deposits from nonmembers as well as members of the Federal reserve system. See id. §§ 341-61. Section 342 does not require the Federal reserve banks to grant to any bank a Master Account. The statute provides that Federal reserve banks "may" open accounts, not that they shall. Id. The Supreme Court has held that "may" in Section 342 merely "confers authority" to act, and does not mean "shall." Farmers' & Merchs.' Bank of Monroe v. Fed. Rsrv. Bank of Richmond, 262 U.S. 649, 662 (1923) (Brandeis, J.) (construing the right to receive checks for collection).[6] Moreover, Congress recently amended the FRA to add a new provision concerning master accounts. On December 23, 2022, the President signed into law the National Defense Authorization Act

---

[6] Congress amended Section 342 in 1980 to allow Federal reserve banks to accept deposits from non-member depository institutions as well as any member bank, see Monetary Control Act of 1980, 12 U.S.C. § 342, Pub. L. 96-221, but did not change the "may receive" language, which existed since 1913 and was interpreted in Farmers' and Merchants' Bank of Monroe. See 262 U.S. at 662.

("NDAA"). Section 5708 of Title LVII of the NDAA amends the FRA by inserting § 11C, entitled "Master Account and Services Database." This amendment confirms that Federal reserve banks may "reject" applications from depository institutions, by requiring the Board to "create and maintain a public, online, and searchable database" that includes "a list of every entity that submits an access request for a reserve bank master account and services . . . including whether . . . a request was approved, rejected, pending, or withdrawn[.]" 12 U.S.C. § 248c(b)(1), Pub. Law No. 117-263 tit. LVII, § 5708 (2022) (emphasis added).

BSJI argues that another subsection, Section 248a(c)(2), should be construed to require Federal reserve banks to afford Master Accounts to every depository institution that requests such an account. See ECF No. 6, at 18-19 (citing 12 U.S.C. § 248a(c)(2)). But Section 248a(c)(2) is directed to the Board, not Federal reserve banks, and is best read as a clause preventing price discrimination in favor of banks that are members of the Federal Reserve System.[7] The section entitled "Pricing of services" instructs the Board to "put into effect a schedule of fees" for certain services based on certain

---

[7] Section 248a appears in subchapter II of the FRA, 12 U.S.C. §§ 241-52, titled "Board of Governors of the Federal Reserve System."

principles. 12 U.S.C. § 248a(a). Among these principles, the
Board is instructed that: "All Federal reserve bank services
covered by the fee schedule shall be available to nonmember
depository institutions and such services shall be priced at the
same fee schedule applicable to member banks . . . ." 12 U.S.C.
§ 248a(c)(2). Section 248a(b) enumerates the "covered services,"
and makes no reference to Master Accounts, much less commands
the Board to direct the opening of a master account for every
institution that seeks one regardless of risk.[8] And the section
does not even state that the services covered by the fee
schedule shall be available to "all nonmember depository
institutions."

---

[8] BSJI cites the Second Circuit Court of Appeals's decision in
Greater Buffalo Press, Inc. v. Fed. Rsrv. Bank of N.Y. to
support its contention that Section 248a(c)(2) requires Federal
reserve banks to open Master Accounts for every depository
institution. See ECF No. 7 at 21. But that opinion addresses the
check clearing services enumerated in Section 248a(b), rather
than Master Accounts, which are not included. See 866 F.2d 38,
39-40 (2d Cir. 1989). Recounting the process of check collection
in the Federal Reserve System, the Court of Appeals emphasized
that Congress's amendments to 12 U.S.C. § 248a made the services
enumerated in that section "available to all banks, regardless
of whether or not they were member banks." Id. at 40. In so
ruling, the Court of Appeals did not find that Federal reserve
banks must open Master Accounts for every bank, but instead
found that the Federal Reserve must make its check clearing
services available without regard to a bank's member status.
Id.; see also Jet Courier Servs., Inc. v. Fed. Rsrv. Bank of
Atlanta, 713 F.2d 1221, 1227 (6th Cir. 1983) (explaining that
the law establishing Section 248a provided that nonmember banks
could receive check clearing and collection services "at the
same fees charged member banks").

BSJI relies on a concurring opinion from Judge Bacharach of the Court of Appeals for the Tenth Circuit, which opined that there is a requirement to open a Master Account for all depository institutions. See Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kan. City, 861 F.3d 1052 (10th Cir. 2017).[9] The issue in Fourth Corner was whether the District Court erred in dismissing the complaint of Fourth Corner Credit Union, which had sought to require the Federal Reserve Bank of Kansas City to open a Master Account for that credit union despite the fact that the credit union sought to provide banking services for marijuana-related businesses. Chief Judge Moritz would have affirmed the dismissal with prejudice. Judge Matheson would have vacated the dismissal and remanded with instructions to dismiss the amended complaint without prejudice on prudential-ripeness grounds. Only Judge Bacharach would have decided the appeal on the merits and then reversed the dismissal of the amended

---

[9] BSJI also relies on Custodia Bank, Inc. v. Fed. Rsrv. Board of Governors, 640 F. Supp. 3d 1169 (D. Wy. 2022). The Custodia Court denied a motion to dismiss an action brought by a depository institution that claimed that the Federal Reserve Bank of Kansas City delayed unreasonably in deciding whether to grant its application for a Master Account. In the course of deciding that motion, the Court found that Judge Bacharach's concurring opinion "may plausibly be the law on this matter," but that a "full statutory interpretation of the matter is better left for another day" after "further development of [the] facts." Id. at 1185. But the standard on this motion for a preliminary injunction is different. BSJI must show that it is likely to succeed on the merits.

complaint, finding that the Fourth Corner Credit Union had a statutory right to a Master Account pursuant to 12 U.S.C. § 248a(c)(2). The panel ultimately vacated the district court's order and remanded with instructions to dismiss the amended complaint by Fourth Corner Credit Union without prejudice. 861 F.3d at 1053 (per curiam).

Judge Bacharach's opinion is neither controlling (even in the Tenth Circuit), nor persuasive. Judge Bacharach relied on 12 U.S.C. § 248a(c)(2) and found it irrelevant that the section did not say explicitly that "all" Federal reserve bank services covered by the fee schedule shall be available to "all" nonmember depository institutions. But the purpose of the statutory section is to prevent price discrimination when a service is offered to a nonmember institution, not to require the Federal reserve banks to provide specific services to nonmember banks. See Jet Courier Servs., Inc., 713 F.2d at 1227. If Congress intended to require Federal reserve banks to provide specific services, the direction would reasonably have been found in the section dealing with the duties and powers of Federal reserve banks and not in the section dealing with fee schedules set by the Board. And Judge Bacharach in his 2017 opinion did not have the advantage of Congress's December 23, 2022 statute, that explicitly acknowledged that the Board was

21

required to maintain a database of Master Accounts rejected by Federal reserve banks. 12 U.S.C. § 248c(b)(1)(B).

Moreover, whatever rights BSJI may have had to open a Master Account is not at issue because BSJI had a Master Account and specifically agreed that the FRBNY had the right to terminate that account. See Brennan Decl., Ex. 2, ECF No. 52-2; id., Ex. 3, ECF No. 52-3, at 7. There is no statute that provides that a Federal reserve bank lacks the power to terminate a Master Account. Rather, there is an agreement governing the Master Account that allowed the FRBNY to close the account, see Brennan Decl., Ex. 2, ECF No. 52-2 (Master Account Agreement); id. at Ex. 3, ECF No. 52-3 (Operating Circular No. 1), and this was reaffirmed in a Supplemental Agreement that BSJI entered into with the FRBNY in 2020 after the FRBNY had closed the Master Account in 2019, id. at Ex. 4, ECF No. 52-4 (Supplemental Terms and Agreement). BSJI waived any "right" when it entered into its contracts with the FRBNY that authorized the FRBNY to terminate the Master Account. See Columbus Park Corp. v. Dep't of Hous. Pres. & Dev., 598 N.E. 2d 702, 706 (N.Y. 1992); see also F.D.I.C. v. Four Star Holding Co., No. 97-cv-4184, 2000 WL 256146, at *3 (S.D.N.Y. Mar. 7, 2000) ("As a general rule, a contractual waiver of a statutory right need not be express so long as it is clearly intentional."), vacated on other grounds, 271 F.3d 75 (2d Cir. 2001) (per curiam). And the

FRBNY specifically relied on its contractual rights when it terminated BSJI's Master Account in 2023.

**ii.**

BSJI contends that the FRBNY is an agency of the United States government and therefore subject to judicial review under the APA, which defines "agency" as an "authority of the Government of the United States." 5 U.S.C. § 701(b)(1). While the Second Circuit Court of Appeals has not yet ruled on this narrow question, <u>Kraus</u>, 943 F.3d at 592, "Congress has gone out of its way to formally separate the [Federal reserve banks] from the government. The [Federal reserve banks] are not part of any executive department or agency." <u>Id.</u> at 597. "Congress has considered the status of the [Federal reserve banks] on multiple occasions and decided <u>not</u> to convert them formally into government agencies." <u>Id.</u> at 598 (emphasis added).[10]

Although Courts of Appeals in other circuits have referred to Federal reserve banks as "instrumentalities" of the federal government in other contexts,[11] Federal reserve banks are not

---

[10] "This separation from general government dates to the founding of the Fed in 1913 when Congress, following other major advanced economies decided to leave governance of money and credit, at least in part, in private hands. . . . [T]he legislative history of the FRA suggests that Congress intended the [Federal reserve banks] to serve the interests of, but stand apart from, the sovereign." <u>Kraus,</u> 943 F.3d at 597.

[11] The parties agreed at the argument on the current motion that no United States Court of Appeals has determined whether Federal reserve banks should be treated as "agencies," under the APA.

part of any executive department or agency. Nor do they have the authority to promulgate regulations with the force and effect of law. Instead, they are "corporations that operate under the supervision and control of a board of directors, which shall perform the duties usually appertaining to the office of directors of banking associations." Id. at 597.

BSJI cites two out-of-circuit decisions, see ECF No. 7, at 23, but neither applies to the circumstances here. In Lee Construction Co., Inc. v. Federal Reserve Bank of Richmond, 558 F. Supp. 165 (D. Md. 1982), the District Court determined that the Federal Reserve Bank of Richmond functioned as an agency, because the Board delegated substantial decision-making authority to the Bank. Id. at 177-78. But, unlike in Lee, the Board does not determine whether the FRBNY may open or terminate a Master Account. Instead, the statute authorizes the FRBNY to use its discretion to make this decision. See 12 U.S.C. § 342. The Lee Court also ultimately concluded that the plaintiff

---

Rather, Federal reserve banks have been treated as "instrumentalities" of the United States, Scott v. Fed. Rsrv. Bank of Kan. City, 406 F.3d 532, 536 (8th Cir. 2005), and exempt from certain state and local taxes. Fed. Rsrv. Bank of St. Louis v. Metrocentre Improvement Dist. No. 1, 657 F.2d 183, 186-87 (8th Cir. 1981)(finding Federal reserve banks to be immune from state and local taxation). However, the Ninth Circuit Court of Appeals held that Federal "Reserve Banks are not federal instrumentalities for purposes of the [Federal Tort Claims Act, 28 U.S.C. §§ 1346 & 2671 to 2680], but are independent, privately owned and locally controlled corporations." Lewis v. United States, 680 F.2d 1239, 1241 (9th Cir. 1982).

lacked standing to sue the Federal reserve bank in that case because the plaintiff had failed to allege a prima facie case that the bank's action was an arbitrary or capricious abuse of discretion or otherwise illegal. Id. at 188.

BSJI also relies on Flight International Group, Inc. v. Federal Reserve Bank of Chicago, 583 F. Supp. 674 (N.D. Ga. 1984), vacated, 597 F. Supp. 462, 678-79 (N.D. Ga. 1984), to support its argument that the FRBNY is an agency subject to the APA. But the since-vacated decision treated the Federal Reserve Bank of Chicago as an agency because other courts found that Federal reserve banks operated as instrumentalities of the government. Flight Int'l Grp., Inc., 583 F. Supp. 674 at 678 (collecting cases). By contrast, the Second Circuit Court of Appeals has emphasized that Federal reserve banks "are not part of any executive department or agency . . . [n]or do they have the authority to promulgate regulations with the force and effect of law." Kraus, 943 F.3d at 597. Indeed, "many financial institutions are . . . considered federal instrumentalities, without attaining the status of government agencies within the meaning of federal procedural rules." In re Hoag Ranches, 846 F.2d 1225, 1227 (9th Cir. 1988).

In any event, treating the FRBNY as an agency does not subject the FRBNY's decision in this case to judicial review. The APA precludes review of "agency action" that is "committed

to agency discretion by law." 5 U.S.C. § 701(a)(2). This is because, "where a decision is committed to agency discretion, review is not to be had if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." Zheng v. Reno, 166 F. Supp. 2d 875, 879 (S.D.N.Y. 2001). The FRA provides the FRBNY with discretion to open or terminate Master Accounts. See 12 U.S.C. § 342. The statute therefore forecloses judicial review under the APA.

Moreover, judicial review under the APA would be "highly deferential and presume[] the agency's action to be valid." Adler v. United States Dep't of Justice, No. 18-cv-2188, 2018 WL 4571677, at *3 (S.D.N.Y. Sept. 24, 2018). A court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ." 5 U.S.C. § 706(2)(A). "The court is not empowered to substitute its judgment for that of the agency." Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1977). Instead, the court's task is "to determine whether the agency has considered the pertinent evidence, examined the relevant factors, and articulated a satisfactory explanation for its action . . . ." J. Andrew Lange, Inc. v. F.A.A., 208 F.3d 389, 391 (2d Cir.

2000); see Residents for Sane Trash Sols., Inc. v. U.S. Army Corps of Eng'rs, 31 F. Supp. 3d 571, 587-88 (S.D.N.Y. 2014).

There is no likelihood that the FRBNY's decision to terminate BSJI's account was arbitrary or capricious or contrary to law. See Adler, 2018 WL 4571677, at *3. The FRBNY undertook a comprehensive investigation to review high risk transaction activity in BSJI's account. See Brennan Decl., Ex. 14, ECF No. 52-14. In its 2023 Risk Analysis Memorandum, Compliance found that BSJI failed to address open and partially open observations made by K2 in previous reports, and that these reports revealed "data quality issues," "model governance" deficits, and "oversight deficiencies." Ex. 14, ECF No. 52-14; see also id. at 8-12 (reviewing K2's findings).

The FRBNY informed the Board of its intent to close BSJI's account, Brennan Decl., Ex. 20, ECF No. 52-20, and then communicated that decision and its grounds to BSJI on April 24, 2023, id., Ex. 21, ECF No. 52-21. In response, BSJI repeatedly claimed that it did not pose undue risk. Vazquez Decl., ¶¶ 56-59, ECF No. 10; see id. Exs. 19-22, ECF Nos. 10-19-22. The FRBNY extended BSJI's closure date. See Benvenuto Decl., ¶ 11, ECF No. 51. But FRBNY ultimately concluded that BSJI failed to address adequately its high-risk, related-party transactional activity, see Brennan Decl., Ex. 9, ECF No. 52-9, and the FRBNY by letter

dated June 30, 2023 advised BSJI that it was proceeding with its decision to close BSJI's account on July 31, 2023. Id.

BSJI now disagrees with the conclusions reached by the FRBNY, but the conclusions were plainly reached after a thorough review of the evidence and pertinent factors and resulted in a decision that explained the FRBNY's rationale. It cannot be found that BSJI is likely to succeed in showing, or has raised serious questions, that the FRBNY's decision was arbitrary, capricious, or otherwise contrary to law. While BSJI disagrees with the FRBNY's careful determination, it is not for the Court to substitute its judgment for the reasoned decision of the FRBNY. See J. Andrew Lange, Inc., 208 F.3d at 391.

### iii.

BSJI's due process claim depends on its erroneous interpretations of 12 U.S.C. § 342 and 12 U.S.C. § 248a(c)(2). Because BSJI is not entitled to a Master Account, BSJI cannot show that the Bank was deprived of liberty or property without due process of law. Clubside, Inc. v. Valentin, 468 F.3d 144, 154 (2d Cir. 2006); see also Town of Castle Rock, Colo. v. Gonzales, 545 U.S. 748, 756 (2005)(for due process purposes, "a benefit is not a protected entitlement if government officials may grant or deny it in their discretion."). Because the FRA provides the FRBNY with the discretion to open and terminate Master Accounts, BSJI does not have a protectable property

interest in a Master Account. Moreover, given the extensive
consideration to BSJI's arguments by the FRBNY, it cannot be
found that BSJI was denied a full and fair opportunity to be
heard on the decision to close its Master Account. Accordingly,
BSJI's due process claims also fail.

### iv.

Finally, the FRBNY's decision to close BSJI's Master
Account did not violate any contract. BSJI argues that the
decision to terminate its Master Account violated the covenant
of "good faith and fair dealing" implicit in its contract with
the FRBNY. See ECF No. 7, at 27-28. However, BSJI is unlikely to
prevail on this claim. The FRBNY had the right under the MAA and
the Supplemental Terms to terminate BSJI's Master Account. See
Brennan Decl., Exs. 2, 4, ECF Nos. 52-2, 52-4. BSJI is a high-
risk institution, owned by a single person, that entered into
questionable transactions which raised concerns over money
laundering. Id., Ex. 14, ECF No. 52-14. While BSJI hired an
accounting consultant who found adequate controls, see ECF No.
73, at 3, the consultant's report was insufficient to convince
the FRBNY to continue BSJI's Master Account. Given the extended
back and forth between the parties, BSJI is unlikely to succeed
on its claim that the FRBNY acted in bad faith, and BSJI has
failed to present any evidence that the FRBNY acted other than
in good faith.

## c.

Given the profound risks associated with money laundering, the public interest weighs against granting a preliminary injunction. See, e.g., United States v. Martin, 320 F.3d 1223, 1227 (11th Cir. 2003) ("The harm from . . . a [money-laundering] transaction does not generally fall upon an individual, but falls upon society in general."); FBME Bank Ltd. v. Mnuchin, 249 F. Supp. 3d 215, 230 (D.D.C. 2017) (noting the "public's interest in protecting the U.S. financial system from illicit activity such as money laundering").

IBEs, like BSJI, have a local territorial regulator, the Office of the Commissioner of Financial Institutions ("OCIF"). Aponte Decl., Ex. 1, ECF No. 13-2, ¶ 2. But the United States Department of the Treasury ("Treasury") recently noted that the OCIF has "severe resource constraints" and has "relatively few examiners and supervisory staff" to effectuate its supervisory program. Brennan Decl., Ex. 6, ECF No. 52-6 at 74. Notably, in 2022, the Treasury warned that IBEs and IFEs are "attractive money laundering vehicles, potentially allowing nefarious actors to misuse them to facilitate illicit financial activity." Id. The Treasury then stated that IBEs and IFEs are "of particular concern because of their offshore banking business model." Id. For the same reasons, IBEs and IFEs pose heightened risk to the

FRBNY, because their access to accounts could cause the FRBNY to facilitate illicit activity.

BSJI's specific and numerous risk factors, see Brennan Decl., Ex. 9, ECF No. 52-9 at 2 (noting concerns); id. at Ex. 14, ECF No. 52-14 (Compliance Risk Analysis of BSJI), justify the FRBNY's decision to close BSJI's Master Account. FRBNY's Compliance Office found a "significant number of red flags identified in BSJI's transaction activity," and a "high concentration of suspicious transactions with parties related to BSJI," see id. at 4, including, for example, numerous transactions involving BSJI's owner. See ECF No. 52-14 at 17.

Accepting deposits from and providing financial services to a financial institution with BSJI's record of noncompliance exposes the FRBNY and the financial system to risk. This harm is not just to the FRBNY, but to the fiscal system, because "federal reserve banks are not operated for the profit of shareholders; rather, they were created and are operated in furtherance of the national fiscal policy." See Starr Int'l Co., Inc. v. Fed. Rsrv. Bank of N.Y., 742 F.3d 37, 40 (2d Cir. 2014). Moreover, maintaining a Master Account with an entity that the FRBNY concluded posed an undue risk of "activities such as money laundering, economic or trade sanctions violations, or other illicit activity," see Brennan Decl., Ex. 20, ECF No 52-20 at 3, implicates the Federal Reserve in BSJI's questionable

31

transactions. Accordingly, granting BSJI's motion for emergency relief would place the public in harm's way.

### III.

The Board argues that BSJI lacks standing to obtain a preliminary injunction against the Board because the Board cannot reopen BSJI's account. "[W]hen a plaintiff's standing is brought into issue the relevant inquiry is whether, assuming justiciability of the claim, the plaintiff has shown an injury to himself that is likely to be redressed by a favorable decision. Absent such a showing, exercise of its power by a federal court would be gratuitous and thus inconsistent with the Art. III limitation." Simon v. E. Ky. Welfare Rts. Org., 426 U.S. 26, 38 (1976).

The Board exercises supervision over reserve banks, but does not have the statutory authority to receive deposits, open or close Master Accounts, or perform other banking services. See 12 U.S.C. §§ 248(j), 342. Operating Circular No. 1 makes clear that a reserve bank can terminate an MAA at any time, and that the Board is not a party to the MAA. See Brennan Decl., Ex. 3, ECF No. 52-3. Indeed, the Circular states that "[a]ll master accounts are subject to Reserve Bank approval," and notes that the Reserve Bank "may close your master account . . . at any time." Id. at 11. Because the Board lacks enforcement power to open or terminate a Master Account, BSJI does not have standing

to obtain a preliminary injunction against the Board. See Lujan, 504 U.S. at 568 (finding no redressability, and therefore no standing, when respondents challenged a "more generalized level of Government action"); Marino v. Town of Branford, No. 17-cv-1828, 2018 WL 691715, at *2 (D. Conn. Feb. 2, 2018) (holding that a plaintiff can seek relief only from "the party with the power to suspend and revoke the plaintiff's license"); Junel Food Ctr. Corp. v. United States, No. 97-cv-2078, 1997 WL 150998, at *2-3 (S.D.N.Y. March 28, 1997) (denying an injunction because the plaintiff had sued the wrong entity).

## CONCLUSION

The Court has considered all of the parties' arguments. To the extent not specifically addressed above, the arguments are either moot or without merit. For the foregoing reasons, the plaintiff's motion for a preliminary injunction against the FRBNY is **denied**. The plaintiff's motion for a preliminary injunction against the Board is **dismissed as moot**.

The Clerk is respectfully directed to close ECF No. 6.

SO ORDERED.

Dated:   New York, New York
         October 24, 2023

                                    John G. Koeltl
                              United States District Judge

33