NAG5banA

```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   BANCO SAN JUAN INTERNACIONAL,
    INC.,
4
                    Plaintiff,              New York, N.Y.
5
                 v.                         23 Civ. 6414 (JGK)
6
    THE FEDERAL RESERVE BANK OF
7   NEW YORK, et al.,

8                   Defendant.

9   ------------------------------x

10                                          October 16, 2023
                                            11:10 a.m.
11
    Before:
12
                        HON. JOHN G. KOELTL,
13
                                            U.S. District Judge
14

15
                           APPEARANCES
16

17
    WINSTON & STRAWN, LLP
18        Attorneys for Plaintiff
    BY:  ABBE D. LOWELL
19        KELLY ANNE LIBRERA

20  SIMPSON THACHER & BARTLETT, LLP
         Attorneys for Defendant Federal Reserve Bank of New York
21  BY:  JONATHAN K. YOUNGWOOD
         MEREDITH K. KARP
22             -and-
    FEDERAL RESERVE BANK OF NEW YORK
23  BY   MICHAEL M. BRENNAN
         MICHELE H. KALSTEIN
24
    THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM
25  BY:  JOSHUA P. CHADWICK
         NICHOLAS JABBOUR
```

NAG5banA

1          (Case called)

2          THE DEPUTY CLERK:  All parties please state who they

3     are for the record.

4          MR. LOWELL:  Your Honor, good morning.  Abbey Lowell

5     and Kelly Librera for the plaintiff Banco San Juan

6     Internacional.

7          THE COURT:  Good morning.

8          MR. YOUNGWOOD:  Good morning, your Honor.  Jonathan

9     Youngwood and Meredith Karp, Simpson Thacher & Bartlett for the

10    Federal Reserve Bank of New York.  Also with us are Mr. Brennan

11    and Ms. Kalstein for the Federal Reserve Bank of New York.

12         THE COURT:  Good morning.

13         MR. CHADWICK:  Good morning, Your Honor.  Joshua

14    Chadwick and Nicholas Jabbour for the Federal Reserve Board.

15         MR. LOWELL:  Your Honor, just to be complete on the

16    record, sitting next to Ms. Karp is Mr. Bloom, general counsel

17    of BSJI, and then in the front are the CEO of BSJI Hector

18    Vasquez and the chairman is Marcelino Bellosta who is here,

19    too.

20         THE COURT:  This is a motion for preliminary

21    injunction.  I am prepared to listen to argument.

22         MR. LOWELL:  Thank you, your Honor.

23         Having been on the phone with you for the hearing of

24    the TRO and obviously knowing how to run things, I don't want

25    to repeat very many of the things which we have submitted and I

NAG5banA

1  know you have read, and I don't want to go over the standards

2  which you know better than I, but I would like to frame three

3  things that I hope I can accomplish this morning.  The first is

4  I want to address immediately one tact that the defendants base

5  so much of their opposition on.  Second, I would like to

6  highlight, in each of the factors, what is the most dispositive

7  issue that we would like you to consider.  And, of course, the

8  third would be to answer the Court's questions.

9          As to that first point, reading the opposition called

10  up to me a variation on a somewhat maybe very overused phrase,

11  and you know it, it is:  If you don't have the facts, you argue

12  the law.  If you don't have the law, you argue the facts.  If

13  you have neither, you shout the phrase money laundering 46

14  times in your brief.  Doing that does get one's attention and

15  maybe that was the point, but saying it four dozen times

16  doesn't substitute for actually being able to prove, even at an

17  early stage, that there is any fact that would justify that

18  allegation.  I think, your Honor, that is being raised, I was

19  trying to figure out where it comes from, but it must be in

20  this preliminary injunction context what defendants would

21  contend are their interests in the balance of hardship analysis

22  that your Honor has to engage in, in order to rule on the

23  preliminary injunction.  Maybe --

24          THE COURT:  It's more than that, though, it's the risk

25  that the bank faces which is part of the defendant's arguments

NAG5banA

with respect to likelihood of success.  In other words, was
there, putting aside just for the moment a right to do what the
defendant did, was there a basis for it, or under contract is
there a good faith basis for doing what the bank did.  And
then, its principal says that one of the risks that the bank
can protect itself against is the risk of money laundering.

So, it is not only balance of the equities, if you
will, or irreparable injury, it is likelihood of success.  It
goes to several of the issues with respect to the right that
the bank had, either under a statute or under its contracts
with BSJ, to do what it did and did it do what it did in good
faith.

MR. LOWELL:  So taking your Honor's point that it does
spill over from what you and I would call balance of equities
or harms, that it affects your consideration of the merits.  I
would say fine, but you have to get through three steps then.
First, you have to accept the possibility that by raising what
they believe to be a risk, it obviates our first point on
success or raising a serious question which is the statutory
mandate that banks and non-member banks as we point out to you
12 U.S.C. 248(a) requires the board and delegated to the FRBNY
to provide this master account.  What the defendants want to do
is say past that, we can go backwards and somehow obviate the
statutory mandate to provide access to this master account
because, down the road, we believe there is a risk.  We believe

NAG5banA

1      that risk involves money laundering.  We believe that risk that

2      involves money laundering has whatever the elements they put

3      forward in their opposition so my first response to you is that

4      even if the board or the defendants totally were regulators of

5      Banco San Juan, which they're not, and even if they did not

6      have an obligation to provide access and maintain what BSJI has

7      had since 2012, which is the access to its master account,

8      which they do have a requirement, that if they actually are

9      saying that they have the ability to prevail at some point in

10     the context we are at -- which is still the preliminary

11     injunction stage, not the trial -- it is my intent to say that

12     Banco San Juan has given you enough to get to the next phase

13     but keep the status quo while we get to the next phase, or

14     else, by the time we get to the next phase, it would be moot.

15          The third point, therefore, is the following:  If we

16     are in the PI mode and they're concerned about keeping the

17     status quo because there is this risk that they have put

18     forward that you have articulated back, that risk has been

19     obviated for the purposes of where we are today and the reason

20     it has been obviated is that there are not one but five layers

21     that will protect whatever the defendants believe to be the

22     risk and those five are the initial frontline officers of the

23     institution who are trained about the issues of compliance.

24     And if that weren't enough the second is the BSA, the Bank

25     Secrecy Act officer who is personally liable in that job to

NAG5banA

make sure that there is compliance.  The third, as you have

seen, is the extensive work of independent auditors with great

reputations like K2 who are on the scene to do the audits and

provide the reports three times a year.  The fourth is, and

most importantly, that it is not a bank without supervision;

there is the Office of the Commissioner of Financial

Institutions of Puerto Rico/OCIF.  And last, and certainly not

least, based on our proceedings past, there is a monitor in

place that looks at every transaction.  So, if you are looking

to see if they have come forward with any substantiation that

they can prevail on the merits in the preliminary injunction

context because they are worried that some risk occurs, that is

a phrase without substance given what I have just said.  But,

there is even more.

Defendants assert that this basis of threat poses a

undue risk to the overall economy.  You have seen that phrase.

Assuming for a second that every transaction that exists in

this institution had that risk -- which of course we don't

concede -- in terms of that standard that they put forward to

succeed on the merits, Banco San Juan's assets represent .0001

of the USGDP, .0003 of some global GDP but that's, you don't

have to get there.  Think about this.  This is a bank now that

has 13 customers -- or it had 13 customers.  In terms of what

we will tell you is the harm that we mentioned during the TRO

hearing that I raised to you today, understand that we are in

NAG5banA

the process of going from 13 to 12 because one of those

customers has decided to start taking whatever funds it has and

remove them to another bank.

THE COURT:  The papers had indicated that there were

14 accounts.

MR. LOWELL:  14 accounts, 13 customers; that's right.

So, with that being the case, in terms of, again, cabining the

point you made as to on the merits, there is only 13 customers,

now possibly 12, in the mix of what would be mitigating the

risk of those five layers.  So there is that to consider.

Consider this as well:  That the bank has been operating

without the risk being materialized that the defendants believe

to be existing for any number of months prior to our TRO

hearing when it first became the Fed's and the Federal Reserve

Board of New York's intention to close the account in July of

2022 until when we got to see you in July of 2023, without

there being this impact that would pose a risk to the overall

economy.  So, consider that as well.

THE COURT:  I don't mean to interrupt you.

MR. LOWELL:  No, please.  If you have a question,

write it in.

THE COURT:  Is there a de minimis exception with

respect to money laundering?  If one of the account holders,

one of the master account holders for the Federal Reserve Bank

of New York was involved in money laundering, wouldn't that

NAG5banA

1    involve the Federal Reserve Bank of New York in aiding,

2    abetting money laundering which, given all of the circumstances

3    including the duties of the bank and the reputation of the

4    bank, wouldn't that be a basis for terminating an account even

5    without determining whether the risk is going to bring down the

6    entire American economy?

7    MR. LOWELL:  Well, my two answers to that, the first

8    one is, if you understand our point that the regulation of an

9    institution with a master account isn't dictated by turning the

10    volume switch or the on/off switch on whether you have the

11    master account to begin with, then I start by again reminding,

12    as they said at our TRO hearing when we were at the point of

13    whether a SAR should or have you had not have been filed, and

14    they conceded they were "not the regular of BSJI."

15    The second point I want to make is let's assume that

16    your question to me was correct, that in the 14 accounts there

17    is a transaction -- it is not necessarily an account holder but

18    I think your question might have been whether an account holder

19    was, but since there is a transaction that might entail what

20    somebody could conclude to be money laundering.  Let's assume

21    for your question that that's what it was.  Well, the question

22    is, Who makes that decision on what basis, when, and on what

23    form of support?  There has been no finding by any entity that

24    any of the transactions involve somebody who is "money

25    laundering."

NAG5banA

1          And I want to say one more thing that would put this

2     in perspective.  In 2019 and 2020, when the events that brought

3     us in the neighborhood of the Fed and the Federal Reserve Board

4     ended with the following:  You have a very motivated FBI and a

5     very motivated U.S. Attorney who took an initial action to

6     freeze an account and then spent months and months

7     investigating as to whether there was what?  Money laundering.

8     And what did they conclude?  There was no money laundering.

9     And consequently, the funds were released, there was a

10    non-prosecution agreement done.  What happened after that that

11    would give anybody pause that where we are at, which is the

12    mitigation of risk only for the purposed of seeing whether

13    shutting us is what they should have done, what happened next?

14    The accounts went from -- lost 90 percent of the accounts, now

15    we know all the people that are involved, we have the five

16    layers.  When we were last sitting in the offices of the

17    Federal Reserve Board of New York in that period of '19 and

18    '20, the Federal Reserve Board said you, Banco San Juan

19    Internacional, are now at the head of the list for putting into

20    place the compliance that we want all IVEs to have.  They

21    basically held us out at the models for others.  What could

22    happen offwards so that today we are at the point of which you

23    and I are asking is it possible that there is a transaction on

24    one account from customer with a master account that might or

25    might not reflect money laundering?  They can't just say it in

NAG5banA

1   order to raise the specter because it does have the effect of

2   you and I having these conversations but there is no basis for

3   it.  And the last piece of why there is no basis for it at this

4   point is that the moving target that we have had to face has

5   been, as we pointed out in our papers, to the point where this

6   money laundering finally got some glue when it was about a bond

7   transaction.  I want to point out for now one thing about the

8   bond transaction.  The bond transaction, which they have such

9   analysis and the underlying memos we got in the first

10  discovery -- which is why I think the next phase of the case is

11  so important -- that bond transaction was in effect from 2014

12  forward, which means that when the United States Attorney's

13  office investigated in 2019 and 2020, and when the Fed decided

14  that we were the exemplary bank that they say that we were,

15  that transaction existed and you didn't hear about it.  Indeed,

16  when they sent the letter on July of 2022 shutting us down

17  because there was this phantom deadline that they say was

18  messed, you can look at that letter and every word and comma in

19  it.  You won't find either the word "bond" or "money

20  laundering."

21       The last piece to show you why their actions on the

22  merits are so unfounded is the comparison on the issue of money

23  laundering that you are raising for me to address and that can

24  be said in two words:  Deutsche Bank.  Deutsche Bank has been

25  the subject of multiple CMP money penalties over the years in

NAG5banA

1    multiple-multiple millions of dollars.  For what?  Money

2    laundering concerns.  And what did the Fed do in 2023 when it

3    came time to address whether there are violations of

4    pre-existing orders which they violated.  Did they shut the

5    master account of Deutsche Bank either in the United States or

6    elsewhere?  They did not.  They fined them another astronomical

7    amount.

8              When you consider the risk that they say merits

9    shutting down while we litigate this case as against the small

10   amount of assets of BSJI and you use that as the measuring

11   mark, your Honor, you have to ask yourself a question and the

12   question is why.  Why would, with a 13-customer, now soon to be

13   12, 14 accounts, maybe fewer than that, with the amount of

14   assets involved in risk, would their action to a Puerto Rico

15   IVEP, we are closing you down, and Deutsche, which has tons and

16   tons and tons of different and amounts that would make us pale

17   by comparison, they get a fine and, by the way, keep operating

18   your master account.  In and of itself, that says we need to

19   explore this case further to figure out what is really going

20   on.

21             THE COURT:  Is that an equal protection argument?

22             MR. LOWELL:  It is an argument that says the

23   following:  It may rise to that once we get further discovery

24   but this is what you do know.  You know that in 2019 there were

25   media reports about the fact that the Fed had decided that the

NAG5banA

1    IVEs were something they didn't have enough patience or time or

2    assets or resources or feelings to continue to regulate or to

3    allow to be in existence.  We know that.  We know that in the

4    beginning of 2022, based on the small amount of discovery we

5    have gotten when we were reaching out and asking for advice as

6    to what was supposed to be reported in that 12-month period, we

7    now see that they were having discussions in which, again, they

8    raised IVEs in Puerto Rico and in that part of the world as

9    something that they would shut down if there was undue risk

10   without defining what undue risk was.  We know that they said

11   nothing to us when we wrote not once, but twice, to get

12   clarification on the issue that they ultimately used to shut

13   the master account and that bank down.  Now we know what was

14   being said behind the scenes which was we want to shut IVEs

15   down.  Do I think that we have gotten to the point of having a

16   pure equal protection argument?  I don't know.  What I do now

17   is there is disparate treatment between people in this part of

18   the world with this amount of assets and something that would

19   be vastly different.  And again I point out that I believe that

20   when we get to that next phase, if we can get the full

21   administrative record, that we can probe why, for example, they

22   had their financial unit look at this transaction when we gave

23   them the answers to the RFIs in the end of 2022.  What did they

24   do with that?  You won't find that in what they have presented.

25            There is a lot that needs to be explored, luckily it

NAG5banA

1    is not a ton, but it is more than I have to present to the

2    Court today.

3          THE COURT:  Let me go back to sort of first

4    principles.  The fist part of the briefs on both sides argue

5    over whether there is a right to a master account under the

6    statutes.  Isn't that the wrong question?  The Federal Reserve

7    Bank of New York granted a master account going back to, as you

8    correctly point out, 2012, to BSJI.  So, they have a master

9    account.  The issue is they terminated the account -- the

10   Federal Reserve Bank of New York terminated the account.  So

11   the few cases that are out there with respect to whether there

12   is a "right" to a master account are really somewhat beside the

13   point.  The issue is did the bank have a right to terminate the

14   account.  And there is no case, so far as I can see, that even

15   addresses that question.  So, the first question then is do you

16   agree that the bank has a right to terminate the account?  If

17   it has that right to terminate the account, what's the

18   standard?  And if the bank has a right to terminate the

19   account, or even if it didn't, whatever rights that were out

20   there, there were at least two contracts that said the bank has

21   the right to terminate the account.  And it doesn't list any

22   standard to terminate the account, it simply says the bank has

23   the right to terminate the account.

24         MR. LOWELL:  I don't want to cut you off.  I mean,

25   finish, please, of course, but there were three things, OK, so

NAG5banA

1    let's start with the first thing.  I know that the case law

2    addresses a slightly different, I don't think it is completely

3    off-base because if, *Fourth Corner* or *Custodia*, which says we

4    challenge the bank's decision not to let us in to begin with,

5    is something that the Court or two judges that have opined on

6    this in any detail say:  No, no, no, 248(a) provides you with

7    the right to have an account.  If a bank like BSJI has the

8    right to an account, it's basis for arguing against what the

9    defendants are doing in this case is stronger, not weaker,

10   because we already have our account.  That is where the bank

11   has made its investments, has reliance, has operated, and it

12   becomes more of a property right that should not be taken away

13   and that leads to your next question.  The contract, for

14   example, which says we have the right to close your account

15   doesn't exist in a vacuum.

16          THE COURT:  Hold on.  I don't think you answered the

17   first question.

18          MR. LOWELL:  The first question --

19          THE COURT:  Which is a --

20          MR. LOWELL:  Do we have a right?  Yes.

21          THE COURT:  But putting aside those two judges, for

22   the moment anyway --

23          MR. LOWELL:  Very learned and very well spoken judges,

24   we should say.

25          THE COURT:  One judge didn't get at least two other

NAG5banA

1    judges to agree with him, and the other judge said, oh, there

2    are sufficient questions at this point that I'm not going to

3    dismiss the case.

4            MR. LOWELL:  Right.

5            THE COURT:  So not the strongest arguments, but --

6            MR. LOWELL:  But you would agree, right, Judge, it is

7    the only jurisprudence that we have to at least consider the

8    framework.  That's what I would say.

9            THE COURT:  But I don't think you answered the

10   question.  Are you saying that the bank doesn't have the right

11   to terminate the account?

12           MR. LOWELL:  I would say that they don't have the

13   right to terminate the account if you look and apply the

14   mandate of 248(a).  On the other hand, if they have any right,

15   let me proceed to the assumption for the moment --

16           THE COURT:  No, no.

17           MR. LOWELL:  I don't believe they have the right.  I

18   believe regulators have the right to shut down a bank.  I

19   believe law enforcement has the right to shut down a bank.  I

20   think that the law enforcement community can work in concert

21   with them.

22           THE COURT:  But where do you get that?  Where do you

23   get the principle that the bank lacks the right to terminate

24   the account?

25           MR. LOWELL:  Well, all I could say is the following --

NAG5banA

```
1              THE COURT:  Hold on.  Hold on.

2              MR. LOWELL:  Go ahead.

3              THE COURT:  It is an important question because what

4    is the standard?

5              MR. LOWELL:  OK.  Well, you mean for them to shut it

6    down what is the standard.

7              THE COURT:  Yes; to withdraw the account, to close the

8    account.  What is the standard?

9              MR. LOWELL:  If nothing else applies, this is what we

10   know as a baseline applies.  They are an entity that operates

11   in a government setting and, among other things, if you are

12   saying that the contract gave them the right and what is the

13   standard, the contract uses phrases like with proper diligence,

14   with good faith.  There is, if you are going to look at

15   contract, we have the contract provision of fair dealing.

16             THE COURT:  Whoa, whoa.

17             MR. LOWELL:  Sorry.

18             THE COURT:  The "ability to terminate the account" is

19   not conditioned on anything.

20             MR. LOWELL:  In the phrase itself.

21             THE COURT:  Yes.  It simply says that the bank has the

22   right to "terminate the account" and will try to give you 30

23   days' notice.  That's it.

24             MR. LOWELL:  The phrase that includes the concept of

25   shutting your account is not qualified in the sentence in which
```

NAG5banA

the phrase occurred but contracts, especially contracts of
government entities, don't exist without there being a
framework of, among other things, the APA, which says you can't
take any action arbitrarily and capriciously.

THE COURT:  Hold on.  Hold on.  We will get to the APA
in a moment.

Under your framework, under your interpretation of the
statutes, you would agree that the bank has the right to
terminate a master account?

MR. LOWELL:  I don't concede that the bank has the
right to -- I don't concede that the Federal Reserve Bank of
New York operating at delegation from the Board has the right
to terminate an account.  I think they can condition the
operating of the account as they have done in the past with,
for example, the requirements of minimum balances.  Whatever.
But I think their right is limited.

THE COURT:  Where do you get that?

MR. LOWELL:  Because 248(a) says that the bank must,
shall, to use the word "shall", provide non-members with
access.  Because the legislative history says it is all banks
getting all services because none of that, including the
history, says, *and by the way, if somewhere along the line we
don't like the way you are doing something, you can take that
master account away.*  They want to merge.

THE COURT:  OK.  Let's move to the next step which is

NAG5banA

1    what then, under any statute, is the standard that the bank is

2    required to follow before terminating the account?

3           MR. LOWELL:  So if, your Honor --

4           THE COURT:  Is there anything in any statute that sets

5    that out?

6           MR. LOWELL:  In the statute of itself in terms of the

7    Federal Reserve Act?  No, not necessarily that I can find you a

8    clause that would qualify 248's "shall" language.  I don't

9    think so.  But that's not the end of the analysis, your Honor,

10   and you know where we are headed.  That's not the end of the

11   analysis because if you are looking at their action they have

12   to conform themselves to rights that institutions like BSJI

13   have, and that right is not to be taken out, for example,

14   without due process of law.  That is something that will

15   confine the actions of any body like the defendants.  It has to

16   not be arbitrary and capricious.  That's a subset of due

17   process, if you will.  They can, if using the contract, avoid

18   the issue of whether they have done it with diligence.  There

19   are standards that the Court finds that once an entity has its

20   master account that the defendants here can take it away.  It

21   is not without unbridled discretion.

22          THE COURT:  Which takes us, I guess, to the APA.  Is

23   there any case that holds that a federal reserve bank is an

24   agency of the government?

25          MR. LOWELL:  I think, first of all by the way, I want

NAG5banA

1  to, before I get to that point, just remind myself and

2  hopefully in doing that remind you that while we are looking

3  for case law that confines the issues that you and I are

4  discussing, the issues of, for example, can the defendants take

5  away is not what was addressed in those two accounts but I did

6  tell you why I think they flavor that.

7          Now to the question of whether they're an agency, I

8  think we did cite a case, I think my colleague will tell me

9  which case.  The *Lee Construction Company* case at 558 F.Supp. D

10  Maryland of 1982, finding that the Federal Reserve Bank of

11  Richmond to be an agency under the APA is one example.  I think

12  we gave you another.

13          THE COURT:  Was that under the APA?

14          MR. LOWELL:  It says it is under the APA, the *Lee*

15  *Construction* case.  We will take a quick look.

16          But assuming for the sake of the point you are asking

17  me about, there was never a case anywhere and you were the

18  first to do it and we know the criteria by which you determined

19  something was an agency.  You know that the issues require an

20  examination of whether or not they have the authority to act in

21  the way that they are supposed to, whether in using the case

22  law or at least generally speaking it is whether or not they

23  have brought decision-making authority with respect to access,

24  whether they act in terms of delegated authority from what we

25  call the bank to the FRBNY, whether they are a federal

NAG5banA

1   instrumentality exercising substantial independent authority.

2   That's a check.  Check that one.  And it is stands to reason

3   that there is no quarrel that the board -- the Federal Reserve

4   Board is a federal agency.  So, the FRBNY is trying to say

5   well, that's not us.  But then you have the logic of how that

6   could be totally impossible because if the Board, both

7   generally and specifically, in the BSJI case have delegated and

8   put their thumb on the scale as to what is going to happen,

9   then you can't have, oh yeah, the board is an agency but we are

10  going to delegate all of our actions and conduct to a federal

11  reserve bank and it is not an agency so we can get out of the

12  requirements of due process, the APA, etc.

13              With one moment, your Honor?

14              (Conferring)

15              MR. LOWELL:  So I am referring to that *Lee*

16  *Construction* case.

17              THE COURT:  That was another district court case?

18              MR. LOWELL:  That is the case I cited a moment ago,

19  you are right.  That is the case in which I said it is a

20  district court, 558.  Footnote 6 is what you should look at.

21              THE COURT:  There is no Court of Appeals case that's

22  ever said that the federal that a federal reserve bank is an

23  agency of the government.

24              MR. LOWELL:  I would say that that is a correct

25  statement.

NAG5banA

1              THE COURT:  OK.

2              MR. LOWELL:  That is a correct statement.

3              THE COURT:  It is remarkable.

4              MR. LOWELL:  Again, we might be in uncharted waters

5    but that doesn't mean we don't have a compass.  We have

6    compasses; we have the due process compass, we have the APA

7    compass.  If it is, I mean, I don't want to use another cliche

8    but again, if an entity quacks like an agency and walks like an

9    agency and then acts, then it may be an agency.  So it seems to

10   me the right.  There is no Court of Appeals but we have the

11   benchmarks of why in this case it is.  And again, remember at

12   least this:  We are not quarreling that the Board itself isn't

13   an agency.  So if it says go out and do our bidding and do it

14   by way of our delegated authority, remember the Board here

15   called its action that we found in the little discovery we have

16   pre-decisional was the way it was phrased.  Therefore, what

17   does that mean?  If it was pre-decisional it means something

18   else had to happen, we now know in the record what happened.

19   The board itself said it is OK to do.  So the Federal Reserve

20   Bank of New York and the Fed worked in concert and one or the

21   other, it ended up that the FRBNY has to be an agency.  If not,

22   in every matter, in a matter like this where it is showing that

23   they are operating not just by the general delegated authority

24   but they are carrying out the wishes of the entity which is,

25   itself, an agency.

NAG5banA

1     So, again, you are pointing out something that I think

2  each time we have law that is not quite on all fours but it is

3  not on zero either, it is on two of the legs or, in some cases,

4  three but not all four.

5     In terms of therefore where would I then go next given

6  your question as to either what is the contract requirement of

7  not acting without it being good faith, fair dealing, or

8  arbitrary and capricious?  This case is the definition of

9  arbitrary and capricious in two ways.  We have set it out -- I

10  won't give the details but you know the two ways; one, the

11  moving target from going from you have missed a deadline that

12  didn't really exist to here are the answers that you provided

13  to the RFIs which our outside auditor say are improvements,

14  which the Fed decides to say no, that means it is a deficiency,

15  to which we then say they're not deficiencies because they have

16  been attended to, to which they then move to say no in the

17  April letter, it has to do with shell companies and has to do

18  with related party transactions.  So we addressed that A, shell

19  companies may be pejorative but they're not, itself, an issue.

20  And by the way, there were no shell companies after outside

21  auditors did what should have been done.  And lastly, as to

22  related party, that goes to the issue of risk again.  How much

23  better is it that in the small bank operating with so few

24  accounts that this bank and all that five layers knows who the

25  customers are.

1              And then lastly, in terms of the standard, well, what

2     is it that they did do?  Why is it that this action is

3     arbitrary and capricious or outside of the requirements of the

4     contract?  Here is why.  Again, it goes back to the very first

5     question you asked when I came to the podium this morning,

6     which is don't they have the right to shut something down if

7     they believe that there is some form of -- I will use the

8     phrase again -- money laundering?  Maybe we can get that far if

9     they did the job to be able to substantiate at the point we are

10    at in a preliminary injunction to your Honor's satisfaction

11    that there was any basis and this is what they did not do.

12    They never responded to those letters in the spring of 2022 for

13    clarification, they magically then transformed that list of

14    improvements that K2 did to becoming deficiencies.  They did

15    this without ever, to this very day calling, meeting, speaking,

16    or seeking the basis of K2's work or their work products or the

17    documents on which K2 came to its conclusions.  They never

18    sought to speak to anybody including the BSA officer at BSJI to

19    be able to test their theory that there is inherent risk.  Once

20    BSJI provided support by yet another outside, independent,

21    well-reputed entity AML RightSource, they repeated their

22    neglect and never spoke to them, got their papers, engaged with

23    them to find out if there was anything other than what they

24    conclude to be the case.  And once they raised the bond issue

25    in that last moment as we were approaching the TRO hearing,

NAG5banA

1    they did not seek an analysis which the auditors did, and when

2    the auditors did it, because we asked them to do it because it

3    was raised as the possibility of the glue that is going to hold

4    their theory that they can shut this bank down what happened?

5    These independent auditors concluded the following:  That this

6    transaction was "routine and legitimate."  You would have

7    imagined when that was done the defendants would have reached

8    out and said, let's get together and understand why what we

9    thought were a problem you find to be routine and legitimate.

10   They didn't do that.

11          And then, if you wanted to find out whether they had

12   any basis to come in to court and say they can shut us down on

13   the whim that there might be a risk of money laundering, you

14   might have thought that they would have, at least in the

15   record, indicated they had a substantial conversation with the

16   actual regulators OCIF  I don't know what they did but you and

17   I have the record and this is what they said they did:  We

18   contacted BSJI's supervisor OCIF.  Period, end of story, end of

19   sentence.

20          THE COURT:  I thought the record indicated that OCIF

21   had no resources and didn't do an audit of the bank for six,

22   seven years.

23          MR. LOWELL:  The record shows that the last audit was

24   2018.  Up until the point of the record there has been one

25   since, there has been one recently.  But that's not what I am

NAG5banA

1    suggesting.  I am suggesting whether they did it or not they

2    operate.  It is not like OCIF was unfamiliar with this bank's

3    operations even if the last audit was before.  What I am saying

4    is if they said they reached out, I am telling you who they

5    didn't reach out to.  So, OK, maybe OCIF didn't do an audit but

6    all those other entities did.  Let's say they're not the

7    government regulator but they are independent, they are

8    reputed.  They were blessed by the Fed when K2 was put on the

9    scene.  But what I am suggesting is I don't know what happened

10   when they say we reached out to OCIF but what we don't see in

11   the record is OCIF saying:  Yes, we had concerns.  No we didn't

12   have concerns.  I suspect that they called OCIF out of courtesy

13   to simply say we are shutting this bank down, we want you to

14   know.  But there are so many other steps along the way that you

15   measure against the measuring stick of whether it is arbitrary

16   or capricious or whether it is acting in good faith or whether

17   it is acting in fair dealing.

18         So it goes back to, again, can they shut a master

19   account of a bank that's been operating -- BSJI, I don't want

20   to use the word "bank" it gets confusing -- BSJI and, if so,

21   when or how?  So I don't concede the first.  I will agree that

22   that, if it exists, then it is not simply the one sentence,

23   that it comes with all kinds of attachments by which this

24   entity the defendants have to operate.  And that's what gets us

25   where we are today.

NAG5banA

1          In terms of prevailing on the merits, at the very

2    least, your Honor, as to the key issues that we have put

3    forward we have raised what the Courts call the serious

4    question that needs further analysis and even if we didn't, any

5    of the issues that we have raised -- I understand that the two

6    judges were in a slightly different context but the issue of

7    whether there is a mandate, the issue of whether or not the APA

8    applies, the issue of whether or not there is an arbitrary and

9    capricious standard, the issue of whether or not the contract

10   requires fair dealing, good faith, all of those, gets us at

11   least to the point of not just serious questions.  If we are at

12   the 50.1 we are at the 50.1.  But what I can tell you is if we

13   cannot keep the status quo in place while we get to the rest of

14   the case, then it becomes a cycle of why do it.  We will do it

15   but we shouldn't have to do it.  You shouldn't have to die for

16   somebody to come back to the operating room and resuscitate you

17   after the fact.  We should be able to keep the status quo.  And

18   in the standard, what could possibly be their harm?  What is

19   their harm next week?  What is their harm next month?  They

20   don't have any because of the five layers, because of the

21   number of accounts, because of the number of transactions,

22   because of the size of the bank, because it just doesn't exist.

23          What is our harm?  Our harm is immeasurable such that

24   we come and ask for injunctive relief.  We are losing

25   customers.  Their nonsense argument that we can find a

NAG5banA

1    corresponding bank when at the same time they are accusing the

2    bank being money launderers is more than circular, it doesn't

3    work.

4              THE COURT:  Do you agree with their statistics that

5    there are about 4,000 depository institutions that don't have

6    master accounts?

7              MR. LOWELL:  I don't know that I faced or addressed

8    that to be able to sit here and answer your question.  I'm

9    sorry.  I don't know whether I agree with that or not but I

10   don't think it is dispositive of the point we are making

11   because I don't know what those 4,000 depository institutions

12   do.  I don't know who their customers are.  I don't know

13   whether or not they're analogous to our situation.  I don't

14   know whether any of those, however many, had an account that

15   was taken back and taken away and closed for bad reasons.  So,

16   I would have to explore all of those to determine whether the

17   analogy has any efficiency.  I can say, though, that if you

18   look at what those harms are that you have to balance, then I

19   don't see any for them.  And I am not trying to be flippant, I

20   am saying that if your concern is that while we litigate this

21   case terrible things are going to happen on the island of

22   Puerto Rico in this bank because there will be terrible things

23   happening, there is no real basis to say that because of the

24   checks and balances.  On the other hand, what will happen to

25   BSJI?  It will go out of business.  You asked at the TRO

NAG5banA

hearing:  Well wait.  And they asked at the TRO hearing:  Why

aren't the people left going to weather the storm?  Well,

they're not weathering the storm, we have already lost -- I

think the record shows that or if it doesn't the supplement

shows -- that there are many of these account holders that are

transferring funds because they don't want to take the risk

that they'll be frozen.  So I think something like in the

beginning of the summer there was $900,000 on account.  Now it

has gone to $200,000.  I think we are in the process of seeing,

and the other reason that is so, so, important is when the

defendants said, wait, there is no harm here because it is not

profitable, it is going to go out of business anyway -- that

defies what we put in the record because this was an incredibly

profitable bank before our first run-in with regulators.  It

was at the tune of, in two years, almost $80 million.  And

then, of course, lost all of that.  But what does it show

today?  Without being interfered with this bank is on the road

to becoming, again, a seven-figure profitable bank within three

years.  That's the trajectory it was on before we ended up in

this litigation.

        So can't get us, corresponding bank, to do business

because A, they won't, and B, if they're worried about our

profitability they should be worried that we are spending too

much money dealing with the corresponding bank.  We are on the

road to recovery -- at least the bank was on the road -- and

NAG5banA

they can't get there.  For example, this issue that we have in

litigation prevents a company like Visa from doing what we

hoped they were going to do which is to provide us with a

credit card which would have been the possibility of creating

more revenue.  It is somewhat circular.  It was the intention

of BSJI when they had an initial meeting to get insurance from

the FDIC.  Again, this becomes a bump in the road to do that.

Our harm is calculable and measurable and not

satisfied with money damages.  Their harm, in the context of a

preliminary injunction proceeding doesn't exist, and that gets

us into the serious question as opposed to having to prove at

this moment at this podium in this courtroom that we are going

to actually win on the merits, which we will do, and I believe

we have given you enough to conclude that.  But, given the

balance of hardships, we are clearly or we should be clearly by

any objective standard, in just the serious question that

requires further litigation.  That's where we are at.  And in

that, there is plenty of serious questions.  And you know how I

that?  Because you asked them to me.  You said where is their

power to close?  What is the standard to do it?  We have given

enough to indicate that these are questions that should be

addressed.

THE COURT:  That, of course, skips over the cases that

say that if this is government action in the public interest,

the serious questions doesn't apply and you have to show a

NAG5banA

1    likelihood of success on the merits.

2         MR. LOWELL:  It doesn't skip over it, Judge.  It

3    skipped over it until I answered it now.  And that is just not

4    an exception you can drive your truck through just by putting

5    yourself at the steering wheel.  The standard is an agency or a

6    government actor, operating in the public interest pursuant to

7    statutory authority, gets you out of serious question.  And, of

8    course, we have now teed up both of those elements as to why

9    they can't get through that exception.  First, we believe

10   they're operating opposite of statutory authority, that's our

11   statutory argument.  And, as to the public interest, if you

12   look, there is plenty of case law on public interest.  What was

13   it?  Shutting down the entity whose customer was doing vast

14   amounts of pollution in the river waters of the entity.  That's

15   where you can assert that this required to shut it down because

16   at that point there was nothing that could be done to undo the

17   harm.

18        So, you are right, there is a standard, it says you

19   get serious question analysis if you are a government entity if

20   and when you can show that, but then I ask you a question back,

21   which is, why should we allow them to put on their government

22   agency hat when they want and take it off when they don't want?

23   Why is it that they say that we get deference as a government

24   agency and then why do they take it off when they say that they

25   we are operating under the contract.

NAG5banA

1          So, consequently, I would only ask if there is a

2     question as to whether there is a statutory mandate and whether

3     they are operating under the case law definition of public

4     interest, then we have teed that up as well.  We believe that

5     they cannot apply that exception to the serious question.  We

6     believe that each of these legs that we stand on -- the

7     mandate, the APA, the contract analysis, would themselves give

8     us both and the prevailing on the merits under the success on

9     the merit theory, but we believe we are in the lesser theory at

10    the very least because of the reasons that I said.

11          THE COURT:  Back to the various statutory arguments.

12    There was an amendment to the Defense Appropriation Act that

13    requires the Federal Reserve to file reports of applications

14    for master accounts that it rejects.  That's a pretty good

15    indication that Congress believes that the Federal Reserve

16    system has the ability to reject master accounts.  Why doesn't

17    that undercut the argument that there is somehow a statutory

18    right to a master account?

19          MR. LOWELL:  It is tricky when any of us -- you do it

20    every day, I don't -- try to glean the intent of Congress

21    through an action in one way that doesn't squarely address the

22    issue.  For example, it is not as if the United States Congress

23    doesn't listen to the Federal Reserve Board when the Federal

24    Reserve Board has something to say.  They were so sure that

25    they have a need for something they can go and ask for it.  And

NAG5banA

```
 1    if what they are saying is the reporting requirement that you

 2    are citing to me is proof that they have the power, I think it

 3    is a league past it but, more importantly -- and again this is

 4    why it is a slippery slope -- we point out in our reply

 5    defendants claim that Congress recently recognized Reserve

 6    Bank's unfettered discretion over master accounts in an

 7    amendment to the Federal Reserve Act -- the one you are talking

 8    about.  The Board lodged this identical argument in Custodia,

 9    although the plaintiff had only applied -- that is, the

10    concept -- the sponsor and the principal drafter of the

11    amendment rebuked the argument in an amicus brief stating what

12    we showed you it stated.

13            And consequently, I just think that your question to

14    me as to whether or not that there is an amendment to the FRA

15    that asks for a report means that there is a power.  I

16    understand your argument.  I think it is based on a secondary

17    application of how to glean one aspect of an amendment that did

18    not address the very issue.  And maybe, Judge -- again, because

19    it is a hypothetical -- maybe the issue is maybe Congress was

20    trying to figure out whether or not the Federal Reserve Board

21    and its banks were operating in good faith, with diligence,

22    consistent with the APA, consistent with the requirements of

23    due process so they could decide what to legislate.  Maybe they

24    wanted to find out that there was something that might rise to

25    the level of equal protection clause.  It cannot mean why
```

NAG5banA

Congress takes a report as a way of indicating that they have

bestowed power on an institution.  All I can do is muse.

THE COURT:  OK.  Thank you.

MR. LOWELL:  Thank you, Judge.

MR. YOUNGWOOD:  Good morning, your Honor.  Jonathan

Youngwood for the Federal Reserve Bank of New York.  I am going

to present and then the Board itself will follow me.

I have a few high-level comments, I want to try to

respond to at least some of the questions you asked, and if I

don't respond to the ones that you want I know you will let me

know, and then I want to walk through a few things that we

didn't discuss yet which is irreparable harm.

Your Honor, this is not an opportunity for this Court

to substitute its judgment for the Federal Reserve Bank of New

York.  The allegations, the facts that are supposedly pled that

would somehow undercut that judgment whatever standard applies,

and I think there is an argument that -- a very strong one that

this being not an agency, the APA does not apply but if it did

apply, because there is no clear -- going to your question,

because there is no clear standard, this Court still cannot

review it.

But the allegations of bad faith, they're ghosts, your

Honor.  They're conclusory, there is some claim of bias, there

is no equal protection clause pled nor could there be based on

these facts or any facts I could imagine.  There is no serious

NAG5banA

1    allegation of lack of process.  In their reply brief on page 16

2    there is a chart that shows all the meetings and the back and

3    forth.  They don't like the results of it but not liking the

4    result is not a lack of process.

5          Your Honor asked a question to which I believe there

6    is an obvious answer.  There is no de minimis exception to the

7    risk of money laundering on the economy.  Just because one bank

8    is small doesn't mean that it doesn't pose a risk, and if you

9    continue the logic that I think was presented, the rule would

10   be small banks can pose risks of money laundering but others

11   can't.  Obviously, if you add up a bunch of small banks you

12   have a risk.  If you have big banks you have a risk.  No money

13   laundering, no risk of money laundering, that is well within my

14   client's discretion to act on and that is what they did here.

15         And then there is a great deal of argument that

16   suggests the problem is that they haven't been convicted of

17   anything in a court.  But that is not the test for assessing

18   risk.  The test is not whether or not the risk has already been

19   realized and proven, it is whether or not there is a risk and

20   that is what is behind the guidelines, the offering circular,

21   the master account agreement, and the supplemental agreement.

22         And, your Honor, I want to talk about the statutory --

23         THE COURT:  Let me just stop you for a moment.

24         The supplemental agreement was entered into after the

25   last investigation.  Is that a standard supplemental agreement

NAG5banA

1    that similar banks with similar risk profiles enter into or was

2    it a specific agreement for this bank?

3            MR. YOUNGWOOD:  Your Honor, I would have to defer as

4    to whether each word is the same but it is a form of agreement

5    that is used in appropriate circumstances.  This is not the

6    only institution that has been asked to agree to that as a

7    condition for going forward.  And your Honor maybe pausing on

8    the agreements.  The history here, I think, is interesting.

9    Obviously the initial agreement was in 2012.  *Fourth Corner*, if

10   it stands for anything, and we would submit it stands for the

11   opinion of one circuit court judge who, as you say, could not

12   get even one of his colleagues to agree with him, obviously

13   also out of circuit, and we would submit to the degree we need

14   to debate it, incorrectly -- I don't want to say decided

15   because nothing was decided -- but the opinion we would say is

16   inconsistent with the law.  *Fourth Corner* then comes and it is

17   after that that this supplemental agreement is signed.  And so

18   if, in some way and I will say, respectfully, with same counsel

19   or at least the same law firm involved as is present here

20   representing the bank, so that sequence I think matters in

21   terms of people thinking that things meant something or didn't

22   mean something.  Obviously following that the board publishes

23   the guidelines which are also in the record.  And then, as your

24   Honor has said, while 342 came first, 248(a) came second but

25   makes no specific reference to 242.  In December of 2022,

NAG5banA

1    248(c) is enacted and, as your Honor has pointed out, includes

2    the word "rejected."

3           So I think there are a lot of ways to get to a denial

4    of this motion.  I think there are a lot of easy paths too.  An

5    easy path is to recognize that here we are talking about an

6    institution that agreed not once, but twice, to sign something

7    that if they did not think -- if they did not think -- my

8    client already had the ability to reject or terminate their

9    account, they signed two agreements that said so.  *Fourth*

10   *Corner* did not address that.  *Custodia* did not address that.

11   So that, in and of itself, takes those cases out.  I don't

12   think it takes the statutes out because the statutes are

13   completely consistent with those two agreements but it provides

14   a different route for assessing all of this because you have

15   two contracts that are clear -- in our view -- as day,

16   including the supplemental agreement that has the words "in

17   their sole discretion" which carries special meaning in the law

18   giving the Federal Reserve Bank of New York really unfettered

19   discretion to terminate.

20          Your Honor, I don't want to get very deep into the

21   facts because as I started I don't think this is the place to

22   reassess them, but in Exhibit N to Mr. Brennan's declaration,

23   as well as in the letters that went back and forth between the

24   parties, there are extensive discussion of the reasons that the

25   risk here was, Judge, of a sort that justify the termination of

NAG5banA

1    this account after many years, many back and forths, honestly

2    lots of chances, and that at this point it's time to terminate

3    this relationship and it is time to do so both under the

4    contracts and under the law and, respectfully, in the interest

5    of the financial system.

6            I do want to touch -- yes, your Honor?

7            THE COURT:  Maybe you were about to touch on this but

8    the gist of the argument on the other side, and certainly the

9    gist of the oral argument is risk.  Risk has never actually

10   come to fruition.  We have many levels of auditors that have

11   looked over these transactions, the auditors initially came up

12   with open issues, they didn't come up with findings, and then

13   we address the open issues.  So we can continue to do that

14   without the risk ever being effectuated.  And the response is?

15           MR. YOUNGWOOD:  Your Honor, I don't know if the risk

16   has come to fruition because, as counsel points out, there has

17   never been a trial to determine that.  But that's not the test.

18   The test is whether there is risk of an institution, with all

19   of the things -- and again, I am happy to walk through them

20   perhaps just in brief, your Honor, but if you look through the

21   record, the FRB of New York identified a series of high-risk

22   transactions in jurisdictions with heightened risk of money

23   laundering that were consistent with efforts to obscure the

24   true source of the funds.  Plaintiff's explanations of these

25   transactions was contradicted by the underlying transaction

NAG5banA

1    documents.  These high-risk transactions largely involved

2    transfers among individuals or entities controlled by close

3    family members of plaintiff's owners.  Plaintiff's compliance

4    systems, particularly those related to money laundering, had

5    numerous weaknesses which exacerbated the transactional

6    concerns and the high-risk characteristics of BSJI's

7    transactions are well known red flags for money laundering.

8    Again, they are risks but that is the system that you have in

9    place to prevent things from coming to fruition and that is

10   consistent, again, with the original agreement, supplemental

11   agreement, the guidelines, the offering circular.

12           Your Honor, do you have a question?

13           THE COURT:  No.

14           MR. YOUNGWOOD:  So, your Honor, again, it gets into an

15   effort by plaintiff to try to turn this preliminary injunction

16   hearing into a complete re-review of the record and there is no

17   standard -- whether it is an agency or not, there is no

18   standard by which this Court is empowered to do that.

19           THE COURT:  I take it after discovery and trial you

20   would say it's not the obligation of the Federal Reserve Bank

21   of New York to prove by a preponderance of the evidence that a

22   money laundering transaction had in fact occurred.

23           MR. YOUNGWOOD:  Correct, your Honor.

24           THE COURT:  If a money laundering transaction had in

25   fact occurred, that ought to be the subject of a separate

NAG5banA

1   action with a higher standard of proof.

2           MR. YOUNGWOOD:  Correct, your Honor.  We do not -- the

3   decision was made based on risk and that's what we want the

4   Federal Reserve Bank to be doing, to be making decisions based

5   on risk to protect the overall financial system and the

6   economy.  If they had to have a full trial on the merits after

7   years of discovery, each time they had to take any action they

8   would be completely incapacitated to protect the financial

9   system.  It's not what the contract that, again, twice signed

10  with the second one being even stronger than the first, and it

11  is not what the statutes, require.

12          Your Honor, I want to talk a little bit about

13  irreparable harm.  It came up a bit but didn't directly come

14  up.  There is no irreparable harm here.

15          THE COURT:  Oh, I think that's not a fair

16  characterization of the last argument, but go ahead.

17          MR. YOUNGWOOD:  I didn't mean to -- your Honor, it

18  came up in bits and pieces.  I just wanted to address it

19  directly.  I don't mean to characterize their argument.

20          Your Honor, the issue is whether or not the master

21  account can be terminated, not whether or not BSJI is going to

22  go out of business.  I don't know if it is going to go out of

23  business.  It is speculation.  Speculation cannot be a basis

24  for irreparable harm.  What I do know is that they've been down

25  this journey before, their account was suspended for 22 months

NAG5banA

1    and they had the customers at the end of that, more or less

2    what they have today so those customers stuck through with

3    them.

4              THE COURT:  That's not accurate.  They have far fewer

5    customers today than they did before the last suspension.

6              MR. YOUNGWOOD:  A hundred percent, your Honor.  That

7    is completely correct.  But that's not what we are litigating

8    today.  We are not litigating if something was done wrong then.

9    There was no suit filed.  What I am saying is that they -- 13,

10   14 accounts, people --

11             THE COURT:  By the way, all of those 13, 14 accounts

12   existed during the last suspension.

13             MR. YOUNGWOOD:  That's my understanding.

14             THE COURT:  OK.

15             MR. YOUNGWOOD:  In other words, they weathered it is

16   the point, your Honor.  But I think the additional point is

17   whether they've pled and, frankly, offered evidence of in nine

18   separate declarations, whether or not they could get a

19   corresponding bank relationship somewhere else.  I re-read this

20   morning, actually, the supplemental or second declaration of

21   Mr. Vasquez and I will leave it to your Honor, of course, but

22   paragraphs 2 through 10, or perhaps 2 through 9, purport to lay

23   this out.  Your Honor, there is a mention of one specific

24   communication, that's in paragraph 2, and then there are

25   generalities of efforts to find other corresponding bank

NAG5banA

1    relationships with some 20 other institutions -- that's in

2    paragraph 5.  We are not given the names of any, the dates of

3    any, rejection letters.  For all we know these date back to the

4    first suspension, to the one suspension.  It is not the

5    responsibility -- I think there is some suggestion in here by

6    Mr. Vasquez that if my client has any ideas they would be open

7    to it.  It is not the responsibility of the Federal Reserve

8    Bank of New York to find them a corresponding banking

9    relationship which leads me to my third point on irreparable

10   harm which is the problems they are having.  As your Honor

11   pointed out, there are thousands and thousands of institutions

12   that function through the U.S. monetary system by virtue of

13   corresponding bank relationships without a master account.

14   There is no reason they can't be one of them.  It is not my

15   client's responsibility to set that up for them, certainly not

16   when we have contracts that say we are able to terminate.  And

17   if they are having problems finding another relationship, that

18   may be because the underlying concerns that the Federal Reserve

19   Bank of New York found may be shared by others.  I don't know.

20   I'm now speculating.  But it is not satisfied, based on their

21   declarations and their pleadings, that they don't have other

22   resources, they don't have other methods of getting to the same

23   place.  They simply want it to be that the Federal Reserve Bank

24   of New York because I assume it is easier.  That's what they

25   want.  They refer to third-party contracts with Visa and others

NAG5banA

and opportunities that they might have if they had that.

That's not the responsibility of the U.S. financial system to

set up for them.  And so, your Honor, for reasons I have said,

I don't think irreparable harm is established here.

In terms of the APA claim and whether or not the

Federal Reserve Bank of New York is an agency, there is

reasonably detailed briefing on this on page 24 through 26.  I

will note that there were two cases that were cited in their

opening brief, both the *Lee* case that you and counsel

discussed, and the *Flight International Group* case; the second

one was vacated so I don't think they're relying on it.  The

*Lee* case itself obviously says what it says but I will note

that, unlike in *Lee*, where the district court heavily relied on

the fact that the board of governors had delegated substantial

decision-making to the reserve banks so their board delegates

to reserve banks, at least according to that judge.  In this

case, the discretion comes from one of two places -- it comes

from the FRA itself.  If you read 342 it is not a delegation by

the board, it is expressly, in 342, to the federal reserve

banks including the Federal Reserve Bank of New York, or from

those two contracts.  And so, whether or not *Lee* is persuasive

or -- it is certainly not controlling, whether it is persuasive

or not, the facts are completely different and not applicable

here.

THE COURT:  Am I right, there is no Court of Appeals

NAG5banA

decision that has ever addressed the issue of whether a federal

reserve bank is an agency for purposes of the APA?

MR. YOUNGWOOD:  As far as I know, your Honor, that is

correct.  We cite various cases that we think touch on the

issue but your statement I believe to be correct.

Your Honor, there is the debate as to whether or not

the standard is the likelihood of success or the substantial

questions.  Several answers on that.  In part, that may turn on

whether or not you find my client to be an agency.  If you do,

then likelihood of success definitely applies.  If you don't,

they lose their APA claim.  And, if you go through the rest of

the claims, they are very hard to draw your line through.  You

have got two contractual claims -- when we have a contract that

clear, on its face, says we can do that so I think the

contractual claims are very problematic for them.  You have a

due process claim which is a very, very, very hard claim to

establish, and whether it applies to an instrumentality versus

an agency it seems, again, I point to that chart on page 16 of

their reply, there has been lots of process here.  You have a

mandamus claim that they don't seem to actually have as a basis

for the preliminary injunction, and then you are left with one

declaratory judgment claim which, standing on its own, is not a

claim if you don't have an independent method of getting to it.

So, I would say that either we have likelihood of

success or they lose the only claim that might have had any, I

NAG5banA

1    don't think, substantive teeth.

2            THE COURT:  Why should likelihood of success, as

3    opposed to serious questions, be applied only to "government

4    agencies" as opposed to "government instrumentalities"?

5            MR. YOUNGWOOD:  Your Honor, I think it is clearly

6    applied to agencies.  I think there is no reason on the

7    likelihood of success not to apply to instrumentalities and, of

8    course, also different arguments against The board.  What I

9    would also say, your Honor, regardless of how you get to

10   likelihood of success -- I didn't say that well.  There is a

11   different way to get to likelihood of success and, again, we

12   think likelihood of success applies.  One of their arguments

13   against it is circular, it goes to the statute and says because

14   we are not following the statute that it therefore doesn't

15   apply.  That is going to the merits, not to the question.  But

16   on the serious questions, they also have to show a hardship

17   and, again, the briefs are replete with this, but it is a

18   hardship on the Federal Reserve Bank of New York and on the

19   financial system not to be able to enforce the contracts and to

20   accept this risk into it.

21           The final point I would make, your Honor, is what I

22   have not heard, although I understand a lot of facts have been

23   talked about and issues of what one might find of, frankly,

24   conclusory allegations of -- I am not even sure if they rise to

25   bias but of something, there must be some reason my client

NAG5banA

1    doesn't like them -- the issues here, your Honor, I think are

2    purely legal.  What do these contracts say?  Are these

3    contracts enforceable?  I don't think they're factual.  And so

4    the question, if there are "serious questions" they are

5    questions that can be answered on this record.  There is no

6    discovery that is needed to, depending on which direction your

7    Honor goes, whether it is the contracts, 342 versus 248(a).

8    Whatever it is, your Honor, the record, which is a pretty thick

9    record, at least a paper record for a preliminary injunction,

10   that record is already there and so what you are left with is

11   legal issues.  Now, I recognize the *Custodia* Court on a motion

12   to dismiss decided that it was going to defer deciding a legal

13   issue for discovery.  Respectfully, that did not make sense.

14   That's exactly what a district court can do which is decide

15   legal issues based on paper.  And so what I would say is that

16   you basically are, on likelihood of merits, on the reasons we

17   have already been talking about, the government actors here,

18   but you are also there because there is no undue hardship shown

19   by them and, frankly, a significant amount shown by the

20   defendants and because, your Honor, the issues that would

21   remain would be purely legal and so there is no benefit in

22   keeping this institution as part of the monetary system were

23   the case to go forward.

24          THE COURT:  On a legal point, how do you distinguish

25   the Second Circuit's decision in *Greater Buffalo*?

NAG5banA

1          MR. YOUNGWOOD:  One second, your Honor?

2          THE COURT:  It is all right if you don't have it.

3          MR. YOUNGWOOD:  No, your Honor, I have it.

4          THE COURT:  I can read the brief.

5          MR. YOUNGWOOD:  Well, your Honor, there is a footnote

6    in our brief that does it and I was going to give you the

7    reasons there.

8          THE COURT:  OK.

9          MR. YOUNGWOOD:  I was not going to go beyond the

10   footnote in our brief.

11         THE COURT:  OK.  Thank you.

12         MR. YOUNGWOOD:  Thank you, your Honor.  I will cede to

13   my colleague.

14         MR. CHADWICK:  Good morning or now afternoon, your

15   Honor.  I generally would offer my agreement with the things

16   that Mr. Youngwood said, I don't want to rehash those points

17   and would, instead, hope to clarify a couple issues, and then

18   focus on the board-specific issues but certainly don't agree,

19   obviously, that a PI would be appropriate as to the Reserve

20   Bank Board.

21         The first issue, just to clarify, your Honor, both in

22   BSJI's reply brief and then this morning there has been a lot

23   of discussion of delegated function.  I think Mr. Youngwood

24   touched on this but it is quite clear that this is not a

25   delegated function.  It is true that the board delegates

NAG5banA

certain functions to reserve banks, and in those cases the
reserve banks perform government function.  BSJI cites the
Board's delegation reg in its brief, 12 CFR 265.20.  You won't
find anything on master accounts there, your Honor.

        Mr. Lowell also said that the board put the thumb on
the scale of this account denial but there is nothing in the
complaint making that allegation nor any facts in the record
that would suggest that.  Just to the contrary, there is no
evidence that the Board has weighed in on this in any way other
than to accept a consultation under the Board's guidelines,
which has helped to ensure the Board's awareness of accounts
listed and help ensure consistency across regional reserve
banks.

        Mr. Lowell also talked about language in that
computation calling this pre-decisional but I would offer that
that is merely a truism.  The decision of the Federal reserve
Bank of New York to close the account had not yet been issued
to BSJI so the fact that it was pre-decisional was just that,
it hadn't been issued.

        On the issue of 12 U.S.C. 248(a), the Monetary Control
Act, your Honor, I did want to clarify a couple of points and
I'm not sure if they've been fleshed out in the briefing to the
extent that they ultimately would be able to reach Rule 12
briefing but I think they are important.  That is, consistent
with its title, the Monetary Control Act of 1980, the purpose

NAG5banA

```
 1   of it was to restore Federal Reserve control open money

 2   supplies.  To facilitate that goal Congress authorized the

 3   Reserve Bank to open deposit accounts for non-member banks for

 4   the first time, and did that by modifying Section 13 of the

 5   Federal Reserve Act which is 12 U.S.C. 342.  It changed the

 6   language there to allow deposits from non-member banks for the

 7   first time.  They notably retained the permissive "may"

 8   language which indicated Congress' intent to keep the

 9   discretion the reserve banks had had with respect to master

10   accounts and deposit accounts since 1913.  And just to touch

11   briefly on the Judge Bacharach decision from the Tenth Circuit,

12   there are many issues and problems with that decision itself

13   but one thing I notice is that Judge Bacharach said that 342,

14   as currently exists, was virtually identical to the prior

15   version when the Supreme Court addressed this issue in the

16   Farmers' and Merchants' case.  That is just not true.  It is a

17   fundamental flaw.  When Congress passed the Monetary Control

18   Act, it allowed reserve banks to accept deposits.  Now,

19   Congress also assigned a role to the board --

20          THE COURT:  I thought the Farmers' case was actually

21   helpful to you.

22          MR. BRENNAN:  It is, your Honor.  It is.  Extremely

23   helpful.  It points out all the spots --

24          THE COURT:  I don't understand why you are quarreling

25   with Judge Bacharach's comment that the Federal Reserve Act was
```

NAG5banA

1    substantially the same.

2          MR. CHADWICK:  Well, I am pointing out, your Honor,

3    that Section 342, it goes to the reserve bank's ability and

4    discretion -- both ability and discretion -- to accept

5    deposits.  And it wasn't just that when Congress passed the

6    Monetary Control Act that it added the pricing provision of

7    248(a), it also made a change to 342.  But when it did that, it

8    did not take away the "may" language, the discretionary

9    language so I think that is a point worth noting.

10          THE COURT:  But the *Farmers'* case is still instructive

11    with respect to the issue of "may" in Section 342.

12          MR. CHADWICK:  A hundred percent, your Honor.  Yes.

13    Absolutely.  My point is that Judge Bacharach was saying that

14    342 doesn't have anything to do with reserve bank accounts and

15    services and our point is 342 has everything to do with it;

16    that that "may" language, even though Congress may change it,

17    it has never taken the "may" language out of 342.

18          THE COURT:  So if I were you I would rather argue that

19    342 is the same with respect to "may" as it was when the

20    Supreme Court interpreted "may" in the *Farmers'* case.

21          MR. CHADWICK:  I take your point, your Honor.  I a

22    hundred percent agree with that point.  Maybe I should --

23          THE COURT:  Moving on.

24          MR. CHADWICK:  -- move on to the 342 point, I don't

25    want to belabor that.

NAG5banA

1          On 248(a) Congress directed the board to set a pricing

2     schedule with certain pricing principles including, as a

3     general matter, that members and non-members would be accessing

4     reserve bank accounts and services for the first time, and one

5     of those principles was reserve bank cost.  Another principle

6     was the general recognition that these services would be

7     available.  Again, the purpose of that was to increase deposits

8     at the reserve banks as a matter of monetary control.

9          Turning to the board-specific issues, and on the

10     standing issues in particular, your Honor, I would like to -- I

11     think from our position it is not clear why the Board is here

12     today as a defendant at all in this action.  The Board, I think

13     everyone agrees, does not open, does not maintain, does not

14     close any deposit accounts much less BSJI's account.

15          Plaintiff extrapolates from the Board's general

16     supervisory authority over the regional reserve banks to

17     conclude that the Board is legally compel to direct BSJI's

18     desired outcome apparently expecting the Court to direct the

19     Board to direct the reserve bank to keep the master account

20     open but that's not the way the federal reserve bank works,

21     your Honor.

22          THE COURT:  You argue that the Board, that there is no

23     standing that the plaintiff has to request a preliminary

24     injunction against the Board because the Board lacks the power

25     to direct the Federal Reserve Bank of New York to continue to

NAG5banA

1    maintain the master account.  What case or cases do you think

2    stand most clearly for that proposition that the plaintiff

3    lacks standing to ask for that relief against the Board?

4         MR. CHADWICK:  I think we have cited a series of cases

5    in our brief, your Honor, from the Second Circuit and district

6    courts within the Second Circuit dealing with licensing issues

7    generally which are analogous here and that would include the

8    *Libertarian Party of Erie County v. Cuomo*, 970 F.3d 106, 122

9    (2d Cir. 2020) where you have got to, in order to have standing

10   you have to direct your case to the entity with the

11   decision-making power over the particular decision at issue;

12   license in those cases, master account here.

13        THE COURT:  So under your theory with respect to the

14   Board, the disposition is not that the preliminary injunction

15   is denied but that the preliminary injunction against the Board

16   is dismissed for lack of standing?

17        MR. CHADWICK:  Well, we make both arguments, your

18   Honor, but I think if we can get past the standing issue would

19   be the easiest and quickest way to get there.  It is neither

20   fairly traceable to any decision of the board or could it

21   possibly redress any harm.  Imagine that an injunction just

22   issued against the Board but not against Federal Reserve Bank

23   of New York, there would be no ability for the Board to redress

24   the harm.

25        THE COURT:  If this were a 12(b)(1) motion, though,

NAG5banA

which it is not, not so clear that the plaintiff lacks standing

against the Board.  *Custodia Bank* said essentially there were

issues of fact on that issue.

MR. CHADWICK:  Two things on *Custodia*, your Honor.

*Custodia* had a very different set of allegations.  Custodia

alleged in the complaint --

THE COURT:  Right, unreasonable delay.

MR. CHADWICK:  -- the Board was directing delay first

and then the decision, but their allegations that the Board was

making a top-down -- those allegations don't exist here and I

would also reiterate what Mr. Youngwood said which is that it

is not clear why there would be any need to move to discovery

under the statutory interpretation question in that case, but

just on the allegations that exist, they are quite different

than what we have in this case.

THE COURT:  You would agree that the Board is an

agency for purposes of the APA?

MR. CHADWICK:  Yes, your Honor.

THE COURT:  OK.  Go ahead.  Anything else?

MR. CHADWICK:  So maybe on that point, just to cover

that point for a second, your Honor, I mentioned that it is not

fairly traceable to the Board, that an injunction against the

Board would have no effect, would not redress the harm that

they claim.  But, even if it were possible for the Board to

take affirmative steps given the deposit-taking function that

NAG5banA

1    Congress vested directly in reserve banks in Section 342, the

2    Board would have to take some additional level of steps, right,

3    and to do that, number one, that would certainly be a mandatory

4    injunction in the sense that the board would have to take

5    affirmative action vis-à-vis the reserve bank, but that type of

6    action, for the Board to leverage whatever power it might have

7    to try to get the reserve bank to take certain action, that is

8    the type of activity that, under the APA which the Board is

9    certainly subject to, would be not reviewable as the agency

10   discretion by law.  I think this Court recognized that in the

11   *Zheng v. Reno* case, which also cited *Heckler v. Chaney*, which

12   is the Supreme Court's leading case, 470 U.S.C. 21.  But, it is

13   essentially asking the Board to take its supervisory authority

14   and exercise it in a certain way vis-à-vis the reserve bank.

15   It is not exactly clear how the Board would go about doing that

16   but, certainly, that is a decision that I think would fall

17   squarely under that rubric of committed agency discretion, by

18   law.

19            THE COURT:  OK.

20            MR. CHADWICK:  I think with that I will stop, unless

21   your Honor has further questions.

22            THE COURT:  No.  Thank you.

23            MR. LOWELL:  Brief rebuttal, your Honor?

24            THE COURT:  Brief.

25            MR. LOWELL:  I will be as brief, to make it just

NAG5banA

1    rebuttal.

2           The things that you just heard from the defendants

3    that deserve rebuttal are as follows:  Whether you are through

4    the prism of what is required under the contract, or whether

5    are you in the prism of whether what is required is confined by

6    the APAs, or whether you are in the prism of whether or not you

7    get a property right taken without due process of law, we have

8    been talking in our request of this Court about process and we

9    pointed out, when I stood here earlier, what the lack of

10   process was and the response that the defendants had was to

11   point you to a chart where they say there is lots of backs and

12   forths.  But, if you look at that chart, it's a forth and not

13   much of a back because what that chart shows, if you look at

14   the time lines, was the tremendous gaps of no involvement in

15   the back to our forth.

16          For example, we pointed out that in the beginning of

17   2022, when there was uncertainty based on when the measuring

18   month occurred, to what was the effect of the COVID year and

19   requests were made, more than once, to please engage us so we

20   do it right.  Months went by and there was no response other

21   than:  You are closed.

22          In October of 2022, when there was a set of requests

23   for information and within two weeks they were responded to, it

24   did not have any back to the forth, even including BSJI's, in

25   January, asking for:  *What do you say?* until in April they did

NAG5banA

1    it again and said:  Our response is you are closed.  That's

2    seven months.  There is no back to our forth.  In May, twice;

3    in June, twice.  These have been the forths without back.  And

4    you can look, as you were asked to do, at Mr. Vasquez' our

5    CEO's affidavit declaration.  There were three attempts in

6    August of 2022.  Two attempts in September of 2022.  There was

7    the request in October of 2022 for the responses to the RFIs.

8    In January there were two reach-outs by the bank for engagement

9    and dialogue and then there was up to the June 2023.  So, if

10   they're saying look and see all of the process that has

11   occurred, we basically say please look and see what the lack of

12   process has been.

13           I want to address this issue of risk because they

14   throw out risk and risk is -- in a certain way it is not a red

15   herring but it's every institution has risk.  It's not that

16   risk exists, it's whether or not risk that exists can be

17   mitigated.  If risk can be mitigated, whether you say it's

18   whether they have the obligation to provide our account or if

19   they take it away they have to have a process reason to do it,

20   that's when you get to the five layers we have talked about.

21   And the one thing that you did not hear, either defendant come

22   to the podium and say in the preliminary injunction is

23   addressing what I asked which is:  What about that fifth layer?

24   We have a monitor in effect which you agreed to put into place

25   with expertise and the ability to look at every transaction and

NAG5banA

you didn't address it for five seconds.  There is no harm or
risk in the moment that we are in because if you look at risk
we are not saying that -- and as you ask me, is it de minimis?
Is there a de minimis exception to money laundering?  Well,
there is not a de minimis risk to money laundering and we are
not saying, oh, what we are asking your Honor to do is allow
small banks to have higher risk than big banks.  That's almost
counter-intuitive given that, again, what did they not address?
They didn't address what you make of the fact that this little
bank, with risk that has not been substantiated and a monitor
in place for every transaction, is being asked to shut down
when Deutsche Bank, with multiple, multiple reasons, has not
been asked to shut down and they didn't address that issue as
well.

   As to the issue of hardship, we are prepared to have
that monitor stay in effect not just through the course of this
trial but if that's what it takes to assure our regulators in
Puerto Rico or those here, there is all of this independence
that is going to mitigate risk.  Again, the issue is not
throwing up that there is risk, it is what is being done to
mitigate it for the system.

   The issue about our contract.  I guess it goes to the
issue of why did we sign two contracts that allow them to do
what they say they're doing.  I point only again to the point
we made in our brief which you know better because I think it

NAG5banA

is your case, we didn't get into in the argument here about the

disfavor that should occur when somebody is being asked to

prospectively waive a statutory right and that's in fact what

they are doing.  And what is interesting is that they're not

saying just we did that.  Their argument is that that operative

agreement applies across the board to every bank.  Every bank

has prospectively waived their right to challenge the Federal

Reserve Board or the bank in which they operate doing something

that they claim is either violative of statute, violative of

the APA, violative of the contract.  Prospectively, it is not

just us, it is every one of the banks.

          I know they asked you to look at Exhibit N of

Mr. Brennan.  I want to point out, back to the issue of the

monitor and their lack of saying it, this is what they said

when we said what about the monitor in their opposition.  I

hope you can make heads or tails of this because I cannot.  As

to monitor it says:  This would not mitigate the risks posed by

the overall gaps in BSJI's compliance program, such as, the

monitoring of segments of BSJI's customer base involves

high-risk activities.  I can't take those words and figure out

what they were saying as to why the scrutiny of every

transaction, every customer, every day doesn't provide the

mitigation of risk we put forward that it does.

          I want to say just a word about the irreparable harm

point that they made.  Yes, please do look at Mr. Vasquez'

NAG5banA

declaration and supplemental declaration not just for the

corresponding bank, which I will come back to in a second, but

to the issue of our customer base.  You are right that the

people that are there now, except that they are beginning to

dwindle and go away, or they sit there as a customer but

they've taken their money out so they have an account that's

dormant, weathered the first storm.  This is not three strikes

and you are out, this is like two strikes and you are out and

we are in the middle of the second strike and we are trying to

preserve the ability to recover so I do ask you to look at that

declaration.

        Where they ask that you put together a response to the

APA argument I would say the following:  They say that the *Lee*

case says what it says.  OK.  The *Lee* case says what it says.

It says they're an agency.  They say that you can cabin *Fourth*

*Corner* for what it says that doesn't apply and that's true.

You say that *Custodia*, they say, can be distinguished in the

way they want on the facts, but if you add up all of this it

doesn't mean that they get to declare that their interpretation

of the only benchmarks we have in this area don't instruct our

request for the status quo to be in place.  It is the only

place we have to look.

        I want to point out as well that the question you

asked about 248(a) and their response about 342, a couple

things to say about that.  The first thing to say is that I

NAG5banA

think the *Farmers' Bank* decision occurred before the control

act and, consequently, 342's "may" occurred before 248's

"shall."  Now, even if that weren't the case -- I don't think a

"may" can overrule a "shall" but even if it could, this is

where I am disoriented.  342, their argument goes, if we may

reject a particular vehicle of deposit, a particular type of

thing, that means we could reject all of it, and if we can

reject all of it, isn't that the same as taking away the

account to begin with?  And that's where the sentence falls

apart.  If they said there is no form of bank transaction --

deposit, transfer, wire, check, ACH -- that we will allow you

to accept across the board that, itself, would then become

subject to a challenge because that couldn't be more arbitrary

and capricious.  You can't say that because I can reject a

certain kind of banking transaction that means I can stop the

person from coming into the bank to begin with.  That's what

their argument of 342 suggests and I don't think it goes that

far to do.

        I think the other thing I want to point out is that on

the issue of corresponding banks, the record has the attempts

made and they say, OK, well they don't given us the name, the

rejection letter.  Fine.  If that's what they need to show that

we have irreparable harm, or if that's what they need to show

that we don't have any alternative but to maintain an account

that we had the right to have for 11 years, that's what

NAG5banA

1    discovery would be for on both sides of the occasion because

2    they haven't put forward a single time that a bank said to a

3    bank accused by anyone of being money laundering and having

4    their master account closed that, OK, fine, bring your business

5    to us, we will allow you to operate under our umbrella.  I

6    mean, it is an intuitive argument but it is an intuitive

7    argument that is loud because why would somebody do business

8    with somebody whose master account was closed because you

9    raised the issue that there was some form of risk of money

10    laundering?  It just isn't going to happen.

11          As to the issue of what we would do in the case going

12    forward, which is partially what they have pointed out -- by

13    the way, again on the irreparable injury issue, and again it is

14    a case that you have written so I know the facts don't line up

15    always in cases, but the declarations we put forward and my

16    showing you that the accounts are dwindling in amount and there

17    is a customer about to leave ought to -- much ought to --

18    fulfill the quote in the case of imminent danger of losing

19    customers is enough.  And we don't want to have to get to the

20    point where we have lost all of them to say, See?  We told you

21    so.

22          As to what is to be done next because it has been

23    raised by your Honor so here are a few things.  We ought to be

24    able to stress test and allow an examination of defendant's

25    conclusion that there was some transaction that has, at the

NAG5banA

point of which they say they can take this action because there
was an indicia of money laundering somewhere in the mix.  What
was their analysis for that and why is that important?  You did
allow discovery.  One of the things we found in the discovery
they conceded, that in the first event which gets me into your
courtroom today, their closure of July of 2022, there was no
underlying memo, no underlying analysis, no basis that we can
test.  We should be able to test their reasons, especially
because theirs reasons keep changing from July to the fall, to
April, to our TRO hearing.  They have indicated that their
intelligence and investigation unit they say devoted seven
months to review the RFI responses and on this basis they
believed there was a risk but they did not tell us what the
concerns of that unit were or how it was going to be tested.
They did not ask the documents that we used to put forward our
answers to the RFI, they did not ask to speak to anybody in the
bank or the outside regulators.  That's what we can test when
we get to that next issue.

          And as to their contract language, I would like to
know how many banks they say have been shut down and they have
been able to get corresponding relationships.  We should be
able to test how BSJI could basically pose an undue risk in
their analysis to the overall economy.  We should be able to
see their real reason for singling us out in light of what they
basically allowed Deutsche to do.  Those are just some of the

NAG5banA

1    issues that would occur.

2            THE COURT:  You say you should be able to explore that

3    issue in discovery.  There is nothing in the papers so far that

4    indicates that the Federal Reserve Bank was acting in bad

5    faith.  Your argument is they were acting on insufficient

6    information that the information that they had and the analysis

7    that they put forward in terms of the analysis of the

8    transactions and the responses to K2 were insufficient and that

9    your analysis was justified and theirs was not.  But there is

10   nothing in the record to suggest bad faith or some improper

11   motivation.  Isn't that right?

12           MR. LOWELL:  I don't think you have heard from me an

13   allegation that the problem is bad faith.  The problem is using

14   the contract concept, the lack of fair dealing and diligence.

15   And diligence is process.  And process is not only the word in

16   the contract, it's what underscores arbitrary and capricious

17   behavior.  That is what we have put forward.  And I think it is

18   enough to show that when you say there is a risk, you ought to

19   have engaged in a process by which your assessment of risk to

20   shut a bank down has some basis to have been made.

21           THE COURT:  I haven't heard from you that the decision

22   was taken in "bad faith."  But, just taking the contract

23   argument, the standard that you rely on is that the decision by

24   the Federal Reserve Bank violated the covenant of "good faith

25   and fair dealing."

NAG5banA

1          MR. LOWELL:  Correct.

2          THE COURT:  But you tell me you are not arguing bad

3     faith.

4          MR. LOWELL:  Well, they're not necessarily -- they're

5     not exactly heads and tails of the word just because they both

6     have the word "faith" in it.  What it means is you can be

7     operating without fair dealing if you do not engage in the

8     proper diligence.  You can be operating in a lack of fair

9     dealing or demonstrate good faith if you have a back and forth

10    over years in which they come to the Court and say, look at all

11    the back and forth, and I show you there has only been all

12    forth and no back.  Does that mean it is bad faith?  I think it

13    means, at the very least, they haven't satisfied the contract

14    requirement of diligence for which they can be held liable.  If

15    we, in discovery, find out that they had it in for this bank or

16    IVEs in general, maybe it rises that they had a pretext.  There

17    is something going on but I don't think I have to have you

18    decide that what they did, to date, evidences bad faith.  What

19    I have to have you decide is that we have raised a serious

20    question as to whether or not these actions basically violate

21    the concept of diligence, fair dealing, or are arbitrary and

22    capricious and I can leave bad faith to a different day.

23         I think that's the best way I can answer your

24    question.  It is not necessarily that they have to mirror each

25    other, they may end up mirroring each other, but we have

NAG5banA

1     provided you enough I think to get to be able to maintain the

2     status quo until we get to the next place.

3                 But on this issue of bad faith or good faith or due

4     diligence, I can't say it any better and I think this would be

5     the way I would like to conclude unless you have any other

6     questions of me.  What do you when you are a banker and you are

7     trying to figure out whether somebody who pretends or purports

8     or is your regulator does the right thing in the right way?  We

9     don't have that inherent ability so you try to find somebody

10    who does.  And you bring in the best people with the best

11    reputation and the best experience and you ask them to look at

12    the exact same transactions and come to their own conclusions.

13    And then they come to a conclusion and then they say that the

14    most indicia is a legitimate transaction.  OK, but that's not

15    the ending point.  The ending point but which I think we

16    prevail today is this issue of process.  So we found the person

17    whose declaration you have, it is Mr. Larson, who is the former

18    Federal Reserve examiner and a policy maker in the very

19    institution and this is how he concludes:  What is most

20    remarkable to me in this circumstance is that the FRBNY

21    compliance function made the specific termination that K2

22    Integrity, the auditors', was incorrect in its assessment of

23    BSJI and did this without any communication or follow-up with

24    K2 Integrity.  In my experience, when a supervisory authority

25    has potential concerns about key conclusions of a qualified,

NAG5banA

1    independent, BSA auditor, the authority would request, in every

2    instance, the relevant underlying documentation and/or the work

3    papers from the auditors and, if concerns remained, engaged in

4    discussions with the auditor to gain a better understanding

5    regarding points of contention.  It would be counterintuitive

6    and anomalous of any supervisory authority to displace those

7    conclusions without at least engaging in a robust dialogue with

8    the auditors to ensure that all available information is

9    considered.

10         In our brief and today when I was here earlier I

11   pointed out the things that they did not do.  That indicates a

12   lack of process.  That indicates that at the preliminary

13   injunction stage we have done more than raise a serious

14   question that we are about to be denied the master account that

15   is necessary to keep this bank alive on a basis that is not

16   proper.

17         Thank you.

18         THE COURT:  All right.  Thank you.  I will take the

19   motion under advisement.  Thank you, all.  I appreciated the

20   briefs and the argument.

21                              o0o

22

23

24

25