UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BANCO SAN JUAN INTERNACIONAL, INC.,

*Plaintiff*,

v.

THE FEDERAL RESERVE BANK OF NEW YORK
AND THE BOARD OF GOVERNORS OF THE
FEDERAL RESERVE SYSTEM,

*Defendants*.

Case No. 1:23-cv-6414 (JGK)

## AMENDED COMPLAINT

Plaintiff Banco San Juan Internacional, Inc. ("BSJI" or the "Bank"), in support of its Amended Complaint against Defendants the Federal Reserve Bank of New York (the "FRBNY") and the Board of Governors of the Federal Reserve System (the "Board"), alleges and states as follows:

## NATURE OF THIS ACTION

1.      BSJI, a Puerto Rico International Banking Entity ("IBE") and previous "master account" holder with the FRBNY since 2012, brings this action for declaratory judgment, issuance of a writ of mandamus, breach of contract, and violation of the Fifth Amendment's Due Process Clause in light of the Board's and the FRBNY's arbitrary, bad faith, and unlawful campaign against BSJI that resulted in the closure of BSJI's "master account" and termination of its access to FRBNY services, in violation of BSJI's statutory, constitutional, and contractual rights.

2.      As one Circuit Court explained, a Federal Reserve "master account" is a "bank account for banks" that gives depository institutions access to the Federal Reserve System's core

banking services, including its electronic payment systems. "Without such access, a depository institution is nothing more than a vault."

3.     A master account also enables its holder to access various services that Federal Reserve Banks are statutorily obligated to provide under the Depository Institutions Deregulation and Monetary Control Act of 1980 (the "Monetary Control Act"), 12 U.S.C. § 248a. These services include, among other things, wire transfer services, automated clearinghouse services, and settlement services. As the Board itself acknowledges, these "key financial services [] undergird the nation's payment system," and financial institutions often refuse to transact with institutions that lack access to such services.

4.     BSJI previously worked in tireless lockstep with the FRBNY to develop industry-leading, exemplary internal controls and compliance systems. Consistent with BSJI's corporate ethos, BSJI dedicated substantial resources—including by hiring additional compliance personnel—and time to these efforts, with an eye towards meeting the FRBNY's every request and ensuring BSJI's continued use of its master account for the benefit of its customers and Puerto Rico generally. BSJI's efforts culminated in the development of what one former FRBNY official described as a "front of the line" compliance system, many components of which were subsequently adopted in guidelines the FRBNY has since issued.

5.     As part of its continued efforts to develop and maintain its exemplary compliance program, BSJI retained the services of several well-regarded external review firms and consultants, including K2 Integrity ("K2"), to evaluate and enhance its Bank Secrecy Act/anti-money laundering ("BSA/AML") and sanctions compliance program.

6.     Notwithstanding BSJI's substantial expenditure of resources and sustained and consistent reliance on outside consultants and former regulators to enhance its BSA/AML and

sanctions compliance program, the FRBNY notified BSJI on April 24, 2023, and reaffirmed on June 30, 2023, that it would terminate BSJI's master account in a matter of weeks due to purported and pretextual "concerns" with its BSA/AML and sanctions compliance program. The FRBNY went so far as to baselessly claim that BSJI somehow posed an "undue risk to the overall economy," a baffling assertion in light of the fact that BSJI's entire transaction volume over the preceding year represented 0.000125 percent of the gross domestic product ("GDP") of the United States and only 0.000032 percent of the GDP of the world.

7.    The FRBNY's and the Board's termination of BSJI's master account violates their duty to provide a level playing field to all depository institutions and runs afoul of the Board and the FRBNY's statutory ambit, which plainly precludes the Board and Federal Reserve Banks from denying Federal Reserve services—for which a master account is a prerequisite—to legally eligible depository institutions like BSJI.

8.    Indeed, the authority to enlarge the scope of the Board and the FRBNY's statutory powers rests with Congress, not Defendants. The Board's and the FRBNY's actions to the contrary violate the law.

9.    And even assuming Defendants enjoy some discretion concerning master account access, their actions towards BSJI show why that discretion must be checked. The FRBNY cannot unilaterally declare itself the sole arbiter of master account access, unrestrained by any statutory, regulatory, contractual, or constitutional review or requirements. Yet the FRBNY has done exactly that, as it has gone so far as to assert that it does "not have to rely on any particular basis" to terminate BSJI's—or any bank's—master account access.

10.    The targeting of BSJI was neither fact-specific nor evidence-based. Instead, the FRBNY, acting in concert with the Board, has recently determined as a matter of policy that certain

types of banking institutions—regardless of a bank's individual *bona fides*—are not worthy of a master account.

11.     This stark departure from the historical practices of the Board and Federal Reserve Banks—the FRBNY included—first manifested in 2015, when the Federal Reserve Bank of Kansas City rejected the master account application of Fourth Corner Credit Union.  Other Federal Reserve Banks soon followed.  As yet another example, in a February 27, 2019 letter, the FRBNY announced that it was halting the approval of *all* new master accounts for Puerto Rican depository institutions, like BSJI.[1]

12.     More recently, at his confirmation hearing on January 11, 2022, Board Chairman Jerome Powell expressed concern to the Senate Committee on Banking, Housing, and Urban Affairs about granting master accounts to special purpose depository institutions ("SPDIs") and other novel bank types.  Senator Lummis of Wyoming asked Chairman Powell:

> The Federal Reserve Act says that a depository institution is any institution eligible for deposit insurance. The FDIC says, in General Counsel Opinion 8867, that an entity is a depository institution if it is creating deposit liabilities out of customer assets and is characterized by state law as a bank. As you know, Chairman Powell, I am terribly concerned about the manner in which Wyoming's special purpose depository institutions are being treated by the Federal Reserve.  We have discussed this.  What is your reaction to this?

13.     Chair Powell testified in response:

> So as we discussed, there are novel charters, and the ["special purpose depository institutions"] are one of them, and we want to be really careful because they are hugely precedential. They are very important from a precedential standpoint.  And so we have been looking carefully at this, and I would say there are good arguments for viewing SPDIs as depository institutions for this purpose, and we are looking carefully at it. I do think we will make some progress on this, and we can talk about it more offline. But I think you do understand that we--you know, if we start granting these there will be a couple hundred of them pretty quickly, and we have

---

[1] Reuters, *Exclusive: New York Fed Cracks Down on Puerto Rico Bank Following Venezuela Sanctions* (April 18, 2019), *available at* https://www.reuters.com/article/us-venezuela-politics-puertorico-exclusi/exclusive-new-york-fed-cracks-down-on-puerto-rico-banks-following-venezuela-sanctions-idUSKCN1RU2EI.

to think about the broader safety and soundness implications. And, you know, it is just hugely precedential. That is really why we have taken our time with it. And we appreciate you bringing it my attention, and so we can continue to talk about it.

14.     Around this same time, the Board and the regional Federal Reserve Banks implemented a practice of (i) not ruling on, or flat out denying, new applications for master accounts by novel banks and Special Purpose Depository Institutions ("SPDIs"), and (ii) terminating existing master accounts previously granted to novel banks and SPDIs, often justifying their decision-making on pretextual (and knowingly erroneous) grounds to effectuate its policy. This approach stands in stark contrast to the historical treatment of master account holders and applicants, as the statutory right to master account access was universally accepted for well over thirty years.

15.     As part of this new policy and practice, in the summer of 2022, the FRBNY, in concert with the Board, notified BSJI that the FRBNY intended to close BSJI's master account. The FRBNY made this decision not because of any new developments that were specific to BSJI, but rather as part of the FRBNY's decision to deny IBEs continued access to master accounts.

16.     Specifically, and in furtherance of its policy targeting IBEs and novel charter banks, in July 2022, the FRBNY advised BSJI that it intended to close BSJI's master account because, the FRBNY asserted, BSJI allegedly had missed the deadlines for submission to the FRBNY of certain audit reports then being prepared by BSJI's outside, independent auditor, K2. In so doing, the FRBNY acted in bad faith, and maliciously, because, among other things:

   a.   the FRBNY knew and recognized that a plain reading of its own rules afforded BSJI still additional time within which it could submit the audit reports;

   b.   the FRBNY had received but deliberately chose not to respond to BSJI's April 2022 correspondence seeking to confirm the audit reports' review period (through June 30, 2022), and anticipated date of delivery of the K2 audit reports

5

(September 30, 2022), for the specific purpose of inducing a "late" delivery of the audit reports;

c. the FRBNY had received but deliberately chose to ignore BSJI's June 2022 correspondence seeking to confirm the same, for the specific purpose of inducing a "late" delivery of the K2 audit reports;

d. the FRBNY knew that had it responded to one or both of BSJI's April or June 2022 letters, and identified a date certain by which the audit reports were due, BSJI and K2 might have satisfied such announced deadline, thereby eliminating the FRBNY's projected basis for termination of the master account; and

e. the FRBNY's decision to terminate the master account in any event was disproportionate to the alleged infraction, even if BSJI had missed the deadline, especially because the reports were already substantially in progress.

17.     After BSJI advised the FRBNY that it intended to bring suit, the FRBNY responded that it would no longer close the master account on the basis of the "missed deadlines."  The FRBNY then sought to generate new grounds on which it would close BSJI's master account.

18.     In April 2023, the FRBNY again notified BSJI of its renewed decision to close BSJI's master account.  Having been put on notice in 2022 that BSJI would challenge in court any closure of its master account, the FRBNY this time generated internal memoranda to paper the record in an effort to justify its closure decision.  However, the FRBNY's grounds and analyses to justify its closure decision were, like in 2022, made in bad faith, and maliciously, because, among other things:

a. The FRBNY, without basis, analysis, or explanation, and without examining or auditing BSJI, *sua sponte* re-characterized K2's recommended "enhancements"

6

to BSJI's compliance program as proof of existing regulatory "deficiencies." K2, which recommended the enhancements, made its recommendations not because the regulations required any changes to BSJI's compliance program, but instead in anticipation of BSJI growing in the years ahead, understanding that the measures would not be necessary in the absence of such growth.  K2 stands by its findings that BSJI's compliance program did not exhibit "deficiencies," as the FRBNY alleged.

b.  K2, which for these purposes was approved by the FRBNY to effectively act as its eyes and ears, found BSJI's compliance program "effective" and "comprehensive."

c.  In their regular course of professional service, two other well-credentialed, independent audit firms likewise found BSJI's compliance program to be "effective" and "comprehensive" during the same or a similar time period.

d.  At the same time that the FRBNY was seeking to terminate BSJI's master account, BSJI's regulator was on site at BSJI, conducting an in-depth examination of BSJI's operations and compliance practices.  Like the three audit firms that audited BSJI over the previous eighteen months, BSJI's regulator ███████████████████████████████████████████ ██████████████████ leaving the FRBNY—which neither examined nor audited BSJI—as the only entity to claim otherwise.

e.  Whether characterized as "enhancements" or "deficiencies," BSJI in fact addressed each of the items of alleged concern.  K2 thereafter validated the fact that BSJI adequately addressed each of the items.

f.   Prior to the April 2023 closure letter, the FRBNY only rarely, if ever, rejected any conclusion by K2 based on a K2 audit, especially in circumstances where the FRBNY did not itself also audit the financial institution.

g.   To the extent the FRBNY might disagree with an independent auditor whom it approved to conduct the subject audit, the FRBNY's practice had been to consult with the auditor and/or to review its workpapers to understand the nature of any disagreement.   Here, the FRBNY neither contacted K2 nor requested or obtained its workpapers, because the FRBNY was not interested in obtaining new information that might undercut its pre-ordained decision, having already pre-determined to terminate BSJI's master account, whether factual grounds existed or not.

h.   While the FRBNY separately criticized BSJI's failure to file Suspicious Activity Reports ("SARs") during the relevant time period, and concluded that such failure purportedly reflected a systems weakness, the FRBNY later acknowledged that it could not identify a single transaction for which a SAR should have been filed but was not.

i.   The FRBNY's additional grounds that there purportedly existed an unacceptable volume of "high risk" "related party" transactions involving "shell companies" in "high risk jurisdictions" are factually frivolous.   In fact, not one of BSJI's customers is a "shell company;" the fact that there exist "related party" transactions is generally viewed as a positive because there is greater access to supporting information to verify the business purpose; and BSJI's multiple auditors have confirmed that BSJI's enhanced due diligence

process appropriately accounts for so-called "high risk" transactions, as should be the case for any financial institution.

j.   That the FRBNY acted in bad faith is further confirmed because its purported concerns related to one set of transactions, but the FRBNY failed to ask for all the documents relevant to make an educated assessment of the propriety of those transactions.  The FRBNY likewise failed to identify its concerns to BSJI prior to notifying BSJI of its intent to close the master account.  Such communication would have allowed the FRBNY the opportunity to obtain still additional facts directly from the bank or its compliance team that would have been relevant to the FRBNY's inquiry.  In any event, an independent BSA/AML audit firm, AML RightSource, did what the FRBNY should have done—it obtained the documents and information necessary to make a proper evaluation of the subject transactions, and it determined that the FRBNY's alleged concerns lack merit.

k.   That the FRBNY acted in bad faith is yet further confirmed because its purported red flags—that the Private Placement Memoranda ("PPMs") underlying the subject bond transactions were "too basic" and should have but did not include an "Events of Default" provision—were false, overstated, and superficial.  The PPMs were not "too basic," and would not be a red flag for illicit activity in any event.  And no Events of Default provision was required under the applicable law.

19.   In sum, the FRBNY determined pursuant to an internal and nonpublic policy that it wanted to refrain from granting master accounts to SPDIs and to novel charters, and

9

simultaneously desired to terminate the master accounts of similar institutions, including IBEs. In the case of BSJI, the FRBNY therefore papered the record, instructing its Compliance and Ethics Director to author an internal memorandum to justify the decision to close BSJI's master account, a decision which the FRBNY had already made. The moving explanations and justifications did not motivate the decision. To the contrary, the decision to close the master account had been made, and the FRBNY reverse-engineered a justification that lacked any basis in law or in fact.

## THE PARTIES

20.     Plaintiff BSJI operates under the supervision of the Office of the Commissioner of Financial Institutions of Puerto Rico ("OCIF"). BSJI was founded in 2011, and its principal place of business is Galería San Patricio, B5, Calle Tabonuco, Suite # 207, Guaynabo, Puerto Rico 00968. BSJI offers traditional banking products and services, such as corporate and personal direct deposit accounts, savings accounts, fixed-term deposits and loans, as well as more sophisticated and structured financial solutions and products.

21.     Defendant FRBNY is one of the 12 Federal Reserve Banks of the United States, with its principal place of business at 33 Liberty Street, New York, New York 10045. The FRBNY is responsible for the Second District in the Federal Reserve System, which is comprised of the State of New York, the 12 northern counties of New Jersey, Fairfield County in Connecticut, Puerto Rico, and the U.S. Virgin Islands. In this capacity, it supervises and regulates Federal Reserve member banks and bank holding companies within the Second District. It is a federal agency of the United States, created by Congress, with its own board of directors. The FRBNY is incorporated as a non-profit governmental corporation, with the capacity to sue and be sued in its own name.

22.     Defendant Board is the governing body of the Federal Reserve System, with its principal place of business at Constitution Ave N.W. & 20th St. N.W., Washington, DC 20551.

The Board is responsible for overseeing the 12 regional Federal Reserve Banks. It is an agency of the United States and is comprised of seven members—also known as "governors"—who are nominated by the President and confirmed by the Senate.

## JURISDICTION AND VENUE

23.     This Court has subject matter jurisdiction under 12 U.S.C. § 632, which provides that "all suits of a civil nature at common law or in equity to which any Federal Reserve bank shall be a party shall be deemed to arise under the laws of the United States, and the district courts of the United States shall have original jurisdiction of all such suits." Additionally, this Court has jurisdiction under 28 U.S.C. § 1331, as this is a civil action "arising under the Constitution, laws or treaties of the United States."

24.     Venue in this District is proper as to the FRBNY under 28 U.S.C. § 1391(b)(1) and (2) because (i) the FRBNY has its principal place of business in this district and (ii) a substantial part of the events giving rise to the claims at issue occurred here. The Federal Reserve Banks Operating Circular No. 1, Account Relationships ("Operating Circular No. 1") also states that "[a]ny action against a Reserve Bank for any act or omission relating to an account relationship or transaction must be brought . . . in the United States District Court and Division where the Administrative Reserve Bank is located." Operating Circular No. 1 ¶ 7.4. The FRBNY is, as mentioned above, located in lower Manhattan. Venue in this District is also proper as to the Board under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims at issue occurred here.

25.     The FRBNY and the Board are subject to this Court's personal jurisdiction because they have purposefully availed themselves of the privileges of conducting business in this District, and a substantial part of the events giving rise to the claims at issue occurred in this District.

## FACTUAL BACKGROUND

I.  **BSJI**

26.     IBEs like BSJI serve as a bridge between U.S. companies and foreign investors. Under Puerto Rican law, the principal goal of IBEs is to attract United States and foreign investors to Puerto Rico.

27.     The governing International Banking Center Regulatory Act specifically provides that the law "is intended to expand the potential market for Puerto Rico's international banking center and will significantly enhance the knowledge and promotion of Puerto Rico through the world's financial community. The principal benefits of an international banking center in Puerto Rico are the expansion of the service sector, the direct and indirect creation of jobs and the increase of the island's economic activity. Puerto Rico offers many favorable conditions for carrying out international banking transactions, such as its political stability, the soundness of its banking system, the close economic ties with the United States, the high degree of professionalism, bilingualism and technical capacity of its human resources, a unified monetary market and system, its privileged geographical location, and a well-developed communications network."

28.     To this end, BSJI, as is required under the applicable law, retains local residents as employees, and, prior to its master account closure, offered corporate banking services, including both corporate accounts and financing as well as personal banking, including personal checking accounts and time deposits.

29.     BSJI operates under the supervision of OCIF, with whom BSJI regularly consults and engages. ███████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████.

30.     Indeed, in recognition of these controls and procedures, in 2014, OCIF expanded the scope of BSJI's powers to authorize BSJI to engage in fiduciary activities, which permits the Bank to offer paying agent and custodial services to bond issuers. ████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████.

31.     BSJI's capital is well over any regulatory benchmark established by any federal regulator for a well-capitalized depository institution.  As of July 13, 2023, the total stockholder's equity of BSJI represented more than 60% of its total assets.  By stark contrast, a typical U.S. depository institution's total shareholders' equity is usually somewhere between 8% and 12% of its total assets.  Further, as of that same date, more than 76% of BSJI's total assets was cash and due from banks.  In short, BSJI's current financial condition has been exceedingly sound.

32.     As of July 13, 2023, BSJI's total account balances were modest, and BSJI undertook comparably few transactions per day.

33.     On November 8, 2011, pursuant to a Master Account Agreement between BSJI and the FRBNY that the FRBNY required BSJI to sign (the "Account Agreement"), BSJI opened its master account with the FRBNY.  The Account Agreement is governed by New York law and incorporates "the provisions" of Operating Circular No. 1, which, in turn, sets forth the terms the FRBNY requires for a Financial Institution to open and maintain a Master Account with the FRBNY.  Operating Circular No. 1 ¶ 1.0.  Dkt. No. 8-2.

34.     Operating Circular No. 1 is also governed by New York law.

35.     As relevant here, Operating Circular No. 1 claims to allow Federal Reserve Banks to "terminate a Master Account Agreement . . . at any time by notice to the Account Holder." *Id.*

¶ 2.10.  This provision—and the proposition that a financial institution must agree to these contractual terms at all—squarely contravene Federal Reserve Bank's statutory mandate, as discussed *infra* at Section III, to provide legally eligible depository institutions with ongoing access to Federal Reserve services, for which a master account is a prerequisite.  As the provision violates the FRBNY's statutory obligations, it is void as against public policy.

36.  This purportedly unfettered discretion is itself also circumscribed by the contractual Duty of Care imposed by Operating Circular No. 1 (*Id.* ¶ 7.1); in the case of the FRBNY, it is likewise qualified by the implied covenant of good faith and fair dealing that arises from any agreement existing under New York law.  Put simply—and setting aside the FRBNY's statutory mandate to provide master account access—the unfettered discretion claimed by the FRBNY is subordinate to the FRBNY's contractual duties to BSJI to act in good faith and with care concerning BSJI's master account.

37.  Execution of an Account Agreement is a prerequisite to obtaining a master account with the FRBNY, and the FRBNY did not provide BSJI with the opportunity to negotiate any terms of the Account Agreement.  Put otherwise, as a condition of obtaining access to the statutorily-entitled master account and the vital services it provides access to, every single eligible institution—BSJI included—must acquiesce to extra-statutory terms, as forced on them in the Account Agreement and, in turn, in Operating Circular No. 1.

## II.   THE IMPORTANCE OF BSJI'S MASTER ACCOUNT

38.  On November 14, 2024, the FRBNY closed BSJI's master account.

39.  Without its master account, BSJI has not been able to effectively function as a depository institution.

40.     Because the Bank is unable to connect to the Federal Reserve Bank payment services such as check clearing services,[2] BSJI's customers have transferred all but nominal sums out of their BSJI accounts. BSJI is therefore losing considerable interest income on a daily basis from investment income it could generate from investing excess cash.

41.     Moreover, under the circumstances, it has been exceedingly challenging for BSJI to find a correspondent bank—a bank that acts as an intermediary between a depository institution like BSJI and a Federal Reserve Bank—to access Federal Reserve System services.  Financial institutions generally will not accept deposits that have been rejected by a Federal Reserve Bank, most especially in circumstances as these where the FRBNY has made inflammatory allegations— as it has in this litigation—that the institution is at risk of facilitating illicit activity, with such allegations expressly being cited as a reason not to even meet with BSJI.

42.     Indeed, all of BSJI's efforts to find a correspondent bank in the wake of the FRBNY's 2019 suspension of a master account and the FRBNY's 2023 termination of BSJI's master account have been rebuffed, a problem exacerbated by the incendiary nature of the FRBNY's allegations in this litigation.

43.     But even if BSJI had not been tarnished by the FRBNY's baseless accusations and found a correspondent bank partner, those efforts would have been an exercise in futility.  For just as the FRBNY asserts it has the right to terminate a master account, so too does it claim the unfettered right to terminate a depository institution's access to Federal Reserve services through a correspondent bank.  Given the FRBNY's actions towards BSJI to date, it is all but inevitable

---

[2] *See* Operating Circular 1 Account Relationships at pp. 6-7 ("A Financial Institution's ARB administers all aspects of Federal Reserve account management through an Account Holder's Master Account, including balance administration, overnight overdraft monitoring, daylight overdraft monitoring, and discount window access.").

that the FRBNY would terminate BSJI's access to Federal Reserve services through a correspondent bank, just as it did with BSJI's master account.

44.     Certain long-term projects that BSJI has worked on have now been jeopardized by the loss of a master account. For example, BSJI had been working with a credit card company for the issuance of BSJI credit cards, which promised to yield an important revenue stream as part of BSJI's business plan. The credit card company, however, had required that BSJI have a master account at a Federal Reserve Bank.

## III.   THE HISTORIC RIGHT TO A MASTER ACCOUNT

45.     For well over thirty years, the right of legally eligible entities (those that satisfy the statutory requirements for accessing the Federal Reserve System, as BSJI indisputably does) to a master account was a matter of fact, explicitly recognized by the Board, the Federal Reserve Banks, and market participants more generally.

46.     This right to a master account and its services derives from 12 U.S.C. § 248a(2), enacted by Congress as part of the Depository Institutions Deregulation and Monetary Control Act of 1980 (the "Deregulation Act"). The Deregulation Act, in large part, was intended to address a severe inequity that had developed in the banking system.

47.     Prior to the current statutory regime, and given the stringent reserve requirements (the amount of funds a bank needs to hold in reserve) that were then imposed by Federal Reserve Banks, only large commercial banks were able to become Federal Reserve Bank members. Federal Reserve Bank membership, in turn, allowed these banks to obtain Federal Reserve services.

48.     But access to these services remained critical for smaller, nonmember banks, which were largely state-chartered banks. As such, large member banks, with the assistance of the Board and Federal Reserve Banks, established Automated Clearing House ("ACH") networks through which they exercised effective monopoly control over access to the national electronic payments

system, charging nonmember banks for access to the Federal Reserve services they received for free. These ACHs—and the role of the Board and the Federal Reserve in operating them—received substantial criticism from nonmember banks, who were effectively obligated to pay whatever fee the ACHs charged to access Federal Reserve services.

49.     Criticism of the inequitable nature of Federal Reserve service access was not limited to market competitors. The U.S. Department of Justice's Antitrust Division, which publicly advocated for equal access to Federal Reserve services for nonmember banking institutions, brought suit against multiple ACHs for monopolizing, with the Board's assistance, access to these vital services in the 1970s. While these lawsuits successfully forced certain ACHs to provide open and equal access to nonmember institutions, they did not bring about the nationwide change necessary to fix this broken system.

50.     On the other side of the coin, given the extreme inflation experienced in the 1970s, member banks experienced growing difficulty in meeting the onerous reserve requirements imposed by Federal Reserve Banks. Many terminated their membership and, by 1980, less than half of U.S. banks were Federal Reserve Bank members.

51.     This had an acute impact on the Board's ability to set monetary policy. By raising or lowering reserve requirements, the Board influences the amount of liquidity in the U.S. financial system which in turn is determinative of interest rates: the more money banks have available to lend, the lower the interest rates, and vice versa. But facing dwindling numbers of member banks subject to reserve requirements, the Board's ability to effectively leverage this critical tool of monetary policy was placed in serious question.

52.     Faced with the realization of a Federal Reserve Bank structure that favored a minority of large banks over the majority of smaller institutions, as well as a crisis of Board monetary policy, Congress acted.  In 1980, the Monetary Control Act was passed into law.

53.     To address the two-tiered system of Federal Reserve service access that had emerged, Congress mandated that Federal Reserve services shall be provided to all legally eligible nonmember depository institutions.  This directive was encapsulated in 12 U.S.C. § 2I(c)(2), which states that "[a]ll Federal Reserve bank services covered by the fee schedule *shall be available to nonmember depository institutions and* such services shall be priced at the same fee schedule applicable to member banks, except that nonmembers shall be subject to any other terms, including a requirement of balances sufficient for clearing purposes, that the Board may determine are applicable to member banks." (emphasis added).

54.     Section 248 accomplishes Congress's goal of ensuring nondiscretionary, equitable access to Federal Reserve services through two mechanisms. First, it mandates that "Federal Reserve Bank services"—which are today accessible only through a master account—"*shall* be available to nonmember depository institutions" (emphasis added).  Second, and as made clear through the statute's utilization of the word "*and*," Section 248 enables the Board to set fee schedules and terms on an equivalent basis for both member bank and nonmember depository institutions alike.

55.     In turn, and to remediate the Board's then-reduced capacity to influence monetary policy, Congress imposed reserve requirements on nonmember depository institutions, albeit at lower levels than those that had precluded their ability to access Federal Reserve services previously. These reserve requirements are reflected at 12 U.S.C. § 461, which likewise defines a nonmember

"depository institution."[3]   Like Section 248a, Section 461's mandate is nondiscretionary: "each depository institution *shall* maintain reserves against its transaction accounts" (emphasis added) at the level set by the Board.

56.     Congress's intent to mandate Federal Reserve service access and reserve requirements for nonmember depository institutions was clear at the time of the Monetary Control Act's implementation.  As stated in the final conference committee report on the Act:

- "The conference reported bill provides certain Federal Reserve requirements for all depository institutions. It does not, however, require any institution to be a member of the Federal Reserve."

- "These reserve requirements would apply to all depository institutions. Depository institutions are authorized to use balances maintained in Federal Reserve banks to satisfy liquidity requirements under the Federal Home Loan Bank Act and the Nation[al] Credit Union Act."

---

[3] BSJI is indisputably a nonmember "depository institution" under 12 U.S.C. § 461.  The term "depository institution" means "any insured bank as defined in Section 3 of the Federal Deposit Insurance Act of 1933, as amended [12 U.S.C.  § 1813] (the "FDI Act") or any bank which is eligible to make application to become an insured bank under Section 5 of such the FDI Act [12 U.S.C. § 1815]."  12 U.S.C. § 461(b)(1)(A)(i).  The term "bank," in turn, means "any insured or noninsured bank, as defined in Section 3 of the Federal Deposit Insurance FDI Act [12 U.S.C. § 1813]."  *Id*. § 461(b)(1)(B).  Section 3 of the FDI Act defines "noninsured bank" as "any bank the deposits of which are not .  .  .  insured," 12 U.S.C. § 1813(h), where "bank" means, as relevant here, "any bank, banking association, trust company, savings bank, industrial bank  .  .  . , or other banking institution which—(A) is engaged in the business of receiving deposits, other than trust funds .  .  .; and (B) is incorporated under the laws of any State [or Puerto Rico] .  .  . ."  12 U.S.C. § 1813(a)(1)–(3).  BSJI is a banking institution engaged in the business of receiving deposits and is incorporated under the laws of Puerto Rico.  As such, it is eligible to become an insured bank under 12 U.S.C. § 1815 and is therefore a "depository institution" within the meaning of 12 U.S.C. § 248a(c)(2).   http://www.federalreserve.gov/paymentsystems/pfs_standards.htm.

- "The House amendment includes a provision for the Federal Reserve to price services provided by the Federal Reserve Banks and open access to these services to all depository institutions on the same terms and conditions as member banks."

57.    That the Monetary Control Act mandated nondiscretionary access to Federal Reserve services—which can be accessed only through a master account—was likewise universally accepted for over three decades.  For example, the FRBNY stated in its 1980 annual report that the Deregulation Act mandates that "services will be available equally to all depository institutions." Likewise, the Board acknowledged that the Deregulation Act was intended to facilitate "competition on an equal basis in the provision of all types of banking services" and "require[d] the Federal Reserve to provide its services to all depository institutions on an equitable basis."  And to this very day, the Board's website acknowledges that Federal Reserve banks are mandated by statute to provide "all depository institutions access to the Federal Reserve's payment services."

58.    But recently, the Federal Reserve Banks and the Board have reversed course on their interpretation of the Deregulation Act and assert now that they have the discretion to terminate master account access and deny access to new applicants.

59.    Per the FRBNY, not only must a depository institution be statutorily eligible for master account access but, separate and apart, that bank must also obtain and retain the blessing of the Federal Reserve Bank in its respective jurisdiction, and that access can be threatened, granted, or stripped at that Federal Reserve Bank's whim, on a moment's notice, and without basis or proper explanation.

60.    In so doing, the FRBNY and other Reserve Banks effectively are usurping the role of the financial institutions' regulators, who are statutorily tasked with ensuring the safety and soundness of the institutions, and who are reposed with the responsibility of determining whether

the institutions within their supervision shall have the continued right to engage in banking services.

61.     The Board is also an active proponent of this improper interpretation of the scope of the FRBNY's authority.  Not only has the Board published guidelines that purport to identify factors the FRBNY and other Federal Reserve Banks should consider in assessing master account access, but it requires Federal Reserve Banks to involve the Board in any decision concerning the denial of master account access.  In particular, pursuant to an "S-Memo" promulgated by the Board in January 2023: "[a]ny Reserve Bank that is considering denying any access request, including an access request from an institution in Tier 1, should consult the director of RBOPS [a division of the Board] prior to communicating any decision to the requesting institution."

62.     This improper interpretation of the scope of Federal Reserve Bank authority has resulted in master account access either being terminated or denied to numerous account holders or applicants.  Publicly, the Board and Federal Reserve Banks claim that this is due to a rise in "novel" banking institutions.   But this explanation fails to convince: the banking industry undergoes constant evolution, and in the preceding thirty-plus years the litany of "novel" institutions did not impact the Board's or the Federal Reserve Banks' recognition of their statutory obligation to provide master account access.

63.     Nor does it address the Board's and the Federal Reserve Banks' lack of supervisory authority over nonmember depository institutions like BSJI that are state- (or territory-) chartered banks subject to state (or territory) regulatory bodies.  It is the responsibility of these local regulators, *not* the Board or the Federal Reserve Banks, to determine whether a depository institution is operationally sound and may continue to operate as a bank, a determination that is a statutory prerequisite to being a legally eligible "depository institution" under 12 U.S.C. § 461.

64.     The right to a master account is a key characteristic of depository institutions that separates them from other forms of financial institutions, such as investment companies, broker-dealers, or lenders.   Without master account access, as noted *supra*, a "depository institution is nothing more than a vault."  But it is only Congress that is legally empowered to determine which institutions are deemed to depository institutions, and which are not.

65.     The Board and the FRBNY have improperly usurped this Congressional authority by acting as the ultimate arbiters of master account access, a defining feature of depository institutions.

66.     The myriad of issues with the Board's and the Federal Reserve Banks' efforts to improperly create a "new regime" (*Biden v. Nebraska*, 143 S. Ct. 2355, 2369 (2023)) by expanding the scope of the Federal Reserve Banks' delegated authority have come to a head of late.  Recently, congressional investigations have focused on the Federal Reserve Banks' standardless, inconsistent, and unchecked decision-making when granting or terminating master account access.  Indeed, this widespread concern regarding the Federal Reserve Banks' behavior—exacerbated by their refusal to cooperate with the corresponding Congressional inquiry—led to recent legislation requiring heightened transparency into the Board's and the Federal Reserve Banks' activities.

67.     Congress has likewise recently rebuffed the Board's and the Federal Reserve Banks' flawed interpretation of the scope of their authority over master account access.  After the Board and certain Federal Reserve Banks began publicly taking the position that Congress's recent transparency legislation affirmed their discretion to terminate master accounts, Senator Patrick Toomey—the legislation's principal author and sponsor—stated that this argument "wildly mischaracterized" the legislation and that the Board had intentionally "misconstrued the

[a]mendment as recognizing or bolstering their discretion to reject master accounts," when it did no such thing.

68.     Members of the current United States Senate Banking Committee and the United States House of Representatives Financial Services Committee have likewise publicly stated that "Congress was clear in requiring master accounts be provided to all depository institutions" and that "the Board and the Federal Reserve Banks [] have only recently reinterpreted the law to arrogate to themselves power that Congress never has granted."

69.     Despite these Congressional rebukes and the fact that the only federal circuit court judge to examine the right of a legally eligible institution to a master account conclusively rejected the Federal Reserve Banks' new interpretation of its authority—which was appropriately described as a "litigation position" lacking statutory or historical basis—the FRBNY and the Board continue to act as if the FRBNY has ultimate, unreviewable authority over master account access.

## IV.     BSJI'S HISTORY WITH THE FRBNY

### A.     The FRBNY's prior temporary suspension of BSJI's master account

70.     BSJI and the FRBNY worked collaboratively together for many years without incident.

71.     In February 2019, however, the FRBNY temporarily suspended BSJI's master account, not based on any malfeasance or misconduct by BSJI, but based instead on media reports of an investigation then being conducted in Puerto Rico regarding two loan facilities granted by BSJI to Petroleos de Venezuela S.A. ("PDVSA"), the Venezuelan state-owned oil and natural gas company, one of which was primarily set up for U.S.-based Caterpillar Inc.'s benefit.

72.     In constructing the loan facilities at issue, which were designed to benefit (directly and indirectly) U.S. manufacturers, and by extension the U.S. economy, BSJI and its customers relied not only on in-house expertise. Instead, experienced U.S. and international legal counsel

were involved, including Hogan & Lovells, Reed Smith, Baker McKenzie, Shutts & Bowen, Allen & Overy, Mendoza Palacios, and DLA Piper.

73.     The loan agreements were complex and sophisticated, and, as the investigating authorities ultimately concluded, entirely lawful.[4]

### B.     BSJI's development of state-of-the-art compliance and controls

74.     In response to the FRBNY's suspension, BSJI representatives promptly began communicating and meeting with FRBNY officials.  From BSJI's perspective, it wanted to give the FRBNY whatever comfort it needed to avoid termination of BSJI's Federal Reserve services.

75.     As an initial step, in April 2019, BSJI retained a highly credentialed team at FTI Consultants ("FTI"), one of the leading management consultant firms in the world, to assess and improve BSJI's BSA/AML compliance program.  This team was led by the former Chairman of the Federal Deposit Insurance Corporation ("FDIC"), William M. Isaac, and former compliance and ethics executive Richard J. Wolf.

76.     Mr. Isaac was appointed by President Carter and confirmed by the United States Senate in early 1978 to serve on the board of directors of the FDIC.  President Reagan appointed him as Chairman of the FDIC where he served for five years, steering the industry out of a financial crisis that saw scores of bank failures.  He also served as chairman of the Federal Financial Institutions Examination Council (1983–1985), as a member of the Depository Institutions Deregulation Committee (1981–1985), and as a member of the Vice President's Task Group on Regulation of Financial Services (1984).  He had also served as Vice President, General Counsel & Corporate Secretary of the largest banking company in Kentucky for four years.

---

[4] U.S. Dep't of Justice, *Bank Of San Juan Internacional, Inc. And The U.S. Attorney's Office For The District Of Puerto Rico Resolve Pending Litigation And Related Matters* (Feb. 11, 2020) https://www.justice.gov/usao-pr/pr/bank-san-juan-internacional-inc-and-us-attorney-s-office-district-puerto-rico-resolve.

77.     Mr. Wolf was at the time a senior advisor with FTI Consulting.  Before that, he served in a variety of legal and compliance roles, including periods of service as Senior Advisor for the Federal Reserve Bank of New York, Chief Ethics Officer for HSBC North America, and global head of compliance and ethics for Cendant Corporation.

78.     The FTI assessment was undertaken despite the fact that ███████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████████████████  But in keeping with its business philosophy—and to provide the FRBNY with the assurances it demanded—BSJI and FTI proceeded with what turned out to be a multi-million-dollar, multi-year assessment of BSJI's compliance program that ultimately cost BSJI over $7 million.

79.     The assessment began with FTI dispatching a team of BSA/AML experts, under Mr. Isaac's direction, to the only office of BSJI (in Guaynabo, Puerto Rico), where Mr. Isaac's team was tasked with identifying any gaps in BSJI's BSA/AML program, formulating a comprehensive plan to address any potential shortcomings, and implementing any such plan to ensure its long-lasting effect.

80.     As Mr. Isaac described, his team focused:

> on establishing a comprehensive customer identification/customer due diligence program; evaluating and strengthening the bank's other pillars associated with policies, procedures, and related controls; assisting the bank with recruiting a permanent and well-qualified BSA/AML compliance officer; implementing a thorough and ongoing compliance training program; and providing for periodic, risk-based, and independent testing of the compliance program. . . .  Among other things, we conducted a detailed BSA/AML "lookback" review of customer transactions, from January 1, 2018, to March 30, 2019, using a risk-based approach.  We also conducted a know-your-customer due diligence review of all BSJI customers to ensure that no prohibited parties may have had access to the U.S. financial system through their accounts at BSJI.  At all times, my team and I committed

25

ourselves to being fully transparent with the Federal Reserve Bank of New York ("FRBNY") with our findings and regularly provided the FRBNY with updates—frequently in person at the FRBNY's headquarters offices in New York City.

81.      This fully voluntary "lookback" was an immense undertaking, lasting about a year, requiring more than 5,500 hours of personnel time, precipitating more than 200 requests for information, and alone cost BSJI more than $4 million to conduct.  At the review's conclusion, FTI certified to the FRBNY that it discovered no evidence of any illicit activity at BSJI.  In other words, the FRBNY suspended BSJI's master account not because of any found wrongdoing— there was none—but merely because of a media story reporting on the pendency of an investigation: BSJI was deemed guilty until proven innocent.  We are not aware of any instance where the FRBNY, or any other Reserve Bank, suspended the master account of a large U.S. bank for those reasons.  To the contrary, there are a number of examples of large U.S. banks being fined, charged, and/or even convicted of crimes without losing their master account.

82.      In July 2019, the FRBNY informed BSJI that it would consider allowing BSJI access to limited service if and when the FRBNY was convinced that no sanctioned or otherwise illicit transactions were, or would be, processed through BSJI's accounts at the FRBNY.  Mr. Isaac and FTI continued to build and enhance BSJI's compliance program, devoting thousands of hours of employee and third-party personnel time to create top-tier internal controls and compliance systems.  At every step of this process, BSJI worked collaboratively and transparently with the FRBNY to satisfy its every request and address any concerns it had.

83.      On December 6, 2019, BSJI and FTI presented updated findings to the FRBNY, confirmed the lack of evidence of illicit activity in BSJI's transaction history, identified the additional improvements made by BSJI over the preceding eight months, and discussed the next steps that BSJI intended to take in improving its compliance system.

84.    During the December 2019 meeting, BSJI also informed the FRBNY that BSJI would be engaging an independent private examiner to review its BSA/AML/OFAC program and other key internal controls on a biannual basis, beginning in Q1 2020, to ensure the Bank was performing with optimal risk mitigation practices.  In so doing, BSJI would be expending its own resources to have an independent third party, acceptable to the FRBNY, act as its private examiner. BSJI also told the FRBNY that it was prepared to have that independent private examiner report its findings directly to the FRBNY.

85.    The FRBNY and, in particular, its general counsel, Michael Held, who had been intimately involved in the BSJI review, expressed appreciation for the efforts BSJI had undertaken and was willing to take in the future.

86.    Notably, as BSJI's discussions with the FRBNY matured, the FRBNY indicated fewer misgivings about BSJI in particular, but rather conveyed its discomfort with IBEs more generally, because they are neither federally regulated nor federally examined; they are instead regulated and examined by their local regulator.  The FRBNY's disclosure to BSJI representatives of its concerns about IBEs generally was in line with the April 2019 news reports of the FRBNY's decision to curtail master accounts for IBEs. *See supra at* p. 4 n.1.

87.    During a second meeting, on February 13, 2020, among Mr. Isaac, Mr. Wolf, and BSJI's management on the one hand, and the FRBNY on the other, BSJI and the FTI team apprised the FRBNY of BSJI's progress over the preceding months and reiterated the additional steps BSJI intended to take in the immediate future.  During the meeting, Mr. Held informed BSJI and its consultants that the FRBNY intended to impose new master-account-related obligations on all IBEs, and observed that BSJI would be "at the front of the line" in terms of meeting the new requirements because many of the steps BSJI had taken proactively, including the use of

independent examiners to conduct testing of controls, were among the new obligations the FRBNY

intended to impose.  In other words, BSJI had already taken many of the actions that the FRBNY

would later impose on all IBEs.

88.     On April 22, 2020—over a year after the FRBNY suspended BSJI's account—the

FRBNY informed BSJI that access to its master account would be restored in a phased approach.

Specifically, the FRBNY advised that after:

> consideration of the information provided on the call and the documents
> provided to FRBNY, FRBNY lays out below a phased path for BSJI to: (1)
> reestablish limited access to its FRBNY accounts and certain Federal
> Reserve financial services; and (2) demonstrate full compliance with the
> requirements of the FRBNY Account and Financial Services Handbook (the
> "Handbook"). FRBNY will consider providing BSJI with broader access to
> Federal Reserve financial services if FRBNY is satisfied that BSJI is in full
> compliance with the requirements of the Handbook.

89.     BSJI immediately began to take the steps requested by the FRBNY, and hired two

more premiere independent consultant firms, K2 and Chain Bridge Partners LLC ("Chain

Bridge"), to assist with these efforts.  K2, a preeminent risk, compliance, investigations, and

monitoring firm, was tasked with validating BSJI's transaction monitoring and sanctions screening

systems, while Chain Bridge, an independent advisory firm led by Jeremiah Norton, a former

director of the FDIC, was responsible for testing and satisfying the operational risk management,

resiliency, and continuity requirements of the Handbook.

90.     BSJI submitted the first tranche of documents called for under the Handbook and

Phase 1A of the restoration plan mandated by the FRBNY on May 8, 2020.  This process continued

over the next seven months, during which BSJI and its consultants regularly met with FRBNY

representatives and apprised them of BSJI's progress, while contemporaneously developing and

submitting additional information for the FRBNY's consideration.  These documents included a

revised business plan and updated policies and procedures for transaction monitoring based on

recommendations from K2.  During this period BSJI also engaged a fourth leading independent consultancy firm, AML RightSource (AMLRS), to perform an independent audit review of BSJI's BSA/AML and OFAC Compliance Programs for the upcoming period of October 1, 2020 to September 30, 2021.

91.    Finally, on December 3, 2020, BSJI was notified that the FRBNY "ha[d] completed its review of both the initial and additional documentation in accordance with the Phase 1B of the plan and [was] satisfied that BSJI ha[d] met the requirements of Phase 1B." Accordingly, BSJI had its master account and "unrestricted access to the Fedwire Securities Service restored via the Federal Reserve Banks' standard offline process," effective December 14, 2020.

92.    During the 22-month period when BSJI's master account access was suspended, BSJI built on its system of controls and governance and transformed it into a top-tier system beyond that of its immediate peer group, and which proved acceptable to the FRBNY.  Indeed, some of BSJI's ideas, such as the use of credentialed third parties acceptable to the FRBNY to act as independent examiners, were adopted by the FRBNY in guidance subsequently promulgated by the Board and applicable to all IBEs and other financial institutions.[5]  These third-party independent examiners were intended to serve as the eyes and ears of the FRBNY since the FRBNY did not have any regulatory or supervisory role over IBEs.

93.    BSJI's Chief Executive Officer, Héctor J. Vázquez, summarizes the extensive measures that BSJI undertook during this 22-month period:

> Also in 2019, BSJI inventoried all bank policies and procedures and completed a compliance program gaps analysis. With the assistance of FTI and with the new BSA Officer's involvement, and added backup staff and resources to assist him, BSJI enhanced its overall system of compliance controls, including revised policies and procedures, and, critically,

---

[5] *See* Board of Governors of the Federal Reserve System, *Guidelines for Evaluating Account and Services Requests*, Final Guidance, 87 Fed. Reg. 51,099-51,110 (Aug. 19, 2022).

completed the implementation of the fully automated transaction-monitoring system. The process also yielded revised Bank Secrecy Act ("BSA")/anti-money laundering ("AML") policies and procedures assembled in a new AML/CFT Manual, which includes specific instructions and clear policy on the filing of Suspicious Activity Reports and a process for escalating questions regarding whether and when to file such a report. BSJI also updated the Know Your Customer program to risk-rate and evaluate BSJI's unique customer base specifically designed for heightened concerns regarding the region and market in which the Bank operates, including a customized risk-rating form to evaluate all customers during the initial due diligence and the enhanced due diligence processes.

In 2020, BSJI adopted new codes of business conduct and ethics for employees, officers, and directors. BSJI trains and tests all employees on BSJI policies regarding AML, sanctions, ethics, and AML. Importantly, BSJI has not only updated its policies and procedures, and automated its transaction monitoring system, but it actively strives to ensure that a culture of compliance permeates its every day decision-making process.

**C.     BSJI suffers immense reputational and economic harm during the temporary suspension of its master account**

94.     While BSJI's FRBNY master account access was temporarily suspended, BSJI's inability to access Federal Reserve services caused it enormous reputational and financial harm. Specifically, BSJI was forced to shrink to a mere fraction of what it once was, and, at the time it commenced this litigation, had retained 3% of the depositors it had prior to the suspension.

95.     As a result, the total number of deposit accounts was reduced by over 97% from January 1, 2019, to July 31, 2022, while the corresponding dollar amount of total deposits dropped by over 66% during the same period.  Moreover, the FRBY's suspension of BSJI's master account, and the corresponding exodus of retail clients, effectively ended BSJI's retail banking services business: BSJI now solely self-funds investment activities because it cannot conduct transactions for its customers through the U.S. financial system.

96.     BSJI's valuable customer relationships were catastrophically frayed as well, and BSJI worked tirelessly to try to rebuild itself after the disaster caused by the prolonged FRBNY master account temporary suspension.

## V.    K2'S 2021 AND 2022 REPORTS

97.    In 2021, in light of the COVID pandemic, K2, BSJI, and the FRBNY reached a variety of accommodations on the respective due dates of various compliance reports. Accordingly, K2 produced (i) the OFAC screening technical validation on June 14, 2021, (ii) the BSA/AML and OFAC compliance program assessment on June 16, 2021, and (iii) the BSA/AML transaction monitoring technical validation on June 29, 2021.  While the reports were all submitted in June 2021, the end of the review period for the various subject matters ranged from April 30 through June 2021, although the information provided for June 2021 was limited to discrete subject matters given the timing of the submissions.

98.    Because the FRBNY requires "annual" submissions, BSJI and K2 discussed the appropriate review period and anticipated submission dates for 2022.  Though the precise submission date of these "annual" reports is not identified in the Handbook, the FRBNY stated that the review period "must cover a full 12-month period.  Generally, FRBNY requires the date of the report of Independent Consultant or Auditor be no more than three months from the end of the 12-month period reviewed by the Independent Consultant or Auditor."

99.    In light of the inconsistent review periods for BSJI's preceding submissions, the FRBNY's requirement that the consultant/auditor reports cover a full 12-month period, and due to the varying submission dates in 2021 as a result of the COVID-19 pandemic, K2 and BSJI concluded that it would be most appropriate to align the review periods going forward.  The 2022 review period was consequently set to be through and including June 30, 2022 for all subject matters and all reports, that is, one year from the end of the review period covered by BSJI's final 2021 compliance report submission.  Given that the last of K2's review periods concluded on June 30, 2022, the K2 reports (per the FRBNY's guidance) would have needed to be concluded and dated "no more than three months" thereafter, that is, by September 30, 2022.

100.    However, BSJI recognized that the Handbook's guidance was (potentially) internally contradictory.  The Handbook required "annual" submissions.  If interpreted to mean a submission for each year, there would be no contradiction at all, because BSJI always intended to file a submission for 2022, just as it did for 2021.  But if interpreted to mean not later than 365 days from the date of the previous submission, then there would appear to a contradiction with the Handbook's requirement that the reports cover a 12-month period, given that it would be impossible to submit a comprehensive report of data from the very same day as the report deadline.  Moreover, the Handbook stated that reports were "generally" required to be submitted "no more than three months from the end of the 12-month" review period but did not provide a concrete deadline, further confusing the matter.  This lack of consistent guidance, coupled with the reporting delays caused by the COVID-19 pandemic, rendered BSJI's reporting deadlines less than clear.

101.    BSJI believed that the obvious and appropriate approach was to seek guidance from the FRBNY itself, as it had done on a regular basis while working with the FRBNY to develop its industry-leading compliance system.  As such, and consistent with the Handbook's guidance that banks should contact the FRBNY in the event of any questions, BSJI contacted the FRBNY.

102.    Specifically, on April 7, 2022, BSJI emailed Claudette Bridgewater of the FRBNY, stating:

> BSJI is developing a work plan to ensure that all documentation required by the FRB-NY Handbook for the year ending December 31, 2022, is completed and submitted in a timely fashion.  As part of the planning process, we would like to confirm our understanding of the steps to be followed and arrange a bilateral call with your group, at your earliest convenience, to ensure that we fulfill FRB-NY requirements.  To facilitate such discussion, below please find a summary of our understanding of this year's process as follows: . . . BSJI is hiring K2 Integrity to provide a model validation and compliance program assessment, the Factor 2 Attestation for 2022.  Their review period will cover [the period] from May 2021 to June 30, 2022.  (BSJI expects that field work and Attestation report be completed by the latter part of the third quarter of 2022).

32

103.     BSJI's April 7, 2022 request went unanswered.

104.     With the conclusion of the review period approaching, BSJI diligently again reached out to Ms. Bridgewater on June 3, 2022—fewer than 60 days from its first written request to the FRBNY for guidance.  BSJI again told the FRBNY that:

> BSJI has engaged K2 Integrity, operating through K2 Intelligence, LLC, as an Independent Consultant to perform the BSA/AML and OFAC Program Assessment, Technical Validation, meeting the requirements of factor 2 of the FRB-NY Handbook.  The scope of the review period will cover from May 1, 2021 to June 30, 2022.  The inclusion of June 2022 in the review period is to align the review periods of both the Program Assessment and the Technical Validation and to ensure complete coverage of relevant internal controls for the current review.

105.     BSJI's second request for FRBNY guidance fared no better.  Once again, the FRBNY did not respond.  Under the circumstances, and in light of the FRBNY's non-objection to BSJI's twice-announced plans, BSJI reasonably proceeded with its process as required by the Handbook, and as communicated to the FRBNY: to submit its reports within three months of the review period's conclusion on June 30, 2022.

## VI.     THE FRBNY ARBITRARILY AND INAPPROPRIATELY TAKES STEPS TO TERMINATE BSJI'S MASTER ACCOUNT, THEN PAUSES TERMINATION

106.     Through the conclusion of the review period, the FRBNY did not respond to BSJI's outreach.

107.     Instead, without warning, on July 18, 2022—fewer than three weeks after the twice-announced review period's conclusion, several months after the Bank's first outreach on the issue, and well within the three *months* the Handbook affords for the submission of a report—the FRBNY sent a letter to BSJI stating that the Bank's "non-compliance" with an alleged June 2022 filing date, "among other things," presented "undue risk" to the FRBNY.  This was an unsupported refrain that, as BSJI would soon learn, the FRBNY would repeatedly, baselessly invoke.  Accordingly, the FRBNY informed BSJI that the FRBNY would terminate BSJI's master account

on September 15, 2022 (a date later briefly extended to September 29, 2022).  Despite the vague reference to "other things," the letter specifically identified only BSJI's alleged tardy filing as a basis for the termination of the master account.

108.    The letter came as a complete shock to BSJI.  Just a year and a half before, the FRBNY had blessed BSJI's systems and controls, as well as its extensive efforts to become a model IBE, by granting BSJI unrestricted access to a master account and FRBNY offline services.  Moreover, and importantly, *the Bank had continually improved its systems and controls since that time*.  Further, the FRBNY's own published advice did not support the FRBNY's actions, and BSJI was denied an opportunity to remedy any purported submission deficiencies.  And, of course, the FRBNY could have avoided any misunderstanding, if in fact there actually was a misunderstanding, had it merely responded to either BSJI's April 7, 2022 or June 3, 2022 communications.

109.    BSJI promptly responded on July 19, 2022, emphasizing that BSJI had repeatedly contacted the FRBNY seeking guidance on the very deadline on which the FRBNY was now predicating its account termination.  BSJI likewise clarified that the reports at issue were currently being prepared, which was consistent with the three-month submission process articulated in the FRBNY Handbook.

110.    Thereafter, on August 11, 2022, BSJI was able to finally have a call with the FRBNY.  During that call, the FRBNY refused to consider BSJI's position, would not explain why it had not responded to BSJI's requests for guidance, claimed that the deadlines for report submission were "clear," and stated that it would not change its decision to terminate BSJI's account.  The FRBNY had decided to terminate BSJI's master account based on the "phantom deadline," and it made clear that its decision was not going to change.

111.   BSJI understood from this call that the FRBNY's decision to close its master account was not based on any alleged transgression by BSJI. It was instead clear that the FRBNY decided to close the master account for reasons that had nothing to do with the alleged failure to satisfy any purported deadline, and that the FRBNY employees on the call were merely following orders and had no discretion to enter into a serious dialogue with BSJI that could avoid closure of the master account.

112.    Evidencing the baselessness of BSJI's account termination, the FRBNY has since admitted that its decision-making process went entirely undocumented: despite the draconian nature of its punishment, the FRBNY generated no internal memoranda supporting its 2022 decision.

113.   BSJI nonetheless continued to reach out to the FRBNY, explaining again the conflicting guidance regarding the supposed deadline, informing it of K2's extensive work to date, pleading with the FRBNY to afford K2 the time necessary to finalize its reports, especially since K2 was nearing completion, and, more generally, asking that the FRBNY enter into a constructive dialogue with BSJI, all to no avail.

114.   Facing the imminent termination of its master account, BSJI was left with limited options. It consequently informed the FRBNY, on September 15, 2022, that the FRBNY's actions were arbitrary and unsupported, leaving BSJI with no other option than to challenge the decision in court.

115.   Rather than defend its conduct in court, on September 19, 2022, the FRBNY wrote to BSJI and stated that it would not proceed with the master account closing on September 29 as it previously advised, but would rather "consider whether [K2's then just-filed and soon-to-be-filed] submission[s] impact[] the Federal Reserve Bank of New York's . . . decision to close BSJI's

master account." The FRBNY simultaneously advised that it would transmit to BSJI Requests for Information ("RFIs") and would consider BSJI's response in determining how to proceed.

116.    In short, and as described more fully below, the FRBNY sought to generate entirely new grounds for its pre-determined decision to close BSJI's master account, an effort that would be consistent with and in furtherance of its internal (and nonpublic) policy to substantially downsize the number of special purpose depository institutions and other novel banks, including IBEs and other state-chartered, non-FDIC-insured financial institutions, that have access to the Federal Reserve System.

## VII.    THE FRBNY AGAIN ACTS TO CLOSE BSJI'S MASTER ACCOUNT

117.    Having born witness to the FRBNY's inexplicable and aggressive effort to terminate BSJI's master account in July-September 2022, and concerned about the FRBNY's behavior, BSJI opted to reach out again to the FRBNY in an effort to open up a dialogue.

118.    Therefore, on January 25, 2023, BSJI sent two letters to the FRBNY, one of which described many of the steps it had taken since 2019 to enhance its compliance program, including its retention of many of the best and most respected consultants—many former regulators—in the country, at an extraordinary cost to BSJI.  In that same letter, BSJI offered to do still more, if only the FRBNY would share with BSJI what the FRBNY wanted it to do.  In this regard, BSJI advised the FRBNY that it "is prepared to take additional action in collaboration with the FRBNY, including, for example, by establishing a cap on master account activity, limiting the functionality of BSJI-provided accounts, or adopting capital requirements, all to address any perceived risk to the Reserve Bank associated with use of the master account."  The second letter, sent by BSJI's General Counsel to FRBNY Legal, offered to have the FRBNY directly supervise BSJI.  Both letters asked for a meeting.

119.    The FRBNY responded to neither letter.

120.    Instead, unbeknownst to BSJI, in January 2023, reflecting the careful choreography between the Board and the Federal Reserve Banks, the Board issued "S-2677," a guidance memorandum to the Federal Reserve Banks that directed them to heavily scrutinize Tier 3 institutions, like BSJI, that the Board chose to characterize as inherently "high risk." In this way, the Reserve Banks and the Board were setting the stage to deprive novel bank charters of master accounts.

121.    The FRBNY wasted little time effectuating its mandate, issuing its second termination letter just three months later.

122.    On April 24, 2023, the FRBNY sent another termination letter to BSJI, advising it that the FRBNY had decided (yet again) to close BSJI's master account. The FRBNY's original basis for account closure—failure to adhere to a phantom deadline—went entirely unmentioned, in apparent recognition that it could not have defended in court its failure to respond to BSJI's communications seeking confirmation of the deadlines. Rather, the FRBNY concocted a list of purported "deficiencies" in BSJI's compliance program and vaguely cited the volume of transactions from unidentified "high-risk jurisdictions" as now justifying its remarkable conclusion: that BSJI, a bank with very few clients and a modest transaction volume, comprising a mere fraction of its former self, poses an "undue risk to the overall economy" and consequently violated Principle 5 of the Board's Guidelines for Evaluating Account and Service Requests.

123.    In the preceding six months, the FRBNY had not once contacted BSJI, despite BSJI's repeated efforts to dialogue with the FRBNY and answer any questions it might have about BSJI's response to the FRBNY's RFIs or to BSJI's multiple letters.

124.    This second effort to deprive BSJI of its master account lacked substantive basis, just as the first did. Among other things, even though K2 (which had been pre-approved by the

FRBNY to audit BSJI) conducted an exhaustive, on-the-ground audit of BSJI's BSA/AML and OFAC compliance program, the FRBNY summarily discarded K2's months of analyses and conclusions, including that BSJI's compliance program met regulatory standards and was otherwise satisfactory, and it did so without any explanation.

125.   On information and belief, the FRBNY had never previously discarded K2's conclusions, much less in circumstances where the FRBNY had not itself actually conducted an on-site examination.

126.   For its part, the FRBNY did not even bother to contact K2 to discuss any questions regarding K2's findings concerning BSJI, a routine step that ordinarily is undertaken before a Federal Reserve Bank might consider discarding an auditor's findings.

127.   Nor did the FRBNY ask for, obtain, or ever review K2's workpapers to discern the reason for any differences between the FRBNY's and K2's conclusions.

128.   BSJI's BSA/AML and OFAC compliance program, largely prepared by top consultants and former regulators, had also been separately reviewed and blessed by AMLRS, which, like K2, is a nationally-recognized, well-credentialed, independent BSA/AML and OFAC auditor.

129.   Further still, a major credit card company independently audited BSJI's BSA/AML and OFAC compliance program by hiring its own BSA/AML and OFAC auditor, at its own expense.  That major credit card company's auditor concluded in 2022 that ██████████████ ███████████████████████████  Consequently, the major credit card company had required BSJI have a master account to approve BSJI's request to employ such credit cards.

130.     Perhaps most importantly, BSJI's regulator, OCIF, ████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████

131.     Additionally, on September 21, 2022, another governmental entity, the highly-respected Financial Industry Regulatory Authority ("FINRA"), which is the self-regulatory organization that regulates and supervises the hundreds of securities broker-dealers and more than 600,000 securities brokers in the United States, approved BSJI's transaction in which it indirectly acquired a 40 percent interest in a securities broker-dealer in Illinois.  FINRA, of course, conducts rigorous reviews as a condition of such a sizable acquisition of any securities broker-dealer that is a member of FINRA.

132.     Moreover, while the FRBNY contends that BSJI imposes a risk of facilitating "economic or trade sanctions violations," in 2020, OFAC conducted a civil investigation and audit of BSJI's OFAC compliance plan.  OFAC closed that investigation without a single finding, and BSJI's OFAC compliance plan has only been enhanced since then, belying the FRBNY's claims.  BSJI's regulator, OCIF, likewise found, █████████████████████████████████ ████████████████████████████████████████.

133.     The FRBNY and the Board—who neither examined nor audited BSJI—are the only outliers, as only they purport to lack comfort with BSJI's compliance program, having purportedly concluded that BSJI poses an "undue risk to the overall economy."

134.     The primary alleged basis for the FRBNY's concerns regarding BSJI's compliance program is that the FRBNY "disagreed" with K2's identification of 13 proposed "enhancements,"

asserting that the proposed "enhancements" should have instead been categorized as "deficiencies." But K2, per industry standards, considered BSJI's entire risk profile in reaching its conclusions. With so few accounts, and with so few incoming transactions over the course of a year BSJI, represents a far smaller risk profile than almost all financial institutions across the country. Whereas the typical financial institution must rely only on computer analytics to discover anomalies among its customers, BSJI's compliance team not only scrutinizes 100 percent of the transactions through computer analytics, but also knows all of BSJI's customers, understands the businesses they are in, and can and does manually evaluate *in real time* the transactions before any transaction is consummated. Simply put, the compliance program for a bank with tens of thousands of customers and potentially hundreds of thousands of transactions annually should be and is very different than a bank with a small number of customers and a modest number of wire transfers each year.

135. Of course, as noted above, K2's conclusion that BSJI's compliance program is effective and comprehensive is consistent with ███████████████████████ and with other audit firms that evaluated and tested BSJI's program over substantially the same time.

136. Regardless of whether the tasks should have been categorized as "enhancements" or "deficiencies," K2 also has confirmed that BSJI has addressed each and every one.

137. The FRBNY also found the fact that BSJI had not filed any SARs was an indication of "weakness in BSJI's compliance program." The FRBNY, however, did not point to a single transaction for which a SAR should have been filed, and later admitted that the FRBNY could not identify even a single SAR that should have been filed but was not, citing the fact that it does not serve BSJI in a supervisory role.

138.    Likewise, the Financial Crimes Enforcement Network ("FinCEN") has neither warned nor fined BSJI for failing to flag a transaction for which a SAR should have been filed. That is not surprising given the exceedingly low number of transactions that pass through BSJI and the fact that each transaction, unlike at the majority of financial institutions, is capable of being reviewed—and is reviewed—in real time.

139.    With its April 24, 2023 letter referencing the "totality of [the FRBNY's] concerns" consisting of 16 bullet points, the FRBNY's calculus should have materially changed when advised that BSJI has addressed K2's recommended enhancements and that K2 was in the process of validating those measures, as those enhancements constituted thirteen of the sixteen (81.25%) of the FRBNY bullet points. K2 later verified that all thirteen recommendations have been addressed.

140.    Instead, in an ensuing June 20, 2023 phone call with BSJI, the grounds upon which the FRBNY's decision rested shifted yet again, with the FRBNY not relying at all on the K2 so-called deficiencies, but now and instead only on alleged transactions of "related party" "shell companies" in "high-risk" jurisdictions.  Not surprisingly, the FRBNY did not identify any particular customer or any particular set of transactions as indicative of supposed illicit activity. But as BSJI laid out in detail in its June 27, 2023 letter responding to the FRBNY's "unspecified shell company" rationale, none of BSJI's accounts involves "shell companies," and BSJI knows and understands the business of each of its customers as part of its enhanced due diligence.

141.    In its submissions to the FRBNY, BSJI provided an exhaustive response to the April 24, 2023 letter, painstakingly detailing BSJI's recent compliance efforts, the FRBNY's failure to account for BSJI's exceedingly modest risk profile, small retail customer base, and limited transaction volume, and the faulty assumptions upon which the FRBNY's contentions—

particularly, that BSJI posed an undue risk to the overall economy—rested.  These submissions, by any measure, should have put any legitimate concerns the FRBNY might have had to rest or, at a minimum, encouraged the FRBNY to engage BSJI in dialogue.

142.    The FRBNY, however, did not act in good faith.  Instead, three days after BSJI provided information about each of its customers (since the FRBNY failed to identify which particular customer(s) the FRBNY had concerns about), on June 30, 2023, the FRBNY sent a third termination letter, in which the FRBNY both mandated that BSJI's account would be closed on July 31, 2023 and lobbed new allegations concerning unspecified "high-risk transaction typologies" it claimed were "suggestive" of illicit activity.

143.    Despite the FRBNY's admission that its only concern was the theoretical risk BSJI posed—for the FRBNY could not identify a *single* illicit transaction—BSJI nevertheless continued to seek a constructive dialogue with the FRBNY.  After BSJI's efforts at dialogue were (again) rebuffed, BSJI was forced to bring suit.

144.    The bad faith and wholly arbitrary nature of the decision against BSJI is all the more apparent when contrasted with the FRBNY's (and other Reserve Banks') actions towards other financial institutions.  Deutsche Bank, for example, was simply subjected to a fine in July 2023 despite having been determined to have "unsafe and unsound" anti-money laundering practices for over eight years.  Similarly, in October 2023, the Board merely ordered a monetary fine against the Metropolitan Commercial Bank of New York despite indications of "widespread fraud" due to its failure to maintain an adequate anti-money laundering compliance program.  And just last month, the Board imposed only a minor fine against the Industrial and Commercial Bank of China Ltd. for the illegal disclosure of confidential supervisory information, despite a

contemporaneous consent order, issued by the bank's state regulator, concerning the Commercial Bank of China's inadequate anti-money laundering compliance program.

145.    In these cases the Board elected to impose only consent decrees and assess financial penalties against large financial institutions, found liable for actual violations of law, and left intact their respective master accounts.  The compliance failures are these banks were likewise not found to pose "an undue risk to the overall economy," despite their vastly larger financial footprints.

146.    The favored treatment afforded to these large financial institutions cannot be explained away by positing—as the Board and the FRBNY have repeatedly done—that federally regulated banks are heavily scrutinized and consequently present less risk than non-federally regulated institutions.   In the case of Deutsche Bank, Metropolitan Commercial Bank of New York, and Industrial and Commercial Bank of China Ltd., there have been determinations that they employed inadequate anti-money laundering compliance programs and yet, in levying penalties, the FRBNY and the Board have taken a drastically different approach than that taken against BSJI, a small IBE, despite those banks' far greater potential impact on the "overall economy."

147.    The impropriety of the FRBNY's decision to disproportionately penalize Puerto Rican IBEs, like BSJI, is compounded by the fact that IBEs are well-recognized to not present unique risks to the U.S. financial system. This was most recently validated by the U.S. Treasury Department, which removed IBEs from its bi-annual list of "vulnerabilities and risks" in its 2024 National Money Laundering Risk Assessment, given that IBEs are subject to the same comprehensive AML legal requirements as federally regulated banks.[6]

---

[6] The Weekly Journal, *US Treasury Dept. eliminates Puerto Rico financial institutions from money laundering risk list* (Feb. 19, 2024), *available at* https://www.theweeklyjournal.com/top-stories/us-treasury-dept-eliminates-puerto-rico-financial-institutions-from-money-laundering-risk-list/article_33a49ca4-cf59-11ee-b6e6-13e638eef1ff.html.

## VIII.   THE BOARD'S INVOLVEMENT IN THE FRBNY'S UNLAWFUL DECISION TO TERMINATE BSJI'S MASTER ACCOUNT

148.    The decision to terminate BSJI's master account was not made by the FRBNY alone.  The Board, which has expressly endorsed the FRBNY's claim to discretion over BSJI's master account and issued "Guidelines" purporting to provide transparency as to how that discretion is applied, is also driving the decision.

149.    Historically, the Board had been silent as to the topic of master account eligibility given that, as detailed above (*supra* at ¶ 9), the right of a statutorily-eligible institution to a master account had been a matter of accepted fact.  However, and in concert with the FRBNY's (as well as other Federal Reserve Banks') reimagination of the scope of their authority, the Board developed and issued Guidelines that purport to clarify the factors Federal Reserve Banks consider in determining whether an entity should be allowed master account access.  The Board issued final guidelines on August 15, 2022 (the "Guidelines"), after the FRBNY had determined it would terminate BSJI's master account access on the basis of an allegedly missed deadline.  *See* Bd. of Govs. Of Fed. Rsrv. Sys., *Guidelines for Evaluating Account and Service Requests*, 87 Fed. Reg. 51,099 (August 15, 2022).

150.    Pursuant to the Guidelines, the Board has delegated to the Federal Reserve Banks, including the FRBNY, the ultimate decision-making discretion on master account access, though the Board made clear that it retains full responsibility for "interpreting the provisions of the [Federal Reserve] Act concerning legal eligibility."  *Id.* at 51,103 n. 11.  Given that the FRBNY operates under the "general supervision authority" of the Board (*id.* at 51,106) and can exercise only that authority which has been delegated to it by the Board (setting aside express congressional delegations to the Federal Reserve Bank), the Board's interpretation of the scope of the FRBNY's

authority both enabled and empowered the FRBNY in its decision to terminate BSJI's master account.

151.    Under the Guidelines, consistent with the Board's S-2677 Memorandum, Federal Reserve Banks are directed to more heavily scrutinize Tier 3 institutions, like BSJI, than other financial institutions.  Also like the Board's S-2677 Memorandum, the Reserve Banks and the Board were setting the table to deprive novel bank charters of master accounts.  On information and belief, no Federal Reserve Bank has granted a Tier 3 institution's application for a master account in the eighteen months since the Board promulgated the Guidelines.

152.    The Guidelines articulate six "Principles" that Federal Reserve Banks should consider in assessing whether an institution merits access to a Federal Reserve Account.  Of particular significance here, Principle 5 of the Guidelines directs Federal Reserve Banks to consider whether "provision of an account and services to an institution should not create undue risk to the overall economy by facilitating activities such as money laundering, terrorism, financing, fraud, cybercrimes, economic and trade sanctions violations, or other illicit activity." *Id.* at 51,109.  The Board, in effect, had proffered a list of buzzwords—undue risk, money laundering, illicit activity—that Federal Reserve Banks could rely upon, with or without a legitimate basis, to close a master account.  The FRBNY predicated its decision to terminate BSJI's master account expressly upon Principal 5.

153.    By its terms, Principle 5 does not permit closure of a master account upon "any" risk to "the economy."  The risk instead must be an "undue risk."  And the "undue risk" must be in relation to the "overall economy."  In so doing, Principle 5 is not satisfied merely upon invocation of the buzz words set forth therein.  Principle 5 instead puts into place a minimum threshold that the Reserve Banks must meet before denying master account access.

154.    The Board also reinforced the necessity of its involvement in *any* decision made by a Reserve Bank concerning the denial of master account access through its issuance of S-2677. Under S-2677, the FRBNY, like all Reserve Banks, was directed to continuously consult with the Board throughout its evaluation process of any entity, like BSJI, that was categorized as a "Tier 3" institution under the Guidelines.  The purpose of this consultation, S-2677 makes clear, is to provide "an opportunity for appropriate Board staff to advise" on the Reserve Bank's assessment, in other words, to approve or reject the FRBNY's "pre-decisions."

155.    The FRBNY adhered to this mandate.  On April 6, 2023, the FRBNY informed the Board that it "intend[ed]" to terminate BSJI's account access and distributed two "pre-decisional" memoranda that described the purported justifications for the FRBNY's intended action against BSJI.[7]

156.    On April 12, 2023, the Board responded and—as it would later acknowledge in this litigation—"validated" the FRBNY's decision to terminate BSJI's master account.  Specifically, the Board stated that it had "no concerns" with the FRBNY's analysis or with the FRBNY "moving forward with its intended action to terminate BSJI's access."   Demonstrating the intimate involvement the Board had with the FRBNY's assessment, more than *twenty-five* staff members of the Board were included on the correspondence.

157.    The Board likewise improperly validated the breadth of the FRBNY's claimed authority prior to the issuance of S-2677.  Following the FRBNY's July 2022 termination decision, Mr. Isaac, on behalf of BSJI, contacted the Board in August 2022 concerning the impropriety of the FRBNY's decision.  Mr. Issac further requested that the Board intervene both to prevent the

---

[7] One of these memoranda noted that the FRBNY would "consult with the Board regarding its closure decision in accordance with its Guidelines S-Letter, S-2667," apparently intending to reference S-letter S-2677.

FRBNY's unlawful conduct and to resolve the dispute amicably.  The Board demurred, making clear that pursuant to their supervision and direction, they had delegated to the FRBNY ultimate "discretion over BSJI's master account and access to Federal Reserve services."

158.    The FRBNY would not have terminated BSJI's master account had the Board expressed concerns or otherwise articulated any objection to the proposed termination.

## IX.    THE FRBNY'S BAD FAITH IS EXEMPLIFIED BY ITS FAILURE TO ENGAGE IN DIALOGUE

159.    As is plain from above, BSJI boasts experienced management and extraordinary consultants on whom BSJI has relied for years and who have validated the strength of BSJI's compliance program.  Among all those familiar with BSJI, the FRBNY is an outlier, not only as to its conclusions, but its total failure even to engage in a dialogue with BSJI.

160.    One such BSJI consultant is Chris Laursen, former Manager of Risk Policy and Guidance for the Federal Reserve Board, as Head of Trading and Capital Markets Risk within the Market and Liquidity Section of the Board of Governors.  Mr. Laursen has affirmed that "BSJI's BSA/AML and OFAC Program is better developed than the programs of larger banks with a substantially greater number of customers, assets, accounts, transactions, and activity types."

161.    The former Chairman of the FDIC, William Isaac, similarly affirms that "BSJI's compliance program, including its staffing, is more than sufficient for its current size and activities" given that it employs a "robust" training program and formal governance processes and compliance models that "exceed" those utilized by similarly sized banks.

162.    Both Mr. Laursen and Mr. Isaac found the FRBNY's conduct to reflect far less than good faith.  Mr. Isaac affirmed that he found "the FRBNY's mistreatment of BSJI to be among the worst that I have seen in the industry, in light of BSJI's inordinate expenditure of resources and absolute commitment to satisfy the FRBNY's every concern.  There is no reason why the FRBNY

could not have identified any alleged new concerns and afforded BSJI a reasonable opportunity to remedy any purported shortcomings – which is what the guidelines published in August 2022 by the Board of Governors of the Federal Reserve System provide for before a Reserve Bank such as the FRBNY opts for account closure."

163.    Christopher Laursen affirms that the FRBNY's review "was superficial and lacked objectivity."   Mr. Laursen identifies a litany of acts of bad faith as well as departures from historical procedures in support of this conclusion, including that the FRBNY (i) failed to "conduct basic due diligence"; (ii) "undertook no follow-up requests or communication" with BSJI's auditor; (iii) "opted not to engage with BSJI on the additional relevant information which might bear on their specific questions or concerns"; and (iv) "chose to reach its conclusions with only limited information."

164.    Notwithstanding BSJI's demonstrated history of open communication, the FRBNY, by letters dated July 18, 2022 and April 24, 2023, notified BSJI of the FRBNY's respective decisions to close BSJI's master account.  On neither occasion did the FRBNY first discuss its alleged concerns or its intended decision with BSJI representatives.

165.    The FRBNY instead found that dialogue was unnecessary precisely because it chose to close BSJI's master account in pursuit of a nonpublic policy that did not require fact-based decision-making.

## COUNT I

### VIOLATION OF THE APA, 5 U.S.C. § 706
### (AGAINST DEFENDANTS FRBNY AND THE BOARD)

166.    All prior paragraphs are incorporated as if fully set forth herein.

167.    Under Section 706 of the APA, "[t]o the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional

and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall . . . hold unlawful and set aside agency action findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706.

168.    The FRBNY and the Board are federal agencies for purposes of the APA.

169.    The FRBNY and the Board are mandated by 12 U.S.C. § 248 to provide Federal Reserve bank services, including access to a master account, to all eligible "depository institutions" on a non-discretionary basis.  BSJI satisfies the statutory requirements for eligibility.  Their failure to fulfill this statutory mandate amounts to arbitrary and capricious action in violation of the APA.

170.    Yet even assuming that the FRBNY and the Board possess some level of discretion concerning master account access, their actions here were patently improper.  As detailed above, the decisions to terminate BSJI's account in 2022 and 2023 were arbitrary, capricious, an abuse of discretion, and/or otherwise not in accordance with law.  The decisions were made without fair notice nor any real opportunity for hearing.  Nor are there any procedures pursuant to which BSJI or similarly-situated institutions can initiate an administrative appeal so as to be heard.  Moreover, the decisions were based on an incomplete and inaccurate assessment of BSJI, lacked any reasonable basis, and were disproportionate to the claimed issues the FRBNY cited, particularly in light of the fact that those purported issues were remediated.

171.    In particular, the 2023 "finding" that BSJI poses an undue risk to the overall economy is arbitrary, capricious, made in bad faith, and contrary to law, in light of, among other things, (i) BSJI's small footprint and (ii) ███████████████████████████████ ███████████████████████████████████████ and by several different BSA/AML/Sanctions audit firms who conducted on-the-ground analysis.

49

172.   Further, the assertion made for the first time in this litigation that one set of customer transactions contains indicia "suggestive" (and poses some "risk" of) illicit activity lacks any basis in fact and was not made in good faith.  Indeed, the FRBNY's alleged bases for its assertion are plainly not suggestive of illicit activity.  In any event, if the FRBNY had performed reasonable due diligence, which it did not, it would have concluded that the referenced set of customer transactions had a lawful purpose and was lawful in all respects.

173.   Accordingly, the FRBNY and the Board's decision to terminate BSJI's master account and, more generally, Federal Reserve services, was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, in violation of 5 U.S.C. § 706(2)(A).

## COUNT II

### Relief Under the Mandamus Act, 28 U.S.C. § 1361
### (AGAINST DEFENDANTS FRBNY AND THE BOARD)

174.   All prior paragraphs are incorporated as if fully set forth here.

175.   Under 28 U.S.C. § 1361, "[t]he district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff."  Here, BSJI requests that this Court issue a writ of mandamus to the FRBNY and the Board to fulfill their nondiscretionary duty to reinstate BSJI's master account access and Federal Reserve services.

176.   This Court has jurisdiction over BSJI's claim under the Mandamus Act.

177.   The FRBNY and the Board are federal agencies for purposes of a claim under 28 U.S.C. § 1361, and are subject to the mandamus power of this Court.

178.   Mandamus is appropriate here given that BSJI is entitled by law to a master account.  Pursuant to 12 U.S.C. § 248, Federal Reserve services "shall be available" to all eligible depository institutions on a non-discretionary basis.  BSJI satisfies the statutory criteria for eligible

depository institutions, and Federal Reserve services are only available through a master account. The FRBNY and/or the Board consequently have a clear nondiscretionary duty to provide BSJI with continuing access to its master account and the associated Federal Reserve services.

179.    Mandamus is necessary in this case because BSJI has exhausted its administrative remedies.  BSJI attempted, again and again, to engage the FRBNY in discussions concerning its master account, in an effort to reach an amicable resolution, yet its  account was nonetheless terminated. The Board likewise refused to intervene and put an end to the FRBNY's unlawful conduct when requested to do so by BSJI, and instead took the position that the FRBNY holds ultimate "discretion over BSJI's master account and access to Federal Reserve services."

180.    Without  a  master  account,  BSJI  has  suffered  substantial  injury.   BSJI  has experienced a precipitous loss of business and clients. In order to recover from this situation, BSJI is incurring millions of dollars in otherwise unnecessary expenses and an inability to develop its business and implement opportunities.

181.    The FRBNY and the Board should thus be ordered to fulfill their nondiscretionary duty to reinstate BSJI's master account access and Federal Reserve services.

## COUNT III

**DECLARATORY JUDGMENT OF BSJI'S RIGHT TO A MASTER ACCOUNT UNDER 12 U.S.C. § 248A(C)(2) (AGAINST DEFENDANTS FRBNY AND THE BOARD)**

182.    All prior paragraphs are incorporated as if fully set forth here.

183.    An  actual  controversy  exists  within  this  Court's  jurisdiction  concerning  the interpretation and application of 12 U.S.C.  § 248 and related statutes, regulations, and policy pronouncements, such that the Court should declare the rights of BSJI.

184.    BSJI asserts this claim under 28 U.S.C. § 2201(a), which provides that "[i]n the case of an actual controversy within its jurisdiction . . . any court of the United States, upon the

51

filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration."

185.    An actual controversy exists in the present case.  The FRBNY and the Board are mandated by 12 U.S.C. § 248 to provide Federal Reserve bank services, including access to a master account, to all eligible "depository institutions" on a non-discretionary basis.  The FRBNY and the Board act jointly to satisfy this statutory obligation: the FRBNY engages directly with applicant entities, and the Board is obligated to exercise its supervisory authority concerning such applications.

186.    BSJI satisfies the statutory requirements for eligibility, and as the Supreme Court's recent opinion in *Biden v. Nebraska* demonstrates, the Board and the FRBNY lack the power to unilaterally expand the scope of authority delegated them by Congress.  Yet the FRBNY and the Board have, in violation of their statutory obligations, arbitrarily decided to terminate BSJI's master account, foreclosing BSJI's much-needed access to FRBNY services.

187.    This controversy arises in the Court's jurisdiction.  The FRBNY resides in New York and many of the events giving rise to this claim have occurred in New York, including the FRBNY's decision, in consultation with the Board, to terminate BSJI's master account.

188.    Through this Complaint, BSJI has filed an appropriate pleading to have its rights declared.  The Court can resolve this controversy by declaring that the effectuation of the FRBNY's and the Board's decision to terminate BSJI's master account violates BSJI's statutory right to a master account and corresponding FRBNY services.

189.    Accordingly, BSJI seeks a declaration from this Court that BSJI has a right to its master account and that the termination of BSJI's master account under the present circumstances and on this record was contrary to the statutory obligations of the FRBNY and the Board.

## COUNT IV

**VIOLATION OF THE FIFTH AMENDMENT'S DUE PROCESS CLAUSE (AGAINST DEFENDANTS FRBNY AND BOARD)**

190.     All prior paragraphs are incorporated as if fully set forth here.

191.     BSJI has a property interest in the master account and the continued operation of the Bank.  The Due Process clause of the Fifth Amendment to the United States Constitution protects that property interest against irrational, arbitrary, or capricious deprivations by federal instrumentalities.

192.     The Due Process clause also requires that the FRBNY and the Board afford BSJI adequate procedures, including but not limited to, a meaningful opportunity to be heard, before terminating the master account.  BSJI has been afforded no such procedures.  Instead, BSJI not only had no opportunity to be heard, but no notice at all prior to being advised that its master account would be closed and its access to other Federal Reserve System services would be terminated.  On information and belief, the FRBNY's refusal to afford BSJI adequate procedures was also based, in part, on a targeted effort by the FRBNY to prevent all IBEs from maintaining, or being granted access to, master accounts.

193.     Accordingly, the FRBNY's and the Board's termination of BSJI's master account and, more generally, of BSJI's access to Federal Reserve services, under the present circumstances and on this record, violated the Due Process clause of the Fifth Amendment to the United States Constitution.

## COUNT V

**BREACH OF THE CONTRACTUAL DUTY OF GOOD CARE (AGAINST DEFENDANT FRBNY)**

194.     All prior paragraphs are incorporated as if fully set forth here.

195.    BSJI's master account was opened, as required by the FRBNY, pursuant to a Master Account Agreement, dated November 18, 2011, between BSJI and the FRBNY.   The Account Agreement is governed by New York law and incorporates "the provisions" of Operating Circular No. 1.  Operating Circular No. 1, in turn, sets "forth the terms under which a Financial Institution may open, maintain, and terminate a Master Account with" a Federal Reserve Bank.  BSJI has abided by the terms of the contracts.

196.    Operating Circular No. 1 imposes upon the FRBNY a "duty of care," under which it is responsible for "actual damages incurred by the Account Holder and proximately caused by the Reserve Bank's lack of good faith and failure to exercise ordinary care."

197.    Operating Circular No. 1's provision of discretion concerning master account access, incorporated by reference into BSJI's Master Account Agreement, contravenes the FRBNY's statutory mandate and is void as against public policy.  But even if that were not the case, a contract's authorization of discretion is subordinate to the contractual duty of care, and the exercise of the FRBNY's purported discretion must comply with that duty.

198.    The FRBNY's lack of due care in reaching its decision to close BSJI's account was manifest, and includes, but is not limited to:

   a.  deliberately ignoring BSJI's repeated outreach seeking to clarify the submission deadline for BSJI's 2022 audit reports, and then using this purported missed deadline as a basis for terminating BSJI's master account;

   b.  failing to engage with BSJI, or its team of consultants and auditors, when assessing BSJI's compliance programs and the bank's alleged risk to the "overall economy," in stark contravention of its historical practices;

    c.   rejecting the findings of BSJI's on-the-ground auditors that BSJI's compliance programs were "effective" and "comprehensive";

    d.   improperly recharacterizing K2's recommended "enhancements" to BSJI's compliance program as proof of existing "deficiencies" that warranted the termination of BSJI's master account;

    e.   failing to even discuss its conclusions with BSJI's auditors, or otherwise seek or obtain the auditors' workpapers;

    f.   using outdated and incorrect data to draw conclusions about the bank, while ignoring the fact that BSJI had already adopted *all* of K2's recommendations;

    g.   conjuring up various baseless rationales to support the closing of BSJI's master account, including a "lack of SAR" reports that the FRBNY did not determine needed to be filed, describing companies as "shell companies" when there were none; and claiming that transactions entered into by BSJI customers were emblematic of "money laundering" when the FRBNY had undertaken no efforts to understand the transactions; and

    h.   asserting, with no support, that the bank somehow poses an undue risk to the overall economy and is engaged in activity suggestive of illicit activity.

199.    Accordingly, the FRBNY's termination of BSJI's master account breached the FRBNY's contractual duty of care to BSJI.

**COUNT VI**
**BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**
**(AGAINST DEFENDANT FRBNY)**

200.    All prior paragraphs are incorporated as if fully set forth here.

201.    BSJI's master account was opened, as required by the FRBNY, pursuant to a Master Account Agreement, dated November 18, 2011, between BSJI and the FRBNY.   The Account Agreement is governed by New York law and incorporates "the provisions" of Operating Circular No. 1.  Operating Circular No. 1, in turn, sets "forth the terms under which a Financial Institution may open, maintain, and terminate a Master Account with" a Federal Reserve Bank.  It is also governed by New York law. BSJI abided by its contractual obligations.

202.    BSJI and the FRBNY's agreement incorporates the covenant of good faith and fair dealing implied in every contract governed by New York law.  This requirement includes an obligation that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

203.    Under New York law, any discretion a contract purports to authorize is subordinated to the implied covenant of good faith and fair dealing.  Put otherwise, even if the FRBNY was afforded the discretion to terminate BSJI's master account under the Account Agreement, that right could not be exercised in a bad faith manner that improperly deprived BSJI of its contractual right to a master account.

204.    The FRBNY's bad faith and arbitrary decision to close BSJI's master account—an account to which it is legally entitled—breaches the contractual duty of good faith it owes to BSJI. As alleged *supra*, each of these rationales was pretextual, baseless, and comprehensively rebutted by BSJI.  The FRBNY's bad-faith actions include, but are not limited to:

205.    The FRBNY's bad faith and arbitrary decision to close BSJI's account breached the contractual duty of care it owes to BSJI.  As alleged above, the FRBNY's bad-faith actions include, but are not limited to:

a.  deliberately ignoring BSJI's repeated outreach seeking to clarify the submission deadline for BSJI's 2022 audit reports, and then using this purported missed deadline as a basis for terminating BSJI's master account;

b.  failing to engage with BSJI, or its team of consultants and auditors, when assessing BSJI's compliance programs and the bank's alleged risk to the "overall economy," in stark contravention of its historical practices;

c.  rejecting the findings of BSJI's on-the-ground auditors that BSJI's compliance programs were "effective" and "comprehensive";

d.  improperly recharacterizing K2's recommended "enhancements" to BSJI's compliance program as proof of existing "deficiencies" that warranted the termination of BSJI's master account;

e.  failing to even discuss its conclusions with BSJI's auditors, or otherwise seek or obtain the auditors' workpapers;

f.  using outdated and incorrect data to draw conclusions about the bank, while ignoring the fact that BSJI had already adopted *all* of K2's recommendations;

g.  conjuring up various baseless rationales to support the closing of BSJI's master account, including a "lack of SAR" reports that the FRBNY did not determine needed to be filed, describing companies as "shell companies" when there were none; and claiming that transactions entered into by BSJI customers were emblematic of "money laundering" when the FRBNY had undertaken no efforts to understand the transactions; and

h.  asserting, with no support, that the bank somehow poses an undue risk to the overall economy and is engaged in activity suggestive of illicit activity.

206.    Moreover, BSJI time and time again committed to working constructively with the FRBNY to alleviate any concerns it had going forward—merited or not—as it had done for the preceding three years.  These repeated offers were met with only silence.

207.    The FRBNY's actions were taken in bad faith and with the intent of depriving BSJI of its contractual right to a master account.  Accordingly, the FRBNY's termination of BSJI's master account, in consultation with the Board, violated the covenant of good faith and fair dealing.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court:

A.    Declare unlawful Defendants' termination of BSJI's master account;

B.    Order that Defendants' termination of BSJI's master account breached its contractual duty of good care, the implied covenant of good faith and fair dealing, the Administrative Procedure Act, and the Due Process Clause;

C.    Issue a writ of mandamus ordering the FRBNY and the Board to restore BSJI's master account and its access to Federal Reserve services;

D.    Award damages to Plaintiff in an amount to be determined at trial, but not less than $ 150 million;

E.    Award Plaintiff reasonable costs, attorneys' fees, and expenses under the Equal Access to Justice Act, 28 U.S.C. § 2412; and

F.    Award such further relief as this Court deems appropriate.


Dated: February 29, 2024                          Respectfully submitted,


                                                  */s/ Abbe D. Lowell*

Abbe David Lowell
ADLowell@winston.com
WINSTON & STRAWN LLP
1901 L St NW
Washington, DC 20036
T: 1-202-282-5000
F: 1-202-282-5100

Kelly A. Librera
KLibrera@winston.com
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166
T: 1-212 294-6700
F: 1-212-294-4700

*Counsel for Banco San Juan Internacional, Inc.*