**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

BANCO SAN JUAN INTERNACIONAL, INC.,

*Plaintiff*,

v.

THE FEDERAL RESERVE BANK OF NEW YORK
and THE BOARD OF GOVERNORS OF THE
FEDERAL RESERVE SYSTEM,

*Defendants*.

Case No. 1:23-cv-06414 (JGK)

## PLAINTIFF BANCO SAN JUAN INTERNACIONAL, INC.'S MEMORANDUM IN OPPOSITION TO DEFENDANTS THE FEDERAL RESERVE BANK OF NEW YORK'S AND THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM'S MOTIONS TO DISMISS

## <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ................................................................................................ 1

ARGUMENT ...................................................................................................... 6

I.  BSJI Has Stated a Claim for Issuance of a Writ of Mandamus, Declaratory Judgment, and Violation of BSJI's Due Process Rights ........................................ 7

    A.  The Board's 1998 Implementation of Master Accounts ............................ 8

    B.  Demand for Universal Federal Reserve Service Access: The Backdrop to the Monetary Control Act ...................................... 9

    C.  The Language of the Monetary Control Act ............................................. 10

    D.  The Legislative History of the Monetary Control Act ............................. 11

    E.  The Board's and the FRBNY's Historic Interpretation of the Monetary Control Act as Mandating Master Account Access as a Right ...................................................................... 12

    F.  Defendants' Criticisms of Section 248a as the Source of BSJI's Right to a Master Account Are Unavailing .............................. 14

    G.  BSJI Has Adequately Pled Its Claim Under the Mandamus Act ............. 17

    H.  BSJI Has Adequately Pled Its Due Process Claim ................................. 17

    I.  BSJI Has Adequately Pled Its Declaratory Judgment Claim ................... 18

II.  BSJI HAS SUFFICIENTLY ALLEGED ITS CLAIMS FOR BREACH OF THE DUTY OF CARE AND THE AND THE IMPLIED COVENANT DUTY OF GOOD FAITH AND FAIR DEALING ..................... 19

    A.  Under Operating Circular No. 1's Duty of Care, the FRBNY Was Contractually Obligated to Act in Good Faith and with Care Towards BSJI ........................................................................ 19

    B.  Operating Circular No. 1 Subjects FRBNY to the Implied Covenant of Good Faith and Fair Dealing ............................... 22

    C.  Breach of Contract Claims Concerning a Lack of Good Faith and the Failure to Exercise Care Implicate Fact-Specific Questions Unsuitable for Resolution on a Motion to Dismiss ................................. 24

    D.  The Amended Complaint Sufficiently Alleges That the FRBNY Breached Its Contractual Duty of Care and the Implied Covenant of Good Faith and Fair Dealing ................................. 24

III.  BSJI HAS ADEQUATELY ALLEGED CLAIMS UNDER THE ADMINISTRATIVE PROCEDURE ACT ......................................... 28

    A.  Defendants are Agencies for Purposes of the Administrative Procedure Act ............................................................................... 29

i

B.      Judicially Manageable Standards Exist by Which This Court Can Adjudicate BSJI's APA Claim................................................................. 31

C.      Defendants' Historical Interpretation of the Monetary Control Act Forecloses the Application of Deference to Their Termination Decision ............................................................................................... 32

D.      The Amended Complaint Adequately Alleges That Defendants Acted Arbitrarily and Capriciously in Terminating BSJI's Master Account ................................................................................................. 33

IV.     BSJI HAS STANDING TO PURSUE ITS CLAIMS AGAINST THE BOARD.......................................................................................................... 34

CONCLUSION................................................................................................................. 36

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ahmed Elkoulily, M.D., P.C. v. N.Y. State Cath. Healthplan, Inc.*,
  153 A.D.3d 768, 61 N.Y.S.3d 83 (N.Y. App. Div. 2d Dep't 2017) ...........................21, 23, 24

*Alexander v. Gardner-Denver Co.*,
  415 U.S. 36 (1974)....................................................................................................................21

*Allentown Mack Sales & Service, Inc. v. NLRB*,
  522 U.S. 359 (1998)..................................................................................................................28

*Anderson v. Bowen*,
  881 F.2d 1 (2d Cir. 1989).........................................................................................................17

*Armstrong v. Exec. Off. of the President*,
  90 F.3d 553, 558 (D.C. Cir. 1996) ..........................................................................................30

*B'klyn Sav. Bank v. O'Neil*,
  324 U.S. 697 (1945)..................................................................................................................21

*Bank of China v. Chan*,
  937 F.2d 780 (2d Cir. 1991)......................................................................................................22

*Bank of N.Y. Mellon Tr. Co., Nat'l Ass'n v. Telos CLO 1006-1 Ltd.*,
  274 F. Supp. 3d 191 (S.D.N.Y. 2017).......................................................................................24

*Barrows v. Burwell*,
  777 F.3d 106 (2d Cir. 2015)......................................................................................................17

*Beckles v. United States*,
  137 S. Ct. 886 (2017)................................................................................................................17

*Connecticut ex rel. Blumenthal v. U.S. Dep't of Interior*,
  228 F.3d 82 (2d Cir. 2000)........................................................................................................32

*Bombay Realty Corp. v. Magna Carta, Inc.*,
  100 N.Y.2d 124 (2003) .............................................................................................................21

*Bowen v. Massachusetts*,
  487 U.S. 879 (1988)..................................................................................................................31

*Brotherhood of R. R. Trainmen v. Balt. & O.R. Co.*,
  331 U.S. 519 (1947)..................................................................................................................15

*Cedeno v. Argent Tr. Co.*,
No. 20-cv-9987 (JGK), 2021 WL 5087898 (S.D.N.Y. Nov. 2, 2021)...................................21

*Citizens to Preserve Overton Park v. Volpe*,
401 U.S. 402 (1971)..........................................................................................................31

*City of Brookings Mun. Tel. Co. v. FCC*,
822 F.2d 1153 (D.C. Cir. 1987)..........................................................................................34

*Custodia Bank Inc v. Fed. Rsrv. Bd. of Governors et al.*,
No. 1:22-cv-00125-SWS, Dkt. No. 317 (D. Wyo. Mar. 29, 2024) ................................2, 6, 16

*Dong v. Smithsonian Inst.*,
125 F.3d 877 (D.C. Cir. 1997)............................................................................................29

*EIG Credit Mgmt. Co., LLC v. CNX Res. Corp.*,
No. 20-cv-2887 (AJN), 2021 WL 1226415 (S.D.N.Y. Mar. 31, 2021)..................................24

*Fantozzi v. Axsys Techs., Inc.*,
No. 07-cv-2667 (LMM), 2008 WL 4866054 (S.D.N.Y. Nov. 6, 2008) .................................23

*Farmers' & Merchs.' Bank of Monroe v. Fed. Rsrv. Bank of Richmond*,
262 U.S. 649 (1923)..........................................................................................................14

*Flight Int'l Grp., Inc. v. Fed. Rsrv. Bank of Chi.*,
583 F. Supp. 674 (N.D. Ga. 1984), *vacated on other grounds*, 597 F. Supp.
462 (N.D. Ga. 1984) .........................................................................................................30

*Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kansas City*,
861 F.3d 1052 (10th Cir. 2017) .......................................................................................8, 14

*Greater Buffalo Press, Inc. v. Fed. Rsrv. Bank of New York*,
866 F.2d 38 (2d Cir. 1989)..................................................................................................11

*Grumman Aircraft Eng'g Corp. v. Renegotiation Bd.*,
482 F.2d 710 (D.C. Cir. 1973), *rev'd on other grounds*, 421 U.S. 168 (1975) ......................30

*IMG Fragrance Brands, LLC v. Houbigant, Inc.*,
679 F. Supp. 2d 395 (S.D.N.Y. 2009)..............................................................................33, 34

*INS v. Cardoza-Fonseca*,
480 U.S. 421 (1987)..........................................................................................................32

*Kapps v. Wing*,
404 F.3d 105 (2d Cir. 2005)...............................................................................................18

*Ky. Dep't of Corr. v. Thompson*,
490 U.S. 454 (1989)..........................................................................................................18

*LCM XXII Ltd. v. Serta Simmons Bedding, LLC*,
 No. 21-cv-3987 (KPF), 2022 WL 953109 (S.D.N.Y. Mar. 29, 2022)....................................23

*Lee Constr. Co. v. Fed. Rsrv. Bank of Richmond*,
 558 F. Supp. 165 (D. Md. 1982)..........................................................................................30

*Legend Autorama, Ltd. v Audi of Am., Inc.*,
 100 A.D.3d 714 (N.Y. App. Div. 2d Dep't 2012) ...........................................................21, 22

*Litvin v. Chertoff*,
 586 F. Supp. 2d 9 (D. Mass. 2008)                                                              19

*Locafrance U.S. Corp. v. Intermodal Sys. Leasing, Inc.*,
 558 F.2d 1113 (2d Cir. 1977)...............................................................................................20

*Loper Bright Enters. v. Raimondo*,
 143 S. Ct. 2429 (2023)...........................................................................................................32

*Lopez v. Davis*,
 531 U.S. 230 (2001)...............................................................................................................11

*M/A–COM Sec. Corp. v. Galesi*,
 904 F.2d 134 (2d Cir. 1990)...................................................................................................22

*McDonnell Douglas Corp. v. U.S. Dep't of the Air Force*,
 375 F.3d 1182 (D.C. Cir. 2004).............................................................................................34

*McKinney v. Caldera*,
 141 F. Supp. 2d 25 (D.D.C. 2001).........................................................................................29

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
 463 U.S. 29 (1983).................................................................................................................28

*N.Y. City Health and Hosps. Corp. v. Perales*,
 954 F.2d 854 (2d Cir. 1992)...................................................................................................32

*Nat. Res. Def. Council v. Regan*,
 67 F.4th 397 (D.C. Cir. 2023)................................................................................................11

*Neurological Surgery Prac. of Long Island, PLLC v. United States H.H.S.*,
 No. 23-cv-02977 (BMC), 2023 U.S. Dist. LEXIS 122757 (E.D.N.Y. July 16,
 2023) ......................................................................................................................................35

*New York v. Atl. States Marine Fisheries Comm'n*,
 609 F.3d 524 (2d Cir. 2010)..............................................................................................29, 30

*PayServices Bank v. Fed. Rsrv. Bank of San Francisco*,
 No. 1:23-cv-00305-REP, 2024 WL 1347094, at *6 (D. Idaho Mar. 30, 2024) .............................6

*Phoenix Light SF Ltd. v. Deutsche Bank Nat'l Trust Co.*,
   585 F. Supp. 3d 540 (S.D.N.Y 2022) (Koeltl, J.)...................................................24

*Relentless, Inc. v. Dep't of Com.*,
   Case No. 22-1219 (Jan. 17, 2024).........................................................................5

*Rivera v. N.Y. City Dep't of Educ.*,
   No. 21-cv-6134 (ENV) (TAM), 2023 WL 2563665 (E.D.N.Y. Feb. 3, 2023)......................20

*Salazar v. King*,
   822 F.3d 61 (2d Cir. 2016)...................................................................................31

*Serdarevic v. Centex Homes, LLC*,
   760 F. Supp. 2d 322 (S.D.N.Y. 2010)....................................................................23

*Soucie v. David*,
   448 F.2d I 067, I 073 (D.C. Cir. 1971) ...................................................................29

*Thyroff v. Nationwide Mut. Ins. Co.*,
   460 F.3d 400 (2d Cir. 2006).................................................................................22

*Touch Concepts, Inc. v. Cellco P'ship*,
   949 F. Supp. 2d 447 (S.D.N.Y. 2013), *aff'd*, 788 F.3d 98 (2d Cir. 2015) ............................23

*Tractebel Energy Mrktg., Inc. v. AEP Power Mrktg., Inc.*,
   487 F.3d 89 (2d Cir. 2007)...................................................................................24

*TVT Records v. Island Def Jam Music Grp.*,
   244 F. Supp. 2d 263 (S.D.N.Y. 2003).....................................................................22

*Westchester v. U.S. Dep't of Hous. and Urban Dev.*,
   778 F.3d 412 (2d Cir. 2015).................................................................................31

*W. Minn. Mun. Power Agency v. Fed. Energy Regulatory Comm'n*,
   806 F.3d 588 (D.C. Cir. 2015) ..............................................................................11

*Whitman v. Am. Trucking Ass'n*,
   531 U.S. 457 (2001)...........................................................................................15

**Statutes**

5 U.S.C. § 551(1) .................................................................................................29

5 U.S.C. § 701(b)(1) ............................................................................................29

5 U.S.C. § 706(2)(A).............................................................................................28

12 U.S.C. § 248a .........................................................................................*passim*

12 U.S.C. § 342 .......................................................................................................3, 14

28 U.S.C. § 1361 .........................................................................................................17

**Other Authorities**

12 C.F.R. § 210.6 .........................................................................................................20

126 Cong. Rec. 6250 (1980) .......................................................................................12

Kyle Campbell, *Judge Rules Against Custodia in Fed Master Account Case,*
    American Banker (Apr. 1, 2024),
    https://www.americanbanker.com/news/judge-rules-against-custodia-in-fed-
    master-account-
    case#:~:text=A%20Wyoming%2Dbased%20federal%20judge,whether%20th
    ose%20applications%20were%20granted%2C .......................................................16

Bd. of Governors of the Fed. Rsrv. Sys., Federal Reserve's Key Policies for the
    Provision of Financial Services,
    https://www.federalreserve.gov/paymentsystems/pfs_about.htm ...............................13

Bd. of Governors of the Fed. Rsrv. Sys., Policies: The Federal Reserve in the
    Payments System, http://www.federalreserve.gov/paymentsystems/
    pfs_frpaysys.htm (issued 1984; revised 1990 and January 2001) ...............................13

Bd. of Govs. of the Fed. Rsrv. Sys., Policies: Principles for the Pricing of the
    Federal Reserve Bank Services,
    http://www.federalreserve.gov/paymentsystems/pfs_principles.htm (last
    updated Nov. 8, 2008) ..............................................................................................12

FRBNY, Annual Report: 1980 at 35 (1981),
    https://.stlouisfed.org/docs/historical/frbny/_frb_newyork.pdf ..............................13

H.R. Rep. No. 95-1590 (1978)......................................................................................12

# <u>INTRODUCTION</u>

Do the FRBNY and the Board wield absolute and unreviewable discretion over depository institutions' access to the U.S. financial system?  This fundamental issue animates Defendants' respective motions to dismiss, as they seek to immunize themselves—both with respect to BSJI and, by necessary implication, any financial institution maintaining or seeking a master account and Federal Reserve services—from judicial scrutiny.  In pressing the Court to adopt such a view, Defendants posit that the governing statutory regime, the Administrative Procedure Act, and basic principles of constitutional, contractual, and common law all fail to provide a check on the breadth of their authority.  They also ask this Court to deem it irrelevant that their decision to terminate BSJI's master account rested on their own subjective, incongruous determination that BSJI, a Puerto Rican bank depository institution of modest size, purportedly posed "undue risk to the overall economy."  As Defendants would have it, as a matter of law, no cause of action permits challenges to their decision-making process, irrespective of the merits of their ultimate decree.  It is a breathtaking claim to unchecked power.

BSJI's history with the FRBNY is a cautionary tale.  Over the course of multiple years BSJI spent thousands of hours and millions of dollars working with the FRBNY to develop a compliance system that both protected BSJI from any undue risk and served as the North Star for other International Banking Entities ("IBEs") seeking to improve their compliance functions. These efforts were contemporaneously validated by the FRBNY, which praised BSJI for its commitment to working with the FRBNY, blessed BSJI's compliance systems and controls, and adopted BSJI's practices in guidance issued to other IBEs.  As Defendants' antagonism towards IBEs and novel institutions grew, however, they chose to deprive BSJI (and other IBEs and novel banks) of the Federal Reserve services and master account to which they were entitled.  In the case of BSJI, this plan was effectuated through a pattern of stonewalling (for months at end, the FRBNY

1

repeatedly declined BSJI's multiple requests for constructive communication) and reverse-engineering shifting, pretextual justifications.  The FRBNY has attempted to shutter BSJI's account on no fewer than three separate and meritless bases—the last effort amidst salacious accusations.  BSJI, whom the FRBNY wrongly accused of facilitating laundering money in this Court, was forced to bring suit.  None of Defendants' recent actions can be reconciled with the FRBNY's own conclusion, just a short while earlier, that BSJI's compliance program was top-notch.  Nor are they compatible with the fact that BSJI—according to Defendants, a purported facilitator of money laundering—has voluntarily sought the scrutiny and transparency of the judicial system to vindicate its rights.

This case presents an enormous issue not yet addressed by any full Court of Appeals, namely, whether Congress endorsed a dual banking system in which the states (through their regulatory processes) are on equal footing with the federal government (through its regulators) or whether, instead, federal entities, including the Defendants here, have the unfettered discretion to effectively overrule the judgment of states and their regulators.  As members of the Senate Finance and House Banking Committee recently concluded:  "[a] depository institution that does not have a master account can't really function as a financial institution, and if the Federal Reserve has the ability to determine which depository institutions can and cannot receive a master account, the Fed would essentially become the ultimate decision-maker for what is a bank in this country, upsetting our dual banking system."  Br. as Amici Curiae in Supp. of Pl's Mot. for Jud. as a Matter of Law, *Custodia Bank Inc v. Fed. Rsrv. Bd. of Governors et al.*, No. 1:22-cv-00125-SWS, Dkt. No. 259 at 15 (D. Wyo. Jan. 19, 2024).  Should this Court (and other courts) continue to endorse the unfettered discretion over access to master accounts and Federal Reserve services that Defendants claim, *any* financial institution, for *any* reason, could

be abruptly shut out of the U.S. financial system without judicial recourse.  While Defendants' actions against BSJI are alone a substantial cause for concern, the proposition that Defendants are empowered to shutter master accounts *carte blanche*—to take one hypothetical example, because a depository institution's CEO spoke negatively about a Board or FRBNY action—is chilling.  Moreover, Defendants' purported policy justification—that they alone guard the U.S. financial system against purported bad actors—squarely contravenes Congress's adoption of this nation's dual-banking system.  Put simply, Congress has established state (or territorial) regulators as the arbiters of state-chartered institutions, and it is their responsibility to determine the soundness of depository institutions.  Defendants are not empowered to exercise unilateral veto power over a state regulator simply because they question the merit of that regulator's decision.

Defendants' arguments are flawed at every juncture.  In seeking a statutory basis for their purported discretion over master account access, Defendants contradict their own historical treatment of the governing statutory regime and claim that the plain language of 12 U.S.C. § 342 ("Section 342") provides unfettered discretion over master account access.  Yet the principal critique they lodge against BSJI's statutory authority for its right to a master account, 12 U.S.C. § 248a ("Section 248a"), that it contains no express reference to master accounts, is also true of Section 342.  The reason for this is readily apparent: master accounts are a recent creation of Defendants, did not exist at the time the Federal Reserve Act and the Deregulation and Monetary Control Act (the "Monetary Control Act") were enacted into law, and are required to access Federal Reserve services only because of Defendants' say-so.  Defendants offer no substantive rebuttal to the volumes of legislative history evidencing Congress's intent to establish Federal Reserve services—which are integral to operating in the U.S. financial system but, per Defendants,

are not made available to a depository institution unless through a master account—as a right of any legally eligible depository institution.  Nor can they seriously contest that Defendants' past practices, as well as the weight of academic analyses concerning Federal Reserve services and master accounts, fully accord with the understanding that BSJI is entitled to a master account and the Federal Reserve services it provides.  BSJI's Mandamus Act, Declaratory Judgment, and Due Process claims should therefore proceed.

Defendants' arguments are even more untenable if one assumes, for the sake of argument, that they hold a degree of discretion over master accounts and Federal Reserve services. The severe implications of their claim to unfettered authority are stark.  Here, the FRBNY claims that Operating Circular No. 1's "Duty of Care" provision does not, despite its clear language, impose a duty of care, and that BSJI cannot bring a claim for breach of that duty against the FRBNY as a matter of law.  This contention is belied by governing Federal Reserve Bank regulations, which make clear that the FRBNY—and all Federal Reserve banks—are obligated to exercise good faith and care and are liable for any violations thereof.  This obligation is plainly memorialized in Operating Circular No.1's Duty of Care.  The FRBNY's bad-faith conduct with respect to BSJI also cannot be excused by Operating Circular's No. 1's so-called "unqualified termination provision"—which itself is void as against public policy—given that contractual grants of discretion are subordinated to the duties of good faith and care.  This doctrine holds equally true with respect to BSJI's claim of the implied breach of the covenant of good faith and fair dealing. Considering the Amended Complaint in its entirety and drawing reasonable inferences in BSJI's favor—as is required at the pleading stage—BSJI has plainly stated a claim both for breach of Operating Circular No. 1's duty of care and the implied covenant of good faith and fair dealing.

With respect to BSJI's Administrative Procedure Act ("APA") claim, Defendants contend that their actions are not subject to judicial scrutiny as a matter of law, whether due to the FRBNY's purported status as a non-agency, the supposed lack of a manageable standard against which their actions here can be assessed, or the notion that they are owed such substantial deference that the merits of their decision-making process cannot be questioned.  Each is incorrect.  Initially, whether an administrative unit qualifies as an "agency" for purposes of the APA turns not on a formalistic assessment of that unit's relationship with other government agencies, but rather on a practical analysis of the extent to which that administrative unit exercises independent authority.  It is illogical that the Board, which claims to perform only advisory functions concerning master account access, is indisputably an agency while the FRBNY, which exercises decision-making and final authority over master accounts, is not.  Defendants likewise cannot seek recourse in the notion that this Court lacks the necessary manageable standards against which to adjudge their actions because Defendants themselves assert that their decision to terminate BSJI's master account was made pursuant to formal regulations and informal administrative guidance.  Both, of course, are well-recognized to supply manageable standards for purposes of an APA claim.  Additionally, Defendants' own historical statements preclude the application of deference to their decision, as it is black-letter law that an agency action that conflicts with its own prior interpretations of the relevant statutory scheme negates the application of *Chevron* deference.

Earlier this year, in criticizing the expansionist approach inherent in judicial deference to agency interpretations of their own powers under the *Chevron* doctrine, Justice Gorsuch recognized that the problem is that "the government always wins" and lamented the doctrine "is exploited against the individual and in favor of the government."  Tr. of Oral Arg. at 21, 135, *Relentless, Inc. v. Dep't of Com.*, No. 22-1219 (Jan. 17, 2024).  Defendants' actions against BSJI

appear to reflect an unsettling adoption of such a mindset.  Neither the *Chevron* doctrine nor statutory law provide (or should provide) Defendants with the immunity they reimagine now. Defendants' assertion that they have unfettered and unreviewable decision-making authority should not be endorsed, especially within the context of a motion to dismiss.  Defendants' motions should be denied and BSJI's case should continue.

## ARGUMENT

BSJI recognizes that this Court considered, in the context of an expedited preliminary injunction proceeding, many of the arguments and facts underlying this dispute.  It likewise acknowledges that two district courts have recently ruled in favor of the Board and other Federal Reserve Banks on the issue of whether a nonmember depository institution is entitled to a master account.  *See PayServices Bank v. Fed. Rsrv. Bank of San Francisco*, No. 1:23-cv-00305-REP, 2024 WL 1347094, at *6 (D. Idaho Mar. 30, 2024); Order on Mot. for Summ. J., *Custodia*, No. 1:22-cv-00125-SWS, Dkt. No. 317 (D. Wyo. Mar. 29, 2024).  But none of these developments compel the dismissal the Defendants seek; on the contrary, BSJI's case should proceed. This Court's earlier preliminary injunction ruling was made on an expedited basis, without the benefit of the additional information contained in BSJI's Amended Complaint, and on an extremely exacting standard that far exceeds the plausibility standard applicable to motions to dismiss. Indeed, in *Custodia*, the district court actually *denied* a similar motion to dismiss made by the Defendants here.  *See* Order Den. Mot. to Dismiss, *Custodia*, No. 1:22-cv-00125-SWS, Dkt. No 164 (D. Wyo. June 8, 2023).  Additionally, neither of the other district court cases addressed the central breach of contract claims that BSJI brings because they in fact never had a master account and thus did not benefit from the contractual duties of due care and good faith imposed on the Defendants thereunder—issues that require fact-intensive analyses.

Through this brief and its case, BSJI provides this Court with a comprehensive elucidation of the issues at hand and the sound bases to deny the Defendants' motions.  Section One addresses BSJI's statutory right to Federal Reserve services and master account access and includes a thorough analysis of the legislative history leading to the enactment of the Monetary Control Act and ensuing interpretations by the Board, Federal Reserve Banks, and Congress itself.  This showing, in turn, evidences that BSJI has adequately pleaded its claims under the Mandamus Act, Due Process Clause, and Declaratory Judgment Act.  Section Two details Defendants' years-long, bad-faith scheme to terminate BSJI's master account—including actions not alleged in BSJI's original complaint—and rebuts the FRBNY's assertion that they have immunized themselves from contractual liability.  Finally, Section Three addresses BSJI's Administrative Procedure Act claim and Defendants' flawed efforts to evade judicial scrutiny under an Administrative Procedure Act review.

## I.      BSJI HAS STATED A CLAIM FOR ISSUANCE OF A WRIT OF MANDAMUS, DECLARATORY JUDGMENT, AND VIOLATION OF BSJI'S DUE PROCESS RIGHTS

Defendants acknowledge that the merit of BSJI's Mandamus Act, Declaratory Judgment, and Due Process claims primarily turns on a matter of statutory interpretation concerning master accounts and access to Federal Reserve services.  As the Amended Complaint details at length, the principal statutory provision at issue, Section 248a, is properly understood to effectuate two of Congress's goals in implementing the Monetary Control Act.  First, it codifies universal access to Federal Reserve services for member institutions and nonmember depository institutions alike; second, it mandates uniform pricing for said services regardless of membership status.  This understanding of 248a was validated, after a comprehensive analysis, by the only federal circuit court judge to consider the question of whether depository institutions are entitled to Federal

Reserve service and master account access. *Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kansas City*, 861 F.3d 1052, 1067–70 (10th Cir. 2017) (Op. of Bacharach, J.).

The primary criticism Defendants lodge against the controlling nature of Section 248a here is that it does not contain the words "master account." This ignores both the relevant statutory regime and the role of master accounts. Practically speaking, master accounts have simply served as the exclusive mechanism through which Federal Reserve services may be accessed for the past twenty-five years, and the Monetary Control Act establishes access to these services as a *right* of nonmember depository institutions. As such, the statutory regime's silence as to master accounts does not suggest congressional acquiescence to the unfettered authority Defendants purport to hold. As the Monetary Control Act, the corresponding legislative history, and thirty years of uniform understanding make clear, Congress did not intend to provide nonmember financial institutions with the keys to access the U.S. financial system only for Defendants to be allowed to bolt the door at their whim.

### A. The Board's 1998 Implementation of Master Accounts

Master accounts—the "bank account for banks"—are a recent creation of the Board. First implemented in 1998, master accounts were introduced to facilitate the growing environment of interstate banking. Whereas depository institutions previously maintained separate clearing accounts—through which they could access Federal Reserve services—at separate Federal Reserve banks, depository institutions were now required to hold a single master account at a designated Federal Reserve bank. This new structure ultimately proved beneficial with respect to ease of account management. Yet it was not without consequence. A depository institution's ability to access Federal Reserve services—and thereby the U.S. financial system—was now inexorably tied to a single Federal Reserve bank. It would be nearly two decades before the practical implications of this development came to bear.

As master accounts were not implemented until almost thirty years after Congress enacted the Monetary Control Act—and nearly ninety years after the Federal Reserve Act—the relevant statutory language does not expressly contemplate the provision of master accounts. Defendants' arguments to the contrary simply cannot reconcile this temporal issue. And while the governing statutory regime does not specifically mention "master accounts," the legislative history underlying the Monetary Control Act, its plain language, and ensuing analyses all make clear that BSJI, like other legally eligible institutions, is statutorily entitled to Federal Reserve services, and consequently a master account.

### B. Demand for Universal Federal Reserve Service Access: The Backdrop to the Monetary Control Act

Prior to the enactment of the Monetary Control Act, Federal Reserve services were directly available only to members of Federal Reserve banks. While these services were provided free of charge, members were required to meet reserve balance requirements at their respective Federal Reserve bank. These reserve requirements, in turn, allowed the Board and the Federal Reserve banks to exercise control over U.S. monetary policy: by increasing or decreasing reserve requirements, the amount of liquidity in the U.S. financial system could be altered. This provided a crucial mechanism over which the Board and the Federal Reserve banks could influence interest rates throughout the market.

The necessity of access to Federal Reserve services, however, was not limited to member banks. Smaller, nonmember—and largely state-chartered—banks likewise required these services to effectively serve their customers. Consequently, large member banks, in concert with the Board and Federal Reserve banks, established Automated Clearing House ("ACH") networks to provide these services to nonmembers indirectly for a substantial fee. In many respects, this structure mirrored that of the "correspondent bank" structure employed by Federal Reserve banks today.

This system was deemed intolerable by the government and market participants alike. Given the effective monopoly exercised by ACHs (with the assistance of the Board and Federal Reserve banks), U.S. Department of Justice's Antitrust Division announced that the antitrust laws "required equal access" to federal reserve services and brought multiple lawsuits against ACHs in the 1970s. Market participants also lodged substantial criticism and engaged in extensive efforts to persuade Congress to remediate the unequal banking system that had developed in the U.S. financial market.

Though a consequence of their own making, the Board and the Federal Reserve banks likewise became proponents of congressional action. As inflation skyrocketed throughout the 1970s, meeting the Board's reserve requirements became an increasingly arduous tasks for all but the largest banks. By 1980, fewer than half of all U.S. banks were Federal Reserve bank members, severely curtailing the Board's ability to influence interest rates and curtail inflation. Federal Reserve membership, the Board concluded, needed to dramatically expand. These efforts propelled the enactment of the Monetary Control Act, which balanced the Board's need for increase membership with the market's demand for an equal playing field.

### C. The Language of the Monetary Control Act

These goals were ultimately embodied in Section 248a of the Monetary Control Act, which states that:

> The schedule of fees prescribed pursuant to this section shall be based on the following principles:
>
> . . . (2) All Federal Reserve bank services covered by the fee schedule shall be available to nonmember depository institutions and such services shall be priced at the same fee schedule applicable to member banks[.]

12 U.S.C. § 248a(c)(2). The fee schedule explicitly covers Federal Reserve services critical to the functioning of a depository institution—including check clearing and collection services, wire

transfer services, automated clearinghouse services, and settlement services—as well as "any new services which the Federal Reserve System offers." *Id.* § 248a(b).

Section 248a's mandate that Federal Reserve services be made available as a matter of right to legally eligible, nonmember depository institutions is evident from Congress's use of the word "shall." It is blackletter law that the use of the word "shall" imposes "discretionless obligations." *Lopez v. Davis*, 531 U.S. 230, 241 (2001); *see also Nat. Res. Def. Council v. Regan*, 67 F.4th 397, 402 (D.C. Cir. 2023) ("It is well established that 'the word "shall" generally indicates a command that admits of no discretion on the part of the person instructed to carry out the directive.'") (citation omitted). This has been squarely acknowledged by the Second Circuit, which recognized that "check clearing services"—one of the enumerated Federal Reserve services in Section 248a— are required by statute to be "made available to all banks." *Greater Buffalo Press, Inc. v. Fed. Rsrv. Bank of New York*, 866 F.2d 38, 40 (2d Cir. 1989). The lack of a restrictive modifier preceding the term "nonmember depository institutions" compels the conclusion that Congress did not intend to limit what nonmember depository institutions were entitled to Federal Reserve services: this was a right provided to all. *See W. Minn. Mun. Power Agency v. Fed. Energy Regulatory Comm'n,* 806 F.3d 588, 592 (D.C. Cir. 2015) (finding that the terms "states" and "municipalities" included all states and all municipalities because of the absence of restrictive modifiers). Because a master account has been deemed by Defendants to be a prerequisite to accessing these mandatory Federal Reserve services, it necessarily follows that legally eligible depository institutions are entitled to master accounts.

### D.  The Legislative History of the Monetary Control Act

The Monetary Control Act's legislative history fully accords with the understanding that BSJI is entitled to Federal Reserve services. Prior to the statute's enactment, the House Committee on Banking Finance and Urban Affair recognized that "the wide access to Federal Reserve services

for nonmember banks authorized by" the Deregulation Act would ensure "*that a basic level of services is available to all banks* throughout this country on a nondiscriminatory basis."  H.R. Rep. No. 95-1590, at 20 (1978) (emphasis added).  The joint conference report that accompanied the Monetary Control Act likewise makes clear that access to Federal Reserve services is a right enshrined by 248a.  126 Cong. Rec. 6250 (1980) (Conf. Rep.) ("The House amendment includes a provision for the Federal Reserve to price services provided by the Federal Reserve banks and open access to [Federal Reserve] services to *all depository institutions* on the same terms and conditions as member banks." (emphasis added)).  And in the aftermath of the statute's passage, the House Subcommittee on Domestic Monetary Policy recognized that "[b]efore the MCA, the payments system was segmented into two distinct and separate areas . . . the Monetary Control Act changed this system in three way. . . . It further specified that these services should be made available to **all depository institutions and not just to member banks**."  The Role and Activities of the Federal Reserve System in the Nation's Check Clearing and Payment System (1984) (emphasis added).

### E. The Board's and the FRBNY's Historic Interpretation of the Monetary Control Act as Mandating Master Account Access as a Right

For over thirty years, the Board and the FRBNY joined Congress, and market participants more broadly, in recognizing that access to Federal Reserve services was a right of nonmember depository institutions.  Defendants' public statements on the topic are myriad.  For example, in the immediate aftermath of the Monetary Control Act's implementation, the Board recognized that "[s]ervices covered by the fee schedule are *available to all depository institutions*."  Bd. of Govs. of the Fed. Rsrv. Sys., Policies: Principles for the Pricing of the Federal Reserve Bank Services, (emphasis added), http://www.federalreserve.gov/paymentsystems/pfs_principles.htm (last updated Nov. 8, 2008).  The FRBNY likewise acknowledged that "services will be *available equally to all*

*depository institutions*" in light of the Monetary Control Act's implementation the following year. FRBNY, Annual Report: 1980 at 35 (1981), https://fraser.stlouisfed.org/files/docs /historical/frbny/1980_frb_newyork.pdf.

This interpretation of the Monetary Control Act did not waiver over the next three decades, as has been recognized by leading academic experts on the Federal Reserve system. Julie A. Hill, *From Cannabis to Crypto: Federal Reserve Discretion in Payments*, 109 Iowa L. Rev. 117, 177–78 (2023). In publication after publication, the Board made clear that "Federal Reserve payment services *are available to all depository institutions* . . . ." Bd. of Governors of the Fed. Rsrv. Sys., Policies: The Federal Reserve in the Payments System, http://www.federalreserve.gov/paymentsystems/ pfs_frpaysys.htm (emphasis added) (issued 1984; revised 1990 and January 2001). And to this day, the Board publicly acknowledges that "Congress expanded the Federal Reserve's role in the payment system with the enactment of the Monetary Control Act of 1980 (MCA). The MCA subjected all depository institutions, not just member banks, to reserve requirements *and also gave all depository institutions access to the Federal Reserve's payment services*." Bd. of Governors of the Fed. Rsrv. Sys., Federal Reserve's Key Policies for the Provision of Financial Services, (emphasis added) https://www.federalreserve.gov /paymentsystems/pfs_about.htm.

As with Section 248a itself, the Board and the FRBNY were unequivocal in their language: *all* depository institutions, on a nondiscretionary basis, held a right to Federal Reserve services access. Defendants' recent, and opportunistic, interpretation of the scope of the Monetary Control Act cannot be reconciled with their own public statements and practices over the decades.

**F. Defendants' Criticisms of Section 248a as the Source of BSJI's Right to a Master Account Are Unavailing**

Defendants contend that Section 342 of the Federal Reserve Act, rather than Section 248a, serves as the principal statutory authority over master account access and, by its "plain text" (Board Br. at 28; FRBNY Br. at 14), grants the FRBNY the unfettered right to terminate BSJI's master account.

In pertinent part, Section 342 states that "[a]ny Federal reserve bank may receive from any of its member banks, or other depository institutions, and from the United States, deposits of current funds in lawful money, national-bank notes, Federal reserve notes, or checks, and drafts . . . ." 12 U.S.C. § 342.  As is plain from the above, the text of Section 342 is utterly silent both as to master accounts and the Federal Reserve services they facilitate.  Rather, Section 342 speaks to the types of entities that may—but are not statutorily required to—make deposits with a Reserve Bank, as well as the forms of currency that the Federal Reserve banks may receive from those institutions.  *See Farmers' & Merchs.' Bank of Monroe v. Fed. Rsrv. Bank of Richmond*, 262 U.S. 649, 655, 662 (1923) ("[N]either section 13, nor any other provision of the Federal Reserve Act, imposes upon reserve banks any obligation to receive checks for collection.").  Whether a depository institution is allowed to deposit certain types of currency says nothing as to whether it is entitled to access Federal Reserve services in the first place.  *See Fourth Corner*, 861 F.3d at 1072 (Op. of Bacharach, J.) (recognizing that Section 342 strictly governs "the types of monetary instruments that Federal Reserve Banks may receive for deposit or collection.").

Defendants' interpretation of the scope of Section 342 produces nonsensical results.  For purposes of the receipt of deposits, Section 342 places nonmember depository institutions on par with the United States: both are subject to the FRBNY's discretion as to what types of currency may be deposited.  If Defendants' interpretation of Section 342 were correct, it would mean that

Congress provided every Federal Reserve bank with the authority to unilaterally block the United States a master account, and consequently the United States's access to its own financial system. "Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions – it does not, one might say, hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'n,* 531 U.S. 457, 468 (2001).  It is unreasonable to assert that Congress delegated such substantial power over the U.S. government to self-proclaimed "independent entities . . . independently run by their own board of directors" (FRBNY Br. at 14) in indirect fashion.

The FRBNY also posits that because Section 248a is located in a statutory subchapter titled the "Board of Governors of the Federal Reserve System," it cannot serve as the source of authority for master account and Federal Reserve services supplied by Federal Reserve banks.  *Id.* at 19. This argument is circular, as it assumes that Congress directly delegated discretion over master account and Federal Reserve service access to Federal Reserve banks in the first instance.  Rather, the Federal Reserve Act permits the Board to delegate "any of its functions," save certain actions not relevant to this dispute, to the Reserve Banks.  And the Board's delegation of responsibility concerning master accounts and Federal Reserve services does not authorize the FRBNY to vitiate a congressional mandate.  In any event, the title of a statute cannot "undo or limit that which the text makes plain." *Brotherhood of R. R. Trainmen v. Balt. & O.R. Co.*, 331 U.S. 519, 529 (1947).

The Board further undermines its interpretation of the relevant statutory provisions by claiming that "Congress recently recognized" Reserve Banks' unfettered discretion over master accounts in an amendment to the Federal Reserve Act (the "Amendment").  Board Br. at 12.  This is incorrect.  As aptly put by Senator Toomey, the sponsor and principal drafter of the Amendment, Defendants' claim "misconstrues the Amendment as recognizing or bolstering their discretion to reject master account applications from statutorily eligible depository institutions.  As its text

makes clear—and as the Board knows from conversations with legislative staff during its drafting—the Amendment was exclusively a transparency measure. . . .”  Br. of Former Sen. Patrick J. Toomey as Amicus Curiae in Supp. of Neither Party, *Custodia*, No. 1:22-cv-00125-SWS, (D. Wyo. Apr. 20, 2023), ECF No. 151 at 2–3.  Senator Toomey has since explained that:

> Knowing that [Reserve Banks] did, in fact, approve some [master account applications], deny others, sometimes reverse themselves . . . I simply wanted them to be required to disclose this . . . [Defendants' interpretation here reflects] a willful refusal to read the English language as it's written.

Kyle Campbell, *Judge Rules Against Custodia in Fed Master Account Case*, American Banker (Apr. 1, 2024), https://www.americanbanker.com/news/judge-rules-against-custodia-in-fed-master-account-case#:~:text=A%20Wyoming%2Dbased%20federal%20judge,whether%20those%20applications%20were%20granted%2C. That Congress recognized that the Defendants were (unlawfully) rejecting master account applications and sought transparency hardly constitutes congressional endorsement of that unlawful practice.

Even if the Amendment were deemed relevant to the question of whether Defendants hold discretion over master account and Federal Reserve service access, the plain text of the Amendment supports BSJI's right to a master account.  Section 5708 of the Amendment provides a definition for “Reserve bank master account and services,” the sole congressional statute to do so.  That provision defines master accounts by reference to Section 248a, not Section 342.  P.L. 117-263 § 5708(a)(3) (“Reserve bank master account and services – The term 'reserve bank master account and services' means an account in which a Federal reserve bank . . . provides any service under section [248a] to an entity other than an official accountholder.”).  Far from supporting Defendants' claim to discretion, the Amendment evidences that Section 248a, a mandate to Federal

Reserve services access—and thus a master account—for all nonmember depository institutions, controls here.

### G.  BSJI Has Adequately Pled Its Claim Under the Mandamus Act

With BSJI's right to a master account and Federal Reserve services established, it readily follows that BSJI has properly alleged a claim under the Mandamus Act.  To establish a claim for a writ of mandamus under 28 U.S.C. § 1361, a plaintiff must allege: "(1) a clear right in the plaintiff to the relief sought; (2) a plainly defined and peremptory duty on the part of the defendant to do the act in question; and (3) no other adequate remedy available."  *Anderson v. Bowen*, 881 F.2d 1, 5 (2d Cir. 1989).  The first two criteria are satisfied: BSJI has a statutory right to access Federal Reserve services through a master account, and Defendants are obligated to provide BSJI with such access.  The Amended Complaint also details BSJI's lack of an alternative adequate remedy, given its unsuccessful efforts both to reach an amicable resolution with the FRBNY or be afforded any administrative right of appeal of the termination decision.  Am. Compl. ¶¶ 170, 179.  BSJI's mandamus claim should proceed.

### H.  BSJI Has Adequately Pled Its Mandamus Act Claim

The sufficiency of BSJI's due process claim flows from BSJI's entitlement to a master account and Federal Reserve services.  The Due Process clause prohibits government actors from depriving property by means of a process "so standardless than it invites arbitrary enforcement."  *Beckles v. United States*, 137 S. Ct. 886, 892 (2017). A violation of a plaintiff's Due Process right is established where it is alleged that: (1) state action (2) deprived him or her of liberty or property (3) without due process of law.  *Barrows v. Burwell*, 777 F.3d 106, 113 (2d Cir. 2015).  BSJI's claim meets this criteria.

BSJI's right to a master account and federal reserve services establishes a protectable property interest for purposes of a due process claim.  Courts consistently recognize that statutes like

§ 248a(c)(2), which "place[] substantive limitations on official discretion . . . [generally] by establishing substantive predicates to govern official decision-making, and []by mandating the outcome to be reached upon a finding that the relevant criteria have been met," create a protected property interest on the statutory entitlement. *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 462 (1989) (internal quotations and citation omitted); *Kapps v. Wing*, 404 F.3d 105, 113 (2d Cir. 2005) ("To [the] extent that state or federal law meaningfully channels the discretion of state or local officials by mandating an award of [a statutory entitlement] to applicants who satisfy prescribed eligibility criteria, plaintiff-applicants possess a property interest.") (internal quotations omitted). BSJI therefore has a protectable property interest in its master account.

As government entities and/or administrative units, Defendants terminated BSJI's master account, which constituted state action depriving BSJI of its property right. *Kapps*, 404 F.3d at 112–13. And as discussed below (*see infra* Section II.D), Defendants' decision to strip BSJI of its access to the U.S. financial system—exemplified by the FRBNY's decision to ignore BSJI's requests for guidance as to BSJI's reporting deadlines, its silence in the face of BSJI's pleas for an open line of communication, its varying and pretextual justifications for shuttering BSJI's master account, and its refusal to provide BSJI with a meaningful opportunity to address any of the FRBNY's purported concerns—epitomized a lack of due process. BSJI has accordingly alleged a claim under the Due Process Clause.

## I. BSJI Has Adequately Pled Its Declaratory Judgment Claim

BSJI's entitlement to Federal Reserve services and master account access also militates against the dismissal of its Declaratory Judgment Act claim. Defendants posit that this claim lacks the requisite independent basis for jurisdiction (Board Br. at 22; FRBNY Br. at 17–18). BSJI has adequately alleged claims under both the Mandamus Act and the Administrative Procedure Act. Each serves as an independent basis for jurisdiction and forecloses the dismissal of BSJI's claim at

this juncture. *See Litvin v. Chertoff,* 586 F. Supp. 2d 9, 11 n.11 (D. Mass. 2008) (denying motion to dismiss declaratory judgment claim "when subject matter jurisdiction is satisfied under the APA and the [M]andamus [A]ct"). Moreover, as BSJI has requested a declaration of its right to a master account going forward, Defendants' contention that the Declaratory Judgment claim is purely retrospective lacks merit.

## II. BSJI HAS SUFFICIENTLY ALLEGED ITS CLAIMS FOR BREACH OF THE DUTY OF CARE AND THE AND THE IMPLIED COVENANT DUTY OF GOOD FAITH AND FAIR DEALING

Even if this Court were to conclude that the governing statutory scheme authorizes the Board and the FRBNY to exercise a degree of discretion concerning master account and Federal Reserve services access, that discretion is not unbounded. Rather, it is circumscribed both by the contractual Duty of Care found in Operating Circular No. 1—a contract that memorializes regulations imposed on the FRBNY by the Board, and which the FRBNY requires all depository institutions seeking a master account to sign—and by the implied covenant of good faith and fair dealing arising under New York law.

### A. Under Operating Circular No. 1's Duty of Care, the FRBNY Was Contractually Obligated to Act in Good Faith and with Care Towards BSJI

Section 7.1 of Operating Circular No. 1, titled "Duty of Care," obligates the FRBNY to act "in good faith" as well to "exercise ordinary care," and imposes liability for actual damages incurred due to the FRBNY's failure to act accordingly. *Id.* Yet the FRBNY contends that this provision strictly operates as a limitation of liability and does not impose any affirmative duty. This is a non-sequitur. For the provision to operate as a partial limitation of the FRBNY's liability in the event of a breach of contract—here, to "actual damages incurred . . . and proximately caused by the Reserve Bank's lack of good faith and failure to exercise ordinary care"—the contract must necessarily establish that such actions constitute a breach of contract in the first place. Section 7.1

is the exclusive provision addressing the FRBNY's obligation to act with good faith and to exercise ordinary care, and the plain language of the contract makes clear that these obligations comprise the FRBNY's "Duty of Care."  A contract provision can do two things: it can establish an affirmative duty owed to the contractual counterparty, and it can also circumscribe the scope of liability for a breach of said duty.  That is precisely what Section 7.1 accomplishes.

The FRBNY's own governing regulations validate the point.  12 C.F.R. § 210.6 imposes a statute of limitations for claims against a Reserve Bank for its lack of good faith or failure to exercise ordinary care, mandating that such claims must be brought within two years of the accrual of such claims.  *Id.*  Plainly, if the FRBNY's contention that it did not owe BSJI a duty of care were correct, there would be no need for a statute of limitations defining the time within which such a claim must be brought.

The FRBNY likewise cannot wave away the duty of care owed by claiming that BSJI waived its contractual claim given Operating Circular No. 1's "unqualified contractual right to close BSJI's master account."  FRBNY Br. at 20, *see* Operating Circular No. 1, § 2.10 (asserting that a Reserve Bank may terminate a Master Account Agreement "at any time by notice").  In support of the proposition that "unqualified" waivers are legal, the FRBNY furnishes cases under New York state law that the FRBNY claims enforced waivers similar to that contained in Operating Circular No. 1.

However, New York law does not supply the relevant standards with respect to the issue of waiver, as it "is well established that federal law governs all questions relating to the validity of and defenses to purported releases of federal statutory causes of action."  *Locafrance U.S. Corp. v. Intermodal Sys. Leasing, Inc.*, 558 F.2d 1113, 1115 (2d Cir. 1977); *see Rivera v. N.Y. City Dep't of Educ.*, No. 21-cv-6134 (ENV) (TAM), 2023 WL 2563665, at *7 n.12 (E.D.N.Y. Feb. 3, 2023)

(applying *Locafrance* to a purported waiver of rights).   Under binding Supreme Court law, "prospective waivers of statutory rights are impermissible." *Cedeno v. Argent Tr. Co.*, No. 20-cv-9987 (JGK), 2021 WL 5087898, at *5 (S.D.N.Y. Nov. 2, 2021).   "Prospective waivers" are waivers that exist prior to the accrual of a cause of action.  *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 52 (1974) (holding that while a plaintiff "may waive his cause of action" concerning a statutory right in a "voluntarily settlement," that right "may not be waived prospectively").   Given that BSJI's claim for breach of contract did not accrue until 2023—more than a decade after BSJI executed Operating Circular No. 1, and three years after BSJI entered into the Supplemental Terms—the FRBNY's efforts to prospectively contract away BSJI's rights are improper, and Operating Circular No. 1's waiver is void as against public policy.  *See B'klyn Sav. Bank v. O'Neil*, 324 U.S. 697, 704 (1945) (finding waivers of statutory rights that thwart legislative policy invalid).

The FRBNY's assertion that its "unqualified contractual right" to terminate BSJI's master account vitiates Operating Circular No. 1's duty of care fails for a second and independent reason. Even where a contract purports to provide a party with unqualified discretion—here, the asserted ability to terminate the contract without cause, at any point—that discretion cannot be exercised in bad faith.  *Legend Autorama, Ltd. v Audi of Am., Inc.*, 100 A.D.3d 714, 716 (N.Y. App. Div. 2d Dep't 2012) ("[E]ven an explicitly discretionary contract right may not be exercised in bad faith so as to frustrate the other party's right to the benefit under the agreement."); *see Ahmed Elkoulily, M.D., P.C. v. N.Y. State Cath. Healthplan, Inc.*, 153 A.D.3d 768, 770, 61 N.Y.S.3d 83 (N.Y. App. Div. 2d Dep't 2017) (applying the *Legend* doctrine to a breach of contract claim concerning a wholly discretionary, but bad-faith, contract termination and affirming denial of motion to dismiss).  For "[a]ll parts of a contract must be read in harmony [] so as not to negate" an express contractual provision. *Bombay Realty Corp. v. Magna Carta, Inc.*, 100 N.Y.2d 124, 127 (2003).

The FRBNY's efforts to vitiate its duty of care through the contract's termination provision should be rejected.

### B. Operating Circular No. 1 Subjects FRBNY to the Implied Covenant of Good Faith and Fair Dealing

New York law implies into every contract a "covenant of good faith and fair dealing, 'pursuant to which neither party to a contract shall do anything which has the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" *Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 407 (2d Cir. 2006) (quoting *M/A–COM Sec. Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir. 1990)). "A party's actions may implicate the implied covenant of good faith when it acts so directly to impair the value of the contract for another party that it may be assumed that they are inconsistent with the intent of the parties." *Bank of China v. Chan*, 937 F.2d 780, 789 (2d Cir. 1991) (citing *M/A–COM Sec. Corp.*, 904 F.2d at 136). "The covenant protects a promisee not against a breach of the express terms of a contract but of the reasonable expectations and inferences otherwise derived from the agreement." *TVT Records v. Island Def Jam Music Grp.*, 244 F. Supp. 2d 263, 278 (S.D.N.Y. 2003) (citation omitted). The parties do not dispute that New York law governs Operating Circular No. 1, and the FRBNY is consequently subject to the implied covenant of good faith and fair dealing.

As with BSJI's breach of contract claim under the duty of care, the FRBNY contends that its contractual right to close BSJI's account "at any time" trumps its obligation to act in good faith and fair dealing. Again, this is incorrect: even when a party is granted "unqualified" discretion under the terms of a contract, that discretion is subordinated to the duty of good faith and fair dealing. *Legend Autorama, Ltd.*, 100 A.D.3d at 716. While the FRBNY cites cases purporting to hold the contrary, these decisions—issued over twenty-five years ago—fail to reflect the current status of New York law, as ensuing opinions by the same courts demonstrate. *Id.* (subjecting an

unqualified discretionary term to the covenant of good faith and fair dealing in 2012); *Ahmed Elkoulily* (same, in 2017); *see also In Touch Concepts, Inc. v. Cellco P'ship*, 949 F. Supp. 2d 447, 468 (S.D.N.Y. 2013), *aff'd*, 788 F.3d 98 (2d Cir. 2015) (recognizing that New York courts have "expanded the use of the implied covenant of good faith . . . holding that a contractual right affording discretion may not be exercised in bad faith" and requiring a contract to "express[ly] defin[e] when discretion may or may not be exercised" for that covenant to be negated).

The FRBNY also insists that the claim for breach of the implied covenant of good faith and fair dealing should be dismissed as duplicative of BSJI's claim for breach of the duty of care. This assertion comes too early: at the pleading stage, it is eminently appropriate to allege a breach of contract and a breach of the implied covenant of good faith and fair dealing in the alternative. *Fantozzi v. Axsys Techs., Inc.*, No. 07-cv-2667 (LMM), 2008 WL 4866054, at *7 (S.D.N.Y. Nov. 6, 2008) (recognizing that "[a] claim for breach of contract does not preclude a party from bringing a claim for breach of the implied covenant of good faith and fair dealing when they are brought in the alternative," as a claimant is later prohibited "from recovering on both theories at the same time"). In any event, the FRBNY has taken the position that Operating Circular No. 1 contains no affirmative duty of care, thus creating a "*bona fide* dispute over whether a contract covers the contested issue." *LCM XXII Ltd. v. Serta Simmons Bedding, LLC*, No. 21-cv-3987 (KPF), 2022 WL 953109, at *15 (S.D.N.Y. Mar. 29, 2022). On a motion to dismiss, a court "must resolve all ambiguities in the contract in Plaintiffs' favor," and the purported absence of a contractual duty of care does not serve as the basis for dismissal of BSJI's claims. *Serdarevic v. Centex Homes, LLC*, 760 F. Supp. 2d 322, 328 (S.D.N.Y. 2010).

**C. Breach of Contract Claims Concerning a Lack of Good Faith and the Failure to Exercise Care Implicate Fact-Specific Questions Unsuitable for Resolution on a Motion to Dismiss**

"[W]hether a party to a contract has acted in good faith generally presents a question of fact for a jury." *Phoenix Light SF Ltd. v. Deutsche Bank Nat'l Trust Co.*, 585 F. Supp. 3d 540, 493 n.44 (S.D.N.Y 2022) (quoting *Bank of N.Y. Mellon Tr. Co., Nat'l Ass'n v. Telos CLO 1006-1 Ltd.*, 274 F. Supp. 3d 191, 215 (S.D.N.Y. 2017)); *Tractebel Energy Mrktg., Inc. v. AEP Power Mrktg., Inc.*, 487 F.3d 89, 98 (2d Cir. 2007) ("[W]hether particular conduct violates or is consistent with the duty of good faith and fair dealing necessarily depends upon the facts of the particular case, and is ordinarily a question of fact to be determined by the jury or other finder of fact."). Consequently, claims that are based on a defendant's lack of good faith and due care are "not suitable for resolution on a motion to dismiss" where the plaintiff plausibly alleges specific conduct from which a contractual breach could be inferred. *EIG Credit Mgmt. Co., LLC v. CNX Res. Corp.*, No. 20-cv-2887 (AJN), 2021 WL 1226415, at *7 (S.D.N.Y. Mar. 31, 2021) (denying motion to dismiss claim based on defendant's alleged lack of good faith) (internal citations omitted). The Amended Complaint readily meets this lenient standard.

**D. The Amended Complaint Sufficiently Alleges That the FRBNY Breached Its Contractual Duty of Care and the Implied Covenant of Good Faith and Fair Dealing**

Taken holistically, the Amended Complaint comprehensively alleges a bad-faith scheme by the FRBNY to deprive BSJI of its master account, in violation of its contractual duty of care—which requires that the FRBNY comport itself in good faith—and the implied covenant of good faith and fair dealing. *See Ahmed Elkoulily, M.D., P.C. v. N.Y. State Cath. Healthplan, Inc.*, 153 A.D.3d 768, 771, 61 N.Y.S.3d 83, 87 (2017) ("[T]o sustain a breach of the implied covenant claim, the claimant must allege and show that the other party exercised a [contractual] right malevolently,

24

for its own gain as a part of a purposeful scheme designed to deprive [claimant] of the benefits under the contract.").

As laid out in the Amended Complaint, the seeds of the FRBNY's bad-faith scheme against BSJI were first planted in 2019, when the FRBNY implemented a policy that halted the approval of any master account applications from Puerto Rican depository institutions, like BSJI, regardless of an individual depository institution's compliance functions or risk profile.  Am. Compl. ¶ 12. The implementation of that policy likewise coincided with the first adverse action the FRBNY would take against BSJI: the suspension of its master accounts based on media reports concerning an ongoing investigation into two loan facilities granted by BSJI.  *Id.* ¶ 71.  Though this suspension was wholly without merit—the investigation uncovered no wrongdoing—BSJI was determined to earn the FRBNY's trust.  As such, in the ensuing years and at the behest of the FRBNY, BSJI engaged in a years-long, multi-million-dollar effort to develop a leading BSA/AML compliance program, one that would serve as a model to other IBEs in the years to come.  At every step of the way BSJI worked with the FRBNY to both continually enhance its compliance program and to assure it that BSJI had never facilitated illegal activity.  *Id.* ¶¶ 75–84.  These efforts proved successful: BSJI built its compliance function into a top-tier system that was endorsed by the FRBNY, which provided BSJI with access to its master account once again.  *Id.* ¶¶ 87–88.  Indeed, the FRBNY went so far as to adopt some of BSJI's practices, like the use of credential third parties blessed by the FRBNY as independent examiners, in subsequently promulgated guidelines.  *Id.* ¶ 92.

After BSJI had spent millions of dollars at the encouragement of the FRBNY, and after the FRBNY blessed BSJI's compliance program, the FRBNY adopted an internal policy to deprive IBEs and novel banks' access to Federal Reserve services.  Am. Compl. ¶ 14–16.  In 2022, after

certain FRBNY reporting deadlines were changed in light of the COVID pandemic, BSJI twice sought, in writing, confirmation from the FRBNY that BSJI could file certain annual reports by September 30, 2022.  Searching for an excuse to close BSJI's master account, the FRBNY willfully ignored both of BSJI's correspondence. *Id.* ¶¶ 97–102.  It chose instead to lie in wait and predicate its first closure decision, communicated by letter dated July 18, 2022, on a purported missed "deadline" for those annual reports.  *Id.* ¶¶ 106–111.  Not only was closure an overreaction to a missed deadline, especially since the reports were then in progress by the FRBNY-approved auditors, but it was a crisis of the FRBNY's own making, because the FRBNY could have avoided any confusion if it had only responded to either of BSJI's inquiries.  Only after BSJI advised the FRBNY that it intended to bring litigation that the FRBNY relented, and advised that it would "pause" its termination decision.  *Id.* ¶¶ 112–14.

The FRBNY then went in search of new, pretextual grounds for its closure decision.  *Id.* Am. Compl. ¶ 115–16.  The FRBNY sent to BSJI a Request for Information to BSJI.  BSJI, continually seeking to maintain a productive and working relationship with the FRBNY, timely provided the requested information and pleaded with the FRBNY to raise any questions or concerns it had, so that they could be addressed by BSJI.  *Id.* ¶ 115.  After months of silence from the FRBNY, BSJI again asked for an open line of communication with the FRBNY.  This too went unanswered, and the FRBNY steadfastly refused to speak with BSJI while it concocted a new pretextual justification for shuttering BSJI's master account.  *Id.* ¶¶ 117–18.  This plan was undertaken in concert with the Board who, unbeknownst to BSJI, issued "S-2677," a guidance memorandum to the Federal Reserve banks that instructed the FRBNY to both heavily scrutinize Tier 3 institutions, like BSJI, that the Board arbitrarily chose to characterize as inherently "high risk," and to coordinate with the FRBNY when deciding to terminate a master account.  *Id.* ¶ 120.

The FRBNY acted swiftly. In April 2024, and once again without any preceding communication, the FRBNY issued a second account termination letter, just as baseless as the first. In this letter, the FRBNY rejected the findings of BSJI's on-the-ground auditor, K2 Integrity (and the conclusions of two other auditors and, for that matter, of BSJI's regulator) that BSJI's compliance program was comprehensive and effective. In doing so, and because K2 Integrity's conclusion demonstrated the bad faith nature of the FRBNY's efforts to close BSJI's master account, the FRBNY baselessly recharacterized certain enhancements K2 Integrity had recommended as "deficiencies." *Id.* ¶¶ 121–141. Bafflingly, the FRBNY did so without ever contacting K2 Integrity, violating its own custom of dialoguing with depository institutions' auditors when the FRBNY was conducting an assessment. Had the FRBNY been acting in good faith and according to its own historical practices, it would have engaged with K2 Integrity to identify, and resolve, the source of their disagreement concerning BSJI's compliance program. *Id.* ¶¶ 124–27. Nor would they have asserted that BSJI poses an "undue risk to the overall economy," an absurd conclusion given the fact that of the fact that the entirety of BSJI's transaction volume over the preceding year represented 0.000125 percent of the gross domestic product ("GDP") of the United States and only 0.000032 percent of the GDP of the world. *Id.* ¶¶ 7, 141. And most tellingly, at no point has the FRBNY ever identified a single illicit transaction engaged in by BSJI: it has shuttered its master account based on the conjectural, and patently incorrect, notion that BSJI poses a theoretical risk to the U.S. economy overall. *Id.* ¶ 131. Moreover, the unprecedented nature of the FRBNY's bad faith behavior towards BSJI has been affirmed by multiple independent banking experts, who have attested that "the FRBNY's mistreatment of BSJI to be among the worst that I have seen in the industry" (*Id.* ¶ 162) and that the FRBNY's review and assessment of BSJI "was superficial and lacked objectivity." *Id.* ¶ 163; *see also id.* ¶¶ 135, 159–161.

Compare Defendants' treatment of BSJI to that of far larger banks that have actually been found liable for illicit activity. As one example, Deutsche Bank, was simply subjected to a fine in July 2023 despite a determination that it had engaged in "unsafe and unsound" anti-money laundering practices for over eight years: its master account was left fully intact. So too was the Metropolitan Commercial Bank of New York allowed to maintain its master account after a finding of "widespread fraud" due to its failure to maintain an adequate anti-money laundering compliance program: it was likewise simply subject to a fine. *Id.* ¶ 144. The FRBNY's draconian treatment of BSJI, an institution that by any measure poses exponentially less risk to the U.S. economy than these global institutions, amply demonstrates that the FRBNY acted in bad faith in terminating BSJI's master account. To extent the Board seeks to avoid such comparison by analogizing its authority to the presumptively unreviewable discretion of a prosecutor (Board Br. at 23), the claim is both inapt and inaccurate. The presumption of unreviewability applies only to decisions to *not* take enforcement action, whereas the Board brought enforcement actions against both Deutsche Bank and Metropolitan Commercial Bank of New York. *Heckler v. Chaney*, 470 U.S. 821, 832 (1985).

## III. BSJI HAS ADEQUATELY ALLEGED CLAIMS UNDER THE ADMINISTRATIVE PROCEDURE ACT

Any discretion Defendants hold over master account access is also circumscribed by their obligations under the Administrative Procedure Act. Under the APA, courts are directed to "hold unlawful and set aside agency action" found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The APA thus "establishes a scheme of 'reasoned decisionmaking'" by which agencies must abide. *Allentown Mack Sales & Serv., In*c., 522 U.S. at 374 (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983)). As agencies, both the Board and the FRBNY are subject to scrutiny under

these standards.  The Amended Complaint comprehensively alleges that the decision to close BSJI's master account, and the process which led to that action, were wholly antithetical to the "reasonable decisionmaking" required by the APA.  *Id.*

### A.  Defendants are Agencies for Purposes of the Administrative Procedure Act

The Administrative Procedure Act ("APA") defines an agency as "each authority of the Government of the United States, whether or not it is within or subject to review by another agency."  5 U.S.C. § 551(1); *id.* 701(b)(1).  The Board acknowledges that it meets this definition and is subject to APA review.  The FRBNY, despite claiming the mantle of congressionally-delegated and unchecked "authority" over depository institutions' access to the U.S. financial system, asserts that it is immune from APA scrutiny as a matter of law.  FRBNY Br. at 15.  Not so.

This Circuit has recognized that "law on the simple question of what is an [APA] agency is quite complex."  *New York v. Atl. States Marine Fisheries Comm'n*, 609 F.3d 524, 531 (2d Cir. 2010) (quoting *McKinney v. Caldera*, 141 F. Supp. 2d 25, 31 (D.D.C. 2001)).  As such, when assessing whether an administrative unit is an APA agency, courts eschew a formalistic assessment in favor of a fact-specific examination of the "structure, function, and mandate" of an administrative entity potentially subject APA review.  *Id.* at 531 (quoting *McKinney*, 141 F. Supp. 2d at 31).  Of particular importance to this analysis is whether the administrative unit exercises "substantial independent authority" to "take final and binding action affecting the rights and obligations of individuals."  *Dong v. Smithsonian Inst.*, 125 F.3d 877, 881–82 (D.C. Cir. 1997) (cleaned up).

Consequently, administrative entities that exercise final decision-making power based on a congressional delegation of authority are deemed agencies for purposes of the APA.  *See Soucie v. David*, 448 F.2d I 067, I 073 (D.C. Cir. 1971) (deeming the Office of Science and Technology

an APA agency given that it performs the nonadvisory "function of evaluating federal programs");
*Grumman Aircraft Eng'g Corp. v. Renegotiation Bd.*, 482 F.2d 710, 714–15 (D.C. Cir. 1973),
*rev'd on other grounds*, 421 U.S. 168 (1975) (finding "Regional Boards" APA agencies, despite
being a subsidiary unit of the Renegotiation Board, because they were "empowered to make final
decisions not even reviewable by the [Renegotiation] Board").  Conversely, administrative units
that do not derive their power from the federal government, or that exercise only advisory
functions, have been found to not be subject to APA review.  *Marine Fisheries*, 609 F.3d at 531
(foreclosing APA review for interstate compacts that derived their powers from the states, not
Congress); *Armstrong v. Exec. Off. of the President*, 90 F.3d 553, 558 (D.C. Cir. 1996) (rejecting
APA claim where administrative unit acted only in an advisory function).

The FRBNY's assertion of unchecked authority over master account access squarely aligns
with an agency's "exercise of substantial independent authority" to take "take final and binding
action" giving rise to APA review.  And the weight of caselaw validates this fact.  *See Lee Constr.
Co. v. Fed. Rsrv. Bank of Richmond*, 558 F. Supp. 165, 179 (D. Md. 1982) ("a consideration of
each and every one of the relevant factors tips the balance in favor of holding that the Bank is an
'agency' for purposes of judicial review under the APA"); *Flight Int'l Grp., Inc. v. Fed. Rsrv. Bank
of Chi.*, 583 F. Supp. 674, 678 (N.D. Ga. 1984) ("There can be no doubt that the Federal Reserve
bank of Chicago is an 'authority' of the government of the United States.  As a member bank of
the Federal Reserve System, it performs important governmental functions and exercises powers
entrusted to it by the United States government."), *vacated on other grounds*, 597 F. Supp. 462
(N.D. Ga. 1984).  As such, both the Board and the FRBNY are agencies for purposes of subject
matter jurisdiction over BSJI's APA claim.

**B.  Judicially Manageable Standards Exist by Which This Court Can Adjudicate BSJI's APA Claim**

Defendants err in their assertion that APA review is unavailable because their master account decisions are allegedly "committed to agency discretion by law."  FRBNY Br. 11–12; Board Br. at 14–15.

To start, the Supreme Court, in *Citizens to Preserve Overton Park v. Volpe*, makes clear that agency actions are presumptively reviewable and that decisions "committed to agency discretion" are but a "*very narrow*" exception to this rule.  401 U.S. 402 (1971); *Westchester v. U.S. Dep't of Hous. and Urban Dev.*, 778 F.3d 412, 418 (2d Cir. 2015) (recognizing the same and that "[u]nder the APA, a party aggrieved by agency action is entitled to judicial review thereof") (internal cited); *see generally Bowen v. Massachusetts,* 487 U.S. 879, 908 n.46 (1988) ("[J]udicial review promotes fidelity to statutory requirements, and, when congressional intent is ambiguous, it increases the likelihood that the regulatory process will be a responsible exercise of discretion.") (internal quotations and citation omitted).  Notwithstanding congressional sensitivity that all banks be afforded Federal Reserve services, Defendants assert that their master account decision-making is unreviewable and fits this "very narrow" exception because, they say, the Federal Reserve Act does not explicitly identify standards upon which to assess a master account closure decision. In so doing, Defendants ignore that an agency's "regulations . . . and informal agency guidance" can serve to set the contours of an agency's discretion, even if the statute otherwise provides none. *Salazar v. King*, 822 F.3d 61, 76 (2d Cir. 2016).

The Board and the FRBNY both assert that the decision to terminate BSJI's master account was made pursuant to the Guidelines for Evaluating Account and Services Requests (the "Guidelines")—formal regulations promulgated through the notice-and-comment process—and S-Letter 2677, informal regulations mandating that actions taken by Reserve Banks be made in

31

consultation with the Board.  These regulations and guidelines readily provide this Court with "judicially manageable standards" for assessing Defendants' decision to terminate BSJI's master account.

### C.  Defendants' Historical Interpretation of the Monetary Control Act Forecloses the Application of Deference to Their Termination Decision

The FRBNY contends that this Court's review of Plaintiffs' allegations concerning the decision to terminate BSJI's master account should be "highly deferential and [would] presume the agency's action to be valid."  FRBNY Br. at 19.  Black-letter law proves this wrong.[1]  Even under the *Chevron* doctrine, where an agency's current interpretation of a statute "conflicts with the agency's earlier interpretation," the agency's action is entitled to "considerably less" deference—if any—than it otherwise would be.  *INS v. Cardoza-Fonseca*, 480 U.S. 421, 446 n.30, (1987); *see also Connecticut ex rel. Blumenthal v. U.S. Dep't of Interior*, 228 F.3d 82, 93 (2d Cir. 2000) ("Plaintiffs are correct that an agency interpretation at odds with an earlier position taken by the agency is entitled to less deference than we generally accord under *Chevron*."); *N.Y. City Health and Hosps. Corp. v. Perales*, 954 F.2d 854, 861 (2d Cir. 1992) ("[W]here [an agency's] policy is inconsistent with an earlier policy, that inconsistency is a ground for rejecting a claim for deference.").

Relying on specific statements of both the Board and the FRBNY, BSJI alleges that Defendants had for decades interpreted the Monetary Control Act as providing a *nondiscretionary* right to Federal Reserve services.  Am. Compl. ¶ 57.  BSJI likewise alleges that the interpretation

---

[1] The Supreme Court is expected to elucidate on the concept of deference to agency interpretation of its own statutory powers by the end of the October 2023 term.  *See Loper Bright Enters. v. Raimondo*, 143 S. Ct. 2429 (2023).

of the governing statutory regime asserted by Defendants in this litigation is a recent, mutually exclusive change in position, an allegation that has been validated by both the current United States Senate Banking Committee and the United States House of Representatives Financial Services Committee.  *Id.* ¶ 68; *see id.* at 10, 58.  In light of these well-pled allegations, at the motion to dismiss stage, Defendants are not owed the deference they claim.[2]

### D. The Amended Complaint Adequately Alleges That Defendants Acted Arbitrarily and Capriciously in Terminating BSJI's Master Account

The FRBNY purports to have closed BSJI's master account in accordance with Principle 5 of the Guidelines (FRBNY Br. at 8), which states "that Provision of an account and services to an institution should not create undue risk to the overall economy *by facilitating activities such as money laundering*, terrorism financing, fraud, cybercrimes, economic or trade sanctions violations, or other illicit activity." (emphasis added).  But as BSJI has alleged and as discussed above in detail (*see supra* Section II.D), despite a years-long campaign the FRBNY has not identified a single transaction that "facilitat[ed] activities such as money laundering"; even now, the FRBNY merely claims that certain transactions raised "red flags", *not* that they actually facilitated illicit activity. A decision based on this sort of unsupported conjecture is precisely the kind of agency action that the APA prohibits. *See State Farm*, 463 U.S. at 42–43 (explaining agency action is arbitrary and

---

[2] To the extent the Board invokes alleged historical examples of it claiming discretion over access to Federal Reserve services and master accounts (Board Br. at 4–5), these are plainly "factual arguments that this Court cannot consider on a motion to dismiss."  *IMG Fragrance Brands, LLC v. Houbigant, Inc.*, 679 F. Supp. 2d 395, 412 (S.D.N.Y. 2009).  And in any event, the bulk of the Board's examples precede the enactment of the Monetary Control Act, from which BSJI's right to a master account and Federal Reserve services access arises.

capricious if it is not based on "reasoned analysis" that indicates the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made" (citation and internal quotation marks omitted)); *McDonnell Douglas Corp. v. U.S. Dep't of the Air Force*, 375 F.3d 1182, 1187 (D.C. Cir. 2004) (stating that a court will "not defer to [an] agency's conclusory or unsupported suppositions"); *City of Brookings Mun. Tel. Co. v. FCC*, 822 F.2d 1153, 1169 & n.46 (D.C. Cir. 1987) (noting "an agency has a duty to consider responsible alternatives to its chosen policy and to give a reasoned explanation for its rejection of such alternatives," and observing "that the failure of an agency to consider obvious alternatives has led uniformly to reversal" (citations and internal quotation marks omitted)).

In any event, whether the agency acted "arbitrarily" or "capriciously" is a factual determination that will require, among other things, testimony from AML RightSource, which found the transactions in question perfectly legitimate based on the diligence that the FRBNY should have performed, (Am. Compl. ¶ 128) and the cross examination of FRBNY witnesses. BSJI has adequately stated claims against Defendants under the APA.

## IV.    BSJI HAS STANDING TO PURSUE ITS CLAIMS AGAINST THE BOARD

The Board contends that this Court lacks subject matter jurisdiction over BSJI's claims against it because it cannot show an injury "fairly traceable to the challenged conduct" of the Board, nor that BSJI will be "redressed by a favorable judicial decision."  Board Br. at 10.  The Board bases this assertion on the incorrect notion that Section 342 vests Reserve Banks with exclusive and unchecked discretion over master account access, and a series of factual arguments concerning the breadth of its authority and involvement in the termination decision that are inappropriate for resolution on a motion to dismiss.  *Id.* at 11–13; *see IMG Fragrance Brands, LLC*, 679 F. Supp. 2d at 415.

Defendants filed a Motion to Dismiss, not a Motion for Summary Judgment.  As a consequence, BSJI's detailed allegations concerning the Board's role in the termination decision—which are to be accepted as true at the motion to dismiss stage—readily establish the requisite predicate for standing.  In any event, the FRBNY operates under the general supervision authority of the Board and can exercise only that authority delegated to it by the Board.  Am. Compl. ¶ 150. Though in contravention of statutory law, it was the Board's delegation of its purported "discretion" over master account access that enabled the FRBNY to take action against BSJI in the first instance.  Likewise, the Board has issued guidance to the Federal Reserve banks, including the FRBNY, which directs them to scrutinize Tier 3 institutions, like BSJI, in a manner that BSJI understands has resulted in no Tier 3 institution being granted a master account since the guidance was issued.  This guidance, memorialized in Board's S-2677 Memorandum, mandated the FRBNY to consult with the Board when deciding to terminate BSJI's master account, and the FRBNY did so.  *Id.* ¶¶ 151–55.  That the Board may have validated the FRBNY's decision absent any substantive inquiry does not support the notion that BSJI's injury is not "fairly traceable" to the Board: to the contrary, it demonstrates that the Board had the specific opportunity to protect BSJI from the FRBNY's improper act, and the ensuing injuries BSJI has suffered, but failed to do so. After all, if the Board had objected, there is no basis to believe that the FRBNY would have gone forward with termination.

The contention that BSJI would not be redressed by a finding in favor of BSJI's claims against the Board also misses the mark.  As the Board is mandated by Congress to supervise the FRBNY, it necessarily follows that the Board exercise those supervisory authorities to prohibit acts in violation of statutory law.  *Neurological Surgery Prac. of Long Island, PLLC v. United States H.H.S.*, No. 23-cv-02977 (BMC), 2023 U.S. Dist. LEXIS 122757, at *12 (E.D.N.Y. July

16, 2023) ("Defendants contend that plaintiff has been harmed not by any conduct on the part of the agencies, but by the failure of (entities supervised by defendant agencies) to comply with statutory directives. But indirect injury is not fatal to standing so long as a plaintiff demonstrates a causal nexus between the alleged injuries and the defendants' conduct — and plaintiff has made that showing here.").  BSJI has adequately alleged standing against the Board, and its claims should be allowed to proceed.

## <u>CONCLUSION</u>

For the foregoing reasons, BSJI respectfully requests that this Court deny Defendants' respective motions to dismiss.

Dated: April 12, 2024            By:     */s/ Abbe David Lowell*

Abbe David Lowell
Kelly A. Librera
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166
Tel.: 1-212 294-6700
Fax: 1-212-294-4700
ADLowell@winston.com
KLibrera@winston.com

*Counsel for Banco San Juan Internacional, Inc.*

## CERTIFICATE OF COMPLIANCE

In accordance with Section II.D of the Court's Individual Practices, excluding the cover page, table of contents, table of authorities, and this certificate of compliance, Plaintiff's Memorandum in Opposition to the Federal Reserve Bank of New York's and the Board of Governors of the Federal Reserve System's Motions to Dismiss (the "Opposition") contains 11,416 words. The Opposition complies with the formatting rules set forth in Section II.D of the Court's Individual Practices.

Dated: April 12, 2024                    By:    */s/ Abbe David Lowell*
                                                Abbe David Lowell