OCC1BSJA

```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    BANCO SAN JUAN INTERNACIONAL,
     INC.,
4
                    Plaintiff,
5
               v.                          23 Civ. 6414 (JGK)
6
     THE FEDERAL RESERVE BANK OF
7    NEW YORK, et al.,

8                   Defendants.            Oral Argument
     ------------------------------x
9                                          New York, N.Y.
                                           December 12, 2024
10                                         10:30 a.m.

11   Before:

12                       HON. JOHN G. KOELTL,

13                                         District Judge

14                           APPEARANCES

15   WINSTON & STRAWN LLP
          Attorneys for Plaintiff
16   BY:  ABBE D. LOWELL, ESQ.
          KELLY A. LIBRERA, ESQ.
17        MATTHEW OLSEN, ESQ.

18   ERIC BLOOM, ESQ.
          General Counsel for Plaintiff Banco San Juan Internacional
19
     SIMPSON THACHER & BARTLETT LLP
20        Attorneys for Defendant Federal Reserve Bank of New York
     BY:  JONATHAN K. YOUNGWOOD, ESQ.
21        MEREDITH D. KARP, ESQ.

22   MICHELE H. KALSTEIN, ESQ.
     MICHAEL M. BRENNAN, ESQ.
23        In-House Counsel for Defendant Federal Reserve Bank of NY

24   JOSHUA P. CHADWICK, ESQ.
     NICHOLAS JABBOUR, ESQ.
25        In-House Counsel for Defendant
          Board of Governors of the Federal Reserve System
```

OCC1BSJA

1              (Case called)

2              THE DEPUTY CLERK:  All parties please state who they

3      are for the record.

4              MR. LOWELL:  Good morning, your Honor.  On behalf of

5      Banco San Juan, Abbe Lowell of Winston & Strawn, Kelly Librera

6      of Winston & Strawn, Matthew Olsen of Winston & Strawn, and the

7      general counsel of the bank, Eric Bloom.

8              THE COURT:  Good morning.

9              MR. YOUNGWOOD:  Good morning, your Honor.  For

10     defendants the Federal Reserve Bank of New York, Jonathan

11     Youngwood, Simpson Thacher.

12             MS. KARP:  Meredith Karp, also Simpson Thacher, and

13     also for the Federal Reserve Bank of New York.

14             THE COURT:  Good morning.

15             MS. KALSTEIN:  Michele Kalstein, Federal Reserve Bank

16     of New York.

17             MR. BRENNAN:  Michael Brennan, Federal Reserve Bank of

18     New York.

19             MR. CHADWICK:  Good morning, your Honor.  Joshua

20     Chadwick for the Federal Reserve Board, along with my colleague

21     Nick Jabbour.

22             THE COURT:  Good morning.

23             All right.  We have a motion to dismiss.  As I've

24     previously told you, one of my former clerks works at the Board

25     in Washington.  Nothing about that affects anything that I do

OCC1BSJA

1    in the case.

2            All right.  Mr. Youngwood?

3            By the way, you all should aim for something like ten

4    minutes or so.  I'm sure I'll have questions for you.

5            MR. YOUNGWOOD:  Thank you, your Honor, and I'm going

6    to perhaps be even briefer, subject to your questions, because

7    I know we were all here a little more than a year ago and the

8    issues really have not changed, even if the style of the motion

9    and the state of the case has changed.

10           In that regard, your Honor, this is a motion to

11   dismiss the amended complaint.  There are some additional

12   allegations and purported facts, many of them I think pled in a

13   conclusory way, but none of them, none of the well-pled new

14   facts in any way, we submit, change the Court's core legal

15   analysis in its October 27 order.  And without going into every

16   aspect of that or every aspect of the substantive briefing that

17   you have both on that motion and again on this before you, the

18   three pillars of that are that the Federal Reserve Bank of New

19   York and the other Federal Reserve banks have discretion to

20   open or close master accounts under the FRA; the Federal

21   Reserve Bank of New York here has a contractual right to close

22   the BSJI master account; and, as your Honor found, the bank is

23   not an agency of the United States.

24           What has changed in the last year is two other

25   district courts have joined your Honor's analysis, the

OCC1BSJA

1    *Payservices* case coming out of Idaho, and the *Custodia* case

2    coming out of Wyoming.  The *Custodia* case I think is of

3    particular note——they're both of particular note, but that one

4    was argued and has been argued, did go through a motion to

5    dismiss, there was discovery allowed, and there was a summary

6    judgment ruling which, notable about that summary judgment

7    ruling is it doesn't rely on the discovery to reach the

8    statutory conclusions that your Honor reached on the

9    preliminary injunction order.

10           THE COURT:  That's on appeal now, right?

11           MR. YOUNGWOOD:  *Custodia* is on appeal, as is

12    *Payservices*.  *Payservices* was argued——we represent the bank,

13    the Federal Reserve Bank of San Francisco.  That was argued a

14    week ago in San Francisco before the Ninth Circuit.  And I

15    understand the *Payservices*——sorry——*Custodia* argument is

16    scheduled for the end of January in the Tenth Circuit.  So they

17    are both obviously ahead of this case in that regard.  And of

18    course I'm not suggesting those district courts' decisions or

19    even decisions of those circuit courts would be controlling

20    here, but they do provide further, we would say, persuasive

21    authority.

22           THE COURT:  Do both cases raise the issue of right to

23    a master account?

24           MR. YOUNGWOOD:  Yes.

25           THE COURT:  Okay.

OCC1BSJA

1            MR. YOUNGWOOD:  And in fact both cases, your Honor,

2     there are other ways in which they differ.  Every case has its

3     own facts.  They both directly raise——in those decisions, both

4     directly discuss——and I believe both decisions came out in the

5     middle of the briefing here, and they're both referenced in the

6     reply briefs, not in the opening briefs, because they weren't,

7     obviously, available.  They both came out at the end of March.

8     Both raised the agency issues square on and both raised the

9     discretion issues square on.

10            THE COURT:  Both cases said that a Reserve bank is not

11     an agency?

12            MR. YOUNGWOOD:  Yes.

13            THE COURT:  Okay.

14            MR. YOUNGWOOD:  And both said that there was

15     discretion and the claims are largely overlapping.  What is

16     absent from those is that there was no contract, so here, we

17     think the discretion argument——hold on a second.

18            Your Honor, I misspoke.  *Payservices* raises agency,

19     *Custodia* does not.  So I correct myself.

20            The additional difference, your Honor, is that there's

21     no contract there, and so we submit to you that the contract

22     first confirms that the reading of the statutory scheme, that

23     there is discretion, is confirmed we think by contracts that

24     clearly confirm discretion, and that they of course provided an

25     independent right, even if the statutory reading was different.

OCC1BSJA

1            As your Honor knows, there are two contracts that are

2    pled here—both the original one relating to the operating

3    circular No. 1 and then the supplemental agreement.  The

4    supplemental agreement does not overwrite the operating

5    circular.  It reconfirms the rights to terminate in it but it

6    gives additional rights to terminate, and under the law we've

7    cited, the New York law and law in this district, that right

8    really controls the contractual claim.

9            I am aware that there are some additional allegations

10   in the complaint concerning good faith or lack of good faith.

11   First, I'd submit to your Honor, those are completely

12   conclusory.  They simply say it, and so I do not think they're

13   pled plausibly or in a way that they're warranting of any

14   credit.  But they wouldn't overlap—they wouldn't overwrite the

15   contractual provisions that give the full and sole discretion

16   to the bank to terminate the master account with the only

17   provision being on a certain number of days' notice, if

18   practicable.

19           There is also an argument that I don't think was

20   raised before, which is pointing in the contract to the

21   limitation of liability provision and the words "good faith"

22   within it.  The problem with that reading, your Honor, it's in

23   the limitation of liability provision.  It doesn't override the

24   parts of the contract that you need to get through to find if

25   there was liability at all.  It's a damages provision, it's not

OCC1BSJA

```
 1   a liability provision.  Other than the words "good faith" being
 2   in there, I don't think it bears any relevance to this
 3   analysis.
 4          With respect, your Honor, just kind of thinking of
 5   what is new and what you didn't have the chance to address,
 6   with respect to the agency argument, I don't think there is
 7   anything that's meaningfully pled that is new and that would
 8   give you reason, based on a new pleading, to revisit that
 9   analysis.  I don't think there are any new pled facts, and I
10   don't think there are, meaningfully, any new argued points.
11          With respect to the discretion point, the new material
12   in the complaint, which I'm sure it appears some other places
13   but largely in paragraphs 45-69, is a whole section on history
14   and custom and practice, but first of all, none of it changes
15   the clear words of the statute, the "may," all the arguments
16   that you've already considered that I won't go through, but it
17   really skips perhaps the most significant part of the
18   legislative history, that when the Monetary Control Act was
19   amended and the sections that we were discussing were touched,
20   342 was one of those, and at the same time the reference to
21   nonmember institutions was added.  Congress did not touch the
22   word "may."
23          And then if you go forward, as your Honor has
24   acknowledged to 2022, when, again, there are amendments, we
25   have the provision that requires the tracking of what is done
```

OCC1BSJA

```
 1    with master accounts and whether they're approved, rejected,
 2    pending, or withdrawn.  There really is no reading of the
 3    insertion of the word "rejected" that doesn't confirm the
 4    discretionary aspect of granting a master account.
 5              Your Honor, I'm happy to go through any of the other
 6    arguments.  I think I've tried to highlight——and again, you
 7    have ample briefing——what we saw was new, what was not able to
 8    be argued before, or wasn't argued before a year ago.  We don't
 9    think any of that changes the prior analysis.
10              THE COURT:  A couple of additional questions.
11              Accepting your position, which is largely the position
12    that I took in denying the motion for a preliminary injunction,
13    does that mean that there is no mechanism for a bank which has
14    a master account closed to complain about the closing of that
15    master account?
16              MR. YOUNGWOOD:  Certainly not in this situation.
17    Having to make it my easiest argument——I think the other
18    arguments work, but my easiest argument, not when you've signed
19    a contract that allows the party you're contracting with to
20    have complete discretion.  That was something they could have,
21    I suppose, not agreed to do, but they did it, and they didn't
22    do it once, they did it twice, and they did it after a history
23    where——and I won't cite the history, but it's in the pleadings,
24    it's before you, you know, a history of issues concerning risk
25    being raised.  They signed the supplemental agreement, which we
```

OCC1BSJA

1    didn't need.  We could have just had the first agreement.  So

2    here, your Honor, I think it's actually an easy no.  I will

3    tell you, the Ninth Circuit——

4         THE COURT:  That, of course, assumes that there is no

5    good-faith exception to the ability to allegedly breach the

6    contract.

7         MR. YOUNGWOOD:  Under this contract, we don't believe

8    the motivation would be relevant.  We also think, even if one

9    were to think it was relevant, based on the pleadings, based on

10   the facts, based on the documents incorporated in the record

11   before this Court, which had the benefit of the prior

12   preliminary injunction, that you really couldn't come to a

13   conclusion that there was a lack of good faith.  I understand

14   your question is a larger one, like take a different set of

15   facts, but I do want to focus on the ones we have.

16        Your Honor, the answer to your question is that would

17   be for Congress, and there are plenty of things that happen in

18   the world, in the country, where Congress has provided

19   remedies, and there are plenty when they don't.

20        THE COURT:  So you've moved to the statute over the

21   contract.  You've told me what you want to tell me about the

22   contract.

23        MR. YOUNGWOOD:  Your Honor, I don't think——I'll give

24   you two answers.  One, I can't come up with a situation where

25   the discretion granted to this contract and the cases we've

OCC1BSJA

1    cited to you, in New York and in this district——once you have

2    unfettered discretion, the motivation doesn't matter, but I

3    will add to it that under the facts of this case, you don't

4    need to answer that question, in our view, because there is a

5    huge record of what happened here and a huge basis for this

6    decision that doesn't require a finding that I see bad faith

7    but I'm not going to be able to do anything because there's

8    actually a full record of good faith here, notwithstanding

9    conclusory allegations in the complaint to the contrary.

10          THE COURT:   Okay.  So then the second issue is,

11   putting the contract aside, no remedy for a bank, which claims

12   that the master account was unfairly in bad faith closed by the

13   local Federal Reserve Bank?  And your answer is, that's right,

14   no remedy; if you want a remedy, go to Congress.

15          MR. YOUNGWOOD:   And I would——you asked about closed,

16   your Honor.  I'd answer the same about denial or rejection of

17   opening.  Effectively, yes, your Honor.  And why do we in part

18   know that, that Congress is an avenue?  Well, I'd actually

19   point back to the 2022 amendment that has Congress tracking and

20   looking over and performing its own oversight role, and again,

21   I don't have to give a litany of it, but there are——Congress

22   gives rights to remedies through statutes.  You need to have a

23   statute that provides for liability, provides an avenue, and in

24   this particular situation, for all the arguments we've

25   discussed, certainly based on these facts but, yes, more

OCC1BSJA

1    generally, Congress has not provided that.  That doesn't mean

2    it's not done anything.  It has oversight.  It's tracking.  I

3    am certain, if there was an issue, there are plenty of avenues

4    to go to Congress to ask, and your Honor, what's remarkable is

5    that you have to look at the database.  There are very, very,

6    very few rejections that have actually been tracked.  So it is

7    not some colossal issue of the banks rejecting all of these.

8    Again, that's not on the record, it is in the database, if your

9    chambers wishes to look, but Congress is watching.

10            THE COURT:  All right.  A more particular question.

11   With respect to the count under the Due Process Clause, what's

12   the basis, as far as you know, for a cause of action for a

13   violation of the Due Process Clause?

14            MR. YOUNGWOOD:  Well, I think there's a number, so I

15   have trouble fully understanding what the basis would be here

16   because——

17            THE COURT:  No, no.  But just assume that there is the

18   deprivation of a privacy right in violation of the Fifth

19   Amendment.

20            MR. YOUNGWOOD:  Yes.  And assume, your Honor, that my

21   client is subject to the Fifth Amendment, right?  I wouldn't

22   be——well, I don't need to tell your Honor.

23            THE COURT:  Right.

24            MR. YOUNGWOOD:  But I wouldn't be, a private citizen

25   wouldn't be, right, so not everyone is, and I don't think

OCC1BSJA

1    they've established that my client is.

2            THE COURT:  But what's the basis for a claim under the

3    Due Process Clause of the Fifth Amendment?  We have all this

4    litigation, if you will, over whether there are enforceable

5    private rights of action under individual constitutional

6    provisions.  So we have *Bivens*, for example.  So here we have a

7    claim that what both the bank and the board did was a violation

8    of the Due Process Clause of the Fifth Amendment.  And I see

9    the parties argue that there was no violation of the Due

10   Process Clause of the Fifth Amendment.  But I don't think in

11   the briefs there is any argument over whether there is a claim

12   that a party can make for a violation of the Due Process Clause

13   of the Fifth Amendment.

14           MR. YOUNGWOOD:  I hear you, your Honor, and I can't

15   think of what the basis would be against this defendant.

16           THE COURT:  Okay.  Thank you.

17           MR. YOUNGWOOD:  Thank you, your Honor.

18           MR. CHADWICK:  Good morning, your Honor.  Joshua

19   Chadwick from Federal Reserve Board.  And I won't take the same

20   amount of time because, from my perspective, it remains a

21   mystery as to why the board continues to be a defendant in this

22   case.  There can be no doubt that the board has no ability to

23   open, close, or maintain master accounts.  This deposit-taking

24   authority was granted by Congress directly in Reserve banks,

25   not to the board, which is a government agency; it is not a

OCC1BSJA

1  bank.  As a result, this Court found, in your Honor's

2  preliminary injunction decision, that BSJI lacks standing as to

3  the board, which has not caused injury to BSJI and could not

4  address the injury that it claims.  Nothing in the amended

5  complaint alters this conclusion.  The central allegation in

6  the complaint——

7      THE COURT:  The response by the plaintiff is that the

8  board effectively controlled the rejection of the master

9  account and that the bank would not have gone forward if the

10  board had simply said no.  So the question is whether that's

11  sufficient to give the plaintiff standing against the board.

12      MR. CHADWICK:  Well, I would submit that it doesn't,

13  your Honor, and I'm not quite sure that their complaint really

14  goes quite that far.  If you look at paragraph 179, they say

15  the board "refused to intervene."  But I would submit that the

16  board had no duty to intervene in a Reserve bank decision

17  vested by Congress in the Reserve bank.  It is of course true

18  that the board exercised its general supervisory authority as

19  to Reserve banks, it has a lot of supervisory authority as to

20  commercial banks, and it used that authority to issue its

21  account access guidelines, but it doesn't make account

22  decisions by Reserve banks a board decision, and there's no

23  facts that suggest——no alleged facts——that the board made the

24  decision here, and it didn't.  The board's obligation under the

25  statute was to issue a pricing schedule based on certain

OCC1BSJA

1    pricing principles, including that pricing for member and

2    nonmember banks would be the same.  That's clear in the

3    Monetary Control Act.  But there's no question that the board

4    has done just that, in full satisfaction of its statutory

5    obligations under the act.  So I would contend that BSJI cannot

6    maintain a suit against the board in this situation and that

7    the motion to dismiss should be granted as to the board for

8    that reason alone, in addition to all the other reasons that

9    Mr. Youngwood has put forth.

10        THE COURT:  And that comes down to your argument of

11   standing.

12        MR. CHADWICK:  Yes, your Honor.

13        THE COURT:  Okay.

14        MR. CHADWICK:  And I'd be happy to answer any

15   questions that you have, but otherwise——

16        THE COURT:  No.  Thank you.

17        Plaintiff?

18        MR. LOWELL:  Good morning, your Honor.

19        THE COURT:  Good morning.

20        MR. LOWELL:  Given what you asked for, I'll respond.

21   I have ten things I would like the Court to consider before it

22   makes its rulings.  I'll try to——

23        THE COURT:  Sure.  Could I ask you a couple of

24   preliminary questions.  Maybe they'll be covered by your

25   points.

OCC1BSJA

1          What's the current status of the bank?

2          MR. LOWELL:  So if you remember, a year ago, we had

3     gone from where we had stood when we were reinstated back in

4     '20 to 13 or 14 accounts and whatever was under deposit then.

5     We are down to 10 accounts and only $20,000 in those accounts

6     because there's no ability to operate, and those are staying

7     there with the chance and with the idea that we will reverse

8     this, get our master account back, and that will be the

9     starting point.  So right now, in terms of where the bank

10    stands, that's where the bank stands.

11         THE COURT:  Okay.  The representation last time was

12    that the bank couldn't operate, that it would close.

13         MR. LOWELL:  Well, it's not operating.  It has people

14    that are willing to keep a total of 20,000 there with the

15    chance that this will be reversed and we'll go forward.  It is,

16    for all intents and purposes, closed.

17         THE COURT:  Okay.  If I were to agree with the motion

18    to dismiss, are you looking for the opportunity to file an

19    amended complaint, or is it time, like the other cases, to go

20    to another court?

21         MR. LOWELL:  It is interesting that we have parallel

22    tracks in various ways that are finding their way up, and maybe

23    all the way up to the Supreme Court, which I'll come back to as

24    one of the things that's changed in the last year, in terms of

25    deference to agencies, in a second, or in half a minute.  But I

OCC1BSJA

1   think the answer is, it's sort of a circular, because I believe

2   what I want to make sure the Court considers today, as it was

3   asking questions of the defendants, is that the record is not

4   quite ready for a final determination as to whether there

5   should be an amendment to the complaint because I think, for

6   example, in the *Custodia* case, which the defendants have put

7   forward and argued is great precedent, I hope it's great

8   precedent for the Court to remember that in that case, the

9   Court denied a motion to dismiss so that it could develop a

10  record on those things that were fact driven.  One of the

11  things that are fact driven would be whether or not the Reserve

12  bank itself is an agency.  That was preserved in the motion to

13  dismiss denial so that discovery could take place, and then

14  thereafter, the rest of the case went forward on that regard.

15  So as to another difference that makes a difference is that we

16  do have those contract claims; we have those contract claims

17  which by definition are fact driven.  Consequently, in those

18  facts, including the existence of a lack of good faith, or, to

19  put it another way, bad faith or lack of fair dealing, that

20  could very well lead to another amendment or a request to amend

21  the complaint.

22          THE COURT:  But haven't you alleged everything that

23  you really wanted to allege in terms of breach of contract,

24  breach of the covenant of good faith and fair dealing in the

25  current complaint?

OCC1BSJA

1          MR. LOWELL:  Yes, in a way, but one of the differences

2    between a year ago and today is the standard of review that

3    you're under.  So when learned counsel at the table to my left

4    says that we have pled conclusorily, well, that's what

5    pleadings are, but those conclusions have to be accepted as

6    true, in a motion to dismiss, and here are the things that the

7    Court needs to accept as true.

8          THE COURT:  Well, no.  Conclusory statements——

9          MR. LOWELL:  Well, I don't mean conclusions, Judge.

10   These are the facts that have been pled, and that the Court, in

11   a motion to dismiss, ought to accept as true, and those facts

12   include the following things.

13         Sorry?

14         THE COURT:  Oh, okay.  We can come back to that.  I've

15   interrupted you on the ten things that you wanted to tell me,

16   which will probably cover the issue of amendment.

17         MR. LOWELL:  It would cover——

18         THE COURT:  Go ahead.

19         MR. LOWELL:  It would cover the facts for which, in a

20   motion to dismiss, the Court must take as true, which would not

21   be "conclusory," and to use counsel's phrase, "huge record,"

22   which was articulated some minutes ago, is right.  There's a

23   huge record that you need to accept as true.  I'll come back to

24   what those six or seven things in the record are that are not

25   conclusions.

OCC1BSJA

1          So you and I have already done a little about what's

2     changed in a year.  Let me tell you a few other things that

3     have changed.  The standard I've already talked to you about.

4     You asked counsel about the pendency of cases that are dealing

5     with some of the same issues.  They're not all the same issues.

6     For example, in neither of the cases is there a contract claim.

7     In *Custodia*, there is not the issue of agency, as counsel

8     corrected himself.  Remember, as you asked me a year ago, that

9     we are dealing with a termination of an account——

10               THE COURT:  That cuts both ways, though.

11               MR. LOWELL:  It cuts both ways.

12               THE COURT:  The existence of the contract would appear

13     to give the right to the bank to close the account at any time.

14     It takes it away from some of the cases where, for example, the

15     account was denied at the outset.

16               MR. LOWELL:  It does, if we were arguing from a

17     position where the contractual right to terminate was the end

18     of the sentence and there was nothing else that came about with

19     that.  But that's not the way it is.  That contractual right to

20     terminate comes with (a) proper notice, which we know is a

21     matter of days, but it also comes with the contractual and

22     implied covenants of good faith, fair dealing, and a duty of

23     care.  So if it was a bare termination right, then it would

24     make a difference or no difference between the statutory

25     interpretation and the contract.  But if it comes with those——

1  and I don't think the Court could find that those terms don't

2  exist——then it becomes an issue of fact as to whether or not,

3  in exercising that contractual theoretical right of

4  termination, it did in fact come as a result of a good-faith

5  consideration or a duty of care or fair dealing, and we have

6  alleged not.

7          THE COURT:  So your argument is that the existence of

8  the contracts, which appear to reinforce the ability of the

9  bank to reject, close the master account, with a few days'

10  notice, that contractually imposed more restrictions on the

11  bank than would have existed without that contract.  That seems

12  to be counterintuitive.  It seems as though the contract is

13  there to certainly solidify the ability of the bank to close

14  the account because there had been problems or perceived

15  problems by the bank with the account.  You say, well, this

16  case differs from some of the other cases because we have a

17  contract that actually limited the ability of the bank to close

18  the account.

19          MR. LOWELL:  Well, to respond, it's not quite the way

20  you said.  There are parallel lines of rights in the world,

21  right?  Some are statutory, some are constitutional, and some

22  are contractual.  It may turn out that in applying the third,

23  which I didn't say it in the right order, but the contractual

24  part, that has obligations on both sides of the equation, which

25  we have agreed to do.  And then the regulator——not the

OCC1BSJA

 1  regulator, I'm sorry, in this case——the New York bank and then

 2  the Fed, in this case New York, has said, this is the way we'll

 3  operate.  But your question starts with a premise that you know

 4  we don't agree with, which was that they had the right to

 5  reject or, in our case, terminate the master account under the

 6  statute, which we don't believe is the case.

 7        THE COURT:  No, I know that.  I was just following up

 8  on the argument you had made a moment ago that this case

 9  differs from other cases because there is this contract, which

10  I took your argument to mean, unlike the other cases, in this

11  case, the bank is further restricted because of the existence

12  of the contract.  From whatever rights it had under the statute

13  in this case, the bank is further restricted because there is a

14  contract.

15        MR. LOWELL:  Bank meaning the defendants.

16        THE COURT:  Meaning the Federal Reserve Bank of

17  New York.

18        MR. LOWELL:  Well, the way you phrased the question is

19  not something I can agree with, because it's not that they're

20  further restricted.  We have a right, and that right is not——is

21  to have a master account conferred to us by 248(a).  Fine.

22  That's what we believe to be the case.  Then there became a

23  contract.  And the contract was between the Fed and us, and

24  then it says, okay, we have this right.  But you, in the

25  contract, said we can terminate that right that you have based

OCC1BSJA

1    on A, B, and C.  And we're suggesting that A, B, and C doesn't

2    exist in this case, and in a motion to dismiss, we have alleged

3    facts that would indicate, if you took it as true, it has not

4    been done with good faith, fair dealing, and duty of care.

5    Just one example, Judge.  They applied, in their regulatory

6    scheme, this idea that they didn't have to but they did say,

7    okay, and by the way, the reason we're doing what we did is we

8    come to the conclusion that BSJI is an under-risk to the

9    overall economy.  That was a regulation, by the way, Judge,

10   that came into effect after they started going after BSJI.  One

11   of the things that would be interesting in discovery is to see

12   cause and effect of that.

13          But putting that moment aside for a second, what they

14   said is that——and if we're alleging good/bad faith and a duty

15   of care, then how do they, the defendants, justify that this

16   bank, which, when we came to you the first time had 14

17   customers, 12 accounts, 13——it's gotten its master account

18   taken away, and since the year has gone by, we had already told

19   you a year ago about Deutsche Bank, which has bazillions of

20   dollars and lots of accounts, and was found wrongdoing that

21   really does affect the overall economy, and never, ever got its

22   master account taken away.  And in the recent past, the

23   historic result of the TD Bank plea of guilty, with gazillions

24   of accounts and amounts of money that really does affect the

25   overall economy.  And they pled guilty.  And they didn't have

OCC1BSJA

1    their master account.  And what we now know from what we're

2    looking at and what we'll explore in discovery, there is not a

3    coincidence going on with these IBEs and various regional

4    banks, because there are a number of them, based on where they

5    exist in the world, are being closed or rejected, and there is

6    an element of that being explored as to whether or not these

7    defendants are operating in good faith.  So you're asking me,

8    is it possible that this right——that the defendants imposed on

9    themselves a higher restriction by entertaining a contract?  My

10   response is, both sides gave themselves rights and obligations,

11   but their right to terminate didn't come without any

12   conditions.  And those conditions are pled in a way that would

13   survive a motion to dismiss.

14           THE COURT:  Okay.  Go ahead.

15           MR. LOWELL:  Thank you.

16           As we're answering questions, I have fewer than ten,

17   but that's what you envisioned would happen.

18           So let me tell you two more things that happened.

19           THE COURT:  Well, as long as——

20           MR. LOWELL:  I'm glad they are——

21           THE COURT:  Oh.  Do you allege that there is any

22   private right of action under the Federal Reserve Act?

23           MR. LOWELL:  There is——well, private right of action.

24   A party can sue under the Administrative Procedure Act as

25   against a claim of arbitrary and capricious conduct.  It is a

OCC1BSJA

1    private cause of action.

2              THE COURT:  By an agency, right?

3              MR. LOWELL:  By an agency.

4              THE COURT:  Right.

5              MR. LOWELL:  And if an entity is not a government

6    entity and they have violated our rights, then that's your

7    first question to me, or one of your first questions to me,

8    whether there might be a further amendment, because if we are

9    now getting to the point of knowing that they're discriminating

10   against our bank for reasons that we believe would not be

11   condoned either by the contract or by things like, as you say,

12   the various aspects of the Constitution, then yes, then there

13   would be 42 U.S.C. 1983 or a *Bivens*-type action.  We're not

14   there yet, but we certainly have provided the foundation for

15   that by our allegations that there is some discrimination going

16   on and bad faith.

17             THE COURT:  No, but I have several conceptual

18   questions, just with the way in which the complaint is drafted

19   and the papers.  There is the Declaratory Judgment Act claim,

20   and then there is a due process claim.  With respect to the

21   Declaratory Judgment Act claim, the Declaratory Judgment Act is

22   not a basis for jurisdiction itself.  So the papers indicate

23   that you find the basis for jurisdiction under the Declaratory

24   Judgment Act in either the APA or the mandamus statute.  And my

25   question is, I just want to make sure that you're not alleging

1    somewhere that there is a private right of action under the

2    Federal Reserve Act, which gives you a basis for federal

3    jurisdiction.  That's the——

4              MR. LOWELL:  I understand your question, and until you

5    asked that question, I'm not sure that in any of the cases that

6    are existing——*Custodia*, *Payservices*, ours, or any——that anybody

7    contemplated it in the way you said.  But when we tried to fold

8    into the mandamus act and the APA, we believed it was broad

9    enough to sustain the elements of what we are alleging they did

10   wrong.  I don't have a better answer than that for now.  I will

11   try to figure out before you rule if there is something else I

12   can add to the record.

13             THE COURT:  Okay.

14             MR. LOWELL:  Because it is asking me to look at

15   analogous areas, and I didn't do that before standing at this

16   podium.

17             THE COURT:  Okay.  My related question, which you were

18   getting to, which I asked your colleague on the other side, is,

19   I read the due process claim, and the parties don't argue

20   anywhere whether there is in fact a cause of action for the

21   violation of the Due Process Clause of the Fifth Amendment.

22   The parties argue either there was or there was no violation of

23   the Due Process Clause.  And it's stark because, you know,

24   there's all this litigation out there whether there is a cause

25   of action under individual constitutional rights.  And there

OCC1BSJA

1  surely has never been one for a violation of the Due Process

2  Clause of the Fifth Amendment.

3          MR. LOWELL:  There is a private right——again, we're in

4  sort of theoretical land, and I appreciate it.  As you're

5  making my brain spin to come up with the analogy, it feels to

6  me there is a private right of action for a violation of the

7  Due Process Clause in another context.  Wouldn't that be the

8  equivalent if you were suing a federal entity or the officials

9  of the agency, a *Bivens* action, and wouldn't it be a 1983?

10         THE COURT:  But 1983 is for state officials.

11         MR. LOWELL:  Right.  But if the Federal Reserve of New

12 York says, we're not a government agency, we're some private

13 entity, that's kind of where they would hang.

14         THE COURT:  There's no claim here for a violation of

15 Section 1983.

16         MR. LOWELL:  Right.

17         THE COURT:  And the Supreme Court has made it clear

18 that *Bivens* actions are carefully limited to the specific areas

19 that the Court has said satisfied *Bivens*, and it's only

20 recognized in very few cases.  So——

21         MR. LOWELL:  I will try to come up with something

22 momentarily.  I don't mean momentarily here——

23         THE COURT:  That's okay.  I wanted to make sure that I

24 wasn't missing something in the briefs on either side, as I

25 tried to work through this.

OCC1BSJA

```
 1              MR. LOWELL:  I think you have not.

 2              THE COURT:  Your colleagues on the other side didn't

 3     come up with anything either, so——

 4              MR. LOWELL:  So it's worthy of consideration, but

 5     luckily for my point of view today, the causes that are alleged

 6     provide us the basis to go forward, in our view.

 7              A couple other quick points on what's changed, and

 8     I'll move to a few others and pleas.  Your questions, other

 9     than the one you just asked, is something that would have been

10     part of my ten, but——remember that other things that have

11     changed besides what I said about contracts and besides the

12     rejection versus termination.  There's a few things.

13              First, there are things that the Court needs to

14     decide, at least in retrospect, before you make your final

15     conclusion on things like whether the right exists that counsel

16     for the defendants say doesn't.  The Supreme Court did decide

17     *Loper Bright*.  The Supreme Court did say, by the way, this idea

18     that we don't have as much discretion and deference, I should

19     say, is something that will come about in a couple of the

20     places I want to address to the Court.

21              THE COURT:  Okay.  Could I just stop you.  I'm sorry.

22              MR. LOWELL:  No, please.  If I've said something——

23              THE COURT:  At the outset, as to *Loper Bright*, this is

24     not a case, so far as I can see, where I'm being asked to defer

25     to an agency interpretation, so a case where I'm being told
```

OCC1BSJA

1    that the statute is ambiguous and I should defer to an agency

2    interpretation.  I and the other courts that have interpreted

3    the statutes have all gone to the statutes and interpreted them

4    *de novo*, without considering what the agency has done or said,

5    and so why is the elimination of *Chevron* relevant here?

6          MR. LOWELL:  It seems to me that if the Court is

7    saying, as counsel briefed and came and argued to you, that

8    248(a) says this and 342 says this, and that had no influence

9    whatsoever on the Court's decisions in this motion to dismiss

10   and you've come upon this based on yourself, then you're right,

11   the limitation of *Loper* would have less, if not no,

12   applicability.  But I didn't read it that way, Judge, and I

13   still don't, because what I'm asking the Court to do is to

14   understand that the government's argument, the New York and the

15   Fed's argument about how they get to the point of saying they

16   have no discretion, is an example.  Last week, Mr. Youngwood

17   was the person who argued in front of the Ninth Circuit in the

18   *Payservices* case.  And the three-judge panel, among other

19   things, asked him:  Are you saying that the discretion that you

20   have is complete and therefore if you had a case in which a

21   bank was deprived on the allegation of some, for example,

22   racial or other discrimination, that bank would have no ability

23   to have rejects?  Or another judge asked:  If there was a case

24   that you will not give a master account to everybody in Idaho,

25   would that be something?  And counsel for the defendants here

OCC1BSJA

1    said, No, no, we don't have that much discretion.  There would

2    be redress.  And what the redress was, we'll find it in another

3    way, we'll find it in Title VII, although that wouldn't work

4    for the Idaho bank, and we'll find it in some way.  So then the

5    defendants say:  Here is our discretion, and this is how we

6    found it.  We can do what we just said we can do without

7    any——and if they're saying that and the court is accepting it,

8    then I think you have to look at it through now the lens of

9    *Loper Bright*.  That's all I'm saying.

10            THE COURT:  Okay.

11            MR. LOWELL:  Or, to put it another way——and this was

12    something raised a year ago and they raised it again this

13    morning.  The defendants ask the Court to accept the notion

14    that——

15            THE COURT:  Could I just——

16            MR. LOWELL:  Please.

17            THE COURT:  It's plain that the defendants are subject

18    to various statutes, including Title VII, or you'd have to get

19    over sovereign immunity and all, but the examples raised by the

20    circuit court judges in the other case are examples of whether

21    the bank or the board is subject to other statutes,

22    regulations.  The question in this case is whether, under the

23    provisions of the Federal Reserve Act, that in some way

24    prevents the bank, under the supervision of the board, from

25    rejecting or closing a master account.  That's wholly

OCC1BSJA

1  different.  But the *Chevron* issue would be, is the court

2  deferring to some agency interpretation as opposed to, in good

3  faith, reading the statutes and making the determination under

4  the statutes.

5          MR. LOWELL:  I don't have any disagreement with that.

6  So as I said, put aside the issue of whether or not this Court

7  and the other courts came to an independent *de novo*

8  consideration without regard to any argument made by the agency

9  or the board.

10          THE COURT:  By the way, I don't think, in my

11  preliminary injunction decision, I cited agency interpretations

12  of the statutes.

13          MR. LOWELL:  Well, when you say——this is a little

14  fuzzy for me, Judge, to be honest.  When you say agency

15  interpretation, as they argue agency interpretation, are they

16  saying, for example, what we're putting in our briefs and

17  telling you that this is the reason 248(a) doesn't work the way

18  it does, it's not a formal rulemaking event, but it's a

19  position of the agency which it's putting forward and saying,

20  Dear, Judge, please accept this?  But I don't want to get hung

21  up as to whether or not what I'm about to say as to your final

22  conclusion for your *de novo* review is governed by *Chevron* or

23  *Loper*.  What I would like the Court to consider before you pen

24  your ultimate decision in this case are a few subpoints to my

25  No. 2, which is, you know, even today——I checked this morning——

OCC1BSJA

in terms of what the government says is the way the statute

works, on their website today, the question is, will the new

account structure——the master accounts, from the time that it

was first put into effect, when master accounts came into

effect, however many years ago, they put on their site a set of

questions and answers:

Will the new account structure be available to all

depository institutions?

A.  They will be applicable to all depository

institutions.

Footnote.  What does the footnote say?  It says, The

Monetary Control Act is the principal statute governing access.

That is 248(a).  It doesn't even mention 342, which is what

they keep saying gives them the "may" that overcomes the

"shall."  And I think that's something to consider.

The next thing they ask is for you to adopt the

position——again, I don't know if it's deference, but it's

asking you to again rule that 248(a) isn't applicable, and one

of the reasons they ask that is they point to the 2020

amendment to the FRA and they say Congress is watching,

Congress is monitoring.  And, you know, you live by statutory

language, then you should also perish by statutory language.

Notice that the statute amendment——which Senator Toomey, who

was the author, has explained its purpose, which was because

one bank that was in the system was agreed to, rejected, agreed

OCC1BSJA

1    to again, and they wanted to know why——mentions the word

2    "application," "rejection," and has no reporting requirement

3    for termination.  The word "termination" doesn't exist anywhere

4    in the amendment.  And we are in the category of termination,

5    not rejection.  And there is a purpose for that, given the

6    purpose of what the amendment was for.

7           And so, again, if you want to be textual, we all, from

8    first year of law school, remember the *expressio unius*.  I'm

9    saying that if their argument is, *oh, Congress has endorsed the*

10   *fact that we have this unbridled discretion and look why,*

11   *because we're reporting on rejections,* they fail, because

12   there's nothing in that that reports on terminations.

13          Similarly, last year——I went back to the transcript.

14   And you asked the defendants the impact of the case here in the

15   circuit of *Greater Buffalo*, and at the time they said they

16   didn't answer it.  And then in your opinion you have a

17   footnote, and your opinion's footnote properly sets out that

18   what's happening here is we're addressing the issue of whether

19   we have an absolute, nondiscretionary right to a master

20   account, and *Greater Buffalo* was talking about a service of

21   check clearing, but I don't think the defendants appreciated

22   what underlies that.  And I'm asking the Court to consider that

23   as well.  What underlies that is this:  The services that the

24   act provides, which includes check clearing, wire transfers,

25   ACH, are services that don't exist without the ability to have

1    a master account.  You can't check clear, you can't wire, you

2    can't do ACH without having a connection to the system, and

3    that connection to the system is a master account.  So to give

4    the full flavor to what the Second Circuit said, as there being

5    a, if you will, all-banks ability to have these services, which

6    they never contested, then it doesn't understand or appreciate

7    that that is saying something without the basis for doing it.

8            Also, I'm asking the Court to consider, before you

9    finally rule that on 248(a) itself, which the government put

10   forward—I'm sorry—Fed and New York put forward as saying this

11   is a pricing structure which the Court also adopted, I went

12   back to look at that, Judge, and I don't understand that

13   application or that argument.  Because 248(a) speaks as

14   follows:  All Federal Reserve Bank services covered by the fee

15   schedule shall—that's where we get the "shall"—be available

16   to nonmember institutions.  It could have been a period, but

17   they had a conjunctive.  And such services will be priced in

18   the same fee.  And was taken out.  It's as if that was the only

19   thing that clause says.  The first part of it says you get the

20   services, stop, full stop.  It's the second clause that says,

21   and it should be at the same price.  To call that sentence

22   simply a pricing basically reads the word "add" out of it and

23   ignores the first part of that.  I want the Court to consider

24   that as well.

25           THE COURT:  Okay.  But all of that comes under the

1   statute which is entitled Pricing of Services, and the specific

2   provision that you rely on comes under the heading of the

3   Schedule of Fees Prescribed Pursuant to this Section Shall Be

4   Based on the Following Principles.  It's hard to read that

5   section directed to the board as a direction which overcomes

6   what 342 says.  I mean, you take issue with my description of

7   that section as a pricing schedule, but that's what it says.

8           MR. LOWELL:  That's what the title says.  The language

9   of the actual admonition and statute still has two parts to it.

10  Look, I do understand, and again, going back to the fact that

11  I'm the person who said what did we learn in the first year of

12  law school, I do understand that in the first year of law

13  school, you also learn that you don't look particularly to the

14  title of something, you look at its merits and its substance

15  and its words.  I get it.  I understand that you can find that

16  the title of that statute and in the section means it's only,

17  if you will, a pricing.  I read it as to what it says.  And

18  then more importantly, when you just raised 342 again, if you

19  want to use the same statutory construction, mechanism, 342's

20  words, yes, it says "may."  Of course it says "may."  But

21  what's the "may" about?  It's a particular transaction type.

22  You may accept deposits.  Now it's kind of like——I was trying

23  to figure out what would be similar, and I haven't come up with

24  a great analysis, but this whole structure seems to me that

25  what you get is a bank that meets the minimum structural

 1   requirements to be in the master account system.  You have to

 2   have minimum deposits, and you do.  And then you get in the

 3   door.  And then they're saying you don't have to take every

 4   transaction, New York, you don't have to accept every

 5   transaction, which answers your question of a year ago, which

 6   is, if they see that there's a bad transaction, are they

 7   silent?  Do they have to shut the bank down in order to stop

 8   it?  No, they don't.  They have the power to look at and do

 9   that.  Having said that, the "may" applies to only part of the

10   function.  But how do you take this "may" and say that it also

11   applies to the services; for example, *Greater Buffalo* says

12   "comes along for the ride."  We all look at "shall" and "may"

13   as if "may" applies to the same set of services than "shall."

14   And "shall" is a broader set of services than "may."  And

15   before the Court rules, I hope that you would look at that,

16   especially because the counsel for the defendants came just

17   moments ago and said, look, this monitoring function shows so

18   few rejections that it shows that the system is not as vast or

19   as problematic as the plaintiff here and in *Custodia* and in

20   *Payservices* say.  I will point out that what's happening and

21   also is out there for you to see in the way it's being reported

22   besides the lack of termination, is that sometimes they're just

23   not ruling on these applications.  People withdraw them because

24   the wait is so long.  I don't think you can look at the fact

25   that that statute has required reporting as an endorsement of

OCC1BSJA

```
1    what happened.  I told you, on the statutory part——I want to
2    get to the contract part in a second, the new cause of action,
3    but I do want to point out that before that, if they conceded
4    in their argument last week that their discretion under 248(a)
5    or 342 or any other number you can come up with is not
6    unbridled because they can't discriminate by race and they
7    can't discriminate by geography, then what we've established is
8    that they have in fact limited their unbridled discretion, and
9    then the question is, where do you draw the line.
10         THE COURT:  Hold on.  You can explain it to me in
11   greater detail, but I don't see anything inconsistent with
12   that.  Neither defendant says that it's above the law.  Neither
13   defendant says that there cannot be statutes out there that
14   apply to them, and that prevent them from violating various
15   laws, including laws against discrimination.  That's a wholly
16   separate argument from whether any of the provisions of the
17   Federal Reserve Act or a contract prevent them from doing what
18   they did in this case.  In order to make that argument, you
19   have to find something in the statute or in the contract that
20   prevents them from doing what they did in this case.  That
21   doesn't mean that they're not subject to other statutes or
22   other laws, or other——
23         MR. LOWELL:  The violation of those other statutes and
24   those other laws.  So just to put it in three levels, and one
25   is they think we don't have discretion at all, and something
```

OCC1BSJA

1    else comes into the system to regulate.  The second is, if they

2    have discretion, then you're right, other things come into

3    bear.  One of the things that comes into play is the

4    Administrative Procedure Act to take that power and not to act

5    arbitrarily and capriciously, and in that second tier of

6    attack, in our complaint and in our argument, we have alleged

7    facts.  The Court needs to accept them as true, that they have

8    acted arbitrarily and capriciously, no differently than if our

9    allegation had been that they denied us our master account, if

10   we were a *Custodia* or terminated our account, as BSJI, for

11   racial discrimination or geographic reasons.  We have alleged

12   arbitrary and capricious conduct.  And the specifics to that,

13   which also carry over onto the contract claim, of good faith,

14   fair dealing, are the things that are in the record—among

15   others, the pretext of the reporting system, then changing to

16   the fact that our consultant said that we had enhancements

17   which they turned into deficiencies.  Then getting a new

18   regulation where they imposed the undue risk of the overall

19   economy, where they have not engaged with the consultants—by

20   the way, the consultants which they hired themselves to review

21   their own transactions.  We have set those out.  We have set

22   out all the facts of what you have now seen both in the

23   injunction and here, as the things they have done that is not

24   conclusory.  It is an allegation that they have done A, B, C,

25   and D.  Pretext.  Looking to not taking an undue risk and not

OCC1BSJA

1    apply it properly.  Saying as to BSJI, you know, if Deutsche

2    Bank and TD Bank are too big to fail, then banks like BSJI and

3    the other IBs are too small to have any rights to not be

4    treated arbitrarily and capriciously.  We have set those out.

5    And so that's the tier of arbitrary and capricious.

6          And then the third tier is our contract claim, which

7    says that we entered a contract with you, yes, you have the

8    right to terminate us, which is what you did, but you didn't do

9    it the way the law requires you to do it, for some of the same

10   reasons that in fact would factor into arbitrary and

11   capricious.  And as to those two, as to the APA, by the way, as

12   to whether New York is an agency or not, is a question of fact.

13   It's not a question of law.  I mean, even in the *Custodia* case

14   that they told you about, that was the case.

15         THE COURT:  Is there any case in the last 25 years

16   which has ever found a Reserve bank to be an agency of the

17   government?

18         MR. LOWELL:  I think we did point to the——

19         THE COURT:  I think——

20         MR. LOWELL:  *Flight International* and the *Lee* cases

21   which talked about the Reserve banks being agency.

22         THE COURT:  Those I think are district court cases

23   which are pretty old.

24         MR. LOWELL:  They are district court cases that——okay,

25   they are pretty old.  But that's what they say.  I mean, and we

OCC1BSJA

1    had this conversation a year ago too.  I don't have a Court of

2    Appeals——we may have one Court of Appeals in the next few

3    months that may opine on that.  One of those cases does address

4    that, one doesn't.  But some of the law that we look to today

5    comes from case decisions that are 100 years old.  It doesn't

6    mean that they're wrong, but I can tell you the factors,

7    though, haven't changed.  You have to have an agency that

8    controls access to government system, that performs important

9    government functions, that it exercised power of the

10   government.  Nobody is denying that the New York Fed here has

11   the ability to regulate whether somebody gets into the system

12   or not and they do so by delegated authority that they've

13   gotten from their supervisor, the overall Federal Reserve

14   Board.  So if you apply the logic or at least the criteria of

15   those district court cases, they still are good law to apply

16   here that this is an agency.

17            And as to the Fed standing argument, I guess it would

18   be the natural place to address it.  I mean, as you addressed

19   it in your question, not that that's your conclusion, but your

20   question does indicate that the Fed basically gives the

21   authority to and says carry it out in this fashion, and what

22   did New York do?  When they weren't able to keep the bank's

23   master account suspended for a late report, they then pivoted

24   to say, the reason is you now are a bank that creates an undue

25   risk to the overall economy, which was adopting the Fed's

OCC1BSJA

1    regulation that was promulgated during the BSJI dispute, to

2    give them the bullet.  It's as if somebody sold the gun, the

3    Fed, to the Federal Reserve Board of New York, who shot it, and

4    the Federal Reserve Board says, don't blame us, we just gave

5    you the gun.  So it seems to me that as to both, the standing

6    issue to the board and as to whether the New York agency is an

7    agency, you look at the criteria, and they both satisfy where

8    their arbitrary and capricious conduct would come into play.

9    And again, I realize we have a year's worth of briefs, but in a

10   motion to dismiss, we have alleged the facts that put that

11   there, and *Custodia* said, as your footnote No. 9, I think it

12   was, said, in a preliminary injunction, we don't need to delve

13   the record, but in a motion to dismiss, we must.

14        The thing I want to say in sort of towards the

15   conclusion, if you have any other questions—I was up to No. 9

16   in my list of 10—is that the contract claim—you asked me a

17   year ago whether I was alleging bad faith, and it was a little

18   bit of a tautology for me because a lack of good faith that the

19   standard is almost says that it has to be bad faith.  But right

20   now I believe that the things that we've pointed out, including

21   the disparate treatment between those banks that they regulate

22   or that they give rights to, gets to the issue of deciding

23   whether there are facts over the contractual rights of duty of

24   care, good faith, and fair dealing.  And those, as I pointed

25   out, your Honor, are not conclusory, to use that word when I

1    adopted it.  But if you look carefully at what we have alleged,

2    it is the individual facts that I have just indicated.  And if

3    you needed them again, they are there, but they have everything

4    to do with applying the 2677-S letter in a way that creates a

5    tier 3 scrutiny that the other banks do, which, contrary to the

6    flavor of 248(a), is not putting these banks on a level playing

7    field, it's not treating them equally.  If the inconsistency in

8    how they first said what we were doing was a risk to the New

9    York and then came up with, it's the overall economy, it's the

10    way they've changed their grounds.

11          And on that, the last piece that you were addressing

12    that I would like to ask you to consider, I don't quite get the

13    argument that if the operating circular, which is included in

14    the contract, does have a provision that says limits of

15    liability, then it is kind of almost obvious to have a limit of

16    liability, then there's the possibility of having liability.

17    And if the stack of their Code of Federal Regulations, which we

18    point out, has a provision which calls for a two-year statute

19    of limitations on any assertion of good faith and ordinary

20    care, isn't that a concession that there is a cause of action

21    for good faith and ordinary care which we have addressed?

22          So lastly, No. 10 on my list was, given the structure

23    of the *Custodia* motion to dismiss, what would be gained by this

24    case going forward to complete the record?  Among other things,

25    what we would do is we would find out the involvement of the

OCC1BSJA

1    Fed in the decision-making, because we saw in the limited

2    discovery that there was such a thing as a pre-decisional

3    memorandum that came into play.  We would find out how it's

4    possible that it turns out that only these IBEs are either

5    being rejected from this part of the country, of our country,

6    or how it's possible that these banks are getting rejected or

7    terminated and banks that really do have an undue influence on

8    the overall economy are allowed to survive and continue

9    notwithstanding pleading guilty to criminal offenses.  You

10    would be able to point——

11    THE COURT:  I actually gave you limited discovery.  I

12    required the board to produce the communications, right?

13    MR. LOWELL:  Yes, we got some, but, yeah, we didn't

14    get the administrative record, per se, because we got limited

15    amounts.  We got one memorandum that we are looking to find out

16    more about.  You did.  You did.  And I don't know the answer to

17    this, so when I come up with the answer to the question that I

18    didn't have for you in the next hours, I will also go back and

19    see what was the limited discovery that existed in discovery

20    for the Court to then deny the motion to dismiss so that a

21    fuller record could be made, and that may be instructive to

22    your Honor as well.

23    So I guess to conclude——and of course if you have

24    questions, fine——I think that there are those three levels that

25    we are addressing.  As to whether we have an absolute right, to

OCC1BSJA

which you've addressed it *de novo* before, I think there are

some things that have happened afterwards, including how they

buttress their argument by what happened in the NDAA amendment

to the FRA.  We have them both in the category, at least at a

motion to dismiss, of being agencies for which arbitrary and

capricious conduct is disapproved.  And we have the specifics

of a bank that is in business that had its master account

terminated by way of a contract issue, which we have given

facts of, that should be explored to determine whether the both

contractual and applied covenants of good faith, fair dealing,

and duty of care, have been violated.  And at this juncture,

that should be enough for this case to go forward.

   THE COURT:  All right.  Thank you.

   Mr. Youngwood?

   MR. LOWELL:  Your Honor, let me just confer with my

colleagues.

   Thank you, your Honor.

   MR. YOUNGWOOD:  Your Honor, I'll just skip around,

make a few very brief points.

   You had asked me and Mr. Lowell about a basis for a

due process claim.  We obviously submit it would be their

burden to find a basis.  Although you are correct, your Honor,

not briefed in this case, there is a discussion of this issue,

if it's useful to you, in the *Payservices* district court

decision, a case which is 2024 WL 137094, Judge Patricco, on

OCC1BSJA

```
 1  page——it's a Westlaw version, as I said——*11, there's a
 2  discussion where he loops together the mandamus act, the due
 3  process, and goes through relatively briefly concluding that,
 4  since he doesn't think it's pled, that the bank is either an
 5  agency or the federal government, that there can't be a due
 6  process claim.  I'm abbreviating what he found, but if it's
 7  helpful, your Honor——
 8          THE COURT:  I'm not getting it.  Does that judge say
 9  that there is a claim?
10          MR. YOUNGWOOD:  No.  He says there's not a claim.
11          THE COURT:  But for reasons other than the fact that
12  it fails to state a claim, rather than the fact that there is
13  no cause of action for a violation of the Due Process Clause.
14          MR. YOUNGWOOD:  He cites one case, your Honor.  It's
15  Bingue——or I'm sure I'm garbling the name, but Bingue v.
16  Pruchak, 512 F.3d 169.  It's a Ninth Circuit case.  And the
17  quote he gives as the Fifth Amendment's Due Process Clause only
18  applies to the federal government.  That is in part——he also
19  doesn't find there to be a due process violation.  But your
20  Honor, I just wanted to——since we've been discussing
21  Payservices, I wanted to share that that court has a brief
22  analysis that touches on the issue.  I didn't say it was
23  directly.  Your Honor, I think I've made this point.  We make
24  it in the brief.  There's a lot of words of lack of good faith
25  or bad faith, and a lot of speculation as to the Federal
```

1    Reserve Bank of New York's attitude towards IBEs.  The

2    pleadings, however, are scant to nothing.  There's——sorry,

3    paragraph 11 of the complaint, which cites to a Reuters article

4    from 2019.  That's really it.  It doesn't outline all the——I'm

5    sorry, I will use the word again——conclusory, conclusory

6    discrimination that's been argued to you.  There's just no

7    basis, if it mattered, even, if there was good faith or bad

8    faith here, and you have our positions on why, given these

9    facts, it doesn't.  It's just not pled in a way that we should

10   have a fishing expedition for two years of discovery to see

11   what there is.  There's just no basis for it.  Your Honor, I

12   won't comment on my Ninth Circuit argument of last week on the

13   different case.  It's on the Ninth Circuit website if anyone

14   wants it.  I don't think that counsel accurately characterized

15   much of the colloquy with the panel.  But it is what it is.

16   The record is what it is.

17          There was discussion of *Greater Buffalo*, which your

18   Honor has already addressed in your prior decision.  What I

19   will note is, you don't have to have a master account to have

20   the check services that are referenced in that case.  We

21   discussed this quite a bit a year ago.  We haven't mentioned it

22   at all today.  But you can have a corresponding bank

23   relationship.  And many, many banks do.  In fact, your Honor,

24   if everyone could just have a master account because they

25   wanted one, I don't think there would be a need for

OCC1BSJA

1    corresponding bank relationships, so this picture of how the

2    whole banking system works really is skipping the availability

3    of the option of the corresponding bank relationship.

4         And your Honor, I think the final point——and I'll be

5    really quite brief because I think your Honor is correct that

6    you didn't base your prior decision on *Chevron* deference.  But

7    to the extent that that matters and it was never the basis of

8    our argument and is not the basis of our argument, you know,

9    *Loper Bright* didn't completely say what agencies do and think.

10   And again, we're not positing that our client is an agency.

11   Doesn't matter.  They said it was less controlling or

12   noncontrolling than it was.  It is still possible——and the

13   *Loper* case at page 2249 acknowledges this and actually this

14   circuit, on November 13, in the *Art and Antique Dealers League*

15   *of America v. SEGGOS*, 2024 U.S. App LEXIS 28736, at *27, also

16   noted that effectively what an agency does may not be something

17   you defer to, but if you're persuaded by it, you're persuaded

18   by it, and agencies do have some familiarity.  But again, I

19   don't think that's the argument here.  I don't think there's a

20   need to get there, because we think the statutes are quite

21   clear.  And my true final point, your Honor——back to the

22   contracts and the limitation of liability.  We haven't taken

23   the position that there's nothing that could happen under those

24   contracts that could lead to liability.  Take the check

25   clearing.  If the bank messed up check clearing for somebody

OCC1BSJA

1    who had a master account and the check was delayed, maybe

2    that's a claim?  And that's why you have limitation of

3    liability clause.  But you have to find, somewhere else in the

4    contract, the basis for the liability, and the claim here is

5    you didn't have a right to take away your master account.  The

6    contract says the contrary, directly and consistently, in more

7    than one place.  And in reference to the original operating

8    circular, it says, with notice——I don't think that's very

9    practical, but I don't think that's the issue here.  Couple

10   days' notice, we have the discretion to take it away.

11        Thank you, your Honor.

12        THE COURT:  All right.

13        MR. CHADWICK:  Just three quick points, your Honor,

14   because I think these are issues that you already understand.

15   But in their briefs and again today, Mr. Lowell used the term

16   "delegation of fair bid."  But I just want to be clear, the

17   Federal Reserve Act lays out authorities of the board and the

18   authorities of the Reserve bank, and it's separate sections of

19   the act.  It also allows the board to delegate certain

20   functions to Reserve banks.  Many of those are laid out in the

21   board's regulations.  That's 12 C.F.R. 265.20.  But just to

22   circle back's to the master accounts are deposit accounts, the

23   deposit-taking function is a Reserve bank function.  There's no

24   credible argument that it's been delegated by the board.

25   That's just plainly incorrect.

OCC1BSJA

1    Quickly, on *the Custodia* issue of discovery, I think

2  if you look at the judge's decision at pages 14 and 15, he's

3  pretty upfront about the fact that discovery was unnecessary

4  and it was a question of statutory interpretation, in the end,

5  that controlled his decision.

6    And then finally, Mr. Lowell I think referred to the

7  Monetary Control Act and 248(a) as synonymous, but 342 is

8  central to that act.  The Monetary Control Act had the ability

9  to charge fees, but needed the authorization to accept deposits

10  in 342.  That's a core aspect of the Monetary Control Act, and

11  that's why we feel it's central here.

12    MR. LOWELL:  Judge, only to address a point that they

13  just brought up that I didn't have a chance to, may I address

14  that?

15    THE COURT:  All right.  Briefly.

16    MR. LOWELL:  It will be very brief.

17    I wanted to address the issue of this corresponding

18  bank issue, which they brought up, because in *Greater Buffalo*

19  and others, first of all, provision in *Greater Buffalo* that's

20  cited for the services.  Doesn't have directly or indirectly.

21  They're inserting the concept that you can have this service

22  through some other means.  And what makes no sense about that

23  point is simply that they have the right to agree or disagree

24  as to whether or not we have the right to get to approve that

25  corresponding bank process.  So they say that our bank creates

OCC1BSJA

1   on undue risk to the overall economy and says so because it

2   talks about the possibility of lack of compliance, red flags of

3   money laundering, whatever.  That's great as a calling card to

4   get a corresponding bank to agree.  We have tried, and there's

5   no corresponding bank that wants to partner with us.  But

6   secondly, they have the right to approve, even that discretion

7   unbridled.  So if they said this about our bank, which they

8   did, I guess I'd like them to go on the record to say they will

9   not disapprove of any corresponding bank that we could possibly

10  find that such a bank would be doing with us.  So the

11  corresponding bank aspect is a bit of a lark.

12          And the second thing they said that I want to come

13  back to is the last piece, which is that after they got

14  discovery and there was a motion for summary judgment, a

15  district court may have very well said discovery had not been

16  necessary, but they only came to that decision after the

17  discovery occurred, not before, or else why would they have

18  ordered discovery on those things that are left.

19          And those are the two points they made that I wanted

20  to respond to.

21          THE COURT:  Okay.  Thank you, all.  I appreciated the

22  briefs.  I appreciated the arguments.  There was a reference to

23  perhaps submitting something else, and I'm not preventing you

24  from doing that, if my questions raised something that has to

25  be responded to.  But if there's going to be any subsequent

OCC1BSJA

1    submission, no more than two pages from any party.  And it's

2    due on Monday.  I'm not suggesting that you have to do this,

3    but there was a suggestion that on a couple of points you

4    wanted to think further.  So—

5            MR. LOWELL:  Certainly one, and I appreciate the

6    opportunity, and I'm not sure we'll have anything, but we can

7    comply with both of those, two pages by Monday.

8            THE COURT:  And the parties should consult.  I mean, I

9    don't want to encourage briefs and reply briefs, surreply

10   briefs, etc.

11           MR. YOUNGWOOD:  Your Honor, I don't think—if you

12   would have said no further submissions, we would not have

13   objected, so I don't know what we'd be responding to.  Could it

14   be that plaintiff writes a brief and you give us two days to

15   respond to it?  Because right now we don't have plans to say

16   anything and I don't know what he's going to write about.

17           THE COURT:  Okay.  The plaintiff can submit no more

18   than a two-page letter by Monday because there were a couple of

19   issues, including what's the statutory basis or other basis for

20   a due process claim, and less so is the plaintiff arguing that

21   there is any private right of action under the Federal Reserve

22   Act.  So no more than two pages, by Monday, and the defendants

23   can submit a response, no more than one page, by Tuesday.

24           MR. YOUNGWOOD:  That's fine, your Honor.

25           MR. LOWELL:  Thank you.

OCC1BSJA

1          THE COURT:  Okay.  Thank you, all.

2          MR. LOWELL:  Thanks for your time.

3          MR. YOUNGWOOD:  Thank you, your Honor.

4                              o0o

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25